**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOHEALTH, INC., *et al.*,[1] | ) | Case No. 26-10914 [●] |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF VIJAY KOTTE, CHIEF
EXECUTIVE OFFICER OF GOHEALTH, INC., IN SUPPORT OF CHAPTER 11
PETITIONS, FIRST DAY MOTIONS, AND ACCESS TO CASH COLLATERAL**

I, Vijay Kotte, Chief Executive Officer of GoHealth, Inc. (collectively, with its Debtor subsidiaries and affiliates, the "Debtors" and, together with the Debtors' non-Debtor subsidiaries and affiliates, "GoHealth" or the "Company"), hereby declare under penalty of perjury:

**Preliminary Statement**[2]

1.      The Debtors commence these cases with the overwhelming support of 100% of their prepetition lenders, approximately 61% of the outstanding GoHealth, Inc. Class A Common Stock., and greater than 99% of the holders of GoHealth Holdings, LLC interests,[3] to effectuate a change of control transaction that leaves general unsecured creditors and preferred equity holders unimpaired and provides a $10 million cash recovery to the Company's common equity holders. These cases mark the culmination of extensive and good-faith restructuring discussions with the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:  GoHealth, Inc. (3805); Blizzard Midco, LLC (3732); Connected Benefits, LLC (2162); e-TeleQuote Insurance, Inc. (2336); ETQ Holdings, LLC (8260); GoHealth Holdings, LLC (3653); GoHealth, LLC (5175); and Norvax, LLC (3063).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  222 West Merchandise Mart Plaza, Suite 1750, Chicago, Illinois 60654.

[2]     Capitalized terms used but not immediately defined herein have the meanings ascribed to them later in this Declaration or in the contemporaneously filed *Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* (as amended, supplemented, or modified from time to time, and including all supplements and exhibits thereto, as applicable, the "Plan").

[3]     Excludes such interests held by GoHealth, Inc.

Company's prepetition lenders and enable a highly consensual transition in ownership that preserves GoHealth's enterprise value and positions the Company for long-term success.

2.      Founded in 2001, GoHealth is a leading health insurance marketplace and Medicare-focused digital health company.  GoHealth assists consumers searching for a Medicare health plan (and certain other insurance products) that meets their needs by leveraging its proprietary technology to compare various insurance products offered by large health insurance providers, such as United, Aetna, Anthem, Humana, and others (the "Carriers") and supporting consumers during and after the enrollment period.  Through its expert guidance, tailored service, and technological excellence, GoHealth simplifies an important yet often confusing process for millions of seniors, making health insurance more accessible, less intimidating, and more responsive to each consumer's individual medical needs.

3.      GoHealth began as a provider of lead management software and certain digital services to independent health brokers.  Over time, the Company shifted its focus from providing software solutions, including real-time quoting and enrollment technology, to independent insurance brokers, to building a direct-to-consumer, in-house health insurance marketplace.  This transition was accelerated by the passage of the Affordable Care Act (the "ACA") in 2010 and ultimately culminated in the Company's initial public offering in 2020.  GoHealth raised over $900 million in connection with its IPO, with an initial valuation of approximately $6.6 billion, making it one of the largest healthcare IPOs of the year.

4.      Unfortunately, GoHealth's very success is what led to its challenges.  GoHealth's successful IPO and lucrative business model inspired a wave of new entrants into the field, escalating competitive pressure.  In 2021, GoHealth raised an incremental $200 million of capital via an upsized credit facility, the proceeds of which would be deployed to, among other things,

acquire high quality leads to grow market share in an increasingly competitive healthcare marketplace landscape. The Company's ability to service this increased debt burden was premised on, among other things, certain assumptions regarding the length of time individuals will remain in a given insurance plan. Unfortunately, these assumptions proved incorrect due to unforeseen shifts in the market and consumer behavior, and GoHealth struggled to generate the cash necessary to service its debt.

5.    As a result, GoHealth entered into several amendments with its lenders at the time, which in pertinent part resulted in an increase in the Company's interest rate and tightened covenants. At the same time, the increase in LIBOR, which followed the general inflationary pressures in the post-COVID environment, increased the Company's debt service obligations. In the aggregate, these forces resulted in the Company's interest rate more than doubling while its overall funded debt balance significantly increased.

6.    The Company proactively addressed these challenges throughout the next several years. *First*, in 2022, the Company raised approximately $50 million of additional capital by issuing the GoHealth, Inc. Preferred Stock through a private investment in public equity ("PIPE") transaction supported by certain of its largest customers. *Second*, also in late 2022, the Company designed and implemented its Non-Agency Business, which consisted of two primary revenue streams: (a) marketing and administrative service fees provided by the Carriers to the Company to facilitate acquisition of new consumers; and (b) a one-time, upfront qualification fee from a Carrier upon placement of a new consumer in a health insurance policy. As part of the growth of the Non-Agency Business, in 2023, GoHealth hired and trained a significant number of agents to write Non-Agency Business ahead of the 2024 annual enrollment period ("AEP"), which occurs every year from October 15th to December 7th.

7.      This strategy was initially successful, generating significant revenue and cash and ultimately enabling the Company to repay borrowings under its then-existing term loan facilities in March and October of 2024.  Despite its early success, unfortunately, this business could not be sustained.  With the rising cost of healthcare outpacing increases in government reimbursement rates, the Carriers were now required to pay for increasingly expensive healthcare coverage for consumers for whom the Carriers had already paid significant amounts to acquire via the Non-Agency Business model.  Additionally, increased pressure from the Centers for Medicare and Medicaid Services ("CMS") toward Medicare Advantage ("MA") health plans, such as implementation of updated condition risk score rules that affect payments to plans and providers, in addition to continued legal risks related to how providers previously coded and billed for patient services under their MA health plans, led to increased challenges for Carriers who had been growing membership in their MA portfolios.  These risks and imbalances led Carriers to scale back significantly on the Non-Agency Business, reduce their marketing spend, and lessen broker distribution of certain high-cost insurance plans, all of which reduced demand for GoHealth's Non-Agency Business and impaired GoHealth's business model.

8.      During the 2024 AEP, GoHealth did write a significant amount of new business; however, the portion of this new business attributable to the Non-Agency Business was smaller than anticipated.  Instead, the vast majority of the new business written in the 2024 AEP was Agency Business, which consists of a much lower upfront commission with renewal commissions received each year a participant re-enrolls (such commissions, the "Backbook Asset").  The year-one commission for Agency Business is significantly less than GoHealth's cost to acquire a consumer ("CAC").  Moreover, fewer Carriers provided sufficient marketing dollars (which Carriers contribute to reach and access high-quality leads) to offset the Company's CAC.  The

4

aggregate result of these shifts was that, while the Company's Backbook Asset increased significantly, its projected liquidity in the first quarter (when year-one commissions for policies placed during the AEP are typically paid) of 2025 was significantly less than forecasted.

9.     On May 1, 2025, the United States Department of Justice filed a Complaint-in-Intervention (the "DOJ Complaint") under the False Claims Act and Anti-Kickback Statute against a number of health insurance companies and brokers, including GoHealth.[4]  The DOJ Complaint alleges, among other things, that from 2016 through at least 2021, the defendant insurers paid kickbacks to the defendant health insurance brokers in the form of administrative, or marketing, payments in exchange for enrolling consumers into the insurers' MA plans.  The DOJ Complaint further alleges that the defendant insurers and health insurance brokers discriminated against certain Medicare beneficiaries (beneficiaries under the age of 65).  GoHealth denies the allegations in the DOJ Complaint and will continue to vigorously defend the allegations.  As of the Petition Date, all defendants have filed answers to the DOJ Complaint, and the parties were in the early stages of discovery.  GoHealth has expended—and expects to continue expending—meaningful time and financial resources defending the DOJ Complaint, placing additional strain on its already constrained liquidity position.  The Company's diminished liquidity projection led to a going concern disclosure in the notes to its Form 10-Q for the second quarter of 2025.

10.     In response to these pressures, the Company explored various financing opportunities, including a securitization of its Backbook Asset.  These efforts ultimately were unsuccessful.

11.     In June 2025, the Company engaged Kirkland & Ellis LLP ("Kirkland") and Alvarez & Marsal North America, LLC ("A&M"), among other advisors, to assist with its strained

---

[4]     *See United States ex rel. Andrew Shea v. eHealth, Inc*, No. 1:21-cv-11777-DJC (D. Mass. Nov. 2, 2021).

liquidity position, upcoming June 30, 2025 maturity of its revolving credit facility, and marketplace uncertainty from the going concern disclosure. The Company, with the assistance of its advisors, immediately engaged with its revolving and term loan lenders to address the upcoming maturity. These negotiations culminated in execution of the 13th amendment to the First Lien Credit Agreement (the "13th Amendment"), which, importantly, extended the maturity of the revolving credit facility to September 30, 2025, sent a message of stability to the market and the Carriers, and provided crucial financial covenant relief to allow the Company some, but not much, time to pursue strategic alternatives. After execution of the 13th Amendment, the Company and its prepetition lenders immediately began engaging on the terms of a longer-term solution to the Company's liquidity situation.

12.     Following months of negotiations, the Company and its lenders entered into a $117 million super-priority credit agreement on August 6, 2025, which provided $82 million of new capital and rolled up approximately $35 million of loans outstanding under the Company's revolving credit facility. Concurrently therewith, such parties executed the 14th amendment to the First Lien Credit Agreement (the "14th Amendment"), which, among other things, terminated all revolving commitments, further extended the maturity of the revolving credit facility to August 5, 2029, permitted the Company to pay-in-kind a portion of the interest on the outstanding term loans and/or revolving loans, waived the amortization of the existing term loans until December 31, 2026, provided various forms of covenant relief, and allowed for incurrence of the Super-Priority Term Loan Facility. Importantly, these changes provided the Company with the liquidity and covenant flexibility necessary to secure financial statements free of a going concern qualification in its third quarter Form 10-Q filed on August 12, 2025, an important show of stability going into the 2025 AEP.

13.     On the closing date of the Super-Priority Term Loan Facility, GoHealth appointed three new independent directors, Alan Carr, Timothy Pohl, and William Transier, and created a new four-member committee (the "Transformation Committee") responsible for overseeing the evaluation of strategic alternatives, including a potential merger or sale transaction, among other tasks.

14.     Additionally, on September 27, 2025, the Company hired Moelis & Company ("Moelis") to assist with its evaluation of strategic alternatives.  Shortly thereafter, the Company, with Moelis's assistance, and monitored by the Transformation Committee, launched a strategic transaction process to explore potential merger options with select counterparties.

15.     While the marketing and sale process was ongoing, the Company continued to take steps to improve business performance by addressing the altered health insurance landscape. Based on ongoing discussions with the Carriers, it became clear that the Non-Agency Business and the related Carrier marketing spend were likely to remain modest and thus not contribute meaningfully to the 2025 AEP.  As a result, the Company focused on reducing its CAC and expanding into other potentially more lucrative insurance fields, such as Special Needs Plans and final expense insurance, as well as dedicating resources to retain policies with existing consumers underlying the Backbook Asset.  The Company also initiated several reductions in force in recognition of its constrained liquidity profile and limitations on its ability to write new business.

16.     The 2025 AEP was relatively successful, particularly in light of the market-related and company-specific challenges that GoHealth faced.  The Company demonstrated operational resilience, achieving very strong customer retention throughout the 2025 AEP period with limited overhead costs.  However, questions remained about the Company's long-term sustainability.

17.    The Company continued to pursue its marketing process for a potential merger during the 2025 AEP and for several months thereafter.  By late February 2026, the potential transactions the Company was exploring seemed less likely to come to fruition in the near-term. As a result, the Company pivoted conversations away from a third-party transaction to a potential change of control transaction.

18.    The Company secured an unqualified audit opinion in connection with its 2025 Form 10-K filed on March 31, 2026, and did not forecast any covenant or payment defaults in the upcoming 12-month period.  As a result, the Company did not face a near-term trigger compelling it to transact with its lenders or to take action to protect itself against potential creditor remedies. Rather, the Company made clear that if its lenders sought to execute a change of control transaction at the time, they had to provide an appropriate recovery for junior stakeholders.

19.    Following lengthy negotiations, the Company reached an agreement in principle with 100% of its prepetition lenders, 61% of the holders of GoHealth, Inc. Class A Common Stock, and greater than 99% of the holders of GoHealth Holdings, LLC ("GoHealth Holdings") interests on the terms of a holistic restructuring transaction, which terms are set forth in the Plan, filed contemporaneously herewith.  The Plan contemplates, among other things,

- issuance of a $20 million exit facility that will, among other things, fund the Equity Recovery Pool (as defined below);

- conversion of approximately $174 million of loans under the Super-Priority Credit Agreement into second-out term loans and conversion of approximately $588 million of loans under the First Lien Credit Agreement into third-out term loans;[5]

- reinstatement of general unsecured claims;

---

[5]    Prior to the Petition Date, the prepetition lenders executed a commitment letter regarding the provision of the new money, second-out, and third-out term loans.

- reinstatement of preferred equity interests;

- a $10 million cash recovery for holders of the Company's common equity interests (the "Equity Recovery"); and

- customary Debtor and third-party releases, subject to the Investigation (as defined below).

20. The Debtors seek to proceed through these chapter 11 cases expeditiously to allow the Company to focus on its core business operations and emerge from bankruptcy well ahead of the start of the 2026 AEP period and the critical pre-AEP period, which begins annually on August 1. The pre-AEP period is vitally important to position the Company for success during its significant revenue-generating and cash flow protective period. During this time, agents become familiar with health plan updates and get trained and re-certified to interact with existing beneficiaries and potential new consumers; each agent's goal is to support a high-quality shopping experience focused on either retaining consumers in their existing plan or helping them enroll in a new plan during the AEP that follows shortly thereafter. As a result, the Company is seeking a combined disclosure statement and confirmation hearing 39 days after the Petition Date.

21. GoHealth's ability to successfully navigate through the upcoming AEP—as it has for the last almost two decades—hinges on its financial strength, uninterrupted operational excellence, and its reputation in the market. Implementing the transactions set forth in the Plan (the "Restructuring Transactions") will position GoHealth for success ahead of the 2026 AEP and, most importantly, protect critical Carrier and customer relationships.

* * *

**Background and Qualifications**

22. I joined GoHealth in June 2022 as Chief Executive Officer and serve on GoHealth, Inc.'s board of directors (the "Board"). I have over 20 years of experience developing and transforming innovative healthcare models and Medicare-focused platforms and public and

9

private ventures. Prior to joining GoHealth, from 2019 to 2022, I was the Chief Solutions Officer and Executive Vice President, Strategy and Corporate Development of R1 RCM Inc., a leading technology provider of revenue-cycle management for healthcare providers. Prior to joining R1 RCM, I worked for DaVita Medical Group as the Chief Financial Officer from December 2015 to December 2017 and as Chief Value Officer from March 2017 to October 2019. Prior to joining DaVita Medical Group, I was the President and Chief Operating Officer of Medicare Operations for Meridian Health Plan. I received a bachelor's degree in Business Administration with a focus on Finance and Organizational Management from Emory University, Goizueta School of Business, and a Masters of Business Administration from the Kellogg School of Management at Northwestern University.

23.     As GoHealth's CEO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am over the age of 18 years and am competent to testify. I submit this declaration (this "Declaration") to assist the Court, the Debtors' stakeholders, and other parties in interest in understanding why the Debtors filed these chapter 11 cases and the goals of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested in the motions filed along with the petitions (collectively, the "First Day Motions").

24.     The facts and statements set forth in each First Day Motion are incorporated herein by reference as if fully set forth herein. I have reviewed and am familiar with the contents of and the relief requested in each First Day Motion and believe that the relief requested in the First Day Motions is necessary for the Debtors to smoothly transition into these chapter 11 cases, to continue ordinary course operations therein, and to maximize the value of the Debtors through these chapter 11 cases.

25.     The statements set forth in this Declaration are based upon my personal knowledge and experience, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team and third-party advisors.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

26.     On June 7, 2026 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court"). In addition, substantially contemporaneously with the filing of this Declaration, the Debtors filed the First Day Motions seeking various types of "first day" relief that will enable the Debtors to meet all necessary obligations in the ordinary course and to fulfill their duties as debtors in possession, ensuring GoHealth's steady and uninterrupted operations during these cases.

27.     To further familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into four parts:

- **Part I** describes the Debtors' corporate history, business operations, organizational structure, and prepetition indebtedness;

- **Part II** describes the circumstances leading to the commencement of these chapter 11 cases;

- **Part III** describes the Plan, the transactions contemplated therein, the Debtors' need for immediate access to cash collateral, and the proposed timeline for the chapter 11 cases; and

- **Part IV** provides support for the relief requested in the First Day Motions.

**Discussion**

I.    **COMPANY BACKGROUND.**

28.    GoHealth is a leading health insurance marketplace and Medicare-focused digital health company in the American healthcare landscape.  By combining cutting-edge technology, deep industry expertise, and a customer-centric approach, GoHealth is a critical resource for millions of seniors navigating the complexities of MA enrollment and a leading e-broker for MA plan submissions and renewals in the United States.  In response to industry challenges over recent years, GoHealth has expanded its focus beyond MA enrollment to offer enrollment services for a variety of other plan types as well.  GoHealth's market leadership in these areas is a testament to its unyielding focus on building customer trust.  GoHealth's efforts resulted in the Company being listed as one of the "Most Trustworthy Companies in America" by *Newsweek* each of the past four years.[6]

29.    As of the Petition Date, GoHealth has approximately 296 full-time employees, of which 239 are employed by the Debtors, including 107 internal licensed agents, and utilizes a network of approximately four external partners and their licensed agents.  Together, these agents help Medicare-eligible consumers in all 50 states navigate Medicare complexities, understand all available plan options, and arrive at the plan best-suited for each individual beneficiary.

   A.    **GoHealth's Corporate History.**

30.    GoHealth was founded by Brandon Cruz and Clinton Jones (the "Founders") in Chicago, Illinois in 2001, originally under the name Norvax, Inc.  Recognizing that health insurance was often confusing and difficult to navigate, the Founders sought to leverage

---

[6]    "Most Trustworthy Companies in America 2026 – Insurance", *Newsweek* (2026), *available at* https://rankings.newsweek.com/most-trustworthy-companies-in-america-2026/insurance.

technology to cut through the confusion. GoHealth initially focused on providing lead management software and other digital solutions, such as website creation, to independent health insurance brokers. In 2004, GoHealth developed proprietary real-time quoting and enrollment technology that enabled independent insurance brokers to show customers more plan options more quickly. GoHealth's mission was simple: improve access to health insurance by making it more understandable and easier to compare, optimize, and purchase plans.

31.     Over time, GoHealth shifted its focus from software solutions for independent insurance brokers to building a direct-to-consumer, in-house health insurance marketplace—first, a consumer comparison site, and then, a full-service agency with its own agents on the beneficiary-facing frontlines. Beginning in 2008, GoHealth began to offer one-on-one agent consultations with prospective beneficiaries. Utilizing its proprietary, carrier-agnostic technology platform, GoHealth's licensed agents began to assist consumers with comparing available health insurance plans and finding the best plan for their specific needs. In 2012, to signal its new, consumer-focused approach, the Company rebranded both its direct-to-consumer and B2B business under one umbrella as "GoHealth."

32.     Further, in 2012, GoHealth received a $50 million private equity investment, which fueled market expansion, operational improvements, and technology development. In the same year, GoHealth gained federal government approval as a private health insurance exchange, which enabled the Company, in 2013, to become the first private health insurance marketplace to enroll consumers in plans that qualified for tax subsidies under the ACA. From there, GoHealth continued to successfully capitalize on favorable industry trends as well as the federal government's initiative to boost individual enrollment in health insurance and foster competition in the health insurance marketplace. In 2016, GoHealth independently entered the MA market,

13

which it previously only served through its Downline Partners (as defined herein).  MA would become—and still remains—GoHealth's primary product focus.

33.     In late 2019, GoHealth received a large-scale investment that valued the company at $1.5 billion.  Then, in 2020, GoHealth filed for an initial public offering on the NASDAQ exchange under the ticker symbol "GOCO" with a valuation of approximately $6.6 billion, successfully raising $914 million in one of the largest healthcare IPOs of the year.

34.     Following the COVID-19 pandemic and the rapid adoption of technology in the healthcare space, GoHealth launched several new technology solutions to bolster its ability to enroll consumers in the best-suited health insurance plans and support them during and after enrollment.  For example, in mid-2020, GoHealth launched its "Encompass" platform to centralize and enhance a consumer's experience partnering with GoHealth to evaluate and select the plan that best fits such consumer's needs.  In 2022, the Company expanded the platform to further support and engage consumers in the end-to-end Medicare enrollment process.  By supporting all Medicare services and leveraging best-in-class agents and insights learned from years of serving millions of customers, the Encompass platform drove enhanced equality, higher consumer satisfaction, and a 20% improvement in overall retention.[7]

35.     In 2023, GoHealth launched the "PlanFit" tool to bring consumers customized, analytics-driven assessments of their Medicare coverage options and further enable GoHealth's agents to match consumers with the best-suited plans.  In connection with PlanFit, GoHealth created "PlanGPT," an AI-powered assistant that streamlines the plan comparison process by retrieving key information from very dense and lengthy plan documentation.  In 2024, PlanGPT

---

[7]     "GoHealth Launches Expanded Encompass Solution as 2022 Medicare Annual Enrollment Period Begins" (Oct. 18, 2022); *available at* https://investors.gohealth.com/news-releases/news-release-details/gohealth-launches-expanded-encompass-solution-2022-medicare.

helped reduce the average call time between a customer and an agent by 10 minutes.[8]

36.     Then, in early October 2024, GoHealth acquired e-TeleQuote, a Medicare insurance marketplace, significantly expanding GoHealth's distribution and operational capacity. As part of this acquisition, e-TeleQuote became one of GoHealth's Downline Partners under GoHealth's external agent channel, GoPartner Solutions, which allowed e-TeleQuote to continue operating as an independent agency while also having access to GoHealth's proprietary technology and numerous marketing channels.

### B.     GoHealth's Business Operations.

37.     GoHealth is a health insurance marketplace focused on matching consumers with the health plan best suited to their needs, for which GoHealth earns a commission.  GoHealth also receives payments from Carriers for various administrative services that it performs in connection with its MA business.  GoHealth maintains two distinct business models: the Agency Business and the Non-Agency Business.  As discussed herein, each business model has multiple product and service offerings, and each operates through both the Company's Internal Agents as well as the Company's Downline Partners.

#### 1.     Agency Business.

38.     GoHealth historically operated under the Agency Business model, pursuant to which GoHealth's agents generate commissions from the Carriers by enrolling consumers in health insurance plans and/or renewing existing enrollments.[9]  Under the Agency Business, when a consumer decides to enroll in an MA plan through GoHealth, they are matched with one of

---

[8]     "GoHealth Helps Medicare Consumers Navigate Another Disruptive Annual Enrollment Period (AEP) With Personalized Guidance" (2025); https://www.gohealth.com/newsroom/press-releases/gohealth-helps-medicare-consumers-navigate-another-disruptive-annual-enrollment-period-aep-with-personalized-guidance/.

[9]     Most of the commissions revenue is generated through enrollment in MA plans; a small amount of GoHealth's commissions revenue derives from the sale of individual and family plan insurance products.

GoHealth's internal licensed agents (the "Internal Agents") and then receive a "PlanFit Check-Up," utilizing GoHealth's proprietary PlanFit tool through the Encompass workflow. The PlanFit Check-Up is a holistic health and benefits assessment that generates a unique PlanFit Score, based on over 180 factors, for that customer. The Internal Agent will use the PlanFit Score to guide that customer to the right MA plan for his or her specific needs. Once a customer has selected a plan, the Internal Agent will assist the customer in enrolling in the plan by electronically submitting the required enrollment forms to the applicable Carrier.

39. GoHealth receives an initial, one-time commission as a result of a new plan enrollment on which GoHealth is the "Agent of Record." Subsequent to a policy renewing, as long as the policyholder remains with the same insurance product, GoHealth receives a stream of monthly renewal commissions.

40. The Agency Business is seasonal, with increased enrollment activity occurring during the AEP, making this 53-day period a critical time for enrolling new customers. Despite receiving AEP submissions in the fourth quarter, the Company's AEP revenue does not begin converting into cash until the first quarter of the following year and continues to be collected as plans are renewed. The next-highest enrollment period is typically January 1 through March 31, during the MA open enrollment period, with the second and third quarters being the lowest enrollment periods. The renewal commissions, paid monthly, provide more cash collections stability.

41. GoHealth also contracts with external agents as part of the Agency Business (such parties, the "Downline Partners"). As described in more detail below, Downline Partners rely on their own marketing efforts to place consumers into healthcare plans, while having access to GoHealth's corporate infrastructure, technology, and resources. When GoHealth completes a plan

enrollment or renewal, through either an Internal Agent or a Downline Partner, GoHealth becomes the "Agent of Record," entitling the Company to a commission.

### 2. Non-Agency Business.

42. Under its Non-Agency Business, which the Company developed and implemented several years ago as part of an initiative to generate additional revenue, GoHealth engages with consumers through the Encompass workflow, assisting them to find the best health insurance plan for their needs. Instead of facilitating plan enrollment themselves, GoHealth's Internal Agents or Downline Partners qualify the consumer as a fit for a particular MA plan and then transfer the consumer to the applicable Carrier, which then processes and submits the beneficiary's plan enrollment application directly to Medicare, with the Carriers acting themselves as the "Agent of Record." In most Encompass relationships, the Carriers separately retain GoHealth through a business-process-outsourcing relationship to provide dedicated licensed agents to complete the enrollments on behalf of the specific Carrier.

43. When the Non-Agency Business was first put in place, the Carriers provided GoHealth with upfront funds to market policies and perform other administrative services in order to facilitate the acquisition of new customers. GoHealth also earns a one-time, upfront qualification fee from the Carriers upon a new consumer's enrollment in a Carrier's health insurance policy. In the aggregate, non-agency revenue from marketing and administrative service fees and qualification fees is larger than GoHealth's CAC and is paid prior to incurrence of the CAC for a given consumer or shortly thereafter. GoHealth does not receive commissions on subsequent renewals for non-agency submissions and enrollments. In 2025, the Non-Agency Business represented approximately 15% of GoHealth's total net revenue.

### a. *GoHealth Protect.*

44. The Non-Agency Business includes "GoHealth Protect," GoHealth's suite of life

insurance products designed to provide financial security and peace of mind for consumers, especially concerning end-of-life costs. GoHealth launched GoHealth Protect in the first half of 2025 to complement GoHealth's Medicare offerings and diversify its revenue. Beginning with a "final expense" offering—coverage designed to help families cover funeral and burial costs— GoHealth Protect also offers guaranteed life insurance acceptance, without the need for a diagnostic medical exam, making this critical insurance accessible to a broad range of people including those with pre-existing conditions.

45.     During the third and fourth quarters of 2025, in light of decreasing demand for MA plans, the Company shifted a significant amount of its focus and resources to GoHealth Protect. Despite lower revenue on a per submission basis compared to Medicare products, such shift was expected to (i) reduce the seasonality of GoHealth's revenues by boosting revenue outside of the AEP, specifically during the second and third quarters of the year, (ii) provide a revenue cushion while demand for MA and other products continues to fluctuate; and (iii) increase agent utilization year-round.

46.     Like other products in the Non-Agency Business, GoHealth is not the Agent of Record for GoHealth Protect enrollments, and the Company's obligation is complete when the life insurance carrier has received the enrollment. Cash is collected in close proximity to the point of sale of such plan, and in some instances, it may be funded in advance of marketing activities.

### b.      *Special Needs Plans ("SNPs").*

47.     GoHealth continues to invest in other product lines such as SNPs, which are condition-specific MA plans designed for beneficiaries with certain, generally chronic or otherwise severe, diseases and health or financial issues that make them dually eligible for Medicare and Medicaid. SNPs generally limit membership to individuals with one or more specific trait(s), which ensures that each plan is tailored to a specific medical or financial need.

Like GoHealth Protect, incorporating SNPs allows GoHealth to utilize its agents more consistently throughout the year and to boost revenue outside of the AEP.  SNP plans historically were sold by GoHealth through both the Agency and Non-Agency Business.

### 3.     Downline Partners.

48.     GoHealth maintains an external agent channel, GoPartner Solutions (the "GPS Channel"), as part of both the Agency Business and the Non-Agency Business.  Under the GPS Channel, GoHealth collaborates with the Downline Partners, offering them access to the Company's technology platform, health plan relationships, and support teams and enabling GoHealth to benefit from a broader consumer audience.  Downline Partners rely on their own marketing efforts to identify consumers but otherwise have access to the Company's tools to help the consumer evaluate the health insurance plans.  The Downline Partner either then refers the consumer to the Carrier directly, with the Carrier completing the enrollment and becoming the Agent of Record (pursuant to the Non-Agency Business), or the Downline Partner completes the enrollment for the Carrier, and GoHealth becomes the Agent of Record (pursuant to the Agency Business).

49.     In either case, GoHealth remits a contractually agreed portion of the commission payments it receives to the applicable Downline Partner.  Although GoHealth's Internal Agents generate the majority of GoHealth's revenues, the GPS Channel nevertheless represents a material portion of GoHealth's annual revenues.

### C.     GoHealth's Organizational Structure.

50.     The Company's organizational structure consists of 16 corporate entities, eight of which are Debtors in these chapter 11 cases.  Of the remaining entities, five are domestically domiciled and three are foreign domiciled—one in each of Slovakia, Pakistan, and Nicaragua.  A comprehensive organizational chart is attached hereto as **Exhibit A**.

**D.      GoHealth's Prepetition Capital Structure.**

51.      As of the Petition Date, the Debtors have approximately $772 million in total funded debt obligations outstanding, including accrued and unpaid interest on the principal amount under each credit facility.  The following table depicts the Debtors' prepetition capital structure.

| Type | Maturity | Approximate Amount Outstanding |
|---|---|---|
| *Secured Debt* | | |
| Super-Priority Term Loans | August 5, 2029 | $174 million[10] |
| First Lien Term Loans | November 4, 2029 | $598 million |
| *Total Funded Debt:* | | **$772 million** |
| *Equity Interests[11]* | | |
| GoHealth Holdings Interests | N/A | 29,302,494 shares |
| GoHealth, Inc. Preferred Stock | N/A | 50,000 shares |
| GoHealth, Inc. Class A Common Stock | N/A | 16,686,419 shares |
| GoHealth, Inc. Class B Common Stock | N/A | 12,616,075 shares |

**1.      Super-Priority Credit Agreement.**

52.      On August 6, 2025, in conjunction with executing the 14th Amendment, the Debtors and certain of the lenders under the First Lien Credit Agreement (as defined below) entered into that certain superpriority senior secured credit agreement (and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Super-Priority Credit Agreement"), by and among Blizzard Midco, LLC., as the holding company, Norvax, LLC, as borrower, the lenders party thereto, and Blue Torch Finance, LLC, as the administrative and collateral agent.  The guarantors under the Super-Priority Credit Agreement include Blizzard Midco, LLC, Connected Benefits, LLC, GoHealth, LLC, ETQ Holdings, LLC, e-TeleQuote Insurance, Inc., and Norvax, LLC (other than with respect to its own Secured Obligations (as defined in the Super-Priority Credit Agreement)), and the Super-Priority Credit

---

[10]   This amount is inclusive of the MOIC Premium (as defined in the Super-Priority Credit Agreement).

[11]   As of May 12, 2026.

20

Agreement is secured by a senior first-priority interest in the Prepetition Collateral (as defined below).

53. The Super-Priority Credit Agreement governs a senior secured super priority term loan, which primed the First Lien Term Loan Facility (as defined below), in an aggregate principal amount of $117 million (the "Super-Priority Term Loan Facility"), comprised of (i) $82 million in new-money term loans (the "Super-Priority New Money Term Loans"), of which (a) $40 million was funded upfront on the effective date of the Super-Priority Credit Agreement, (b) $40 million was available as delayed-draw term loans on or after October 1, 2025, subject to certain restrictions, and (c) $2 million of which was a 3% paid-in-kind closing payment added to the principal balance as of execution of the Super-Priority Credit Agreement, and (ii) $35 million in roll-up term loans (together with the Super-Priority New Money Term Loans, the "Super-Priority Term Loans") resulting from the Revolving Loan Conversion (as defined below).

54. The Super-Priority Term Loans bear interest in cash at the rate of, at the Debtors' election, SOFR plus 5.50% or ABR plus 4.50% and mature on August 5, 2029. In addition, the Super-Priority New Money Term Loans are subject to a 2.00x multiple-on-invested-capital (the "MOIC"), payable in cash upon partial or full repayment, prepayment, maturity, or acceleration of the Super-Priority Term Loans. The MOIC steps down to 1.75x for repayments occurring between January 1, 2026 and April 1, 2027. As of the Petition Date, the outstanding principal amount of the Super-Priority Term Loans, excluding the MOIC, is approximately $117.4 million.

### 2. First Lien Credit Agreement.

55. The Debtors are party to that certain credit agreement, dated as of September 13, 2019 (as and as may be further amended, restated, amended and restated, supplemented or

otherwise modified from time to time, the "First Lien Credit Agreement"),[12] by and among Blizzard Midco, LLC., as the holding company, Norvax, LLC, as borrower, the lenders party thereto, and Blue Torch Finance, LLC, as the administrative and collateral agent. The guarantors under the First Lien Credit Agreement are the same as those under the Super-Priority Credit Agreement. The First Lien Credit Agreement provides for a first lien term loan facility (the "First Lien Term Loan Facility," and the obligations thereunder, the "First Lien Term Loans"), secured by a first-priority lien on substantially all of the Debtors' assets (the "Prepetition Collateral").

56.     Prior to the execution of the 14th Amendment on August 6, 2025, the First Lien Credit Agreement also provided for a revolving credit facility comprised of two classes of revolving commitments (the "Class A Revolving Credit Facility" and the "Class A-1 Revolving Credit Facility," respectively), each of which was fully drawn immediately prior to the 14th Amendment. The 14th Amendment, which the Debtors entered into in conjunction with executing the Super-Priority Credit Agreement, terminated all commitments under the Class A-1 Revolving Credit Facility and the Class A Revolving Credit Facility. Loans outstanding under the Class A Revolving Credit Facility as of the effective date of the 14th Amendment were converted dollar-for-dollar into First Lien Term Loans under the First Lien Credit Agreement, and loans outstanding

---

[12]   The First Lien Credit Agreement was amended by that certain Amendment No. 1 to the Credit Agreement and Incremental Facility Amendment, dated as of March 20, 2020, that certain Incremental Facility Agreement and Technical Amendment No. 2 to Credit Agreement, dated as of May 7, 2020, that certain Incremental Facility Agreement No. 3, dated as June 11, 2020, that certain Amendment No. 4 to the Credit Agreement and Incremental Facility Agreement, dated as May 7, 2021, that certain Amendment No. 5 to Credit Agreement and Incremental Facility Agreement, dated as of June 11, 2021, that certain Amendment No. 6 to the Credit Agreement and Incremental Facility Agreement, dated as of November 10, 2021, that certain Amendment No. 7 to Credit Agreement, dated as of March 14, 2022, that certain Amendment No. 8 to the Credit Agreement, dated as of August 12, 2022, that certain Amendment No. 9 to the Credit Agreement, dated as of November 9, 2022, that certain Amendment No. 10 to the Credit Agreement, dated as of March 15, 2023, that certain Amendment No. 11 to the Credit Agreement, dated as of March 12, 2024, that certain Amendment No. 12 to the Credit Agreement, dated as of October 15, 2024, as amended and restated by that certain Amendment and Restatement Agreement, dated as of November 4, 2024, as amended and restated by that certain Amendment No. 13 to the Credit Agreement, dated as of June 30, 2025, that certain Amendment No. 14 to the Credit Agreement, dated as of August 6, 2025.

under the Class A-1 Revolving Credit Facility immediately prior to the 14th Amendment were rolled into the Super-Priority Term Loans (the "Revolving Loan Conversion").

57. The First Lien Term Loans bear interest at the rate of SOFR plus 7.50%, subject to the borrower's election to PIK a portion of the interest, in which case the interest rate is Adjusted Term SOFR plus 8.00% (of which Adjusted Term SOFR plus 4.50% shall be cash and 3.50% PIK). The First Lien Term Loans mature on November 4, 2029, and as of the Petition Date, the outstanding principal amount of the First Lien Term Loans is approximately $575.7 million.

### 3. Intercreditor Agreement.

58. The relationship between the Super-Priority Term Loan Facility and the First Lien Term Loan Facility is governed by that certain superpriority intercreditor agreement, dated as of August 6, 2025 (and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement") between, *inter alia*, Blue Torch Finance, LLC as the administrative and collateral agent under the Super-Priority Credit Agreement and Blue Torch Finance, LLC as the administrative and collateral agent under the First Lien Credit Agreement.

### 4. Equity Interests.

59. Debtor GoHealth, Inc. is a holding company that operates and conducts business through GoHealth Holdings, LLC in an organizational structure commonly referred to as an umbrella partnership-C-corporation ("Up-C") structure. Pursuant to such Up-C structure, GoHealth, Inc. holds a majority of the outstanding GoHealth Holdings Interests and is the sole managing member of GoHealth Holdings, while a minority of GoHealth Holdings Interests are held by other members of GoHealth Holdings. As is customary for a company organized in an Up-C structure, GoHealth, Inc.'s certificate of incorporation authorizes the board of directors to

issue shares of preferred stock and two classes of common stock, GoHealth, Inc. Class A Common Stock, and GoHealth, Inc. Class B Common Stock (together, the "Common Stock").

### a.   *GoHealth Holdings Interests.*

60.   Prior to the Company's IPO, GoHealth Holdings had 295,561,968 units issued and outstanding. In connection with the IPO and the Up-C structure put into place, a portion of the GoHealth Holdings Interests were contributed to GoHealth Inc., while the rest remained outstanding. As of May 12, 2026, 29,302,494 units of GoHealth Holdings Interests remain outstanding, 16,686,419 of which are held by GoHealth, Inc., and 12,616,075 of which are held by third parties.

61.   The holders of GoHealth Holdings Interests may, subject to certain exceptions, from time to time at each of their options require GoHealth Holdings to redeem all or a portion of their GoHealth Holdings Interests (along with an equal number of shares of Class B Common Stock (and such shares shall be immediately cancelled)) in exchange for, at GoHealth, Inc.'s election, newly-issued shares of Class A Common Stock on a one-for-one basis, or to the extent available, cash, in each case, in accordance with the terms of the GoHealth Holdings governing documents.

62.   The GoHealth Holdings Interests are structurally senior to the GoHealth, Inc. Preferred Stock.

### b.   *GoHealth, Inc. Preferred Stock*.

63.   On September 23, 2022, GoHealth raised $50 million from certain investors through the issuance of 50,000 shares of Series A Convertible Perpetual Preferred Stock (the "GoHealth, Inc. Preferred Stock"). The Certificate of Designations, dated as of September 23, 2022 (the "COD"), that governs the GoHealth, Inc. Preferred Stock sets forth a variety of rights

to which the GoHealth, Inc. Preferred Stock are entitled. For example, dividends on each share of GoHealth, Inc. Preferred Stock accrue at an annual rate equal to 7.00%.

64. The GoHealth, Inc. Preferred Stock are also convertible at the option of the holders thereof into GoHealth, Inc. Class A Common Stock in accordance with the COD. Alternatively, a holder of GoHealth, Inc. Preferred Stock may instead elect to receive upon conversion one share of Series A-1 Convertible Non-Voting Perpetual Preferred Stock (the "A-1 Preferred Stock") for every 1,000 shares of GoHealth, Inc. Class A Common Stock otherwise deliverable upon conversion and cash in lieu of any fractional shares of A-1 Preferred Stock. Holders of A-1 Preferred Stock are only entitled to dividends if GoHealth declares such dividends. As of the date hereof, no A-1 Preferred Stock are issued and outstanding.

65. The GoHealth, Inc. Preferred Stock are senior to the Common Stock with respect to dividend rights and rights on the distribution of assets on any liquidation, dissolution, or winding up.

### c. GoHealth, Inc. Common Stock.

66. As of May 12, 2026, 16,686,419 shares of GoHealth, Inc. Class A Common Stock are issued and outstanding, which includes an aggregate of 4,766,219 shares of GoHealth, Inc. Class A Common Stock issued to the holders of First Lien Term Loans as consideration for their entry into the 14th Amendment. The GoHealth, Inc. Class A Common Stock trades on The Nasdaq Global Market under the ticker symbol "GOCO" and has both voting and economic rights.

67. In connection with the IPO and the Up-C structure, GoHealth Inc. issued Class B Common Stock to holders of GoHealth Holdings Interests, at a one-to-one ratio, to reflect the voting rights of the GoHealth Holdings Interest holders and in accordance with GoHealth, Inc.'s and GoHealth Holdings' respective organizational documents. Class B Common Stock has voting rights but does not have economic rights.

25

**II.     EVENTS LEADING TO THE FILING OF THESE CHAPTER 11 CASES.**

**A.     Operational and Liquidity Challenges.**

**1.     Increased Debt Service Obligation.**

68.     The circumstances giving rise to GoHealth's chapter 11 filing largely began following the Company's 2020 IPO.  Although the IPO was, by all measures, a success—raising over $900 million at a valuation of approximately $6.6 billion—the Company soon thereafter found itself in an increasingly competitive market that required continued investment to stay ahead.  In 2021, the Company entered into the fifth amendment to the First Lien Credit Agreement, pursuant to which the Company refinanced its then-outstanding term loan facility and raised $200 million in the form of new revolving commitments.  Although the additional capital helped GoHealth continue to grow its market share, GoHealth soon struggled to satisfy the increased debt service obligations.  These obligations continued to grow as a result of subsequent amendments to its credit facility that increased the interest rate, among other restrictive changes.

**2.     Creation of the Non-Agency Business.**

69.     Although the Company raised $50 million in additional capital through the 2022 issuance of the GoHealth, Inc. Preferred Stock, the Company continued to struggle with its burdensome debt obligations.  The Company implemented the Non-Agency Business in an effort to generate new revenue streams and in anticipation of the need for cash to offset the growing debt obligations.  The Non-Agency Business initially succeeded, quickly generating revenue and cash sufficient to allow GoHealth to pay down some of its existing debt obligations.

70.     Encouraged by its success, GoHealth continued to invest in its Non-Agency Business, hiring and training more Internal Agents to write Non-Agency Business during the 2024 AEP.  Around this time, however, the rising cost of healthcare began outpacing government reimbursement rates for Carriers.  Carriers who were paying GoHealth marketing fees and one-

time commissions for the placement of each consumer now faced significant exposure on account of the expensive MA plans for such consumers. Additionally, the added pressures from CMS related to implementation of updated condition risk score rules that affect payments to plans, in addition to continued legal risks related to past health plan coding practices, further challenged the Carriers' ability to make a profit in the MA space. With this backdrop, the Carriers scaled back the Non-Agency Business, frustrating the Company's efforts to generate more revenue. With much less Non-Agency Business written during the 2024 AEP than anticipated, the Company faced a liquidity crisis in Q1 2025, when the commissions GoHealth earned during the 2024 AEP were paid.

### 3.  Going-Concern Qualification.

71.  These persistent challenges resulted in the Company making a going concern disclosure in the notes to its Form 10-Q for the second quarter of 2025, filed on May 16, 2025. This generated immediate and significant uncertainty in the marketplace as well as a sharp decline in the Company's stock price in the days that followed. Notably, certain Carriers expressed serious concern about the Company's ability to write new business in the 2025 AEP as a result of the qualification. This was especially problematic for the Company because if any, let alone multiple, Carriers decided to terminate their contracts with GoHealth, the financial and reputational consequences for the Company would be detrimental. As such, it was essential that GoHealth quickly resolve the going concern warning.

### B.  The Company's Prepetition Initiatives.

72.  In the time leading up to and immediately following the Q2 2025 going concern disclosure, the Company began evaluating and subsequently implementing several measures to address the various operational and liquidity challenges it was facing.

### 1.    Credit Facility Amendments.

73.    The Company retained Kirkland and A&M to evaluate strategic alternatives in June 2025, in the midst of these liquidity challenges and in the face of an upcoming June 30, 2025 maturity on the revolving credit facility then under the First Lien Credit Agreement. The Company immediately began working with its lenders to reach a short-term solution to avoid triggering an event of default on June 30. Through the 13th Amendment, the parties extended the maturity of the revolving credit facility to September 30, 2025. The extension allowed the Company, its lenders, and its advisors to work towards a longer-term solution.

74.    The 13th Amendment also provided the Debtors with the ability to pursue a receivables financing arrangement, such as a potential securitization transaction, regarding the Backbook Asset on terms and conditions satisfactory to the Required Lenders (as defined in the 13th Amendment). Thereafter, the Company, in consultation with its advisors, determined that the securitization of its Backbook Asset could provide GoHealth with the liquidity necessary to address its upcoming debt maturity and improve its overall cash profile. Accordingly, the Company and its advisors invested meaningful time and resources preparing for a potential securitization transaction.

75.    However, as discussions between the Company and various constituents continued, it became apparent that such a securitization transaction was not actionable. Instead, the Company and its lenders ultimately negotiated and entered into the Super-Priority Credit Agreement and the 14th Amendment (together, the "August 2025 Transactions"). The August 2025 Transactions resulted in $117 million of bridge financing, of which $82 million was new money and $35 million was roll-up term loans. In addition, the financial covenants under the Super-Priority Credit Agreement provided the Company with liquidity cushion to avoid a qualified opinion in the next Form 10-Q, and comparable covenants in the First Lien Credit Agreement were loosened. Such

covenant relief, combined with the new money infusion, enabled the Company to get a clean opinion in its Form 10-Q filed on August 12, 2025.

76.     In connection with the August 2025 Transactions, the Board created the Transformation Committee, with exclusive power and authority to review, formulate, negotiate, and recommend to the Board for approval various strategic alternatives such as potential refinancings, securitizations, mergers, acquisitions, and restructurings.

### 2.     Additional Operational Changes.

77.     Around the same time as GoHealth began engaging advisors, it launched GoHealth Protect.  Like the implementation of the Non-Agency Business, GoHealth Protect—which involves final expense insurance rather than MA coverage—is designed to offset both the traditional seasonality of the Company's revenue by shifting revenue away from the AEP and fluctuating demand for MA products.  While the Company is optimistic about the outlook for GoHealth Protect, SNPs, and other new or developing products, these investments have not yet grown to sufficiently offset the impact on the Company's revenues and cash from the declining demand for MA plans and products.

78.     As the Company's liquidity concerns continued to linger following the August 2025 Transactions, the Company worked diligently with A&M to design and implement a cost-cutting strategy.  Such efforts have allowed the Company to avoid a default under the Super-Priority Term Loan Facility and the First Lien Term Loan Facility, preserving the runway under the August 2025 Transactions to arrive at a comprehensive solution.

79.     In addition, prior to the commencement of these chapter 11 cases, the Company and its stakeholders prioritized tailoring the Company's arrangements with the Carriers to its current circumstances, while protecting these important relationships.

### 3. Governance.

80. Throughout this process, the Company continued working with its professional advisors, including Kirkland as legal counsel, A&M as financial advisor, and Moelis as investment banker. The advisors have assisted the Board and the Transformation Committee, on a regular basis, in carefully exploring, evaluating, and negotiating various strategic alternatives, ultimately resulting in an agreement with the lenders on the terms of the value-maximizing transactions contemplated in the Plan.

81. Ultimately, the Board, at the recommendation of the Transformation Committee and in a sound exercise of its business judgment, has determined that the best option to maximize value for all stakeholders and to reduce the possibility of disruption ahead of the 2026 AEP and the related pre-AEP period is to swiftly implement the Restructuring Transactions. Doing so will enable GoHealth to enter the pre-AEP period and the 2026 AEP having quickly emerged from these chapter 11 cases under new ownership.

## III. THE PREPACKAGED PLAN AND THESE CHAPTER 11 CASES.

### A. Negotiating the Plan.

82. In the months leading up to the Petition Date, the Debtors, the lenders, and a majority of the equityholders maintained regular dialogue regarding potential strategic alternatives for GoHealth, including various potential M&A opportunities and other transactions to address the Company's capital structure. Certain of these alternatives failed to materialize or were not pursued for various reasons. Following a rigorous, multi-month strategic transaction process to identify a potential merger counterparty, the Company and its key stakeholders engaged in extensive discussions regarding a potential change of control transaction that would transition ownership to the secured lenders while either unimpairing or providing meaningful recoveries to junior stakeholders. The Company and its key stakeholders considered multiple means of effectuating

such a transaction and ultimately agreed that the best path forward was to implement the transaction through these chapter 11 cases. The Debtors provided voluminous diligence to the lenders, including an extensive data room with hundreds of documents and thousands of pages of information, and engaged proactively and substantively on transaction structure and terms. The ultimate decision to pursue the Restructuring Transactions with the lenders is the culmination of months of extensive strategic review of available alternatives, including regular meetings of the Board and the Transformation Committee.

83.    The Plan represents a significant achievement for GoHealth and is a testament to the collaboration between all key stakeholders, as well as the lenders' confidence in the enduring strength of GoHealth's business in the lead-up to the AEP 2026 and beyond. The key terms of the Plan are as follows:[13]

- issuance of a $20 million exit facility that will, among other things, fund the Equity Recovery Pool;

- conversion of approximately $174 million of loans under the Super-Priority Credit Agreement into second-out term loans and conversion of approximately $588 million of loans under the First Lien Credit Agreement into third-out term loans;[14]

- reinstatement of all General Unsecured Claims;

- reinstatement of the Preferred Equity Interests;

- a $10 million cash recovery to Common Stockholders; and

- customary Debtor and third-party releases, subject to the Investigation (as defined below).

---

[13]    This summary of key terms of the Plan is qualified in its entirety by reference to the Plan, the exhibits thereto, and other materials referenced therein. Among these, the Plan is the only operative document and controls in the event of any inconsistencies between the Plan and this summary.

[14]    Prior to the Petition Date, the prepetition lenders executed a commitment letter regarding the provision of the new money exit facility.

B.    **Cash Collateral.**[15]

84.    The Debtors and the Prepetition Secured Parties (as defined in the Cash Collateral Motion) negotiated in good faith in the lead-up to the Petition Date regarding the consensual use of cash collateral (the "Cash Collateral").  Access to Cash Collateral will provide the Debtors with the liquidity necessary to ensure they are able to continue operating during the chapter 11 cases in order to preserve the value of their estates and to pursue confirmation of the Plan.

85.    It is my understanding that all of the Debtors' available cash constitutes the Prepetition Secured Parties' Cash Collateral, and the Prepetition Secured Parties have security interests in substantially all of the Debtors' assets, including any proceeds generated from the Debtors' assets and operations.  As such, I do not believe the Debtors have sufficient unencumbered cash to operate their business, let alone the added costs of administering these chapter 11 cases.  Without prompt access to Cash Collateral, I do not believe the Debtors will be able to satisfy employee compensation obligations, satisfy payables incurred in the ordinary course of business, or fund the administration of these chapter 11 cases.  Such failures would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  I believe the Debtors' access to Cash Collateral and ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases.

86.    Against that backdrop and in conjunction with the negotiation of the Plan, the Debtors negotiated with the Prepetition Secured Parties to develop a budget, adequate protection

---

[15]    Capitalized terms used but not defined in this section shall have the meanings set forth in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion"), filed concurrently herewith.

32

package, and restructuring timeline that would induce the lenders to consent to the use of their Cash Collateral.  Given the Debtors have sufficient cash on hand to sustain expected operations in the ordinary course, the Debtors and the Prepetition Secured Parties agreed that consensual use of Cash Collateral was appropriate in light of the circumstances and anticipated cadence of the chapter 11 cases.  The agreed upon terms regarding the consensual use of Cash Collateral are set forth in the proposed Interim Order.

87.     To determine anticipated liquidity needs, I worked with A&M to review and analyze projected cash receipts and disbursements and develop assumptions to ground the budget. Using that analysis, A&M then prepared a budget outlining the Debtors' postpetition cash flow forecast over the projected seven week duration of these chapter 11 cases (the "Initial Budget").[16] The Initial Budget contains line items for cash flows anticipated to be received and disbursed during the time period for which the Initial Budget is prepared and includes all reasonable, necessary, and foreseeable expenses that the Debtors expect to incur as a result of the operation of their business during such time, as well as the projected costs of these chapter 11 cases.

88.     I have remained involved in discussions regarding the budget as it has continued to develop in the weeks preceding the chapter 11 cases.  I review the budget regularly with A&M, participate in Board and Transformation Committee meetings where A&M presents the latest budget, and have engaged with the Prepetition Secured Parties on specific questions regarding disbursements reflected therein.  Based on my experience and extensive discussions with the Debtors' management team and advisors, including A&M, I believe the Initial Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

---

[16]   A copy of the budget, which is the "Initial Budget" under the terms of the proposed Interim Order, is attached as Exhibit 1 to the proposed Interim Order of the Cash Collateral Motion.

89. Based on the Initial Budget, the Debtors' projected remaining cash balance at the end of the first four weeks of these chapter 11 cases will be approximately $7 million, and their remaining cash balance at the end of the six-week period will be approximately $6 million. Accordingly, the Initial Budget establishes that, subject to the continued access to Cash Collateral, the Debtors will have sufficient cash on hand to operate their business in the ordinary course.

90. It is my understanding that the Debtors propose to provide the Prepetition Secured Parties with an adequate protection package including, among other things, regular reporting obligations, adequate protection liens, superpriority claims, and payment of certain fees and expenses. I believe that each form of adequate protection is appropriate under the circumstances and will adequately protect the Prepetition Secured Parties against any actual diminution in value of their interest in the Cash Collateral.

91. Because the Debtors' access to Cash Collateral is fundamental to the Debtors' continued business operations and the success of these chapter 11 cases, I believe the relief requested in the Cash Collateral Motion is necessary and appropriate to avoid immediate and irreparable harm to the estates.

**C.    Independent Investigation.**

92. On May 14, 2026, the Company's independent directors, with the assistance of Pachulski Stang Ziehl & Jones LLP, commenced an investigation (the "Investigation") into potential claims and causes of action of the Debtors, including against parties that have historically held a majority of the Company's outstanding equity interests. The Investigation is ongoing, but the Debtors anticipate that it will conclude in advance of the date of the proposed confirmation hearing. The Plan currently proposes to release claims held by the Debtors against these and other parties, but the Debtors reserve the right to amend the Plan, as appropriate, based on the outcome of the Investigation.

**D.      Prepetition Solicitation Results.**

93.      Prior to the commencement of these chapter 11 cases, the Debtors commenced solicitation for the Plan.  The Debtors set a voting deadline of May 19, 2026 for holders of claims and interests who are also members of the Ad Hoc Revolver Group and Ad Hoc TL Group (the "Lender Voting Deadline").[17]  Holders of GoHealth Holdings Interests and GoHealth, Inc. Class A Common Stock have until July 8, 2026 at 4:00 p.m. (prevailing Central Time) to vote on the Plan (the "Interests Voting Deadline").[18]  As set forth in the preliminary voting report filed contemporaneously herewith, the Debtors have already received ballots accepting their Plan from holders of 100% of the outstanding Super-Priority Term Loans, 100% of the outstanding First Lien Term Loans, 61% of the outstanding GoHealth, Inc. Class A Common Stock, and greater than 99% of the outstanding GoHealth Holdings Interests.  While the Debtors are optimistic that additional stakeholders, particularly the Company's public shareholders who have not yet had the opportunity to participate directly in the restructuring process, will choose to support the Plan between now and the Interests Voting Deadline, the Debtors already have extensive stakeholder consensus, sufficient to confirm the Plan.

---

[17]    The Ad Hoc Revolver Group and the Ad Hoc TL Group were able to change their vote until the Company files the first voluntary petition for chapter 11.

[18]    See the *Motion of Debtors for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (V) Granting Related Relief*, filed concurrently herewith.

**E.      The Proposed Timeline for the Chapter 11 Cases and Path Forward.**

94.      The Debtors agreed to certain milestones in connection with the consensual use of cash collateral to ensure an orderly and timely implementation of the Restructuring Transactions. These include:

| Event | Timeline |
| --- | --- |
| Voting Record Date | May 12, 2026 |
| Lender Voting Deadline | May 19, 2026 |
| Solicitation Commencement | June 7, 2026 |
| Petition Date | June 7, 2026 |
| First Day Hearing | June 9, 2026 (subject to court availability) |
| Deadline to Serve Confirmation Hearing Notice | June 10, 2026 |
| Initial Plan Supplement Filing | July 1, 2026 |
| Interests Voting Deadline | July 8, 2026 |
| Objection Deadline | July 8, 2026 |
| Reply Deadline | July 13, 2026 |
| Confirmation Hearing | July 16, 2026 (subject to court availability) |
| Emergence / Effective Date | July 17, 2026 |

95.      In my opinion, preserving value for the benefit of the Debtors' estates depends, in large part, on the Debtors proceeding promptly to confirmation of the Plan and to emergence from chapter 11 shortly thereafter. Going through chapter 11 and emerging swiftly will (i) permit the Debtors to minimize uncertainty among employees (including Internal Agents), Carriers, Downline Partners, and other critical vendors, (ii) reduce, if not entirely eliminate, potential disruptions to the Debtors' agent network and business operations (which is particularly critical

with the 2026 AEP and the pre-AEP period soon approaching), and (iii) preserve critical liquidity by reducing unnecessary professional fees and other administrative costs that I understand inevitably would accrue in a prolonged chapter 11 process. The Plan is broadly supported by all of the Debtors' financial stakeholders and a majority of their equityholders, and because all interested parties will have had ample notice and an opportunity to participate in these chapter 11 cases, the expeditious confirmation of the Plan and the consummation of the Restructuring Transactions are both feasible and clearly in the best interests of the Debtors, their estates, and all interested parties.

## IV.   EVIDENTIARY BASIS FOR RELIEF REQUESTED IN THE FIRST DAY MOTIONS.

96.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions, seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and execute a swift and smooth restructuring for the benefit of all interested parties.

97.     With respect to the First Day Motions requesting authority to pay certain prepetition claims, I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, except to the extent relief is "needed to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

98.     On the Petition Date, the Debtors filed the following First Day Motions:

- **All Trade Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Payment of All Trade Claims in the Ordinary Course of Business, (II) Confirming the Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief.*

- **Cash Collateral Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Limited Use of Cash Collateral, (II) Granting Adequate Protection Liens and Superpriority Expense Claims to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.*

- **Cash Management Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief.*

- **Claims Agent Retention Application.** *Application of Debtors for Appointment of Donlin, Recano & Company, LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), Effective as of the Petition Date.*

- **Creditor Matrix Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Redact Certain Personally Identifiable Information of Individuals and (B) Serve Parties in Interest by Email, (II) Modifying the Requirement to File a List of Equity Security Holders, (III) Approving the Form and Manner of Service of Notices, and (IV) Granting Related Relief.*

- **Customer Programs Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Fulfill and Honor their Carrier Programs and (B) Continue, Renew, Replace, Terminate, and Implement Their Carrier Programs, and (II) Granting Related Relief.*

- **Disclosure Statement Scheduling Motion.** *Motion of Debtors for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (V) Granting Related Relief.*

- **Insurance Motion.**  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Modify, Supplement, Extend, or Enter Into New Insurance Policies, and (C) Continue to Pay Broker Fees, and (II) Granting Related Relief.*

- **Joint Administration Motion.**  *Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

- **NOL Motion.**  *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Stock, (II) Directing that Certain Transfers of and Declarations of Worthlessness with Respect to Stock in Violation of the Procedures Shall be Null and Void, and (III) Granting Related Relief.*

- **Taxes Motion.**  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief.*

- **Wages Motion.**  *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Compensation and Benefits Programs, and (II) Granting Related Relief.*

99.     I have reviewed and am familiar with the contents of each of the First Day Motions and have consulted with the advisors to ensure that I understand each First Day Motion and the specific relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate, and each such factual statement is incorporated herein by reference.

100.     Based upon my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is essential to enable the Debtors to transition seamlessly into chapter 11 with minimal disruption or loss of productivity and value.  Further, I believe that the Restructuring Transactions and the timeline contemplated for these cases are value-maximizing and in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in each of the First Day Motions,

39

the Debtors' business and their estates will suffer immediate and irreparable harm—including potential loss of critical Carrier relationships, agent attrition, and diminished consumer confidence—that cannot be remedied after the fact and that will jeopardize the prospect of successfully implementing the Restructuring Transactions. Accordingly, and for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  June 7, 2026

/s/ *Vijay Kotte*

Name: Vijay Kotte
Title:   Chief Executive Officer