**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOHEALTH, INC., *et al.*,[1] | ) | Case No. 26-10914 [●] |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT RELATING**
**TO THE JOINT PREPACKAGED CHAPTER 11**
**PLAN OF GOHEALTH, INC. AND ITS DEBTOR AFFILIATES**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No.2436)
James O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                joneill@pszjlaw.com
                ecorma@pszjlaw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
Alexandra F. Schwarzman, P.C. (*pro hac vice* pending)
David R. Gremling (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          anup.sathy@kirkland.com
                alexandra.schwarzman@kirkland.com
                dave.gremling@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors' federal tax identification numbers, are: GoHealth, Inc. (3805); Blizzard Midco, LLC (3732); Connected Benefits, LLC (2162); e-TeleQuote Insurance, Inc. (2336); ETQ Holdings, LLC (8260); GoHealth Holdings, LLC (3653); GoHealth, LLC (5175); and Norvax, LLC (3063). The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 222 West Merchandise Mart Plaza, Suite 1750, Chicago, Illinois 60654.

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS <u>NOT</u> AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

<u>**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**</u>

**SOLICITATION OF VOTES ON THE *JOINT PREPACKAGED CHAPTER 11 PLAN OF GOHEALTH, INC. AND ITS DEBTOR AFFILIATES* FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 3** | **Super-Priority Loan Claims** |
| **CLASS 4** | **First Lien Claims** |
| **CLASS 6** | **GoHealth Holdings Interests** |
| **CLASS 8** | **GoHealth, Inc. Class A Common Stock** |

**IF YOU ARE IN CLASS 3, CLASS 4, CLASS 6, OR CLASS 8, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

**DELIVERY OF BALLOTS**

---

**FOR HOLDERS OF CLAIMS AND INTERESTS IN CLASS 3, CLASS 4, AND CLASS 6 BALLOTS MAY BE RETURNED BY THE FOLLOWING METHODS:**

**BY REGULAR MAIL, OVERNIGHT MAIL, OR HAND DELIVERY AT:**

**GOHEALTH, INC., ET AL. BALLOT PROCESSING**
**C/O DONLIN, RECANO & COMPANY, LLC**
**P.O. BOX 2053**
**NEW YORK, NEW YORK 10272-2042**

**BY ELECTRONIC ONLINE SUBMISSION**
**VIA DONLIN RECANO & COMPANY, LLC'S ONLINE E-BALLOT PORTAL**

TO RETURN YOUR BALLOT VIA THE ONLINE E-BALLOT PORTAL, PLEASE VISIT **HTTPS://WWW.BANKRUPTCY.ANGEIONGROUP.COM/GOHEALTHVOTE** AND FOLLOW THE DIRECTIONS TO SUBMIT YOUR BALLOT. IF YOU CHOOSE TO SUBMIT YOUR BALLOT VIA THE E-BALLOT SYSTEM, YOU SHOULD NOT ALSO RETURN A HARD COPY OF YOUR BALLOT.

PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT TO DONLIN RECANO & COMPANY, LLC ("**DONLIN**" OR THE "**SOLICITATION AGENT**").

---

**FOR HOLDERS OF CLASS 8 GOHEALTH, INC. CLASS A COMMON STOCK:**

- **IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE (WHICH MAY BE YOU), PLEASE COMPLETE, SIGN, AND DATE THE BENEFICIAL HOLDER BALLOT AND RETURN IT PROMPTLY IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY 4:00 P.M. (PREVAILING EASTERN TIME) ON OR BEFORE THE APPLICABLE VOTING DEADLINE.**

- **IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO DONLIN, PLEASE COMPLETE THE BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY DONLIN BY THE APPLICABLE VOTING DEADLINE.**

---

**TO VOTE ON THE PLAN, BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT AS DIRECTED ON YOUR BALLOT BY THE <u>APPLICABLE VOTING DEADLINE</u>, WHICH IS:**

> **(I)      6:00 P.M. (PREVAILING EASTERN TIME) ON MAY 19, 2026, FOR HOLDERS OF CLAIMS IN CLASS 3 OR CLASS 4; OR**

> **(II)     4:00 P.M. (PREVAILING EASTERN TIME) ON JULY 8, 2026, FOR ALL HOLDERS OF INTERESTS IN CLASS 6 AND CLASS 8.**

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN:**

**YOU CAN CONTACT THE SOLICITATION AGENT BY E-MAIL AT: GHIINFO@ANGEIONGROUP.COM (REFERENCING "<u>GOHEALTH, INC.</u>" IN THE SUBJECT LINE).**

**YOU CAN ALSO CONTACT THE SOLICITATION AGENT BY PHONE TOLL-FREE AT (877) 583-1578 OR +1 (332) 284-1398 (INTERNATIONAL).**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS AND/OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PREPACKAGED PLAN OF GOHEALTH, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "PLAN").[2] NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN, AND RELATED DOCUMENTS. ASSUMING THE REQUISITE ACCEPTANCES TO THE PLAN ARE OBTAINED, THE DEBTORS WILL SEEK THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN AT THE CONFIRMATION HEARING.

HOLDERS OF CLAIMS AND/OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM AND/OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (WHEN AND IF APPROVED) DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN RELEVANT PROVISIONS OF THE BANKRUPTCY CODE, AND CERTAIN ANTICIPATED EVENTS REGARDING THE DEBTORS' FORTHCOMING CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AS OF THE DATE HEREOF OR SPECIFIED THEREIN. WHILE THE DEBTORS BELIEVE THAT SUCH

---

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan shall govern**.

FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND/OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE OR DISTRIBUTE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT, AS WELL AS ANY APPLICABLE PROCEDURES WITH RESPECT TO THE TRANSACTIONS THAT MAY BE RELATED THERETO, IN EACH CASE, FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY DISCLOSURE CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND/OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND/OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE

**CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING <u>ARTICLE VII</u> HEREIN, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO ACCEPT OR REJECT THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

<u>**FORWARD-LOOKING STATEMENTS**</u>

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:**

- **BUSINESS STRATEGY;**
- **TECHNOLOGY;**
- **DEMAND FOR THE COMPANY'S PRODUCTS AND SERVICES;**
- **FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**
- **LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**
- **FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;**
- **THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;**
- **AVAILABILITY AND TERMS OF CAPITAL;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**

- **RISKS IN CONNECTION WITH ACQUISITIONS;**

- **THE RISK ASSOCIATED WITH THE DEBTORS' FAILURE TO COMPLY WITH THE EXTENSIVE LAWS AND GOVERNMENTAL REGULATIONS APPLICABLE TO THE UNITED STATES HEALTHCARE AND HEALTH INSURANCE INDUSTRIES; AND**

- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' OR COMPANY'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' OR COMPANY'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CARRIERS' AND CUSTOMERS' RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS, INCLUDING THOSE GOVERNING THE HEALTH INSURANCE MARKETS IN THE UNITED STATES; TRADE BALANCE; NATURAL DISASTERS; PANDEMICS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS.**

**RECOMMENDATION BY THE DEBTORS**

EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH DEBTOR'S ASSETS, AND PROVIDE THE BEST RECOVERY TO THE DEBTORS' STAKEHOLDERS.  AT THIS TIME, EACH DEBTOR BELIEVES THAT THE RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS AND/OR INTERESTS WHOSE VOTES ON THE PLAN ARE BEING SOLICITED <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOT (ACCEPTING THE PLAN) SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN THE APPLICABLE VOTING DEADLINE, WHICH IS <u>MAY 19, 2026, AT 6:00 P.M. (PREVAILING EASTERN TIME)</u> FOR HOLDERS OF CLAIMS IN CLASS 3 OR CLASS 4 OR <u>JULY 8, 2026, AT 4:00 P.M. (PREVAILING EASTERN TIME)</u> FOR HOLDERS OF INTERESTS IN CLASS 6 AND CLASS 8, AND PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE SOLICITATION MATERIALS, INCLUDING IN YOUR BALLOT.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued pursuant to the Plan on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws"), or the securities laws of any other jurisdiction.  The Plan has not been approved or disapproved by the SEC or any similar federal, state, local, or foreign regulatory authority and neither the SEC nor any such other regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  Any representation to the contrary is a criminal offense.

The Debtors are relying on Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act and Blue-Sky Laws provisions to exempt from registration under the Securities Act and Blue-Sky Laws the offer of New Common Interests to the Holders of First Lien Claims prior to the Petition Date in connection with the solicitation of votes to accept or reject the Plan.  The New Common Interests may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.  Hedging transactions involving such securities may not be conducted unless in compliance with the Securities Act and any applicable laws of other jurisdictions.

After the Petition Date, the Debtors expect to rely on Section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution of New Common Interests under the Plan, and to the extent such exemption is not available, then the Debtors expect to offer, issue, and distribute such New Common Interests under the Plan in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act and/or other applicable exemptions from registration. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Securities issued pursuant to the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act (including, to the extent applicable, Rule 144 under the Securities Act) and may be subject to any additional restrictions on the transferability of such securities pursuant to the applicable underlying documentation.

Certain securities issued under the Plan may also constitute "control securities" as defined under Rule 144 of the Securities Act and may be subject to legends and resale restrictions. In addition, New Common Interests issued pursuant to section 1145(a) of the Bankruptcy Code to persons who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code (including, in certain circumstances, "affiliates" as defined in Rule 144(a)(1) under the Securities Act) will also be subject to resale restrictions. Reference is made to Article XI ("Certain Securities Law Matters") of this Disclosure Statement for important information regarding resales, including limitations applicable to "affiliates" under Rule 144 and "underwriters" under section 1145(b) of the Bankruptcy Code.

EXCEPT TO THE EXTENT PUBLICLY AVAILABLE, THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, THE PLAN, AND THE INFORMATION SET FORTH HEREIN AND THEREIN ARE CONFIDENTIAL.  THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE DEBTORS, THEIR SUBSIDIARIES, AND THEIR RESPECTIVE DEBT AND SECURITIES.  EACH RECIPIENT HEREBY ACKNOWLEDGES THAT IT (A) IS AWARE THAT THE FEDERAL SECURITIES LAWS OF THE UNITED STATES PROHIBIT ANY PERSON (AS DEFINED IN SECTION 101(41) OF THE BANKRUPTCY CODE, A "PERSON") WHO HAS MATERIAL NON-PUBLIC INFORMATION ABOUT A COMPANY, WHICH IS OBTAINED FROM THE COMPANY OR ITS REPRESENTATIVES, FROM PURCHASING OR SELLING SECURITIES OF SUCH COMPANY OR FROM COMMUNICATING THE INFORMATION TO ANY OTHER PERSON UNDER CIRCUMSTANCES IN WHICH IT IS REASONABLY FORESEEABLE THAT SUCH PERSON IS LIKELY TO PURCHASE OR SELL SUCH SECURITIES AND (B) IS FAMILIAR WITH THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT"), AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND AGREES THAT IT WILL NOT USE OR COMMUNICATE TO ANY PERSON OR ENTITY, UNDER CIRCUMSTANCES WHERE IT IS REASONABLY LIKELY THAT SUCH PERSON OR ENTITY IS LIKELY TO USE OR CAUSE ANY PERSON OR ENTITY TO USE, ANY CONFIDENTIAL INFORMATION IN CONTRAVENTION OF THE EXCHANGE ACT OR ANY OF ITS RULES AND REGULATIONS, INCLUDING RULE 10B-5 PROMULGATED THEREUNDER.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................................................... 1

II.     PRELIMINARY STATEMENT. ....................................................................................... 1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
       AND THE PLAN. .............................................................................................................. 5

      A.      What is chapter 11? ................................................................................................ 5
      B.      Why are the Debtors sending me this Disclosure Statement? .............................. 6
      C.      Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure
           Statement? ............................................................................................................. 6
      D.      Am I entitled to vote on the Plan? ........................................................................ 6
      E.      What is the deadline to vote on the Plan? ............................................................ 7
      F.      How do I vote for or against the Plan? ................................................................. 7
      G.     Why is the Bankruptcy Court holding a Confirmation Hearing? ........................ 7
      H.     What is the purpose of the Confirmation Hearing? ............................................. 8
      I.       Who do I contact if I have additional questions with respect to this Disclosure
           Statement or the Plan? .......................................................................................... 8
      J.      What will I receive from the Debtors if the Plan is consummated? ..................... 8
      K.     What will I receive from the Debtors if I hold an Allowed Administrative Claim,
           Professional Fee Claim, or a Priority Tax Claim? ............................................... 13
      L.      Why are Holders of GoHealth, Inc. Class A Common Stock and Holders of
           GoHealth, Inc. Class B Common Stock receiving different recoveries under the
           Plan? ..................................................................................................................... 15
      M.    What is the TRA Amendment? ............................................................................ 16
      N.     Are any regulatory approvals required to consummate the Plan? ....................... 16
      O.     What happens to my recovery if the Plan is not confirmed or does not go effective?
           .............................................................................................................................. 16
      P.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when
           the Plan goes effective, and what is meant by "Confirmation," "Effective Date,"
           and "Consummation?" .......................................................................................... 17
      Q.     What are the sources of Cash and other consideration required to fund the Plan? ........... 17
      R.      Are there risks to owning the New Equity Interests upon the Debtors' emergence
           from chapter 11? ................................................................................................... 17
      S.      Is there potential litigation related to the Plan? ................................................... 17
      T.      What is the Management Incentive Plan ("MIP") and how will it affect the
           distribution I receive under the Plan? .................................................................. 17
      U.     Does the Plan preserve Causes of Action? ........................................................... 18
      V.      Will there be releases, exculpation, and injunction granted to parties in interest as
           part of the Plan? ................................................................................................... 18
      W.    Does the Bankruptcy Code protect against discriminatory treatment? .............................. 25
      X.      Will the Company retain documents after any Effective Date? ........................... 25
      Y.      What is the effect of Reimbursement or Contribution? ....................................... 25
      Z.      What is the effect of the Plan on the Debtors' ongoing business? ....................... 25
      AA.    Will any party have significant influence over the corporate governance and
           operations of the Reorganized Debtors? .............................................................. 26
      BB.    Could subsequent events potentially affect recoveries under the Plan? .............. 26
      CC.    Do the Debtors recommend voting in favor of the Plan? .................................... 26

| | | | |
|---|---|---|---|
| | DD. | Who Supports the Plan?............................................................................... | 26 |
| **IV.** | | **CORPORATE HISTORY AND BUSINESS OPERATIONS** ................................................. | **27** |
| | A. | Corporate History ........................................................................................ | 27 |
| | B. | GoHealth's Business Operations. ................................................................ | 28 |
| | C. | GoHealth's Organizational Structure.......................................................... | 30 |
| | D. | GoHealth's Prepetition Capital Structure ................................................... | 30 |
| **V.** | | **EVENTS LEADING TO THE FILING OF THESE CHAPTER 11 CASES** ....................... | **34** |
| | A. | Operational and Liquidity Challenges. ........................................................ | 34 |
| | B. | The Company's Prepetition Initiatives. ....................................................... | 35 |
| **VI.** | | **THE PREPACKAGED PLAN AND THESE CHAPTER 11 CASES** .................................... | **36** |
| | A. | Negotiating the Plan.................................................................................... | 36 |
| | B. | Independent Investigation. .......................................................................... | 37 |
| | C. | First Day Relief............................................................................................ | 37 |
| | D. | Proposed Confirmation Schedule ................................................................ | 38 |
| **VII.** | | **OVERVIEW OF THE PLAN** ............................................................................................. | **38** |
| | A. | The Plan ....................................................................................................... | 38 |
| | B. | Treatment of Executory Contracts and Unexpired Leases............................ | 45 |
| | C. | Provisions Governing Distributions............................................................. | 49 |
| | D. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.................... | 55 |
| | E. | Conditions Precedent to Confirmation and Consummation of the Plan .......... | 57 |
| **VIII.** | | **RISK FACTORS** .............................................................................................................. | **59** |
| | A. | Bankruptcy Law Considerations.................................................................. | 59 |
| | B. | Risks Related to Recoveries Under the Plan................................................ | 65 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Business.......... | 67 |
| | D. | Risks Related to the Offer and Issuance of Securities Under the Plan .......... | 72 |
| **IX.** | | **SOLICITATION AND VOTING PROCEDURES** ................................................................. | **73** |
| | A. | Holders of Claims Entitled to Vote on the Plan........................................... | 74 |
| | B. | Voting Record Date ..................................................................................... | 74 |
| | C. | Ballots Not Counted.................................................................................... | 74 |
| | D. | Notice of Non-Voting Status ....................................................................... | 74 |
| **X.** | | **CONFIRMATION OF THE PLAN** ................................................................................... | **75** |
| | A. | Requirements for Confirmation of the Plan................................................. | 75 |
| | B. | Best Interests of Creditors/Liquidation Analysis ........................................ | 75 |
| | C. | Feasibility.................................................................................................... | 75 |
| | D. | Acceptance by Impaired Classes ................................................................. | 76 |
| | E. | Confirmation Without Acceptance by All Impaired Classes.......................... | 76 |
| **XI.** | | **CERTAIN SECURITIES LAW MATTERS**....................................................................... | **77** |
| | A. | New Common Interests ................................................................................ | 77 |

B.  Exemption from Registration Requirements; Issuance of New Common Interests Under the Plan ................................................................................ 78

C.  Resales of New Common Interests; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code .................................................................... 78

**XII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................................................................................... 82**

A.  Introduction ................................................................................................ 82

B.  Certain United States Federal Income Tax Consequences of the Plan to the Debtors, the Reorganized Debtors, and Equityholders of GoHealth Holdings ............... 83

C.  Certain United States Federal Income Tax Consequences of the Plan to U.S. Holders of Super-Priority Loan Claims, First Lien Claims, GoHealth Holdings Interests and GoHealth, Inc. Class A Common Stoc ......................................... 86

D.  Certain United States Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Super-Priority Loan Claims, First Lien Claims, and GoHealth, Inc. Class A Common Stock ................................................................................. 90

E.  Information Reporting and Back-Up Withholding ............................................ 95

**XIII.  RECOMMENDATION .......................................................................... 96**

**EXHIBITS[3]**

EXHIBIT A     Plan of Reorganization

EXHIBIT B     Financial Projections

EXHIBIT C     Liquidation Analysis

EXHIBIT D     Organizational Chart

---

[3]   Each Exhibit is incorporated herein by reference.

## I.   INTRODUCTION.

GoHealth, Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors," and together with their non-Debtor affiliates, "GoHealth" or the "Company"), are pursuing proposed restructuring and recapitalization transactions (the "Restructuring Transactions").

The Debtors have launched a solicitation of votes to accept or reject the *Joint Prepackaged Plan of Reorganization of GoHealth, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan" and, such solicitation, the "Solicitation") to certain Holders of Claims against and Interests in the Debtors.  The Debtors are transmitting this disclosure statement ("Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the Solicitation. A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

The Debtors intend to promptly commence voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to seek Confirmation and Consummation of the Plan.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.   PRELIMINARY STATEMENT.

The Debtors commence these cases with the overwhelming support of 100% of their prepetition lenders, the holders of 61% of the outstanding GoHealth, Inc. Class A Common Stock, and the holders of more than 99% of the outstanding GoHealth Holdings Interests[3] to effectuate a change of control transaction that leaves general unsecured creditors and preferred equity holders unimpaired and provides a $10 million cash recovery to the Company's common equity holders.  These cases mark the culmination of extensive and good-faith restructuring discussions with the Company's prepetition lenders and enable a highly consensual transition in ownership that preserves GoHealth's enterprise value and positions the Company for long-term success.

Founded in 2001, GoHealth is a leading health insurance marketplace and Medicare-focused digital health company.  GoHealth assists consumers searching for a Medicare health plan (and certain other insurance products) that meets their needs by leveraging its proprietary technology to compare various insurance products offered by large health insurance providers, such as United, Aetna, Anthem, Humana, and others (the "Carriers") and supporting consumers during and after the enrollment period.  Through its expert guidance, tailored service, and technological excellence, GoHealth simplifies an important yet often confusing process for millions of seniors, making health insurance more accessible, less intimidating, and more responsive to each consumer's individual medical needs.

GoHealth began as a provider of lead management software and certain digital services to independent health brokers.  Over time, the Company shifted its focus from providing software solutions, including real-time quoting and enrollment technology, to independent insurance brokers, to building a

---

[3]   Excludes such interests held by GoHealth, Inc.

1

direct-to-consumer, in-house health insurance marketplace.  This transition was accelerated by the passage of the Affordable Care Act (the "ACA") in 2010 and ultimately culminated in the Company's initial public offering in 2020.  GoHealth raised over $900 million in connection with its IPO filing, with an initial valuation of approximately $6.6 billion, making it one of the largest healthcare IPOs of the year.

Unfortunately, GoHealth's very success is what led to its challenges.  GoHealth's successful IPO and lucrative business model inspired a wave of new entrants into the field, escalating competitive pressure. In 2021, GoHealth raised an incremental $200 million of capital via an upsized credit facility, the proceeds of which would be deployed to, among other things, acquire high quality leads to grow market share in an increasingly competitive healthcare marketplace landscape.  The Company's ability to service this increased debt burden was premised on, among other things, certain assumptions regarding the length of time individuals will remain in a given insurance plan.  Unfortunately, these assumptions proved incorrect due to unforeseen shifts in the market and consumer behavior, and GoHealth struggled to generate the cash necessary to service its debt.

As a result, GoHealth entered into several amendments with its lenders at the time, which in pertinent part resulted in an increase in the Company's interest rate and tightened covenants.  At the same time, the increase in LIBOR, which followed the general inflationary pressures in the post-COVID environment, increased the Company's debt service obligations.  In the aggregate, these forces resulted in the Company's interest rate more than doubling while its overall funded debt balance significantly increased.

The Company proactively addressed these challenges throughout the next several years.  *First*, in 2022, the Company raised approximately $50 million of additional capital by issuing the GoHealth, Inc. Preferred Stock through a private investment in public equity ("PIPE") transaction supported by certain of its largest customers.  *Second*, later in 2022, the Company designed and implemented its Non-Agency Business, which consisted of two primary revenue streams:  (a) marketing and administrative service fees provided by the Carriers to the Company to facilitate acquisition of new consumers; and (b) a one-time, upfront qualification fee from a Carrier upon placement of a new consumer in a health insurance policy. As part of the growth of the Non-Agency Business, in 2023, GoHealth hired and trained a significant number of agents to write Non-Agency Business ahead of the 2024 annual enrollment period ("AEP"), which occurs every year from October 15th to December 7th.

This strategy was initially successful, generating significant revenue and cash and ultimately enabling the Company to repay borrowings under its then-existing term loan facilities in March and October of 2024.  Despite its early success, unfortunately, this business could not be sustained.  With the rising cost of health care outpacing increases in government reimbursement rates, the Carriers were now required to pay for increasingly expensive health care coverage for consumers for whom the Carriers had already paid significant amounts to acquire via the Non-Agency Business model.  Additionally, increased pressure from the Centers for Medicare and Medicaid Services ("CMS") toward Medicare Advantage ("MA") health plans, such as implementation of updated condition risk score rules that affect payments to plans and providers in addition to continued legal risks related to how providers previously coded and billed for patient services under their MA health plans, led to increased challenges for Carriers who had been growing membership in their MA portfolios.  These risks and imbalances led Carriers to scale back significantly on the Non-Agency Business, reduce their marketing spend, and lessen broker distribution of certain high-cost insurance plans, all of which reduced demand for GoHealth's Non-Agency Business and impaired GoHealth's business model.

During the 2024 AEP, GoHealth did write a significant amount of new business; however, the portion of this new business attributable to the Non-Agency Business was smaller than anticipated.  Instead, the vast majority of the new business written in the 2024 AEP was Agency Business, which consists of a

much lower upfront commission with renewal commissions received each year a participant re-enrolls (such commissions, the "Backbook Asset"). The year-one commission for Agency Business is significantly less than GoHealth's cost to acquire a consumer ("CAC"). Moreover, fewer Carriers provided sufficient marketing dollars (which Carriers contribute to reach and access high-quality leads) to offset the Company's CAC. The aggregate result of these shifts was that, while the Company's Backbook Asset increased significantly, its projected liquidity in the first quarter (when year-one commissions for policies placed during the AEP are typically paid) of 2025 was significantly less than forecasted.

On May 1, 2025, the United States Department of Justice filed a Complaint-in-Intervention (the "DOJ Complaint") under the False Claims Act and Anti-Kickback Statute against a number of health insurance companies and brokers, including GoHealth.[4] The DOJ Complaint generally alleges, among other things, that from 2016 through at least 2021, the defendant insurers paid kickbacks to the defendant health insurance brokers in the form of administrative, or marketing, payments in exchange for enrolling consumers into the insurers' MA plans. The DOJ Complaint further alleges that the defendant insurers and health insurance brokers discriminated against certain Medicare beneficiaries (beneficiaries under the age of 65). GoHealth denies the allegations in the DOJ Complaint and will continue to vigorously defend the allegations. As of the Petition Date, all defendants had filed answers to the DOJ Complaint, and the parties were in the early stages of discovery. GoHealth has expended—and expects to continue expending—meaningful time and financial resources defending the DOJ Complaint, placing additional strain on its already constrained liquidity position. The Company's diminished liquidity projection led to a going concern disclosure in the notes to its Form 10-Q for the second quarter of 2025.

In response to these pressures, the Company explored various financing opportunities, including a securitization of its Backbook Asset. These efforts ultimately were unsuccessful.

In June 2025, the Company engaged Kirkland & Ellis LLP ("Kirkland") and Alvarez & Marsal North America, LLC ("A&M"), among others, to assist with its strained liquidity position, upcoming June 30, 2025 maturity of its revolving credit facility, and marketplace uncertainty from the going concern disclosure. The Company, with the assistance of its advisors, immediately engaged with its revolving and term loan lenders to address the upcoming maturity. These negotiations culminated in execution of the 13th amendment to the First Lien Credit Agreement (the "13th Amendment"), which, importantly, extended the maturity of the revolving credit facility to September 30, 2025, sent a message of stability to the market and the Carriers, and provided crucial financial covenant relief to allow the Company some, but not much, time to pursue strategic alternatives.

After execution of the 13th Amendment the Company and its prepetition lenders immediately began engaging on the terms of a longer-term solution to the Company's liquidity situation.

Following months of negotiations, the Company and its lenders entered into a $115 million super-priority credit agreement on August 6, 2025, which provided $82 million of new capital and rolled up approximately $35 million of loans outstanding under the Company's revolving credit facility. Concurrently therewith, such parties executed the 14th amendment to the First Lien Credit Agreement (the "14th Amendment"), which, among other things, terminated all revolving commitments, further extended the maturity of the revolving credit facility to August 5, 2029, permitted the Company to pay-in-kind a portion of the interest on the outstanding term loans and/or revolving loans, waived the amortization of the existing term loans until December 31, 2026, provided various forms of covenant relief, and allowed for incurrence of the Super-Priority Term Loan Facility. Importantly, these changes provided the Company with the liquidity and covenant flexibility necessary to secure financial statements free of a going concern

---

[4]    *See United States ex rel. Andrew Shea v. eHealth, Inc*, No. 1:21-cv-11777-DJC (D. Mass. Nov. 2, 2021).

qualification in its third quarter Form 10-Q filed on August 12, 2025, an important show of stability going into the 2025 AEP.

On the closing date of the Super-Priority Term Loan Facility, GoHealth appointed three new independent directors, Alan Carr, Timothy Pohl, and William Transier, and created a new four-member committee (the "Transformation Committee") responsible for overseeing the evaluation of strategic alternatives, including a potential merger or sale transaction, among other tasks.

Additionally, on September 27, 2025, the Company hired Moelis & Company ("Moelis") to assist with its evaluation of strategic alternatives. Shortly thereafter, the Company, with Moelis's assistance, and monitored by the Transformation Committee, launched a strategic transaction process to explore potential merger options with certain select counterparties.

While the marketing and sale process was ongoing, the Company continued to take steps to improve business performance by addressing the altered health insurance landscape. Based on ongoing discussions with the Carriers, it became clear that the Non-Agency Business and the related Carrier marketing spend were likely to remain modest and thus not contribute meaningfully to the 2025 AEP. As a result, the Company focused on reducing its CAC and expanding into other potentially more lucrative insurance fields, such as Special Needs Plans and final expense insurance, as well as dedicating resources to retain policies with existing consumers underlying the Backbook Asset. The Company also initiated several reductions in force in recognition of its constrained liquidity profile and limitations on its ability to write new business.

The 2025 AEP was relatively successful, particularly in light of the market-related and company-specific challenges that GoHealth faced. The Company demonstrated operational resilience, achieving very strong customer retention throughout the 2025 AEP period with limited overhead costs. However, questions remained about the Company's long-term sustainability.

The Company continued to pursue its marketing process for a potential merger during the 2025 AEP and for several months thereafter. By late February 2026, the potential transactions the Company was exploring seemed less likely to come to fruition in the near-term. As a result, the Company pivoted conversations away from a third-party transaction to a potential change of control transaction.

The Company secured an unqualified audit opinion in connection with its 2025 Form 10-K filed on March 31, 2026, and did not forecast any covenant or payment defaults in the upcoming 12-month period. As a result, the Company did not face a near-term trigger compelling it to transact with the lenders or to take action to protect itself against potential creditor remedies. Rather, the Company made clear that if the lenders sought to execute a change of control transaction at the time, they had to provide an appropriate recovery for junior stakeholders.

Following lengthy negotiations, the Company reached an agreement in principle with 100% of its prepetition lenders, the holders of 61% of the outstanding GoHealth, Inc. Class A Common Stock, and the holders of more than 99% of the outstanding GoHealth Holdings Interests[5] on the terms of a holistic restructuring transaction, which terms are set forth in the Plan. The Plan contemplates, among other things,

- issuance of a $20 million exit facility that will, among other things, fund the Equity Recovery Pool;

_____

[5] Excludes such interests held by GoHealth, Inc.

- conversion of approximately $173.9 million of loans under the Super-Priority Credit Agreement into second-out term loans and the conversion of approximately $588.3 million of loans under the First Lien Credit Agreement into third-out term loans; [6]

- reinstatement of general unsecured claims;

- reinstatement of preferred equity interests; and

- a $10 million cash recovery for holders of the Company's common equity interests (the "Equity Recovery"); and

- customary Debtor and third party releases, subject to the Investigation.

The Debtors seek to proceed through these chapter 11 cases expeditiously to allow the Company to focus on its core business operations and emerge from bankruptcy well ahead of the start of the 2026 AEP and the critical pre-AEP period, which begins annually on August 1. The pre-AEP period is vitally important to position the Company for success during its significant revenue-generating and cash flow protective period. During this time, agents become familiar with health plan updates and get trained and re-certified to interact with existing beneficiaries and potential new consumers; each agent's goal is to support a high-quality shopping experience focused on either retaining consumers in their existing plan or helping them enroll in a new plan during AEP that follows shortly thereafter. As a result, the Company is seeking a combined disclosure statement and confirmation hearing 39 days after the Petition Date.

GoHealth's ability to successfully navigate through the upcoming AEP—as it has for the last almost two decades—hinges on its financial strength, uninterrupted operational excellence, and its reputation in the market. Implementing the transactions set forth in the Plan (the "Restructuring Transactions") will position GoHealth for success ahead of the 2026 AEP and, most importantly, protect critical Carrier and customer relationships.

> **FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS AND/OR INTERESTS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly-situated equity holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

---

[6] Prior to the Petition Date, the prepetition lenders executed a commitment letter regarding the provision of the new money loans.

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.     Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires that the Debtors prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such Disclosure Statement with all Holders of Claims and/or Interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.     Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?**

By sending this Disclosure Statement and soliciting votes for the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases.  The Bankruptcy Court will consider final approval of this Disclosure Statement together with Confirmation of the Plan at the same hearing, which may be scheduled as soon as 39 days after commencing the Chapter 11 Cases, all subject to the Bankruptcy Court's approval and availability.

**D.     Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Super-Priority Loan Claims | Impaired | Entitled to Vote |
| Class 4 | First Lien Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | GoHealth Holdings Interests | Impaired | Entitled to Vote |
| Class 7 | GoHealth, Inc. Preferred Stock | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 8 | GoHealth, Inc. Class A Common Stock | Impaired | Entitled to Vote |
| Class 9 | GoHealth, Inc. Class B Common Stock | Impaired and Receiving No Distribution | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Intercompany Claims | Unimpaired / Impaired and | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| | | Receiving No Distribution | |
| Class 11 | Intercompany Interests | Unimpaired / Impaired and Receiving No Distribution | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth above in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest, as applicable, in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth therein shall apply separately to each of the Debtors (to the extent applicable). All of the potential Classes for the Debtors are set forth in the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

### E.      What is the deadline to vote on the Plan?

For Holders of Claims in Class 3 and Class 4, the voting deadline with respect to the Plan (the "Lender Voting Deadline") is May 19, 2026, at 6:00 p.m. (prevailing Eastern Time). For all Holders of Interests in Class 6 and Class 8, the voting deadline with respect to the Plan (the "Interests Voting Deadline," and together with the Lender Voting Deadline, the "Voting Deadlines") is July 8, 2026, at 4:00 p.m. (prevailing Eastern Time).

### F.      How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and/or Interests that are entitled to vote on the Plan (the "Ballots"). Holders of Claims and Interests in Classes 3, 4, and 6 can return their Ballot by mail or by completing the Ballot via the online e-Ballot portal at https://www.bankruptcy.angeiongroup.com/gohealthvote. Holders of Claims in Class 8 should follow the instructions provided by their Nominee regarding the return of their Ballots.

For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that the Ballot containing your vote is **actually received** by the Solicitation Agent **on or before the applicable Voting Deadline,** *i.e.*, **May 19, 2026, at 6:00 p.m., prevailing Eastern Time for Holders of Claims in Class 3 or Class 4 or July 8, 2026, at 4:00 p.m., prevailing Eastern Time, for Holders of Interests in Class 6 or Class 8.**

### G.      Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. Shortly after the commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy

Court schedule the Confirmation Hearing, at which time the Debtors will seek, among other things, Confirmation of the Plan.  At the Confirmation Hearing, the Debtors will also seek Bankruptcy Court approval of this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and that the Debtors shared this Disclosure Statement with all Holders of Claims and Interests whose votes on the Plan are being solicited.  All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**H.      What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is to seek approval of the Plan and this Disclosure Statement.  If so approved, the Bankruptcy Court will have held that this Disclosure Statement has provided the Voting Classes with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**I.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Solicitation Agent, Donlin, by calling (877) 583-1578 (Toll free from US / Canada) OR +1 (332) 284-1398 (International), or e-mailing ghiinfo@angeiongroup.com with "GoHealth, Inc." in the subject line.  Copies of the Plan, this Disclosure Statement, and any other publicly-filed documents in the Chapter 11 Cases are available free of charge, as applicable, by:  (a) visiting the Debtors' restructuring website when made public; (b) emailing ghiinfo@angeiongroup.com (with "GoHealth, Inc." in the subject line); or (c) calling the Solicitation Agent at the number(s) listed above.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases by visiting the Bankruptcy Court's website at https://www.deb.uscourts.gov or the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours 8:00 a.m. to 4:00 p.m., prevailing Eastern Time.

**J.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court, or otherwise.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION**

8

**OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[7]**

| | | SUMMARY OF ESTIMATED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated Recovery under the Plan |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, shall either: (i) receive payment in full in Cash; (ii) have its Allowed Other Secured Claim Reinstated; or (iii) receive such other treatment that renders its Allowed Other Secured Claim Unimpaired. | $0 | 100% |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date (or, if payment is not then due, in accordance with such Allowed Other Priority Claim's terms in the ordinary course of business), each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, treatment consistent with section 1129(a) of the Bankruptcy Code. | $0 | 100% |
| Class 3 | Super-Priority Loan Claims | Except to the extent that a Holder of an Allowed Super Priority Loan Claim agrees to less favorable treatment of its Allowed Super Priority Loan Claim, on the Effective Date, each Holder of an Allowed Super Priority Loan Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Super Priority Loan Claim, its Pro Rata share of the Senior Takeback Debt. | $173,923,593 | 100%[8] |

---

[7]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

[8]   Recovery under the Plan includes estimated cash collections (interest received and excess cashflow sweeps recovered) during the projection period (July 2026 - December 2029), cash as of December 2029, and an estimate of recoveries of the remaining anticipated future commissions less any amounts payable to Downline Partners after December 2029 using an expected expense ratio. These amounts do not account for the present value of those cash flows being received over time.

| | | SUMMARY OF ESTIMATED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated Recovery under the Plan |
| Class 4 | First Lien Claims | Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment of its Allowed First Lien Claim, on the Effective Date, each Holder of an Allowed First Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed First Lien Claim, its Pro Rata share of: (i) the Junior Takeback Debt; and (ii) the New Common Interests, subject to dilution, if any, on account of the Management Incentive Plan. Notwithstanding the foregoing, to the extent that a Holder of an Allowed First Lien Claim that is a member of the Ad Hoc Revolver Group advises the Debtors in writing no less than five (5) Business Days prior to the Effective Date that it declines receipt of its Pro Rata share of the New Common Interests, such declined New Common Interests shall be re-allocated pro rata among the members of the Ad Hoc Revolver Group that do not decline receipt of the New Common Interests. | $598,275,099 | Greater than 0% to 19%[9] |
| Class 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date (or, if payment is not then due, in accordance with such Allowed General Unsecured Claim's terms in the ordinary course of business), each Holder of an Allowed General Unsecured Claim shall, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, and at the option of the Debtors, with the consent of the Required Lenders, or the Reorganized Debtors: (i) have its Allowed General Unsecured Claim Reinstated; or (ii) receive payment in full in Cash on the date any payment is due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to, or the agreement governing, such Allowed General Unsecured Claim. | $45,561,738 | 100% |

---

[9] Recovery under the Plan includes estimated cash collections from the remaining anticipated future commissions less any amounts payable to Downline Partners after December 2029 using an expected expense ratio after repayment of the Super-Priority Loan Claims class. These amounts do not account for the present value of those cash flows being received over time.

| | | SUMMARY OF ESTIMATED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated Recovery under the Plan |
| Class 6 | GoHealth Holdings Interests | Except to the extent that a Holder of an Allowed GoHealth Holdings Interest agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed GoHealth Holdings Interest shall receive, in full and final satisfaction of such Interest, its Specified Pro Rata Share of the Equity Recovery Pool.[10] | N/A | Pro Rata Distribution of $10,000,000[11] |
| Class 7 | GoHealth, Inc. Preferred Stock | Except to the extent that a Holder of Allowed GoHealth, Inc. Preferred Stock agrees to less favorable treatment, on the Effective Date, all Allowed GoHealth, Inc. Preferred Stock shall be Reinstated and converted to GoHealth Preferred Interests. | $56,886,294 | Reinstated |
| Class 8 | GoHealth, Inc. Class A Common Stock | Except to the extent that a holder of Allowed GoHealth, Inc. Class A Common Stock agrees to less favorable treatment, on the Effective Date, each Holder of Allowed GoHealth, Inc. Class A Common Stock (except, for the avoidance of doubt, Holders of such Interests that are Debtors) shall receive, in full and final satisfaction of such Interest, its Specified Pro Rata Share of the Equity Recovery Pool.[12] | N/A | Pro Rata Distribution of $10,000,000[13] |
| Class 9 | GoHealth, Inc. Class B Common Stock | On the Effective Date, all GoHealth, Inc. Class B Common Stock shall be cancelled, released, discharged, extinguished, and of no further force or effect, and Holders of such GoHealth, Inc. Class B Common Stock shall receive no distribution. | N/A | 0% |
| Class 10 | Intercompany Claims | On the Effective Date, each Allowed Intercompany Claim shall be, at the option of the Debtors, with the consent of the Required Lenders, or the Reorganized Debtors: <br> (i)     Reinstated; <br> (ii)    adjusted, converted to equity, set off, settled, distributed, or contributed; <br> (iii)   discharged, cancelled, and released without any distribution on account of such Allowed Intercompany Claims; or | $4,084,462 | 0% to 100% |

---

[10]   Pursuant to the Plan, each Holder of GoHealth, Inc. Class A Common Stock or GoHealth Holdings Interests that is also a lender under the First Lien Credit Agreement or Super-Priority Credit Agreement shall waive its right to recover its Specified Pro Rata Share of the Equity Recovery Pool.

[11]   Recovery is Pro Rata Distribution of $10 million; *see* Article III.B of the Plan.

[12]   Pursuant to the Plan, each Holder of GoHealth, Inc. Class A Common Stock or GoHealth Holdings Interests that is also a lender under the First Lien Credit Agreement or Super-Priority Credit Agreement shall waive its right to recover its Specified Pro Rata Share of the Equity Recovery Pool.

[13]   Recovery is Pro Rata Distribution of $10 million; *see* Article III.B of the Plan.

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated Recovery under the Plan |
| | | (iv) otherwise addressed at the option of the Debtors, with the consent of the Required Lenders, or the Reorganized Debtors. | | |
| Class 11 | Intercompany Interests | On the Effective Date, each Allowed Intercompany Interest shall be at the option of the Debtors, with the consent of the Required Lenders, or the Reorganized Debtors: <br> (i) Reinstated; <br> (ii) adjusted, converted to equity, set off, settled, distributed, or contributed; <br> (iii) discharged, cancelled, and released without any distribution on account of such Intercompany Interests; or <br> (iv) otherwise addressed at the option of the Debtors, with the consent of the Required Lenders, or the Reorganized Debtors. | N/A | 0% to 100% |

1. **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan or the Plan Supplement shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

2. **Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

3. **Voting Classes, Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

4. **Intercompany Interests.**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience to maintain the prepetition corporate structure, and for the ultimate benefit of the Holders of the New Common Interests in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, unless otherwise set forth in the Restructuring Transactions Memorandum, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned

by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

5. **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan with the consent of the Required Lenders to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

6. **Controversy Concerning Impairment.**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

7. **Subordinated Claims and Interests.**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

K. **What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1. **Administrative Claims**.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim (including Claims of the type described in section 503(b)(9) of the Bankruptcy Code), in full and final satisfaction of its Allowed Administrative Claim, shall be paid in full in Cash, in accordance with the following: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably

13

practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**2.     Professional Fee Claims**.

**(a)     Final Fee Applications and Payment of Professional Fee Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund on the Effective Date with Cash equal to the Professional Fee Amount, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

**(b)     Professional Fee Escrow Account**.

No later than the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to, action, order, or approval of the Bankruptcy Court.

**(c)     Professional Fee Amount**.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

14

**(d)      Post-Confirmation Fees and Expenses**.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, or 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. A good faith estimate of the fees owed to Professionals incurred following the Confirmation Date through the Effective Date shall be included in the Professional Fee Escrow Account and paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, that such estimate shall not be deemed to limit the amount of fees and expenses actually incurred by such Professionals.

**3.      Priority Tax Claims**.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, on the Effective Date, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**4.      Payment of Restructuring Expenses**.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth in the Plan, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course (but no later than within ten (10) Business Days of receipt of an invoice), Restructuring Expenses related to implementation, Consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date in accordance with, if applicable, the respective engagement letter or fee letter and the Cash Collateral Orders, and solely upon receipt of an invoice from any Entity requesting such Restructuring Expenses with reasonable detail (but without the need for time detail). On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

**L.      Why are Holders of GoHealth, Inc. Class A Common Stock and Holders of GoHealth, Inc. Class B Common Stock receiving different recoveries under the Plan?**

GoHealth, Inc. is a holding company that operates and conducts business through GoHealth Holdings, LLC in an organizational structure commonly referred to as an umbrella

partnership-C-corporation ("Up-C") structure. Pursuant to such Up-C structure, GoHealth, Inc. is a holding company that holds a majority of the outstanding GoHealth Holdings Interests and is the sole managing member of GoHealth Holdings, LLC, while certain GoHealth Holdings Interests are held by other members. Pursuant to its Up-C structure, GoHealth, Inc. has two series of common stock, GoHealth, Inc. Class A Common Stock, having one vote per share and economic rights, and GoHealth, Inc. Class B Common Stock, having one vote per share and no economic rights. Shares of GoHealth, Inc. Class B Common Stock were issued to holders of GoHealth Holdings Interests (other than GoHealth, Inc.) in an equal number to their outstanding GoHealth Holdings Interests. GoHealth, Inc's and GoHealth Holdings, LLC's respective organizational documents require that GoHealth, Inc. and GoHealth Holdings, LLC continue to maintain a one-to-one ratio between the number of shares of GoHealth, Inc. Class B Common Stock and the number of GoHealth Holdings Interests owned by such holders and their respective permitted transferees.

Because Holders of GoHealth, Inc. Class B Common Stock have no prepetition rights to dividends or distributions or other economic rights at GoHealth, Inc. whereas Holders of GoHealth Holdings Interests and GoHealth, Inc. Class A Common Stock both have prepetition economic rights, the recoveries provided under the Plan are consistent with the prepetition rights of GoHealth Holdings Interests, the GoHealth, Inc. Class A Common Stock, and the GoHealth, Inc. Class B Common Stock. Specifically, because GoHealth, Inc. Class B Common Stock has no economic rights, Holders of such Interests are not receiving a recovery under the Plan with respect to their GoHealth, Inc. Class B Common Stock, but will receive their Pro Rata share of the Equity Recovery Pool in respect of their GoHealth Holdings Interests, because such interests have prepetition economic rights. Holders of GoHealth, Inc. Class A Common Stock have prepetition economic rights, and thus will receive their Pro Rata share of the Equity Recovery Pool.

**M.     What is the TRA Amendment?**

GoHealth, Inc., GoHealth Holdings, LLC, CB Blizzard Co-Invest Holdings, L.P., CCP III AIV VII Holdings, L.P., and each of the members of GoHealth Holdings, LLC are party to that certain tax receivable agreement, dated July 15, 2020 (the "TRA"). Pursuant to the TRA, certain non-Company parties to the TRA are entitled to receive payments equal to 85% of the amount of tax benefits, if any, that the Company actually realizes (or in some circumstances, is deemed to realize) as a result of the utilization of certain tax attributes. In addition, a Change in Control (as defined in the TRA) triggers an early termination payment (the "Early Termination Payment"). The TRA Amendment is a core component of the Agreement reflected in the Plan. Through the TRA Amendment, the Debtors and their supporting stakeholders, including certain other parties to the TRA, seek to amend the TRA so that (a) Consummation of the Plan does not trigger a Change of Control and any associated Early Termination Payment and (b) no future payments may be made pursuant to the TRA if such payment is not permitted under, or would result in a breach of or an event of default under, any credit agreement or other financing arrangement of the Company or its subsidiaries. The execution of the TRA Amendment was a key part of the agreement that resulted in, among other things, the funding of the Equity Recovery Pool.

**N.     Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory or other approvals are required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**O.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide Holders of

Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, see Article VIII.B of this Disclosure Statement and the Liquidation Analysis attached hereto as **Exhibit C**.

**P.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived before the Plan can go effective.  Initial distributions to Holders of Allowed Claims and Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  "Consummation" of the Plan refers to the occurrence of the Effective Date.

**Q.      What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors shall fund or make distributions under the Plan, as applicable, with:  (1) the Debtors' cash on hand, (2) the Exit Facility, and (3) the New Equity Interests.  *See* Article VII.A.4 of this Disclosure Statement, entitled "Sources of Consideration for Plan Distributions."

**R.      Are there risks to owning the New Equity Interests upon the Debtors' emergence from chapter 11?**

Yes.  *See* Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**S.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* Article VIII.C.7 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article X.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**T.      What is the Management Incentive Plan ("MIP") and how will it affect the distribution I receive under the Plan?**

Following the Effective Date, the New Board shall adopt and implement a management incentive plan, which may provide for the grants of cash-based awards and/or equity or equity-based awards with respect to New Common Interests to employees, directors, consultants, and other service providers of the Reorganized Debtors, as determined at the discretion of the New Board in consultation with the Chief Executive Officer of the Reorganized Debtors.  Any New Common Interests issued under the MIP will dilute other New Common Interests issued under the Plan.

The terms and conditions of the Management Incentive Plan, including any and all awards granted thereunder, shall be determined by the New Board in consultation with the Chief Executive Officer of the Reorganized Debtors, including with respect to the participants, allocation, timing and the form and structure and extent of issuance and vesting.

**U.     Does the Plan preserve Causes of Action?**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**V.     Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' release, Third-Party Release, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Released Parties and the Exculpated Parties in obtaining their support for the Restructuring Transactions and the Plan.

18

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

You may choose to opt in to the Third-Party Release. If you opt in to the Third-Party Release, you will receive a release from the Releasing Parties.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" IN THE PLAN AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE AGENTS; (D) ALL HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4 WHO VOTE TO ACCEPT THE PLAN; (E) ALL HOLDERS OF INTERESTS IN CLASS 6 AND CLASS 8 AFFIRMATIVELY OPT IN TO THE RELEASES SET FORTH IN THE PLAN; (F) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ARE PRESUMED TO ACCEPT THE PLAN AND AFFIRMATIVELY OPT IN TO THE RELEASES SET FORTH IN THE PLAN; (G) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ARE DEEMED TO REJECT THE PLAN AND AFFIRMATIVELY OPT IN TO THE RELEASES SET FORTH IN THE PLAN; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH CLAUSE (I); AND (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH CLAUSE (H) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN.** [14]

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

### 1.    Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or

---

[14] For the avoidance of doubt, unless expressly indicated on a Ballot voting to accept the Plan, the members of the Ad Hoc Revolver Group participating in the Plan are doing so only in their capacity as holders of Super-Priority Loan Claims and/or First Lien Claims as of the Petition Date, and any actions taken by a member of the Ad Hoc Revolver Group in connection with the Plan and the Restructuring Transactions as well as any releases provided in connection with the Plan are only with respect to such lender's interest in the Super-Priority Loan Claims or First Lien Claims that are now owned or subsequently acquired by such member of the Ad Hoc Revolver Group. In addition, the provisions of the Plan shall only apply to such trading desk(s), fund(s), account, branch, Affiliate(s), unit and/or business group(s) that have a beneficial interest in such Claim and shall not apply to any other trading desk(s), fund(s), account, branch, Affiliate(s), unit and/or business group(s) of the members of the Ad Hoc Revolver Group, which, so long as they are not acting at the direction of or for the benefit of such member of the Ad Hoc Revolver Group or such Ad Hoc Revolver Group member's investment in the Debtors, will not be considered "Releasing Parties" or "Released Parties" under the Plan.

Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action (including any Causes of Action or Claims based on theories or allegations of successor liability) that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided in the Plan, any default or "event of default" by the Debtors or their non-Debtor Affiliates with respect to any Claim or Interest existing immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any GoHealth, Inc. Preferred Stock or Intercompany Interests that are Reinstated), subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

### 2. Release of Liens.

**Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim or any related Claim that may be asserted against a non-Debtor Affiliate, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder, including the Agents) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim or claim against a non-Debtor Affiliate (and the applicable agents for such Holder, including the Agents) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or non-Debtor Affiliate (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment**

of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

        3.        **Releases by the Debtors**.

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, as of the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, their Estates, and the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, and the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the Debtors' in or out-of-court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Cash Collateral Orders, the Confirmation Order, any other Definitive Document, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facilities, the Exit Facility Documents, the New Equity Interests, any other Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Plan, the Disclosure Statement, the Cash Collateral Orders, the Plan Supplement, or any other Definitive Document, or any Restructuring Transaction, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement under the Restructuring Transactions, or

21

upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing Debtor Release, the Debtor Release set forth above does not release (1) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (2) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement; or (3) any Released Party from actual fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4. **Releases by the Releasing Parties**.

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, and their Estates (as applicable) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Debtors' in or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Cash

22

**Collateral Orders, the Confirmation Order, any other Definitive Document, the formulation, preparation, dissemination, negotiation, or filing of the Plan, the Disclosure Statement, the Plan Supplement, the Exit Facilities, the Exit Facility Documents, the New Equity Interests, any other Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Plan, the Disclosure Statement, the Cash Collateral Orders, or the Plan Supplement, any other Definitive Document, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing Third-Party Release, the Third-Party Release set forth above does not release (1) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan; (3) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement; or (4) any Claims against a Released Party arising from actual fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release, except as provided therein.**

**5.      Exculpation**.

**Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan, Disclosure Statement, the Plan Supplement, the Exit Facilities, the Exit Facility Documents, the New Equity Interests, the Cash Collateral Orders, any other Definitive Document, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Plan, the Disclosure**

Statement, the Cash Collateral Orders, the Plan Supplement, the negotiation and pursuit of the Definitive Documents, the Plan Supplement, the pursuit of Confirmation, the pursuit of Consummation, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes to accept or reject the Plan and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions will not, be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder. In addition, notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

6.      Injunction.

Except as otherwise specifically provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests or Causes of Action that have been released, discharged, settled, or are subject to exculpation under the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (4) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such Entities or against the property of such Entities, in each case, on account of or in connection with or with respect to any such Causes of Action, Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims or Interests released, discharged, subject to exculpation, or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim

24

**by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action released, discharged, settled, or that is subject to Article VIII.C, Article VIII.D, and Article VIII.E of the Plan, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### W. Does the Bankruptcy Code protect against discriminatory treatment?

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### X. Will the Company retain documents after any Effective Date?

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

### Y. What is the effect of Reimbursement or Contribution?

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### Z. What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date, which is the date on which (1) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (2) the Plan is declared effective by the Debtors. On or after the Effective Date, and except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, the Reorganized Debtors may operate

their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan (including the Restructuring Transaction Memorandum and the other documents contained in the Plan Supplement), the Plan Supplement, or the Confirmation Order, regardless of whether taken before, on, or after the Effective Date will be deemed authorized and approved by the Bankruptcy Court in all respects.

AA.     **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the current members of the board of directors of GoHealth, Inc. shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the New Organizational Documents. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Except to the extent that a current director on the board of directors or applicable Governing Body of the Debtors is designated to serve as a director, manager, or sole manager of a Reorganized Debtor, the current directors or managers on the board of directors or other Governing Body, or any sole manager, of the Debtors prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Debtors on or after the Effective Date, and such director shall be deemed to have resigned or shall otherwise cease to be a director of the Debtors on the Effective Date. Each of the directors, managers, sole managers, and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced, or removed in accordance with such New Organizational Documents.

Assuming that the Effective Date occurs, Holders of Allowed First Lien Claims that receive distributions representing a substantial percentage of outstanding shares of the New Common Interests may be in a position to influence matters requiring approval by the holders of shares of New Common Interests, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

BB.     **Could subsequent events potentially affect recoveries under the Plan**?

Potentially, yes. Any number of subsequent events may interfere with the Plan recoveries.

CC.     **Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Restructuring Transactions provide for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative. The Debtors believe that the Restructuring Transactions, which contemplate a significant deleveraging of the Debtors' balance sheet and will allow them to emerge from chapter 11 expeditiously, are in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under and pursuant to the Plan.

DD.     **Who Supports the Plan?**

*As of the Petition Date, the Plan is supported by the Debtors, Holders of 100 percent of Class 3 Super-Priority Loan Claims, Holders of 100 percent of Class 4 First Lien Claims, Holders of 99.45 percent Class 6 GoHealth Holdings Interests, and Holders of 61 percent Class 8 GoHealth, Inc. Class A Common Stock*. The Debtors are also soliciting the acceptance or rejection of the Plan by the

26

Company's remaining Holders of Class 6 GoHealth Holdings Interests and Class 8 GoHealth, Inc. Class A Common Stock, which may support the Plan and the Restructuring Transactions.

## IV.   CORPORATE HISTORY AND BUSINESS OPERATIONS.

### A.   Corporate History.

GoHealth was founded by Brandon Cruz and Clinton Jones (the "Founders") in Chicago, Illinois in 2001, originally under the name Norvax, Inc. Recognizing that health insurance was often confusing and difficult to navigate, the Founders sought to leverage technology to cut through the confusion. GoHealth initially focused on providing lead management software and other digital solutions, such as website creation, to independent health insurance brokers. In 2004, GoHealth developed proprietary real-time quoting and enrollment technology that enabled independent insurance brokers to show customers more plan options more quickly. GoHealth's mission was simple: improve access to health insurance by making it more accessible, understandable, and easier to compare, optimize, and purchase plans.

Over time, GoHealth shifted its focus from software solutions for independent insurance brokers to building a direct-to-consumer, in-house health insurance marketplace—first, a consumer comparison site, and then, a full-service agency with its own agents on the beneficiary-facing frontlines. Beginning in 2008, GoHealth began to offer one-on-one agent consultations with prospective beneficiaries. Utilizing its proprietary, carrier-agnostic technology platform, GoHealth's licensed agents began to assist consumers with comparing available health insurance plans and finding the best plan for their specific needs. In 2012, to signal its new, consumer-focused approach, the Company rebranded both its direct-to-consumer and B2B business under one umbrella as "GoHealth."

Further, in 2012, GoHealth received a $50 million private equity investment, which fueled rapid market expansion, operational improvements, and technology development. In the same year, GoHealth gained federal government approval as a private health insurance exchange, which enabled the Company, in 2013, to become the first private health insurance marketplace to enroll consumers in plans that qualified for tax subsidies under the ACA. From there, GoHealth continued to successfully capitalize on favorable industry trends as well as the federal government's initiative to boost individual enrollment in health insurance and foster competition in the health insurance marketplace. In 2016, GoHealth independently entered the MA market, which it previously only served through its Downline Partners (as defined herein); MA would become—and still remains—GoHealth's primary product focus.

In late 2019, GoHealth received a large-scale investment that valued the company at $1.5 billion. Then, in 2020, GoHealth filed for an initial public offering on the NASDAQ exchange under the ticker symbol "GOCO" with a valuation of approximately $6.6 billion, successfully raising $914 million in one of the largest healthcare IPOs of the year.

Following the COVID-19 pandemic and the rapid adoption of technology in the healthcare space, GoHealth launched several new technology solutions to bolster its ability to enroll consumers in the best-suited health insurance plans and support them during and after enrollment. For example, in mid-2020, GoHealth launched its "Encompass" platform to centralize and enhance a consumer's experience partnering with GoHealth to evaluate and select the plan that best fits such consumer's needs. In 2022, the Company expanded the platform to further support and engage consumers in the end-to-end Medicare enrollment process. By supporting all Medicare services and leveraging best-in-class agents and insights learned from

years of serving millions of customers, the Encompass platform drove enhanced quality, higher consumer satisfaction, and a 20% improvement in overall retention.[15]

In 2023, GoHealth launched the "PlanFit" tool to bring consumers customized, analytics-driven assessments of their Medicare coverage options and further enable GoHealth's agents to match consumers with the best-suited plans. In connection with PlanFit, GoHealth created "PlanGPT," an AI-powered assistant that streamlines the plan comparison process by retrieving key information from very dense and lengthy plan documentation. In 2024, PlanGPT helped reduce the average call time between a customer and an agent by 10 minutes.[16]

Then, in early October 2024, GoHealth acquired e-Telequote, a Medicare insurance marketplace, significantly expanding GoHealth's distribution and operational capacity. As part of this acquisition, e-Telequote became one of GoHealth's Downline Partners under GoHealth's external agent channel, GoPartner Solutions (the "GPS Channel"), which allowed e-Telequote to continue operating as an independent agency while also having access to GoHealth's proprietary technology and numerous marketing channels.

### B. GoHealth's Business Operations.

GoHealth is a health insurance marketplace focused on matching consumers with the health plan best suited to their needs, for which GoHealth earns a commission. GoHealth also receives payments from Carriers for various administrative services that it performs in connection with its MA business. GoHealth maintains two distinct business models: the Agency Business and the Non-Agency Business. As discussed herein, each business model has multiple product and service offerings, and each operates through both the Company's Internal Agents as well as the Company's Downline Partners.

### 1. Agency Business.

GoHealth historically operated under the Agency Business model, pursuant to which GoHealth's agents generate commissions from the Carriers by enrolling consumers in health insurance plans and/or renewing existing enrollments.[17] Under the Agency Business, when a consumer decides to enroll in an MA plan through GoHealth, they are matched with one of GoHealth's internal licensed agents (the "Internal Agents") and then receive a "PlanFit Check-Up," utilizing GoHealth's proprietary PlanFit tool through the Encompass workflow. The PlanFit Check-Up is a holistic health and benefits assessment that generates a unique PlanFit Score, based on over 180 factors, for that customer. The Internal Agents will use the PlanFit Score to guide that customer to the right MA plan for his or her specific needs. Once a customer has selected a plan, the Internal Agent will assist the customer in enrolling in the plan by electronically submitting the required enrollment forms to the applicable Carrier.

---

[15]    "GoHealth Launches Expanded Encompass Solution as 2022 Medicare Annual Enrollment Period Begins" (2022); https://investors.gohealth.com/news-releases/news-release-details/gohealth-launches-expanded-encompass-solution-2022-medicare.

[16]    "GoHealth Helps Medicare Consumers Navigate Another Disruptive Annual Enrollment Period (AEP) With Personalized Guidance" (2025); https://www.gohealth.com/newsroom/press-releases/gohealth-helps-medicare-consumers-navigate-another-disruptive-annual-enrollment-period-aep-with-personalized-guidance/.

[17]    Most of the commissions revenue is generated through enrollment in MA plans; a small amount of GoHealth's commissions revenue derives from the sale of individual and family plan insurance products.

GoHealth receives an initial, one-time commission as a result of a new plan enrollment on which GoHealth is the Agent of Record.  Subsequent to a policy renewing, as long as the policyholder remains with the same insurance product, GoHealth receives a stream of monthly renewal commissions.

The Agency Business is seasonal, with increased enrollment activity occurring during AEP, making this 53-day period a critical time for enrolling new customers.  Despite receiving AEP submissions in the fourth quarter, the Company's AEP revenue does not begin converting into cash until the first quarter of the following year and continues to be collected as plans are renewed.  The next-highest enrollment period is typically January 1 through March 31, during the MA open enrollment period, with the second and third quarters being the lowest enrollment periods.  The renewal commissions, paid monthly, provide more cash collections stability.

GoHealth also contracts with external agents as part of the Agency Business (such parties, the "Downline Partners").  As described in more detail below, Downline Partners rely on their own marketing efforts to place consumers into healthcare plans, while having access to GoHealth's corporate infrastructure, technology, and resources.  When GoHealth completes a plan enrollment or renewal, through either an Internal Agent or a Downline Partner, GoHealth becomes the "Agent of Record," entitling the Company to a commission.

### 2. Non-Agency Business.

Under its Non-Agency Business, which the Company developed and implemented several years ago as part of an initiative to generate additional revenue, GoHealth engages with consumers through the Encompass workflow, assisting them to find the best health insurance plan for their needs.  Instead of facilitating plan enrollment themselves, GoHealth's Internal Agents or Downline Partners qualify the consumer as a fit for a particular MA plan and then transfer the consumer to the applicable Carrier, which then processes and submits the beneficiary's plan enrollment application directly to Medicare, with the Carriers acting themselves as the "Agent of Record."  In most Encompass relationships, the Carriers separately retain GoHealth through a business-process-outsourcing relationship to provide dedicated licensed agents to complete the enrollments on behalf of the specific Carrier.

When the Non-Agency Business was first put in place, the Carriers provided GoHealth with upfront funds to market policies and perform other administrative services in order to facilitate the acquisition of new customers.  GoHealth also earns a one-time, upfront qualification fee from the Carriers upon a new consumer's enrollment in a Carrier's health insurance policy.  In the aggregate, non-agency revenue from marketing and administrative service fees and qualification fees is larger than GoHealth's CAC and is paid prior to incurrence of the CAC for a given consumer or shortly thereafter.  GoHealth does not receive commissions on subsequent renewals for non-agency submissions and enrollments.  In 2025, the Non-Agency Business represented approximately 15% of GoHealth's total net revenue.

### (a) GoHealth Protect.

The Non-Agency Business includes "GoHealth Protect," GoHealth's suite of life insurance products designed to provide financial security and peace of mind for consumers, especially concerning end-of-life costs.  GoHealth launched GoHealth Protect in the first half of 2025 to complement GoHealth's Medicare offerings and diversify its revenue.  Beginning with a "final expense" offering—coverage designed to help families cover funeral and burial costs—GoHealth Protect also offers guaranteed life insurance acceptance, without the need for a diagnostic medical exam, making this critical insurance accessible to a broad range of people including those with pre-existing conditions.

During the third and fourth quarters of 2025, in light of decreasing demand for MA plans, the Company shifted a significant amount of its focus and resources to GoHealth Protect. Despite lower revenue on a per submission basis compared to Medicare products, such shift was expected to (i) reduce the seasonality of GoHealth's revenues by boosting revenue outside of the AEP, specifically during the second and third quarters of the year, (ii) provide a revenue cushion while demand for MA and other products continues to fluctuate; and (iii) increase agent utilization year-round.

Like other products in the Non-Agency Business, GoHealth is not the Agent of Record for GoHealth Protect enrollments, and the Company's obligation is complete when the life insurance carrier has received the enrollment. Cash is collected in close proximity to the point of sale of such plan, and in some instances, it may be funded in advance of marketing activities.

### (b)      Special Needs Plans ("SNPs").

GoHealth continues to invest in other product lines such as SNPs, which are condition-specific MA plans designed for beneficiaries with certain, generally chronic or otherwise severe, diseases and health or financial issues that make them dually eligible for Medicare and Medicaid. SNPs generally limit membership to individuals with one or more specific trait(s), which ensures that each plan is tailored to a specific medical or financial need. Like GoHealth Protect, incorporating SNPs allows GoHealth to utilize its agents more consistently throughout the year and to boost revenue outside of the AEP. SNP plans historically were sold by GoHealth through both the Agency and Non-Agency Business.

### 3.      Downline Partners.

GoHealth maintains an external agent channel, GoPartner Solutions, as part of both the Agency Business and the Non-Agency Business. Under the GPS Channel, GoHealth collaborates with the Downline Partners, offering them access to the Company's technology platform, health plan relationships, and support teams and enabling GoHealth to benefit from a broader consumer audience. Downline Partners rely on their own marketing efforts to identify consumers but otherwise have access to the Company's tools to help the consumer evaluate the health insurance plans. The Downline Partner either then refers the consumer to the Carrier directly, with the Carrier completing the enrollment and becoming the Agent of Record (pursuant to the Non-Agency Business), or the Downline Partner completes the enrollment for the Carrier, and GoHealth becomes the Agent of Record (pursuant to the Agency Business).

In either case, GoHealth remits a contractually agreed portion of the commission payments it receives to the applicable Downline Partner. Although GoHealth's Internal Agents generate the majority of GoHealth's revenues, the GPS Channel nevertheless represents a material portion of GoHealth's annual revenues.

### C.      GoHealth's Organizational Structure.

The Company's organizational structure consists of 16 corporate entities, eight of which are Debtors in these chapter 11 cases. Of the remaining entities, five are domestically domiciled and three are foreign domiciled—one in each of Slovakia, Pakistan, and Nicaragua. A comprehensive organizational chart is attached hereto as **Exhibit D**.

### D.      GoHealth's Prepetition Capital Structure.

As of the Petition Date, the Debtors have approximately $772 million in total funded debt obligations outstanding, including accrued and unpaid interest on the principal amount under each credit facility. The following table depicts the Debtors' prepetition capital structure.

| Type | Maturity | Approximate Amount Outstanding |
|---|---|---|
| *Secured Debt* | | |
| Super-Priority Term Loans | August 5, 2029 | $174 million[18] |
| First Lien Term Loans | November 4, 2029 | $598 million |
| *Total Funded Debt:* | | **$772 million** |
| *Equity Interests*[19] | | |
| GoHealth Holdings Interests | N/A | 29,302,494 shares |
| GoHealth, Inc. Preferred Stock | N/A | 50,000 shares |
| GoHealth, Inc. Class A Common Stock | N/A | 16,686,419 shares |
| GoHealth, Inc. Class B Common Stock | N/A | 12,616,075 shares |

### 1.      Super-Priority Credit Agreement.

On August 6, 2025, in conjunction with executing the 14th Amendment, the Debtors and certain of the lenders under the First Lien Credit Agreement (as defined below) entered into that certain superpriority senior secured credit agreement (and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Super-Priority Credit Agreement"), by and among Blizzard Midco, LLC, as the holding company, Norvax, LLC, as borrower, the lenders party thereto, and Blue Torch Finance, LLC, as the administrative and collateral agent.  The guarantors under the Super-Priority Credit Agreement include Blizzard Midco, LLC, Connected Benefits, LLC, GoHealth, LLC, ETQ Holdings, LLC, e-Telequote Insurance, Inc., and Norvax, LLC (other than with respect to its own Secured Obligations (as defined in the Super-Priority Credit Agreement)), and the Super-Priority Credit Agreement is secured by a senior first priority interest in the Prepetition Collateral (as defined below).

The Super-Priority Credit Agreement governs a senior secured super priority term loan, which primed the First Lien Term Loan Facility (as defined below), in an aggregate principal amount of $117 million (the "Super-Priority Term Loan Facility"), comprised of (i) $82 million in new-money term loans (the "Super-Priority New Money Term Loans"), of which (a) $40 million was funded upfront on the effective date of the Super-Priority Credit Agreement, (b) $40 million was available as delayed-draw term loans on or after October 1, 2025, subject to certain restrictions, and (c) $2 million of which was a 3% paid-in-kind closing payment added to the principal balance as of execution of the Super-Priority Credit Agreement and (ii) $35 million in roll-up term loans (together with the Super-Priority New Money Term Loans, the "Super-Priority Term Loans") resulting from the Revolving Loan Conversion (as defined below).

The Super-Priority Term Loans bear interest in cash at the rate of, at the Debtors' election, SOFR plus 5.50% or ABR plus 4.50% and mature on August 5, 2029.  In addition, the Super-Priority New Money Term Loans are subject to a 2.00x multiple-on-invested-capital (the "MOIC"), payable in cash upon partial or full repayment, prepayment, maturity, or acceleration of the Super-Priority Term Loans.  The MOIC steps down to 1.75x for repayments occurring between January 1, 2026 and April 1, 2027.  As of the Petition Date, the outstanding principal amount of the Super-Priority Term Loans, excluding the MOIC, is approximately $117.4 million.

---

[18]    This amount is inclusive of the principal amount of the MOIC Premium (as defined in the Super-Priority Credit Agreement).

[19]    As of May 12, 2026.

### 2.       First Lien Credit Agreement.

The Debtors are party to that certain credit agreement, dated as of September 13, 2019 (as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"),[20]  by and among Blizzard Midco, LLC, as the holding company, Norvax, LLC, as borrower, the lenders party thereto, and Blue Torch Finance, LLC, as the administrative and collateral agent.  The guarantors under the First Lien Credit Agreement are the same as those under the Super-Priority Credit Agreement.  The First Lien Credit Agreement provides for a first lien term loan facility (the "First Lien Term Loan Facility," and the obligations thereunder, the "First Lien Term Loans"), secured by a first priority lien on substantially all of the Debtors' assets (the "Prepetition Collateral").

Prior to the execution of the 14th Amendment on August 6, 2025, the First Lien Credit Agreement also provided for a revolving credit facility comprised of two classes of revolving commitments (the "Class A Revolving Credit Facility" and the "Class A-1 Revolving Credit Facility," respectively), each of which was fully drawn immediately prior to the 14th Amendment.  The 14th Amendment, which the Debtors entered into in conjunction with executing the Super-Priority Credit Agreement, terminated all commitments under the Class A-1 Revolving Credit Facility and the Class A Revolving Credit Facility.  Loans outstanding under the Class A Revolving Credit Facility as of the effective date of the 14th Amendment were converted dollar-for-dollar into First Lien Term Loans under the First Lien Credit Agreement, and loans outstanding under the Class A-1 Revolving Credit Facility immediately prior to the 14th Amendment were rolled into the Super-Priority Term Loans (the "Revolving Loan Conversion").

The First Lien Term Loans bear interest at the rate of SOFR plus 7.50%, subject to the borrower's election to PIK a portion of the interest, in which case the interest rate is Adjusted Term SOFR plus 8.00% (of which Adjusted Term SOFR plus 4.50% shall be cash and 3.50% PIK).  The First Lien Term Loans mature on November 4, 2029, and as of the Petition Date, the outstanding principal amount of the First Lien Term Loans is approximately $575.7 million.

### 3.       Intercreditor Agreement.

The relationship between the Super-Priority Term Loan Facility and the First Lien Term Loan Facility is governed by that certain superpriority intercreditor agreement, dated as of August 6, 2025 (and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement") between, *inter alia*, Blue Torch Finance, LLC as the administrative and collateral agent under the Super-Priority Credit Agreement and Blue Torch Finance, LLC as the administrative and collateral agent under the First Lien Credit Agreement.

---

[20]   The First Lien Credit Agreement was amended by that certain Amendment No. 1 to the Credit Agreement and Incremental Facility Amendment, dated as of March 20, 2020, that certain Incremental Facility Agreement and Technical Amendment No. 2 to Credit Agreement, dated as of May 7, 2020, that certain Incremental Facility Agreement No. 3, dated as of June 11, 2020, that certain Amendment No. 4 to the Credit Agreement and Incremental Facility Agreement, dated as May 7, 2021, that certain Amendment No. 5 to Credit Agreement and Incremental Facility Agreement, dated as of June 11, 2021, that certain Amendment No. 6 to the Credit Agreement and Incremental Facility Agreement, dated as of November 10, 2021, that certain Amendment No. 7 to Credit Agreement, dated as of March 14, 2022, that certain Amendment No. 8 to the Credit Agreement, dated as of August 12, 2022, that certain Amendment No. 9 to the Credit Agreement, dated as of November 9, 2022, that certain Amendment No. 10 to the Credit Agreement, dated as of March 15, 2023, that certain Amendment No. 11 to the Credit Agreement, dated as of March 12, 2024, that certain Amendment No. 12 to the Credit Agreement, dated as of October 15, 2024, as amended and restated by that certain Amendment and Restatement Agreement, dated as of November 4, 2024, as amended and restated by that certain Amendment No. 13 to the Credit Agreement, dated as of June 30, 2025, that certain Amendment No. 14 to the Credit Agreement, dated as of August 6, 2025.

4.      **Equity Interests**.

Debtor GoHealth, Inc. is a holding company that operates and conducts business through GoHealth Holdings, LLC in an organizational structure commonly referred to as an umbrella partnership-C-corporation ("Up-C") structure.  Pursuant to such Up-C structure, GoHealth, Inc. holds a majority of the outstanding GoHealth Holdings Interests and is the sole managing member of GoHealth Holdings, while a minority of GoHealth Holdings Interests are held by other members of GoHealth Holdings.  As is customary for a company organized in an Up-C structure, GoHealth, Inc.'s certificate of incorporation authorizes the board of directors to issue shares of preferred stock and two classes of common stock, GoHealth, Inc. Class A Common Stock, and GoHealth, Inc. Class B Common Stock (together, the "Common Stock").

(a)      **GoHealth Holdings Interests**.

Prior to the Company's IPO, GoHealth Holdings had 295,561,968 units issued and outstanding.  In connection with the IPO and the Up-C structure put into place, a portion of the GoHealth Holdings Interests were contributed to GoHealth Inc., while the rest remained outstanding.  As of May 12, 2026, 29,302,494 units of GoHealth Holdings Interests remain outstanding, 16,686,419 of which are held by GoHealth, Inc., and 12,616,075 of which are held by third parties.

The holders of GoHealth Holdings Interests may, subject to certain exceptions, from time to time at each of their options require GoHealth Holdings to redeem all or a portion of their GoHealth Holdings Interests (along with an equal number of shares of Class B Common Stock (and such shares shall be immediately cancelled)) in exchange for, at GoHealth, Inc.'s election, newly-issued shares of Class A Common Stock on a one-for-one basis, or to the extent available, cash, in each case, in accordance with the terms of the GoHealth Holdings governing documents.

The GoHealth Holdings Interests are structurally senior to the GoHealth, Inc. Preferred Stock.

(b)      **GoHealth, Inc. Preferred Stock**.

On September 23, 2022, GoHealth raised $50 million from certain investors through the issuance of 50,000 shares of Series A Convertible Perpetual Preferred Stock (the "GoHealth, Inc. Preferred Stock"). The Certificate of Designations, dated as of September 23, 2022 (the "COD"), that governs the GoHealth, Inc. Preferred Stock sets forth a variety of rights to which the GoHealth, Inc. Preferred Stock are entitled. For example, dividends on each share of GoHealth, Inc. Preferred Stock accrue at an annual rate equal to 7.00%.

The GoHealth, Inc. Preferred Stock are also convertible at the option of the holders thereof into GoHealth, Inc. Class A Common Stock in accordance with the COD.  Alternatively, a holder of GoHealth, Inc. Preferred Stock may instead elect to receive upon conversion one share of Series A-1 Convertible Non-Voting Perpetual Preferred Stock (the "A-1 Preferred Stock") for every 1,000 shares of GoHealth, Inc. Class A Common Stock otherwise deliverable upon conversion and cash in lieu of any fractional shares of A-1 Preferred Stock.  Holders of A-1 Preferred Stock are only entitled to dividends if GoHealth declares such dividends.  As of the date hereof, no A-1 Preferred Stock are issued and outstanding.

The GoHealth, Inc. Preferred Stock are senior to the Common Stock with respect to dividend rights and rights on the distribution of assets on any liquidation, dissolution, or winding up.

33

(c)     **GoHealth, Inc. Common Stock**.

As of May 12, 2026, 16,686,419 shares of GoHealth, Inc. Class A Common Stock are issued and outstanding, which includes an aggregate of 4,766,219 shares of GoHealth, Inc. Class A Common Stock issued to the holders of First Lien Term Loans as consideration for their entry into the 14th Amendment. The GoHealth, Inc. Class A Common Stock trades on The Nasdaq Global Market under the ticker symbol "GOCO" and has both voting and economic rights.

In connection with the IPO and the Up-C structure, GoHealth Inc. issued Class B Common Stock to holders of GoHealth Holdings Interests, at a one-to-one ratio, to reflect the voting rights of the GoHealth Holdings Interest holders and in accordance with GoHealth, Inc.'s and GoHealth Holdings' respective organizational documents.  Class B Common Stock has voting rights but does not have economic rights.

## V.     EVENTS LEADING TO THE FILING OF THESE CHAPTER 11 CASES.

### A.     Operational and Liquidity Challenges.

#### 1.     Increased Debt Service Obligation.

The circumstances giving rise to GoHealth's chapter 11 filing largely began following the Company's 2020 IPO.  Although the IPO was, by all measures, a success—raising over $900 million at a valuation of approximately $6.6 billion—the Company soon thereafter found itself in an increasingly competitive market that required continued investment to stay ahead.  In 2021, the Company entered into the fifth amendment to the First Lien Credit Agreement, pursuant to which the Company refinanced its then-outstanding term loan facility and raised $200 million in the form of new revolving commitments. Although the additional capital helped GoHealth continue to grow its market share, GoHealth soon struggled to satisfy the increased debt service obligations.  These obligations continued to grow as a result of subsequent amendments to its credit facility that increased the interest rate, among other restrictive changes.

#### 2.     Creation of the Non-Agency Business.

Although the Company raised $50 million in additional capital through the 2022 issuance of the GoHealth, Inc. Preferred Stock, the Company continued to struggle with its burdensome debt obligations. The Company implemented the Non-Agency Business in an effort to generate new revenue streams and in anticipation of the need for cash to offset the growing debt obligations.  The Non-Agency Business initially succeeded, quickly generating revenue and cash sufficient to allow GoHealth to pay down some of its existing debt obligations.

Encouraged by its success, GoHealth continued to invest in its Non-Agency Business, hiring and training more Internal Agents to write Non-Agency Business during the 2024 AEP.  Around this time, however, the rising cost of healthcare began outpacing government reimbursement rates for Carriers. Carriers who were paying GoHealth marketing fees and one-time commissions for the placement of each consumer now faced significant exposure on account of the expensive MA plans for such consumers. Additionally, the added pressures from CMS related to implementation of updated condition risk score rules that affect payments to plans, in addition to continued legal risks related to past health plan coding practices, further challenged the Carriers' ability to make a profit in the MA space.  With this backdrop, the Carriers scaled back the Non-Agency Business, once again frustrating the Company's efforts to generate more revenue. With much less Non-Agency Business written during the 2024 AEP than anticipated, the Company faced a liquidity crisis in Q1 2025, when the commissions GoHealth earned during the 2024 AEP were paid.

34

3.      **Going-Concern Qualification**.

These persistent challenges resulted in the Company making a going concern disclosure in the notes to its Form 10-Q for the second quarter of 2025, filed on May 16, 2025.  This generated immediate and significant uncertainty in the marketplace as well as a sharp decline in the Company's stock price in the days that followed.  Notably, certain Carriers expressed serious concern about the Company's ability to write new business in the 2025 AEP as a result of the qualification.  This was especially problematic for the Company because if any, let alone multiple, Carriers decided to terminate their contracts with GoHealth, the financial and reputational consequences for the Company would be detrimental.  As such, it was essential that GoHealth quickly resolve the going concern warning.

B.      **The Company's Prepetition Initiatives.**

In the time leading up to and immediately following the Q2 2025 going concern disclosure, the Company began evaluating and subsequently implementing several measures to address the various operational and liquidity challenges it was facing.

1.      **Credit Facility Amendments**.

The Company retained Kirkland and A&M to evaluate strategic alternatives in June 2025, in the midst of these liquidity challenges and in the face of an upcoming June 30, 2025 maturity on the revolving credit facility then under the First Lien Credit Agreement.  The Company immediately began working with its lenders to reach a short-term solution to avoid triggering an event of default on June 30.  Through the 13th Amendment, the parties extended the maturity of the revolving credit facility to September 30, 2025.  The extension allowed the Company, its lenders, and its advisors to work towards a longer-term solution.

The 13th Amendment also provided the Debtors with the ability to pursue a receivables financing arrangement, such as a potential securitization transaction regarding the Backbook Asset on terms and conditions satisfactory to the Required Lenders (as defined in the 13th Amendment).  Thereafter, the Company, in consultation with its advisors, determined that the securitization of its Backbook Asset could provide GoHealth with the liquidity necessary to address its upcoming debt maturity and improve its overall cash profile.  Accordingly, the Company and its advisors invested meaningful time and resources preparing for a potential securitization transaction.

However, as discussions between the Company and various constituents continued, it became apparent that such a securitization transaction was not actionable.  Instead, the Company and its lenders ultimately negotiated and entered into the Super Priority Credit Agreement and the 14th Amendment (together, the "August 2025 Transactions").  The August 2025 Transactions resulted in $115 million of bridge financing, of which $80 million was new money and $35 million was roll-up term loans.  In addition, the financial covenants under the Super-Priority Credit Agreement provided the Company with liquidity cushion to avoid a qualified opinion in the next Form 10-Q, and comparable covenants in the First Lien Credit Agreement were loosened.  Such covenant relief, combined with the new money infusion, enabled the Company to get a clean opinion in its Form 10-Q filed on August 12, 2025.

In connection with the August 2025 Transactions, the Board created the Transformation Committee, with exclusive power and authority to review, formulate, negotiate, and recommend to the

35

Board for approval various strategic alternatives such as potential refinancings, securitizations, mergers, acquisitions, and restructurings.[21]

### 2.      Additional Operational Changes.

Around the same time as GoHealth began engaging advisors, it launched GoHealth Protect.  Like the implementation of the Non-Agency Business, GoHealth Protect—which involves final expense insurance rather than MA coverage—is designed to offset both the traditional seasonality of the Company's revenue by shifting revenue away from the AEP and fluctuating demand for MA products.  While the Company is optimistic about the outlook for GoHealth Protect, SNPs, and other new or developing products, these investments have not yet grown to sufficiently offset the impact on the Company's revenues and cash from the declining demand for MA plans and products.

As the Company's liquidity concerns continued to linger following the August 2025 Transactions, the Company worked diligently with A&M to design and implement a cost-cutting strategy.  Such efforts have allowed the Company to avoid a default under the Super-Priority Term Loan Facility and the First Lien Term Loan Facility, preserving the runway under the August 2025 Transactions to arrive at a comprehensive solution.

In addition, prior to the commencement of these chapter 11 cases, the Company and its stakeholders prioritized tailoring the Company's arrangements with the Carriers to its current circumstances while protecting these important relationships.

### 3.      Governance.

Throughout this process, the Company continued working with its professional advisors, including Kirkland as legal counsel, A&M as financial advisor, and Moelis as investment banker.  The advisors have assisted the Board and the Transformation Committee, on a regular basis, in carefully exploring, evaluating, and negotiating various strategic alternatives, ultimately resulting in an agreement with the lenders on the terms of the value maximizing transactions contemplated in the Plan.

Ultimately, the Board, at the recommendation of the Transformation Committee and in a sound exercise of its business judgment, has determined that the best option to maximize value for all stakeholders and to reduce the possibility of disruption ahead of the 2026 AEP and the related pre-AEP period is to swiftly implement the Restructuring Transactions.  Doing so will enable GoHealth to enter the pre-AEP period and the 2026 AEP, having quickly emerged from these chapter 11 cases under new ownership.

## VI.      THE PREPACKAGED PLAN AND THESE CHAPTER 11 CASES.

### A.      Negotiating the Plan.

In the months leading up to the Petition Date, the Debtors, the lenders, and a majority of equityholders maintained regular dialogue regarding potential strategic alternatives for GoHealth, including various potential M&A opportunities and other transactions to address the Company's capital structure. Certain of these alternatives failed to materialize or were not pursued for various reasons.  Following a rigorous, multi-month strategic transaction process to identify a potential merger counterparty, the Company and its key stakeholders engaged in extensive discussions regarding a potential change of control transaction that would transition ownership to the secured lenders while either unimpairing or providing

---

[21]   The current members of the Transformation Committee are Alan Carr, Timothy Pohl, William Transier, and Bao Truong.

36

meaningful recoveries to junior stakeholders.  The Company and its key stakeholders considered multiple means of effectuating such a transaction and ultimately agreed that the best path forward was to implement the transaction through these chapter 11 cases.  The Debtors provided voluminous diligence to the Lenders, including an extensive data room with hundreds of documents and thousands of pages of information, and engaged proactively and substantively on transaction structure and terms.  The ultimate decision to pursue the Restructuring Transactions with the lenders is the culmination of months of extensive strategic review of available alternatives, including regular meetings of the Board and the Transformation Committee.

The Plan represents a significant achievement for GoHealth and is a testament to the collaboration between all key stakeholders, as well as the lenders' confidence in the enduring strength of GoHealth's business in the leadup to the AEP 2026 and beyond.

### B.     Independent Investigation.

On May 14, 2026, the Company's independent directors, with the assistance of Pachulski Stang Ziehl & Jones LLP, commenced an investigation (the "Investigation") into potential claims and causes of action of the Debtors, including against parties that have historically held a majority of the Company's outstanding equity interests.  The Investigation is ongoing, but the Debtors anticipate that it will conclude in advance of the date of the proposed confirmation hearing.  The Plan currently proposes to release claims held by the Debtors against these and other parties, but the Debtors reserve the right to amend the Plan, as appropriate, based on the outcome of the Investigation.

### C.     First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors intend to file several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge upon written or other request to the Solicitation Agent by:  (a) emailing the Solicitation Agent at giinfo@angeiongroup.com with a reference to "GoHealth, Inc." in the subject line; (b) visiting the Debtors' restructuring website, when made public, at https://www.bankruptcy.angeiongroup.com/gohealth; or (c) calling the Solicitation Agent toll-free at (877) 583-1578 or +1 (332) 284-1398 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases by visiting the Bankruptcy Court's website at https://www.deb.uscourts.gov or the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours 8:00 a.m. to 4:00 p.m., prevailing Eastern Time.

D.   **Proposed Confirmation Schedule**.

Under the Cash Collateral Order, the Debtors agreed to certain case milestones to ensure an orderly and timely implementation of the Restructuring Transactions. It is imperative that the Debtors proceed swiftly to Confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs. Expeditious Confirmation of the Plan and Consummation of the Restructuring Transactions is in the best interests of the Debtors, their Estates, and their stakeholders.

Pursuant to the agreed upon milestones, the Debtors must obtain Confirmation of the Plan within 50 days of the Petition Date. Accordingly, the Debtors have proposed the following key case dates, subject to Court approval and availability.

| Event | Date/Timing |
| --- | --- |
| Voting Record Date | May 12, 2026 |
| Lender Voting Deadline | May 19, 2026 at 6:00 p.m. (prevailing Eastern Time) |
| Solicitation Commencement Deadline | June 7, 2026 |
| Petition Date | June 7, 2026 |
| Plan, Disclosure Statement, and Solicitation Materials to be filed with the Bankruptcy Court | June 7, 2026 |
| Deadline to File Preliminary Voting Report | June 7, 2026 |
| First Day Hearing | June 9, 2026, subject to court availability |
| Initial Plan Supplement Deadline | July 1, 2026 |
| Interests Voting Deadline<br>Objection Deadline<br>Opt-In Deadline | July 8, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Confirmation Hearing | July 16, 2026, subject to court availability |
| Effective Date | July 17, 2026 |

VII.   **OVERVIEW OF THE PLAN**.

A.   **The Plan**.

The Plan contemplates the following key terms, among others described herein and therein:

1.   **General Settlement of Claims and Interests**.

As discussed in detail herein and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best

38

interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be, and shall be, final.

### 2. Restructuring Transactions.

Before, on, and after the Effective Date, the applicable Debtors, with the consent of the Required Lenders (not to be unreasonably withheld), and the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable: (1) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Plan Supplement and having other terms for which the applicable parties agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution, delivery, and entry into the Exit Facility Documents; (5) the issuance and distribution of the New Equity Interests as set forth in the Plan; (6) the implementation after the Effective Date of the Management Incentive Plan as determined at the discretion of the New Board in consultation with the Chief Executive Officer; (7) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (8) such other transactions that, in the reasonable business judgment of the Debtors (subject to the consent of the Required Lenders (not to be unreasonably withheld)) or the Reorganized Debtors, as applicable, are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to sections 105, 363, 1123, and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate the Restructuring Transactions described in, approved by, contemplated by, or necessary to effectuate the Plan or any of the Definitive Documents.

### 3. The Reorganized Debtors.

The Reorganized Debtors shall be authorized to adopt any agreements, documents, and instruments and to take any actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth in the Plan or as otherwise provided for in the Restructuring Transactions Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

**4.        Sources of Consideration for Plan Distributions.**

The Debtors shall fund or make distributions under the Plan, as applicable, with: (1) the Debtors' cash on hand as of the Effective Date, (2) the Exit Facility, and (3) the New Equity Interests.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Equity Interests, will be exempt from Securities Act registration, as described more fully in Article IV.J of the Plan.

**(a)        Cash on Hand.**

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand as of the Effective Date and proceeds from the New Money Exit Facility to fund distributions to Holders of Allowed Claims, consistent with the terms of the Plan.

**(b)        Exit Facilities.**

On the Effective Date, the Reorganized Debtors shall issue the Exit Facilities, the terms, conditions, structure, and principal amount of which will be set forth in the Exit Facility Documents.  Confirmation of the Plan shall constitute (a) approval of the Exit Facilities and the Exit Facility Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Exit Facilities, including executing and delivering the Exit Facility Documents, in each case, without any further notice to or order of the Bankruptcy Court.  On the Effective Date, the Exit Facilities shall be issued and distributed as provided for in the Restructuring Transactions Memorandum and the Exit Facility Documents pursuant to, and in accordance with, the Plan.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, valid, binding, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  To the extent provided in the Exit Facility Documents, the Exit Facility Agents are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  The guarantees granted under the Exit Facility Documents have been granted in good faith, for legitimate business purposes and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and

40

shall not otherwise be subject to avoidance, recharacterization or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

### (c)     New Equity Interests.

Reorganized GoHealth shall be authorized to issue a certain number of GoHealth Preferred Interests and New Common Interests pursuant to its New Organizational Documents.  The issuance of the GoHealth Preferred Interests and New Common Interests, including equity awards reserved for the Management Incentive Plan, shall be authorized as determined at the discretion of the New Board in consultation with the Chief Executive Officer of the Reorganized Debtors without the need for any further corporate, limited liability company, partnership or similar action or without any further action by any of the Debtors or Reorganized Debtors.  On the Effective Date, the New Equity Interests shall be issued and distributed pursuant to, and in accordance with the Plan.

All of the New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, and, with respect to any New Equity Interests issued by a corporation, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).  The New Equity Interests will not be registered under the Securities Act or listed on any national securities exchange or quoted through any automated quotation system as of the Effective Date.  Additional information relating to the applicability of the securities Laws is available in Article XI.A herein.

As of the Effective Date, the Reorganized Debtors do not expect to be subject to reporting requirements promulgated under United States federal securities Law.

### 5.     TRA Amendment

On or before the Effective Date, certain of the Debtors and certain of the TRA Holders (as defined in the TRA) party thereto shall enter into the TRA Amendment, substantially in the form set forth in the Plan Supplement.

### 6.     Corporate Existence.

Except as otherwise provided in the Plan, the Confirmation Order, the New Organizational Documents, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable

41

state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified in accordance with the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 7.    Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrance and interests. On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound down and liquidated in connection with the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum) shall be treated as being liable on any Claim that is discharged pursuant to the Plan.

### 8.    New Organizational Documents.

On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended in a manner consistent with the terms and conditions and consent rights set forth in the Governance Term Sheet, as may be necessary to effectuate the transactions contemplated by the Plan; *provided* that the Holders (as defined in the Governance Term Sheet) and Reorganized GoHealth are deemed to have entered into the LLC Agreement (as defined in the Governance Term Sheet). To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation or formation in accordance with the corporate laws of the respective state, province, or country of incorporation or formation. The New Organizational Documents will prohibit the issuance of non-voting Equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement. After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of incorporation or formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation or formation and the New Organizational Documents without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, any Holder's acceptance of the New Equity Interests shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Reorganized Debtors.

For the avoidance of doubt, in accordance with Article III of the Plan, the New Organizational Documents shall Reinstate all GoHealth, Inc. Preferred Stock; *provided* that the New Organizational Documents shall include such modifications, amendments, supplements, restatements or other agreements as necessary to reflect the conversion of the GoHealth, Inc. Preferred Stock to GoHealth Preferred Interests

in Reorganized GoHealth, which, for the avoidance of doubt, shall be a limited liability company; *provided further* that any Holder's acceptance of GoHealth Preferred Interests shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Reorganized Debtors.

From and after the Effective Date, all Holders of New Common Interests and GoHealth Preferred Interests shall be subject to the terms and conditions of the New Organizational Documents. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Organizational Documents to each Holder of New Common Interests and GoHealth Preferred Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Holders of New Common Interests and GoHealth Preferred Interests shall be deemed to have executed the New Organizational Documents and be parties thereto, without the need to deliver signature pages thereto.

### 9. Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, (including the Restructuring Transactions Memorandum and the other documents contained in the Plan Supplement), the Plan Supplement, or the Confirmation Order, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved by the Bankruptcy Court in all respects. All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate limited liability company, or other governance action required by the Debtors or Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or Reorganized Debtors, including the New Equity Interests, the New Organizational Documents, the Exit Facilities, the Exit Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.M of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 10. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors and their respective officers, directors, and boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 11. Director, Officer, and Manager Liability Insurance.

After the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance

policies, will be entitled to the full benefits of any such policy for the full term of such policy, and to the extent of its or their limits of liability, regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Effective Date.

### 12.    Employment Obligations.

On the Effective Date, the Reorganized Debtors shall (1) assume all employment agreements or letters, indemnification agreements, severance agreements, or other agreements entered into with current and former employees and (2) assume and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, supplemental executive retirement plans, change-in-control agreements, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity before the Effective Date of the Plan; provided, however, that in each case, the full amount necessary to satisfy such obligations shall be set aside to satisfy such obligations; provided further, for the avoidance of doubt, that the consummation of the Plan and Restructuring Transactions shall not trigger or be deemed to trigger (a) any change of control, change in control, immediate vesting, termination or similar provision therein or (b) an event of "good reason" (or a term of like import).

Notwithstanding anything in the Plan to the contrary, the Debtors shall not assume any (i) equity or equity-based incentive plans, employee stock purchase plans and any other agreements or awards or provisions set forth in any agreements, awards, plans or programs that provide for rights to acquire Interests or New Common Interests and (ii) any agreement, award, program, or plan whose value or performance is related to Interests or New Common Interests or other ownership interests of any Debtor, in each case, which shall be deemed to be terminated on the Effective Date.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 13.    Cancellation of Instruments, Certificates, and Other Documents.

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, and the Stockholders Agreement, shall automatically be deemed cancelled, discharged, and of no further force and effect, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, and the Agents shall be released from all duties and obligations thereunder. Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan or the Confirmation Order.

### 14.    Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, as applicable; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of

44

trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security pursuant to the Plan; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 15.    Cashless Transactions.

Notwithstanding anything to the contrary set forth in the Plan, the treatment of Claims, distributions, and other transactions contemplated hereby may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

### 16.    Payment of Statutory Fees.

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### B.    Treatment of Executory Contracts and Unexpired Leases.

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided in the Plan, and subject to the consent of the Required Lenders (not to be unreasonably withheld), all Executory Contracts or Unexpired Leases will be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) previously expired or terminated pursuant to their own terms; (2) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (3) are the subject of a motion to reject that is pending on the Effective Date; or (4) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and/or assumptions and assignments of the Executory Contracts or Unexpired Leases as set forth in the Plan or Schedule of Proposed Cure Amounts, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, assumptions of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable

45

contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Unless otherwise provided in the Plan or agreed to by the Debtors (with the consent of the Required Lenders (not to be unreasonably withheld)), each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors, subject to the consent of the Required Lenders (not to be unreasonably withheld), or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Proposed Cure Amounts at any time up to forty-five (45) days after the Effective Date.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be Filed.

**2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.**.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, and (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**.

The Debtors or Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Proposed Cure Amounts, pay Cures, if any, on or prior to the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreements and/or the ordinary course of business among the parties thereto. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to a proposed assumption, including pursuant to the Plan, or related Cure amount must be Filed, served, and actually received by counsel to the Debtors no later than the date that is thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, as applicable, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors, as applicable, of the applicable Cure costs; *provided* that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Debtors or Reorganized Debtors, as applicable, also may settle any Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or such other setting as requested by the Debtors for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after (1) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (2) as may be agreed upon by the Debtors (with the consent of the Required Lenders (not to be unreasonably withheld)) or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors (with the consent of the Required Lenders (not to be unreasonably withheld)) and the Reorganized Debtors, as applicable, reserve

47

the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and payment of any applicable Cure cost (including in the amount of $0.00, if applicable) pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contracts or Unexpired Leases at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.C of the Plan shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's finding of adequate assurance of future performance under all assumed Executory Contracts and Unexpired Leases.

4. **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

5. **Insurance Policies**.

Each of the Debtors' insurance policies (including D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors, and all obligations of the Debtors under such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall continue as obligations of the Reorganized Debtors.

6. **Indemnification Provisions.**

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be (1) reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the Indemnification Provisions in place prior to the Effective Date, and (2) shall be assumed by the Reorganized

48

Debtors; *provided* that nothing shall expand any of the Debtors' indemnification obligations in place as of the Petition Date or constitute a finding or conclusion that any party that may seek indemnification is entitled to indemnification under the terms of such Indemnification Provisions or is intended to effectuate the survival of any indemnification obligations for any party other than those parties with rights to indemnification under such Indemnification Provisions as of the Petition Date.

After the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Effective Date.

### 7. Reservation of Rights.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors (with the consent of the Required Lenders (not to be unreasonably withheld)) or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

### 8. Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 9. Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### C. Provisions Governing Distributions.

### 1. Timing and Calculation of Amounts to Be Distributed.

Unless otherwise provided in the Plan or paid pursuant to a prior Court order, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions applicable to such Holder that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed

Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

## 2. Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent on, or as reasonably practicable after, the Effective Date or as due in the ordinary course of business.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All distributions to any Disbursing Agent on behalf of the Holders of Claims (or the designees of such Holders, as applicable) shall be deemed completed by the Debtors when received by such Disbursing Agent.  Distributions made under the Plan shall be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

## 3. Rights and Powers of Disbursing Agent.

### (a) Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### (b) Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course without duplication of payments of Restructuring Expenses or Professional fees.

**4.        Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

**(a)        Record Date for Distribution**.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable). If a Claim, other than one based on a Security that is traded on a recognized securities exchange, is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, which shall receive distributions in accordance with the applicable procedures of DTC.

**(b)        Delivery of Distributions in General**.

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

**(c)        No Fractional Distributions**.

In the discretion of the Reorganized Debtors, no distribution and issuance of New Common Interests to any single Holder of Allowed Claims whose aggregate sum of New Common Interests to be distributed to such holder would be worth less than $250 value shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. No fractional New Common Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of New Common Interests that is not a whole number, the actual distribution of New Common Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded up to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded down to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Interests to be distributed to Holders of Allowed Claims or Allowed Interests shall be adjusted as necessary to account for the foregoing rounding. For distribution purposes (including rounding), DTC will be treated as a single Holder. In the event that elections are to be made within DTC, distributions will be made at the beneficial owner level in accordance with the elections received thereto. The Debtors reserve the right to adjust the rounding conventions discussed herein, including the methods used for allocating through DTC.

**(d)** **Undeliverable Distributions and Unclaimed Property**.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder (or its designee, as applicable), at which time such distribution shall be made to such Holder (or its designee, as applicable) on the next distribution date without interest. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Article VI.D.4 of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

All distributions returned as, and that remain, undeliverable for a period of 120 days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims or Interests or its successors to such property or interest in property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution of such unclaimed property.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 120 days after the date of issuance thereof. Thereafter, the amount represented by such voided checks shall irrevocably revert to the Reorganized Debtors and any Claim in respect of any such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check before 120 days after issuance shall be made to the applicable Disbursing Agent by the Holder of the Allowed Claim to whom such check was originally issued.

**5.** **Surrender of Canceled Instruments or Securities**.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder (and the applicable Agents for such Holder) of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV of the Plan shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary in the Plan, this paragraph shall not apply to certificates or instruments evidencing Claims or Interests that are Unimpaired under the Plan.

**6.** **Distributions on Account of Obligations of Multiple Debtors**.

Each Claim asserted against multiple Debtors shall be treated as a single Claim and its Holder shall be entitled to a single distribution. For the avoidance of doubt, no Holder of any Claim shall receive more than a 100% recovery on account of such Holder's Claim.

52

**7.** **Manner of Payment**.

At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

**8.** **Indefeasible Distributions.**

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback or turnover provisions.

**9.** **Compliance with Tax Requirements**.

In connection with the Plan, to the extent applicable, the Disbursing Agent and the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. Any such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any person entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the applicable Disbursing Agent an appropriate Form W-9 or (if the payee is a non-U.S. Person) applicable Form W-8.

**10.** **Allocations**.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

**11.** **No Postpetition Interest on Claims**.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**12.** **Foreign Currency Exchange Rate**.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S.

dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)* on the Petition Date.

### 13.  Setoffs and Recoupment.

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### 14.  Claims Paid or Payable by Third Parties.

#### (a)  Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within five (5) Business Days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the five (5) Business Day grace period specified above until the amount is fully repaid.

#### (b)  Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

54

**(c)** **Applicability of Insurance Policies**.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained in the Plan, nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**D.** **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**.

**1.** **Disputed Claims Process**.

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not file Proofs of Claim, and Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. Except for Proofs of Claim permitted by the Cash Collateral Orders, all Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors or the Reorganized Debtors. Except for Proofs of Claim permitted by the Cash Collateral Orders, upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in the Plan to the contrary, disputes regarding (a) the amount of any Cure pursuant to section 365 of the Bankruptcy Code and (b) Claims (including Administrative Claims and Professional Fee Claims) that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided in the Plan, all Proofs of Claim Filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

**2.** **Allowance of Claims**.

After the Effective Date and subject to the terms of the Plan, the Reorganized Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date. The Reorganized Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

55

3.      **Claims Administration Responsibilities**.

Except as otherwise specifically provided in the Plan, the Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (a) File, withdraw, or litigate to judgment any objections to Claims, (b) settle or compromise any such objections to Claims without further notice to or action, order, or approval of the Bankruptcy Court, and (c) administer and adjust the Claims Register to reflect such settlements or compromises without further notice to or action, order, or approval of the Bankruptcy Court. Except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to the Plan, as applicable.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable non-bankruptcy Law. If the Debtors or Reorganized Debtors, as applicable, dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all Claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

4.      **Estimation of Claims and Interests**.

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

5.      **Adjustment to Claims or Interests without Objection**.

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to the Plan) on the Claims Register by the Debtors or the Reorganized Debtors or the Claims and Noticing Agent without the Debtors or the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

6.      **Disallowance of Claims or Interests**.

Except as otherwise expressly set forth in the Plan and subject to the terms thereof, including Article VIII of the Plan, all Claims and Interests of any Entity from which property is sought by the Debtors

56

under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### 7. No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount pending resolution of the dispute.

### 8. Distributions After Allowance.

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

### E. Conditions Precedent to Confirmation and Consummation of the Plan.

### 1. Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

- the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and Restructuring Transactions, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

- each Definitive Document, including any exhibits, schedules, amendments, modifications or supplements thereto shall have been executed or otherwise effectuated and be in form and substance reasonably acceptable to the Debtors and the Required Lenders, except as otherwise specified in the Plan;

- all fees and expenses of retained Professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account;

- all accrued and unpaid Restructuring Expenses shall have been paid in full;

- the Bankruptcy Court shall have entered the Confirmation Order and the Cash Collateral Orders, each of which shall (1) be in form and substance acceptable to the Required Lenders and the Debtors and (2) have become a Final Order;

- the New Common Interests and GoHealth Preferred Interests shall have been issued by the Reorganized Debtors (or shall be issued concurrently with the effectiveness of the Plan);

- the New Organizational Documents, subject to the consent rights set forth in the Plan, shall have been executed and/or effectuated (or shall be executed and/or effectuated concurrently with the effectiveness of the Plan) and be in form and substance acceptable only to the Required Lenders in their sole discretion;

- the Exit Facility Documents, subject to the consent rights set forth in the Plan, shall have been executed and/or effectuated (or shall be executed and/or effectuated concurrently with the effectiveness of the Plan) and shall be in form and substance acceptable to the Debtors and the Required Lenders;

- the Debtors shall have assumed (or amended and assumed) the Carrier Contracts;

- the TRA Amendment shall have been executed and/or effectuated (or shall be executed and/or effectuated concurrently with the effectiveness of the Plan);

- no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued any order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any of the Restructuring Transactions or any of the Definitive Documents; and

- as of the Effective Date, no temporary restraining order, preliminary or permanent injunction, judgment, or other order preventing the Restructuring Transactions or any of the transactions contemplated by any of the Definitive Documents, shall have been entered, issued, rendered, or made, nor shall any proceeding seeking any of the foregoing be commenced or pending; nor shall any proceeding seeking any of the foregoing be threatened by a governmental body; nor shall there be any law promulgated, enacted, entered, enforced, or deemed applicable to any of the parties which makes the consummation of the Restructuring Transactions or any of the transactions contemplated by any of the Definitive Documents illegal, void or rescinded.

### 2.   Waiver of Conditions.

The conditions to Confirmation and Consummation set forth in Article IX.A of the Plan may be waived, in whole or in part, with the written consent (email shall suffice) of the Debtors and the Required Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

### 3.   Effect of Failure of Conditions.

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively.

4.      **Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## VIII.   RISK FACTORS.

BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.   THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

A.      **Bankruptcy Law Considerations**.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, but will not necessarily affect the validity of the vote of the Voting Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Voting Classes.

1.      **The Debtors May Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**.

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, converting to a chapter 7 case, and any other transaction that would maximize the value of the Debtors' Estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

### 2. Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Although the Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code, once any Chapter 11 Cases have been commenced, a Holder could challenge the classification. In such event, the cost of the Plan and the time needed to confirm the Plan may increase, and the Debtors cannot be sure that the Bankruptcy Court will agree with the Debtors' classification of Claims and Interests. If the Bankruptcy Court concludes that either or both of the classification of Claims and Interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require a resolicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors classification of Claims and Interests is not appropriate.

### 3. The Bankruptcy Court Might Not Approve the Debtors' Use of Cash Collateral.

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the prepetition secured creditors, as applicable. Such access to cash collateral will provide necessary liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### 4. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

### 5. The Debtors Could Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or

transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Allowed Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

**6.      The Debtors Might Not Be Able to Secure Confirmation of the Plan**.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them or Allowed Interests in them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

**7.      The Debtors May Not Be Able to Secure Non-Consensual Confirmation Over Certain Impaired Non-Accepting Classes**.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such non-consensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of non-consensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

61

8.  **Even if the Restructuring Transactions Are Successful, the Debtors Will Face Continued Risk Upon Emergence from Bankruptcy**.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' services, and increasing expenses. *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

9.  **The Bankruptcy Court Could Find the Prepetition Solicitation of Acceptances Inadequate**.

Usually, all votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable non-bankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the

requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

10. **The Chapter 11 Cases Could Be Converted to Cases under Chapter 7 of the Bankruptcy Code**.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

11. **One or More of the Chapter 11 Cases May Be Dismissed**.

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases. In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

12. **The Debtors May Object to the Amount or Classification of a Claim**.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

13. **Risk of Non-Occurrence of the Effective Date**.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or met, the Effective Date will not take place.

14. **Contingencies Could Affect Distributions to Holders of Allowed Claims and Allowed Interests**.

The distributions available to Holders of Allowed Claims and Allowed Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Allowed Interests to be subordinated to other Allowed Claims or Allowed Interests. The occurrence of any and all such contingencies, which could affect distributions available to

Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of re-vote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims or Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims or Interests, as applicable, contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims or Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Allowed Interests under the Plan.

### 15. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization. The Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to reductions in the amounts of their Claims against the Debtors' Estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Transactions and Plan and the significant deleveraging and financial benefits that they embody.

### 16. The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan.

Although the prepackaged Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding could itself have an adverse effect on the Debtors' business. A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' business.

The disruption that the bankruptcy process would have on the Debtors' business could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

17.     **The Debtors May Be Unsuccessful in Obtaining First Day Orders to Permit the Debtors to Pay Their Key Suppliers and Employees, or to Continue to Perform Customer Programs, in the Ordinary Course of Business**.

The Debtors have tried to address potential concerns of their key customers, vendors, employees, and other parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' business might suffer.

18.     **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Its Confirmation**.

The Debtors reserve the right, prior to the Confirmation or substantial Consummation thereof, subject to the provisions of Section 1127 of the Bankruptcy Code and applicable law, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all Classes of adversely affected creditors and interest Holders accept the modification in writing or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of Holders accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

B.     **Risks Related to Recoveries Under the Plan**.

1.     **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**.

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims or Interests in the various Classes that might be Allowed. Among other things, estimates will fluctuate based on general economic and business conditions, capital market conditions, and industry-specific and Company-specific factors (including the ability of the Reorganized Debtors to achieve strategic goals, objectives, and targets over applicable periods).

2.     **The New Common Interests Are Subject to Dilution**.

The ownership percentage represented by the New Common Interests distributed to Holders of First Lien Claims on the Effective Date under the Plan will be subject to dilution by the MIP Shares. The New Common Interests may also be diluted by any other equity interests that may be issued in connection with the Plan or after consummation of the Plan in accordance with the terms of the New Organizational Documents, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued after the consummation of the Plan.

65

3.      **The Debtors Might Be Controlled by Significant Holders**.

Assuming that the Effective Date occurs, Holders of First Lien Claims will receive distributions representing all of the outstanding shares of the New Common Interests (subject to dilution by the MIP Shares).  If the holders of a significant portion of the New Common Interests were to act as a group, such holders would be in a position to control the outcome of actions requiring shareholder approval, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.  Such Holders may have interests that differ from those of the other Holders of shares of New Common Interests and may vote in a manner adverse to the interests of such other Holders.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of the New Common Interests.  In addition, a Holder of a significant number of shares of the New Equity Interests may sell all or a large portion of its shares of the New Equity Interests within a short period of time, which sale may adversely affect the trading price of the shares of the New Equity Interests.  A holder of a significant number of shares of the New Equity Interests may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' business, and, as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors.  Such actions by Holders of a significant number of shares of the New Equity Interests may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

4.      **Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent Potential Market Values**.

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Debtors' Securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

5.      **The Terms of the New Organizational Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**.

The terms of the New Organizational Documents are subject to change based on negotiations between the Debtors, the Ad Hoc TL Group, and the Ad Hoc Revolver Group.  Other Holders of Claims and Interests will not participate in these negotiations, and the results of such negotiations may affect the rights of equity holders in Reorganized GoHealth following the Effective Date.

6.      **The Terms of the Exit Facility Documents Are Subject to Change Based On Negotiations and the Approval of the Bankruptcy Court**.

The terms of the Exit Facility Documents are subject to change based on negotiations between the Debtors, the Ad Hoc TL Group, and the Ad Hoc Revolver Group.  Other Holders of Claims and Interests will not participate in these negotiations, and the results of such negotiations may affect the rights of equity holders in Reorganized GoHealth, Inc. following the Effective Date.

66

7.      **Certain Tax Implications of the Plan**.

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the United States federal income tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims and Interests.

C.      **Risks Related to the Debtors' and the Reorganized Debtors' Business**.

1.      **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal and premium, if any, on their indebtedness.

2.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.      **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business**.

While the Debtors intend the prepackaged chapter 11 process to be short, the Debtors' future results will be dependent upon the successful Confirmation and Consummation of the Plan. A long period of

operation under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4.      Financial Results May Be Volatile and May Not Reflect Historical Trends.

The financial projections attached hereto as **Exhibit B** (the "Financial Projections") are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Equity Interests and the ability of the Debtors to make necessary payments. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur. The information included in this Disclosure Statement does not necessarily conform to the information, including with respect to the Financial Projections, that would be required if the solicitation was made pursuant to a registration statement filed with the SEC or another securities regulator.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting may be different from historical trends.  The Financial Projections contained herein do not currently reflect the impact of "fresh start" accounting.

68

**5.** **The Reorganized Debtors May Not Be Able to Implement the Business Plan**.

While the Debtors believe that Consummation of the Plan will put them in a strong position to implement their go-forward business plan, various factors beyond the Reorganized Debtors' control may hinder or prevent their successful implementation of the business plan. In particular, the Reorganized Debtors' successful implementation of the business plan depends significantly on maintaining and protecting their backbook commissions receivables. Given the nature of the Debtors' customer arrangements, there can be no assurance that the Reorganized Debtors will be able to maintain and protect their backbook commissions receivables. The erosion of the Reorganized Debtors' backbook commissions receivables may materially and adversely affect their operating results and hinder or prevent their successful implementation of the business plan.

**6.** **The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**.

The Debtors' operations are subject to various federal, state, and local laws and regulations. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors.

**7.** **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**.

Currently and in the future, the Reorganized Debtors are or may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. In addition, the Debtors are currently defendants in the DOJ Complaint alleging that the defendant health insurance brokers incentivized their employees and agents to sell plans based on the defendant insurers' kickbacks and set up teams of insurance agents who were improperly incentivized to sell those insurers' plans. The Debtors deny the allegations in the DOJ Complaint and have expended—and expects to continue expending—significant time and financial resources defending the DOJ Complaint. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

**8.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**.

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' business and the results of operations.

**9.      The Debtors' Liquidity Needs May Impact Revenue.**

If the Debtors' cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and conditions of the Cash Collateral Orders; (b) their ability to maintain adequate Cash on hand; (c) their ability to confirm, and consummate the Plan; and (d) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that Cash on hand, cash flow from operations is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

**10.      If the Debtors Fail to Comply with the Extensive Laws and Governmental Regulations That Apply to the United States Healthcare Industry, the Debtors Could Suffer Penalties or be Required to Make Significant Changes to Their Operations, Which Could Adversely Affect the Cost, Manner, and Feasibility of Doing Business.**

The Debtors operate in a heavily regulated industry and are subject to extensive regulation by government agencies, including the March 2010 Healthcare Reform, the Short-Term, Limited-Duration Insurance Final Rule, the Anti-Kickback Laws, the Federal Civil False Claims Act and State False Claims Laws, HIPAA, Privacy Laws and Data Security Regulations.  Certain regulations can vary significantly from jurisdiction to jurisdiction, and interpretation of existing laws and regulations may change.  Federal and state legislatures may also enact various legislative proposals that could materially impact certain aspects of the Debtors' business.

In addition to federal and state healthcare laws, the Debtors are also subject to regulations and guidelines issued by the Centers for Medicare and Medicaid Services ("CMS") that place a number of requirements on health insurance carriers and agents and brokers in connection with the marketing and sale of Medicare Advantage and Medicare Part D prescription drug plans.  The Debtors are subject to similar requirements of state insurance departments with respect to the marketing and distribution of Medicare

Supplement plans.  CMS and state insurance department regulations and guidelines include a number of prohibitions regarding the ability to contact Medicare-eligible individuals and place many restrictions on the marketing of Medicare-related plans.

Noncompliance could have an adverse effect on the Debtors' business, results of operations, financial condition and cash flows.  The marketing, invoicing, documenting and other practices of health care suppliers are all subject to government scrutiny.  Government agencies periodically open investigations and obtain information from health care suppliers pursuant to the legal process.  Violations of law or regulations can result in severe administrative, civil and criminal penalties and sanctions, including disqualification from Medicare and other reimbursement programs, which could have an adverse effect on the Debtors' business, results of operations, financial condition and cash flows.  Additionally, changes to the United States and other governmental payor programs, including reductions in reimbursement rates or delays in timing of reimbursement payments, could also have an adverse effect on the Debtors' business, results of operations, financial condition and cash flows.

While the Debtors have established numerous policies and procedures to address compliance with these laws and regulations, there can be no assurance that the Debtors' efforts will be effective to prevent a material adverse effect on the Debtors' business from noncompliance issues.

11.     **The Cyclical Nature of the Medicare Advantage Plan Enrollment Process May Lead to Volatility**.

The Debtors' business is highly cyclical.  There is an increase in enrollment activity during AEP, which makes this period that lasts less than a quarter of the year a critical time for enrolling new customers. Despite receiving AEP submissions in the fourth quarter, the AEP revenue does not typically begin converting into cash until the first quarter of the following year, and AEP revenue continues to be collected as plans are renewed. The second-highest enrollment period is typically January 1 through March 31, during the MA open enrollment period, with the second and third quarters being the periods with the lowest enrollment activity.  The renewal commissions, which are paid monthly, provide more revenue stability.

12.     **The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service All of Their Indebtedness and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful**.

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt.  These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

71

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

**D.      Risks Related to the Offer and Issuance of Securities Under the Plan**.

**1.      Holders of New Common Interests May Be Restricted in Their Ability to Transfer or Sell Their Securities**.

Before the Petition Date the offering of any New Common Interests shall be exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

After the Petition Date, pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the New Common Interests as contemplated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The shares of New Common Interests to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Common Interests in the Corporate Governance Documents.

The shares of New Common Interests that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New Common Interests in the Corporate Governance Documents.

Recipients of the New Common Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New Common Interests.

*See* Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters," for additional details.

**2.      A Liquid Trading Market for the Shares of New Common Interests May Not Develop**.

Although the Reorganized Debtors may apply to relist the New Common Interests on a national securities exchange, the Debtors make no assurance that the Reorganized Debtors will be able to obtain this listing or, even if the Reorganized Debtors do, that liquid trading markets for shares of New Common Interests will develop.  The liquidity of any market for New Common Interests will depend upon, among

other things, the number of Holders of shares of New Common Interests, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New Common Interests will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell shares of New Common Interests may be substantially limited, and the price for shares of the New Common Interests may decline or may be considered unfavorable. You may be required to bear the financial risk of your ownership of the New Common Interests indefinitely.

In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements of the Securities Act, and Holders of the New Common Interests will not be entitled to any information except as expressly required by the Corporate Governance Documents. As a result, the information which the Debtors are required to provide in order to issue the New Common Interests may be less than the Debtors would be required to provide if the New Common Interests were registered. Among other things, the Debtors may not be required to provide: (a) separate financial information for any subsidiary; (b) select annual audited financial data; (c) selected quarterly financial data; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair your ability to evaluate your ownership and the marketability of the New Common Interests.

### 3. Certain Securities will be Subject to Resale Restrictions.

The New Common Interests to be issued under the Plan have not been registered under the Securities Act, any state securities laws, or the laws of any other jurisdiction. Such securities are being issued and sold pursuant to an exemption from registration under the Bankruptcy Code and applicable securities laws. Accordingly, such securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act, and other applicable law. In addition, holders of New Common Interests will be subject to the Corporate Governance Documents. Further, any securities issued pursuant to Section 1145(a) of the Bankruptcy Code to persons who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to resale restrictions. *See* Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters," for additional details.

### 4. The Trading Price for the New Common Interests May Be Depressed Following the Effective Date.

Following the Effective Date, certain shares of the New Common Interests may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements. In addition, Holders of Claims that receive the New Common Interests may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Common Interests available for trading could cause the trading price for the New Common Interests to be depressed, particularly in the absence of an established trading market for the New Common Interests.

## IX. SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed prepetition to Holders of Claims in Class 3 and Class 4 and postpetition to Holders of Interests in Class 6 and Class 8 in connection with the solicitation of votes to accept or reject the Plan. This Disclosure Statement is accompanied by a ballot to be used for voting on the Plan.

A.      **Holders of Claims Entitled to Vote on the Plan**.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims or Interests in Class 3, Class 4, Class 6, and Class 8 (collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, if the Plan is Confirmed and Consummated, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes on the Plan from Holders of Claims or Interests in Classes 1, 2, 5, 7, 9, 10, or 11.

B.      **Voting Record Date**.

**The Voting Record Date is May 12, 2026** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan, and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.      **Ballots Not Counted**.

**No Ballot will be counted toward Confirmation of the Plan if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the Ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to any person or entity other than the Solicitation Agent; (5) it is unsigned; (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to your Ballot for additional requirements with respect to voting to accept or reject the Plan.**

ANY BALLOT <u>RECEIVED AFTER THE APPLICABLE VOTING DEADLINE</u> THAT IS OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS <u>ARTICLE IX</u> OF THE DISCLOSURE STATEMENT OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL <u>NOT</u> BE COUNTED WITH RESPECT TO VOTING ON THE PLAN WITHOUT THE CONSENT OF THE COMPANY.

D.      **Notice of Non-Voting Status**.

As explained more fully in the Disclosure Statement Order, Holders of Disputed Claims, or Holders of Claims against and Interests in the Debtors that are not in the voting classes, other than Holders of Claims and Interests in Classes 10 and 11, will receive a Notice of Non-Voting Status and Opt In Form in lieu of a Solicitation Package (each as defined in the Disclosure Statement Order Order).  Each Notice of Non-Voting Status and Opt In Form will include, among other things:  (a) instructions as to how to view or obtain copies of this Disclosure Statement (including the Plan and the other exhibits hereto), the Confirmation Order, and all other materials in the Solicitation Package (excluding ballots) from Donlin

Recano free of charge or the Court's website via PACER; (b) an Opt In Form by which all Holders or potential Holders of Claims or Interests can elect to opt in to the releases contained in Article VIII of the Plan; (c) a disclosure regarding the releases and the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan; (d) notice of the Plan Objection Deadline; (e) notice of the Confirmation Hearing; and (f) information related thereto.

## X.   CONFIRMATION OF THE PLAN.

### A.   Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (a) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for Confirmation; (ii) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for Confirmation; and (iii) the Plan has been proposed in good faith.

### B.   Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code. Accordingly, the Debtors believe that the best interests test has been satisfied.

### C.   Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows. Creditors and other interested parties should review Article VIII of this Disclosure

Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit B** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

#### D.      Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[8]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the allowed interests in such Class that vote on the Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests that are eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

#### E.      Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy

---

[8] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.       No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.  The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly."  All Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank based on the prepetition rights of the Claims or Interests in such Class.

### 2.       Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it satisfies the "fair and equitable" requirement.  No Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.     CERTAIN SECURITIES LAW MATTERS.

### A.      New Common Interests.

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Common Interests to certain Holders of Claims against the Debtors.  The Debtors believe that the class of New Common Interests will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law.

The following discussion of the issuance and transferability of the New Common Interests relates solely to matters arising under United States federal and state securities laws.  The rights of holders of New Common Interests, including the right to transfer New Common Interests, will also be subject to any restrictions in the Corporate Governance Documents to the extent applicable.  Recipients of the New Common Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.

B.     **Exemption from Registration Requirements; Issuance of New Common Interests Under the Plan**.

The Debtors expect to rely on one or more exemptions from, or transactions not subject to, the registration requirements of the Securities Act and applicable Blue-Sky Laws in connection with the offer, issuance, and distribution of securities pursuant to the Plan.  Prior to the Petition Date, the Debtors are relying on Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, and/or other available exemptions from registration, and similar Blue-Sky Laws provisions, to exempt from registration under the Securities Act and Blue-Sky Laws the offer of New Common Interests to Holders of Allowed First Lien Claims.  In addition, after the Petition Date, any securities that may not be issued to such persons pursuant to Section 1145 of the Bankruptcy Code will be issued in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act, and/or other available exemptions from registration.  Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance, and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

After the Petition Date, the Debtors believe that the issuance of the New Common Interests (other than any New Common Interests underlying the MIP) will be exempt from federal registration requirements under Section 1145 of the Bankruptcy Code, except in certain limited circumstances as explained in more detail in this Disclosure Statement and/or the Plan.  For the avoidance of doubt, any securities that may not be issued to persons pursuant to Section 1145 of the Bankruptcy Code are expected to be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act, and/or other available exemptions from registration.

In addition, the Debtors believe that any New Common Interests underlying the MIP will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D and Rule 701 promulgated thereunder and/or Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of any New Common Interests.  Recipients of the New Common Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.  As discussed below, the exemptions provided for in Section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in Section 1145(b) of the Bankruptcy Code.

C.     **Resales of New Common Interests; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code**.

1.     **Resales of New Common Interests Issued Pursuant to Section 1145**.

New Common Interests (other than any New Common Interests underlying the MIP) to the extent offered, issued and distributed pursuant to Section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within ninety (90) days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1)

78

under the Securities Act, subject to the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in Section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns 10 percent or more of a class of voting securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Interests pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act. Under certain circumstances, holders of such New Common Interests who are deemed to be "underwriters" may be entitled to resell their New Common Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of "control" securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Interests would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Interests and, in turn, whether any Person may freely trade such New Common Interests under the federal securities laws. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 will not be available for resales of such New Common Interests by Persons deemed to be underwriters or otherwise.

79

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW COMMON INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

2.      **Resales of New Common Interests Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act**.

Prior to the Petition Date, all New Common Interests will be offered in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable state securities laws. In addition, any securities that may not be issued to such persons pursuant to Section 1145 of the Bankruptcy Code (including any securities underlying the MIP) will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act, and/or other available exemptions from registration.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of "restricted securities" and "control securities" if certain conditions are met. These conditions vary depending on whether the issuer is a reporting company that files reports with the SEC under the Exchange Act and whether the holder is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." Reorganized GoHealth does not intend to be a reporting company under the Exchange Act. With respect to issuers that are not reporting companies under the Exchange Act, a non-affiliate of such an issuer who has not been an affiliate of such issuer during the preceding ninety (90) days may resell restricted securities of such issuer pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Common Interests by affiliates of the Debtors. Restricted securities may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Common Interests offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period, may not be made to a United States person or for the account or benefit of a United States person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a United States person and is not acquiring the securities for the account or benefit of any United States person or is a United States person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available

exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

All New Common Interests will bear a restrictive legend. Each certificate or book-entry interest representing, or issued in exchange for or upon the transfer, sale or assignment of, any New Common Interests shall be stamped or otherwise imprinted with a legend in substantially the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON DATE OF ISSUANCE, HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION."**

The Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 or another applicable exemption from registration as a condition to the removal of such legend or to any resale of the New Common Interests. The Debtors will also reserve the right to stop the transfer of any New Common Interests if such transfer (x) is not effected in compliance with Rule 144 or in compliance with another applicable exemption from registration (including Section 1145 of the Bankruptcy Code) or (y) would otherwise make the Debtors subject to the periodic reporting requirements under the Exchange Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Common Interests are exempt from the registration requirements of Section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Common Interests will also be subject to any applicable transfer restrictions contained in the Corporate Governance Documents.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW COMMON INTERESTS MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**.

    **A.    Introduction**.

The following discussion is a summary of certain United States federal income tax consequences of the Consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for United States federal income tax purposes) of Super-Priority Loan Claims, First Lien Claims, GoHealth Holdings Interests and GoHealth, Inc. Class A Common Stock. This summary is based on the United States Internal Revenue Code of 1986, as amended (the "IRC"), the United States Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the United States Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS, as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of United States federal income taxation that may be relevant to the Debtors, the Reorganized Debtors, or to certain Holders of Claims or Interests in light of their individual circumstances. This discussion does not address tax issues with respect to Holders of Claims or Interests subject to special treatment under the United States federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities (including subchapter S corporations), beneficial owners of Holders that are pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims or Interests who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). This summary does not address any aspect of state, local, estate, gift, or non- United States taxation or United States federal non-income tax considerations (including the Medicare tax imposed on certain net investment income). This summary assumes that a Holder of a Claim or Interest holds only Claims or Interests, as applicable, in a single Class and holds such Claims or Interests as "capital assets" within the meaning of section 1221 of the IRC (generally, property held for investment). This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for United States federal income tax purposes in accordance with their form, none of the Allowed Claims or Interests is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for United States federal income tax purposes, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders of Claims or Interests that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the United States federal income tax consequences to Holders of Allowed Claims (a) that hold 10 percent or more of the equity of the Debtors or that will hold 10 percent or more of the equity of the Reorganized Debtors after receiving

the distributions contemplated by the Plan or (b) (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (ii) that are deemed to reject the Plan, or (iii) that are otherwise not entitled to vote to accept or reject the Plan. This discussion also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for United States federal income tax purposes is: (a) an individual that is a citizen or resident of the United States; (b) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to United States federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim or Interest that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for United States federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for United States federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or such beneficial owner) and the activities of the partner (or such beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the United States federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND NON-UNITED STATES INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.     **Certain United States Federal Income Tax Consequences of the Plan to the Debtors, the Reorganized Debtors, and Equityholders of GoHealth Holdings**.

1.     **Characterization of the Restructuring Transactions**.

For U.S. federal income tax purposes, GoHealth, Inc. (the "Corporation") is treated as a corporation, GoHealth Holdings ("Holdings") is treated as a partnership and Norvax, LLC, which is the borrower under the Super-Priority Credit Agreement and the First Lien Credit Agreement, is treated as an entity that is disregarded from Holdings. Accordingly, the U.S. federal income tax consequences of the Restructuring Transactions (other than with respect to holders of Interests in Class 8) will generally be borne by Holdings' equityholders (including the Corporation) rather than Holdings and its subsidiary Debtors. Among other things, the cancellation of Claims against Holdings is expected to give rise to cancellation of debt income ("COD Income"), which COD Income generally should be allocated to Holdings' equityholders (including the Corporation).

The Debtors currently anticipate that as part of the Restructuring Transactions, (1) Holdings will remain a partnership for U.S. federal income tax purposes, (2) the holders of Allowed Claims in Classes 3

and 4 will receive their Pro Rata share of the Senior Takeback Debt, the Junior Takeback Debt and/or the New Common Interests, as applicable,  directly from Norvax, LLC, which is an entity that is disregarded from Holdings for U.S. federal income tax purposes, (3) the holders of Allowed Interests in Class 6 will receive their Pro Rata share of the Equity Recovery Pool from Holdings in complete redemption of their Holdings Interests and (4) the holders of Allowed Interests in Class 8 will receive their Pro Rata share of the Equity Recovery Pool from the Corporation (after Holdings distributes such portion of the Equity Recovery Pool directly or indirectly to the Corporation) in complete redemption of their GoHealth, Inc. Class A Common Stock, in each case of clauses (2) through (4) in a transaction that is taxable to such holders.  If a different structure is utilized, then a modified tax discussion will be filed as part of the Plan Supplement with respect to such modified structure.

**THE STRUCTURE DESCRIBED ABOVE IS SUBJECT TO CHANGE IN ALL RESPECTS.  IF AND TO THE EXTENT CHANGES ARE MADE TO THE STRUCTURE OF THE RESTRUCTURING TRANSACTIONS THAT AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED HEREIN, A SUPPLEMENTAL DISCLOSURE REFLECTING SUCH CHANGES WILL BE INCLUDED IN THE PLAN SUPPLEMENT.**

**2.    Cancellation of Debt and Reduction of Tax Attributes**.

As a result of the Restructuring Transactions, the Debtors are expected to recognize a substantial amount of COD Income.

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the amount of any Cash, (ii) the issue price of any new indebtedness issued by the debtor, and (iii) the fair market value of any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.  Unless an exception or exclusion applies, COD Income constitutes United States federal taxable income like any other item of taxable income.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if (i) the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception") or (ii) the taxpayer is insolvent (but only to the extent of the taxpayer's insolvency) (the "Insolvency Exception").  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the taxable income (or loss) for the year in which the debt exchange occurs has been determined.  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  Deductions deferred under section 163(j) of the IRC are not subject to reduction under these rules.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced).  Any excess COD Income over the amount of available tax attributes will generally not give rise to United States federal income tax and will generally have no other United States federal income tax impact.

Under section 108(d)(6) of the IRC, when an entity that is a flow-through entity (such as Holdings) realizes COD Income, its partners (including, with respect to Holdings, the Corporation) are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Because the Corporation (and any other subsidiary through which the Corporation will own its equity interests in Holdings at the time of the consummation of the Plan) will be a Debtor in these chapter 11 Cases, the Bankruptcy Exception will apply to the Corporation and any such subsidiary.

The exact amount of any COD Income (if any) that will be realized by Holdings (and by extension, the portion of such COD Income that will be allocated directly or indirectly to the Corporation) will not be determinable until the Consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the Senior Takeback Debt and the Junior Takeback Debt and the fair market value of the New Common Interests given in satisfaction of any Allowed Claims, none of which can be determined until after the Plan is consummated. Accordingly, the Debtors are currently unable to determine the precise effect that the COD Income exclusion rules will have on the Debtors and their United States federal income tax attributes.

### 3. Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Corporation's ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

#### (a) General Section 382 and 383 Annual Limitation.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, net unrealized built-in losses (a "NUBIL"), deductions deferred under section 163(j) of the IRC, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Interests pursuant to the Restructuring Transaction will result in an "ownership change" of the Corporation for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation.

#### (b) General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any

85

month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.65 percent for changes that occur in May 2026). The 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (the "Recognition Period") or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[9] If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period. The Reorganized Debtors are expected to have a NUBIL and therefore certain of the deductions recognized by the Reorganized Debtors during the Recognition Period are expected to be subject to the 382 Limitation. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

However, where the ownership change occurs pursuant to a confirmed chapter 11 plan, the annual limitation generally is calculated (with certain adjustments) by reference to the value of the debtor corporation's new stock immediately after the ownership change, but not in excess of the fair market value of the debtor corporation's pre-change gross assets. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

C. **Certain United States Federal Income Tax Consequences of the Plan to U.S. Holders of Super-Priority Loan Claims, First Lien Claims, GoHealth Holdings Interests and GoHealth, Inc. Class A Common Stoc .**

1. **Consequences to U.S. Holders of Super-Priority Loan Claims**.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a Super-Priority Loan Claim will receive its Pro Rata share of Senior Takeback Debt on the Effective Date.

A U.S. Holder of a Super-Priority Loan Claim is expected to recognize gain or loss equal to (a) the issue price of the Senior Takeback Debt received less (b) the U.S. Holder's adjusted tax basis in its Super-Priority Loan Claim. The adjusted tax basis of a U.S. Holder's Super-Priority Loan Claim generally will equal such U.S. Holder's actual or deemed purchase price for such Super-Priority Loan Claim, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Super-Priority Loan Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss, except to the extent described below under "market discount." If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Super-Priority Loan Claim for longer than one year.

---

[9] Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation. However, proposed Treasury Regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area. Additionally, a variety of public comments have been made by government officials indicating that the proposed Treasury Regulations will not be finalized in their current form and, instead, will be "re-proposed" in modified form. Accordingly, the Debtors do not expect the proposed Treasury Regulations to apply to them or to the Reorganized Debtors with respect to any "ownership change" that occurs pursuant to the Plan.

Non-corporate taxpayers are generally subject to a reduced United States federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

A U.S. Holder of a Super-Priority Loan Claim should obtain a tax basis in the Senior Takeback Debt equal to the issue price of the Senior Takeback Debt. The holding period for the Senior Takeback Debt should begin on the day following the receipt of such Senior Takeback Debt.

2.      **Consequences to Holders of First Lien Claims of the Restructuring Transactions**.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a First Lien Claim will receive its Pro Rata share of (i) Junior Takeback Debt and (ii) New Equity Interests on the Effective Date.

A U.S. Holder of a First Lien Claim is expected to recognize gain or loss equal to (a) the sum of the issue price of the Junior Takeback Debt received and the fair market value of the New Equity Interests received less (b) the U.S. Holder's adjusted tax basis in its First Lien Claim. The adjusted tax basis of a U.S. Holder's First Lien Claim generally will equal such U.S. Holder's actual or deemed purchase price for such First Lien Claim, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such First Lien Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss, except to the extent described below under "market discount." If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Super-Priority Loan Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced United States federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

A U.S. Holder of a First Lien Claim should obtain a tax basis in the New Equity Interest and Junior Takeback Debt received equal to the fair market value of the New Equity Interest as of the Effective Date and the issue price of the Junior Takeback Debt, respectively. The holding period for any such New Equity Interest and Junior Takeback Debt should begin on the day following the receipt of such New Equity Interest and Junior Takeback Debt.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

3.      **Consequences to Holders of GoHealth Holdings Interests of the Restructuring Transactions**.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Interests, each Holder of GoHealth Holdings Interests will receive its Pro Rata share of the Equity Recovery Pool.

As discussed above, under section 108(d)(6) of the IRC, the holders of GoHealth Holdings Interests will be allocated their share of COD Income from GoHealth Holdings. A U.S. Holder's ability to qualify for the Insolvency Exception will depend on whether such U.S. Holder is insolvent. For purposes of determining a U.S. Holder's insolvency (measured immediately prior to the Effective Date), the U.S. Holder

would be treated as if it were individually liable for an amount of GoHealth Holdings' debt equal to the amount of the COD Income allocated to such U.S. Holder.

The receipt by a U.S. Holder of its Pro Rata share of the Equity Recovery Pool in exchange for the GoHealth Holdings Interests will be a taxable exchange under Section 1001 of the IRC.  Accordingly, such U.S. Holder will recognize gain or loss equal to (1) the amount of the Equity Recovery Pool received by such U.S. Holder, plus (2) the amount of liabilities of GoHealth Holdings allocated to such U.S. Holder for U.S. federal income tax purposes immediately prior to the Effective Date, less (3) such U.S. Holder's adjusted tax basis in its GoHealth Holdings Interests (after taking into account any increase resulting from COD Income allocated to such U.S. Holder). The character of such gain or loss as capital or ordinary will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Interests in such U.S. Holder's hands and the amount of certain "hot assets" owned by GoHealth Holdings.  ***U.S. Holders should consult their own tax advisors concerning the tax consequences of their receipt of the Equity Recovery Pool***.

> ### 4.    Consequences to Holders of GoHealth, Inc. Class A Common Stock of the Restructuring Transactions.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Interests, each Holder of GoHealth, Inc. Class A Common Stock will receive its Pro Rata share of the Equity Recovery Pool.

A U.S. Holder of GoHealth, Inc. Class A Common Stock is expected to recognize gain or loss equal to (a) the amount of the Equity Recovery Pool received less (b) the U.S. Holder's adjusted tax basis in its GoHealth, Inc. Class A Common Stock.  The adjusted tax basis of a U.S. Holder's GoHealth, Inc. Class A Common Stock generally will equal such U.S. Holder's actual or deemed purchase price for such GoHealth, Inc. Class A Common Stock. Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss.  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held its GoHealth, Inc. Class A Common Stock for longer than one year.  Non-corporate taxpayers are generally subject to a reduced United States federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations

> ### 5.    Accrued Interest.

To the extent that the fair market value of the consideration received by a U.S. Holder of a Super-Priority Loan Claim or First Lien Claim on an exchange of its Allowed Claim under the Plan is attributable to accrued but untaxed interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder).  Conversely, a U.S. Holder of a Super-Priority Loan Claim or First Lien Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of a Super-Priority Loan Claim or First Lien Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims.  Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt

instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest.  Certain Treasury Regulations, however, allocate payments first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. *U.S. Holders of* a Super-Priority Loan Claims and First Lien Claims *are urged to consult their own tax advisors regarding the proper allocation of the consideration received under the Plan*.

### 6.    Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Super-Priority Loan Claim or First Lien Claim, who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a *de minimis* amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain allocated to a U.S. Holder in connection with the taxable disposition of a Super-Priority Loan Claim or First Lien Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the applicable Allowed Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).    *U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim*.

### 7.    Limitations on Capital Losses.

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 8.    United States Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Interests.

### (a)    Dividends on New Common Interests.

Any distributions made on account of the New Common Interests will constitute dividends for United States federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized GoHealth as determined under United States federal income tax principles.  "Qualified dividend income" allocable to an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in

its shares of the New Common Interests. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized GoHealth has sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

### (b)     Sale, Redemption, or Repurchase of New Common Interests.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Interests. Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has a holding period in the New Common Interests of more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Interests as ordinary income if such U.S. Holder took a bad debt deduction with respect to its First Lien Claims or recognized an ordinary loss on the exchange of its First Lien Claims for New Common Interests.

### D.     Certain United States Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Super-Priority Loan Claims, First Lien Claims, and GoHealth, Inc. Class A Common Stock.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions as contemplated by the Plan and as described above, and includes only certain United States federal income tax consequences of the Plan to Non-U.S. Holders of Super-Priority Loan Claims, First Lien Claims, GoHealth Holdings Interests and GoHealth, Inc. Class A Common Stock. The rules governing the United States federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the United States federal, state, local, non-United States, and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Interests.

### 1.     United States Federal Income Tax Consequences to Non-U.S. Holders of Super-Priority Loan Claims and First Lien Claims of the Restructuring Transactions.

Whether a Non-U.S. Holder realizes gain or loss on the exchange of Super-Priority Loan Claims or First Lien Claims ("Debt Claims") and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders holding the same class of Claims. Any gain realized by a Non-U.S. Holder of a Debt Claim on the exchange of its Debt Claims (other than any gain attributable to accrued but untaxed interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Accrued Interest") generally will not be subject to United States federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and

90

certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to United States federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to United States sources exceed capital losses allocable to United States sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to United States federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.    United States Federal Income Tax Consequences to Non-U.S. Holders of GoHealth, Inc. Class A Common Stock of the Restructuring Transactions.

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any GoHealth, Inc. Class A Common Stock and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders holding the same class of Claims. Any gain realized by a Non-U.S. Holder of GoHealth, Inc. Class A Common Stock on the exchange of its Allowed Claims generally will not be subject to United States federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met, (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) or (c) GoHealth, Inc. is considered a "United States real property holding corporation" (a "USRPHC").

If the first exception applies, the Non-U.S. Holder generally will be subject to United States federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to United States sources exceed capital losses allocable to United States sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to United States federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

If the third exception applies, a Non-U.S. Holder of GoHealth, Inc. Class A Common Stock generally will be subject to United States federal income tax on any gain recognized as a result of the exchange of such GoHealth, Inc. Class A Common Stock for its Pro Rata share of the Equity Recovery Pool under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder. Taxable gain from a disposition of an interest in a USRPHC would be treated as effectively connected with such Non-U.S. Holder's conduct of a United States trade or business. A Non-U.S. Holder would also be

subject to withholding tax equal to 15 percent of the amount realized on the disposition and generally required to file a United States federal income tax return.  The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's United States federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS.  Provided the GoHealth, Inc. Class A Common Stock is considered regularly traded on an established securities market for purposes of the IRC, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of all outstanding Class A Common Stock during a specified testing period.  Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.

In general, a corporation would be a USRPHC with respect to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) such Non-U.S. Holder's holding period for its interests in the corporation.  The Debtors do not believe that GoHealth, Inc. is a USRPHC, in light of the nature of their assets and business operations, but no formal study has been or will be conducted in this regard

### 3.      **Accrued Interest**.

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID, if any) with respect to Debt Claims that is not effectively connected with a United States trade or business carried on by the Non-U.S. Holder may qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to United States federal income tax or withholding, *provided* that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in the Debtors within the meaning of section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to the Debtors, actually or constructively through the ownership rules under section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the Debtors an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest income allocable to a Non-U.S. Holder that is not effectively connected with a United States trade or business carried on by the Non-U.S. Holder will generally be subject to United States federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E,

special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Certain United States Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," under the Plan, the aggregate consideration to be distributed in respect of Debt Claims will be allocated first to the principal amount of such Debt Claims, with any excess allocated to accrued but unpaid interest on such Debt Claims, if any.

If interest income allocable to a Non-U.S. Holder is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay United States federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply), *provided* the appropriate statement is provided to Debtors unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to United States federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.   Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

4. **United States Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Interests**.

(a) **Dividends on New Common Interests**.

Any distributions made with respect to New Common Interests (other than certain distributions of stock of Reorganized GoHealth) will constitute dividends for United States federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized GoHealth as determined under United States federal income tax principles (and thereafter first as a return of capital which reduces such Non-U.S. Holder's basis in such New Common Interests and then, generally, capital gain).  Except as described below, dividends paid with respect to New Common Interests that are not effectively connected with a Non-U.S. Holder's conduct of a United States trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to United States federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non- United States person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such

93

payments. Dividends paid with respect to New Common Interests that are effectively connected with a Non-U.S. Holder's conduct of a United States trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to United States federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for United States federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If Reorganized GoHealth is a USRPHC, distributions to a Non-U.S. Holder will generally be subject to withholding by such Reorganized Debtor at a rate of 15 percent to the extent they are not treated as dividends for United States federal income tax purposes. The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS. In the event the New Common Interests are regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes New Common Interests during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations. As discussed above, the Debtors do not believe they are, and do not believe the Reorganized Debtors will be, USRPHCs, in light of the nature of their assets and business operations, but no formal study has been conducted in that regard.

### (b)    Sale, Redemption, or Repurchase of New Common Interests.

A Non-U.S. Holder generally will not be subject to United States federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Common Interests unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a United States trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such New Equity Interest is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to United States federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to United States sources exceed capital losses allocable to United States sources during the taxable year of disposition of the New Common Interests. If the second exception applies, the Non-U.S. Holder generally will be subject to United States federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for United States federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a United States trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

94

If the third exception applies, a Non-U.S. Holder of New Common Interests generally will be subject to United States federal income tax on any gain recognized on the disposition of all or a portion of the New Common Interests under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder.  Taxable gain from a disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would be treated as effectively connected with such Non-U.S. Holder's conduct of a United States trade or business.  A Non-U.S. Holder would also be subject to withholding tax equal to 15 percent of the amount realized on the disposition and generally required to file a United States federal income tax return.  The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's United States federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS.  In the event the New Common Interests are regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes New Common Interests during a specified testing period.  Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations. As discussed above, the Debtors do not believe they are, and do not believe the Reorganized Debtors will be, USRPHCs, in light of the nature of their assets and business operations, but no formal study has been conducted in that regard.

5.    **FATCA**.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their United States account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally United States-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce United States-source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to United States federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of any stock, debt instrument, or other property that can produce United States-source dividends or interest have been effectively suspended under proposed Treasury Regulations, which can be relied on until final regulations become effective.  Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW COMMON INTERESTS.**

E.    **Information Reporting and Back-Up Withholding**.

The Debtors, the Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may

95

make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless such Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct United States taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, TERRITORIAL, OR NON-UNITED STATES TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.   RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims and Holders of Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: June 7, 2026

GOHEALTH, INC.
on behalf of itself and all other Debtors

By:   */s/ Vijay Kotte*

Name: Vijay Kotte
Title: Chief Executive Officer