**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GOHEALTH, INC., *et al.*,[1] | ) | Case No. 26-10914 [●] |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS**
**TO (A) CONTINUE TO OPERATE THE CASH MANAGEMENT**
**SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS**
**RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS,**
**AND (D) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS,**
**(II) GRANTING ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION**
**INTERCOMPANY TRANSACTIONS, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:[2]

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively): (a) authorizing the Debtors to (i) continue to operate their Cash Management System (as defined herein) and maintain their existing Debtor Bank Accounts (as defined herein), (ii) honor certain prepetition and postpetition obligations related thereto, (iii) maintain

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are: GoHealth, Inc. (3805); Blizzard Midco, LLC (3732); Connected Benefits, LLC (2162); e-TeleQuote Insurance, Inc. (2336); ETQ Holdings, LLC (8260); GoHealth Holdings, LLC (3653); GoHealth, LLC (5175); and Norvax, LLC (3063). The location of the Debtors' service address for purposes of these chapter 11 cases is: 222 West Merchandise Mart Plaza, Suite 1750, Chicago, Illinois 60654.

[2] A detailed description of the Debtors and their business, including the facts and circumstances supporting this motion, is set forth in the *Declaration of Vijay Kotte, Chief Executive Officer of GoHealth, Inc., in Support of the Debtors' Chapter 11 Petitions, First Day Motions, and Access to Cash Collateral* (the "First Day Declaration"). Capitalized terms used but not defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

existing Business Forms (as defined herein) in the ordinary course of business, and (iv) continue to perform Intercompany Transactions (as defined herein) consistent with prepetition practice; (b) granting administrative expense status to the Intercompany Transactions; and (c) granting related relief.  In addition, the Debtors request that the Court (as defined herein) schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

**Jurisdiction and Venue**

2.      The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 345, 363, 364, 503, 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 2015-1, and 9013-1.

**Background**

5.      On June 7, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**The Cash Management System**

**I.      Overview.**

6.      In the ordinary course of business, the Debtors, together with their non-Debtor affiliates, maintain an integrated, centralized cash management system (the "Cash Management System"), a schematic of which is attached as Exhibit 1 to the Interim Order and Final Order, to facilitate the efficient operation of their business.  The Debtors use the Cash Management System to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight of the Cash Management System and implements controls for accepting, processing, and releasing funds in the ordinary course of the Debtors' business, including in connection with the Intercompany Transactions. The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are properly accounted for.  The Cash Management System is comparable to cash management systems commonly used by businesses similar in size and scale to the Debtors.

7.      Some of the Debtor Bank Accounts are subject to security interests in favor of the lenders under the First Lien Credit Agreement and the Super-Priority Credit Agreement (together, the "Prepetition Credit Facilities").  Additionally, four of the Debtor Bank Accounts are subject to

3

deposit account control agreements, which enable lenders to perfect their security interests over such accounts and are part of the collateral package for the Prepetition Credit Facilities.

8.     Because of the nature and operational scale of the Debtors' business, any disruption to the Cash Management System will have an immediate and significant adverse effect on the Debtors' operations and ability to achieve their chapter 11 objectives to the detriment of all stakeholders.  It is therefore critical that the Cash Management System remain in place on a postpetition basis. Accordingly, the Debtors request authority, but not direction, to continue operating their existing Cash Management System and to honor certain prepetition obligations related thereto in the ordinary course of business during the pendency of these chapter 11 cases, consistent with prepetition practice.

## II.     The Bank Accounts and Ordinary Course Flow of Funds.

### A.     Bank Accounts.

9.     As of the Petition Date, the Cash Management System comprises 22 bank accounts, 19 of which are owned and controlled by the Debtors (the "Debtor Bank Accounts"), and three of which are owned and controlled by non-Debtor affiliates (the "Non-Debtor Bank Accounts," and together with the Debtor Bank Accounts, the "Bank Accounts").  The Debtor Bank Accounts are maintained at five well-capitalized financial institutions, each of which is an Authorized Depository (as defined herein):

- The Huntington National Bank ("Huntington Bank");

- Bank of America, N.A. ("Bank of America");

- BMO Bank N.A. ("BMO");

- Valley National Bank ("Valley Bank"); and

- Citibank, N.A. ("Citibank") (Citibank, together with Valley Bank, Huntington Bank, Bank of America, and BMO, the "Cash Management Banks").

4

10.     The Bank Accounts are identified on Exhibit 2 attached to the Interim Order and Final

Order and are described in the following table:

| Bank Accounts | Account Descriptions |
|---|---|
| **Main Operating Account**<br><br>Norvax, LLC<br>*1 Account:*<br>*Huntington Bank*<br>x8302 | Debtor Norvax, LLC ("Norvax") holds a main operating account at Huntington Bank, which serves as the Debtors' primary account for all ordinary course cash inflows and outflows (the "Main Operating Account"). Funds are swept from the Main Operating Account to and from zero balance accounts ("Zero Balance Accounts" or "ZBAs"), which are a combination of certain Receivables Accounts, Disbursement Accounts, and Other Operating Accounts (each as defined herein). The funds deposited into the Main Operating Account are used to satisfy the Debtors' payment obligations that are not covered by the other ZBAs, including rent, marketing, general overhead, and disbursements to the Non-Debtor Bank Accounts operated by Tatra Banka ("Tatra Bank") to fund operations in Slovakia.<br><br>Payments from third parties are transferred into the Main Operating Account from various ZBAs and Other Operating Accounts. Funds in the ZBAs are swept into the Main Operating Account at the close of each business day.<br><br>Additionally, funds from the Main Operating Account are manually transferred to the Money Market Accounts (as defined herein) operated by Huntington Bank as excess cash is available to earn higher interest income.<br><br>Debt service payments are made out of the Main Operating Account.<br><br>The Main Operating Account is subject to a deposit account control agreement pursuant to the Prepetition Credit Facilities. |
| **Other Operating Accounts**<br><br>Norvax, LLC<br>*1 Account:*<br>*Huntington Bank*<br>x7881<br><br>GoHealth, LLC<br>*1 Account:*<br>*Huntington Bank*<br>x8797<br><br>GoHealth Holdings, LLC<br>*1 Account:*<br>*Huntington Bank*<br>x3775<br><br>GoHealth, Inc.<br>*1 Account:*<br>*Huntington Bank*<br>x8947 | The Cash Management System includes six additional operating accounts, four of which are Debtor Bank Accounts (the "Other Operating Accounts").<br><br>The Other Operating Accounts that are Debtor Bank Accounts are all operated by Huntington Bank. The Other Operating Account held by Norvax (ending 7881), receives cash from an outside bank, Merrill Lynch & Co. ("Merrill Lynch"), for employee stock transactions and, in rare cases, makes payments to Merrill Lynch for taxes and any associated fees with the transactions. The Other Operating Account (ending 8797) held by GoHealth, LLC is the Debtors' primary commissions account and is responsible for both receipts and downline disbursements. Both the Norvax and GoHealth, LLC Other Operating Accounts are ZBAs. Accordingly, at the end of each business day, any excess funds held in these Other Operating Accounts are swept into the Main Operating Account for other disbursements.<br><br>Debtor GoHealth Holdings, LLC maintains an Other Operating Account (ending 3775) which was set up in connection with funding from outside investors for the Debtors' business. This account assists with the payment of bank fees for the GoHealth, Inc. Other Operating Account (ending 8947) via manual transfer. The GoHealth, Inc. Other Operating Account (ending 8947) holds a *de minimis* balance. Neither of these accounts is a ZBA and therefore neither is subject to any sweeps. |

| Bank Accounts | Account Descriptions |
|---|---|
| **Disbursement Accounts**<br><br>GoHealth, LLC<br>*2 Accounts:*<br>*Huntington Bank*<br>x7309<br>x6747<br><br>Norvax, LLC<br>*1 Account:*<br>*Huntington Bank*<br>x8905 | The Debtors hold three disbursement accounts to fund their operations (collectively, the "Disbursement Accounts"), including certain general and administrative expenses, vendor payments, corporate overhead expenses, and third-party benefits administrators. All three of the Disbursement Accounts are ZBAs. GoHealth, LLC holds two Disbursement Accounts, both of which are operated by Huntington Bank. The Disbursement Account (ending 7309) serves to pay agent licensing fees and renewals, and the Disbursement Account (ending 6747) makes disbursements relating to self-insured health policies and records no inflows. Norvax holds the remaining Disbursement Account, which is operated by Huntington Bank (ending 8905) and makes payments to third-party benefits administrators.<br><br>The Disbursement Accounts are funded by the Main Operating Account. Disbursements for purposes not covered by the Disbursement Accounts are made by the Main Operating Account.<br><br>Since the Disbursement Accounts are ZBAs, the funds contained within them are subject to automatic sweeps at the end of each business day. Any funds not used by the end of each business day are swept to the Main Operating Account. |
| **Receivables Accounts**<br><br>GoHealth, LLC<br>*1 Account:*<br>*BMO*<br>x3979<br><br>Norvax, LLC<br>*1 Account:*<br>*BMO*<br>x3783<br><br>Connected Benefits, LLC<br>*1 Account:*<br>*Huntington Bank*<br>x1156<br><br>e-TeleQuote Insurance, Inc.<br>*1 Account:*<br>*Valley Bank*<br>x2336 | The Cash Management System includes five receivables accounts, which primarily consist of commissions from new insurance plan enrollments and renewal of existing plan enrollments. Four of the five receivables accounts are held by Debtors (the "Receivables Accounts").<br><br>The GoHealth, LLC account (ending 3979) and Norvax account (ending 3783), both operated by BMO, serve as Receivables Accounts for legacy commissions that are under $100,000 on an annual basis. Neither account is a ZBA, and their balances typically are not transferred to the Main Operating Account or Other Operating Accounts via manual transfer. The Connected Benefits, LLC account (ending 1156) operated by Huntington Bank receives legacy commissions related to policies sold by Connected Benefits, LLC prior to its acquisition by GoHealth. This account is a ZBA.<br><br>The e-TeleQuote Insurance, Inc. account (ending 2336) operated by Valley Bank serves as a receivable account for legacy commissions for ETQ Holdings, LLC. This Receivables Account is set up as a checking account, whereby funds are manually transferred to the Main Operating Account on an as-needed basis, as well as to and from the e-TeleQuote Insurance, Inc. Money Market Account (as defined herein). The e-TeleQuote Insurance, Inc. Receivables Account is subject to a deposit account control agreement under the Prepetition Credit Facilities. |
| **Money Market Accounts**<br><br>Norvax, LLC<br>*1 Account:*<br>*Huntington Bank*<br>x4059<br><br>e-TeleQuote Insurance, Inc.<br>*1 Account:*<br>*Valley Bank*<br>x8842 | The Debtors maintain two money market accounts (the "Money Market Accounts"), through which the Debtors invest excess cash.<br><br>The Money Market Account held by Norvax and operated by Huntington Bank (ending 4059) invests excess cash as available from the Main Operating Account (ending 8302). About once a week, funds are transferred manually from the Main Operating Account to the Norvax Money Market Account. The Norvax Money Market Account is subject to a deposit account control agreement pursuant to the Prepetition Credit Facilities.<br><br>The other Money Market Account is held by e-TeleQuote Insurance, Inc., operated by Valley Bank (ending 8842), and invests excess cash from the Receivables Account held by e-TeleQuote Insurance, Inc. (ending 2336). The e-TeleQuote |

6

| Bank Accounts | Account Descriptions |
|---|---|
| | Insurance, Inc. Money Market Account is subject to an account control agreement pursuant to the Prepetition Credit Facilities.<br><br>The Money Market Accounts are not ZBAs, and any cash transferred to these accounts is moved via manual transfer rather than automatic sweep. |
| **Payroll Account**<br><br>Norvax, LLC<br>*1 Account:*<br>*Huntington Bank*<br>x1769 | Debtor Norvax maintains one account with Huntington Bank (ending 1769) which is used to pay payroll and payroll taxes (the "Payroll Account").  The Payroll Account is a ZBA and is typically funded via a reverse wire, with funds pushed to the outside payroll provider on Thursdays prior to pay runs on Fridays and the subsequent negative balance covered via ZBA transfer from the Main Operating Account.  The Payroll Account also receives payroll tax refunds and small payroll-related payments. |
| **Dormant Accounts**<br><br>Norvax, LLC<br>*2 Accounts:*<br>*Bank of America*<br>x1561<br>x9211<br><br>*1 Account:*<br>*BMO*<br>x2338 | Debtor Norvax maintains three dormant bank accounts (the "Dormant Accounts"), two of which are operated by Bank of America and one of which is operated by BMO.  As of the Petition Date, the Dormant Accounts reflect no activity. |
| **Professional Fee Escrow Account**<br><br>Norvax, LLC<br>*1 Account:*<br>*Citibank*<br>x2464 | The Debtors maintain a Debtor Bank Account at Citibank (the "Professional Fee Escrow Account"), which was opened prior to the Petition Date to hold (a) funds in escrow for payment of professionals during these chapter 11 cases and (b) the Carve-Out (as defined in the Cash Collateral Motion).[3] |
| **Non-Debtor Bank Accounts**<br><br>GoHealth, s.r.o<br>*2 Accounts:*<br>*Tatra Bank*<br>x0663<br>x2201<br><br>ETQ HK SPV, Inc.<br>*1 Account:*<br>*Valley Bank*<br>x5703 | The Cash Management System includes three Non-Debtor Bank Accounts held by certain non-Debtor affiliates.<br><br>Two Non-Debtor Bank Accounts (ending 0663 and 2201) are held by non-Debtor GoHealth, s.r.o ("GoHealth Slovakia") and operated by Tatra Bank.  These Non-Debtor Bank Accounts are operating accounts and primarily fund the limited operations of GoHealth Slovakia, which provides critical technology services to the Debtors.  The Non-Debtor Bank Account ending in 0663 receives disbursements from the Main Operating Account in USD, converts such disbursements to Euro, and then transfers such disbursements to the Non-Debtor Bank Account ending in 2201, which makes disbursements for GoHealth Slovakia's operations.<br><br>The remaining Non-Debtor Bank Account is a receivables account (ending 5703) held by non-Debtor ETQ HK SPV, Inc. ("ETQ") and operated by Valley Bank.  This |

---

[3] "Cash Collateral Motion" means the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, filed concurrently herewith.

| Bank Accounts | Account Descriptions |
|---|---|
| | account receives legacy commissions from previous policies sold by ETQ. This account does not make disbursements. |

### B.      Cash Collections.

11.      The Debtors' sole source of cash collections is commissions earned from various carrier partners for the sale of new insurance policies to their customers and the renewal of legacy insurance policies.  The main commissions account is the Other Operating Account held by Debtor GoHealth, LLC and operated by Huntington Bank (ending 8797).  This account receives the bulk of commissions inflows and is a Zero Balance Account.  Three other Debtor Bank Accounts receive commissions on a smaller scale.  The Receivables Account held by Debtor Connected Benefits, LLC and operated by Huntington Bank (ending 1156) receives deposits from legacy commissions and is a Zero Balance Account.  Additionally, the Receivables Account held by GoHealth, LLC and operated by BMO (ending 3979) receives legacy commissions under $100,000 on an annual basis, maintaining a small balance that is not typically transferred to the Main Operating Account.  Finally, Valley Bank operates a Receivables Account held by Debtor e-TeleQuote Insurance, Inc. (ending 2336), which receives the majority of commissions from the renewals of the e-TeleQuote Insurance, Inc. insurance policies.  Non-Debtor ETQ also receives a small commissions inflow from time to time into the receivables account it holds (ending 5703) at Valley Bank.

### C.      Disbursements.

12.      The Debtors pay most of their ordinary course operating expenses through the below Bank Accounts, each of which is designated for specific purposes.  Payments from these accounts are largely made via ACH and wire.  The Debtors estimate that disbursements for the Cash Management System average approximately $29 million per month.

- *Main Operating Account x8302*.   To pay any necessary disbursements not paid through the Disbursement Accounts, including general operating expenses, marketing costs, debt service obligations, rent obligations, and disbursements to Non-Debtor Bank Accounts to fund GoHealth Slovakia's operations.

- *Other Operating Account x7881*.  To make payments to Merrill Lynch for taxes and other associated fees related to employee stock transactions.

- *Other Operating Account x8797*.   To pay commissions to the Debtors' external agency partners.

- *Disbursement Account x7309*.  To pay agent licensing fees and renewals.

- *Disbursement Account x8905*.   To pay third-party benefits administrators.

- *Disbursement Account x6747*.   To pay for self-insured health benefits claims.

- *Payroll Account x1769*.  To pay payroll and payroll taxes.

- *Non-Debtor Bank Account x2201*.  To make disbursements to fund GoHealth Slovakia's operations.

**III.   Bank Fees.**

13.   In the ordinary course of business, the Debtors incur periodic service charges, costs, chargebacks, overdrafts, and other fees in connection with the maintenance of the Cash Management System (collectively, the "Bank Fees").   The Bank Fees are automatically deducted from the corresponding Debtor Bank Accounts by their respective Cash Management Banks on a monthly basis.[4]  The Debtors pay approximately $10,000 per month in Bank Fees on average.  The Debtors estimate that they owe approximately $10,000 in Bank Fees as of the Petition Date, all of which is

---

[4]   Huntington Bank's Bank Fees are typically debited from the accounts ending in 8302, 8947, and 3775 around the 15th of each month, and the account ending in 4059 on the 10th of each month.  Valley Bank's Bank Fees are generally deducted from the account ending in 2336 around the 15th of each month.  BMO's Bank Fees are generally deducted from the account ending in 3783 around the 22nd day of each month.

expected to come due before entry of the Final Order. To ensure the uninterrupted operation of the Cash Management System, the Debtors request authority, but not direction, to pay all outstanding amounts on account of the Bank Fees and to continue to do so in the ordinary course of business on a postpetition basis, consistent with prepetition practice.

**IV.      Credit Card Program.**

14.      As part of the Cash Management System, the Debtors maintain a corporate credit card program (the "Credit Card Program"), pursuant to which a small group of employees are issued purchasing cards ("P-Cards") by Huntington Bank and Valley Bank.[5]  P-Cards are provided to company personnel largely at the executive level, but also on a select basis to designated department employees to facilitate ordinary course payments related to licensing, facilities, and procurement.  In addition to the P-Cards, the Debtors provide executives with credit cards issued by American Express (the "Amex Cards," and together with the P-Cards, the "Credit Cards") for business expenses such as travel-related costs.  Amex Cards are issued only to the Debtors' executives.

15.      Credit Card balances are paid monthly to Huntington Bank by auto debit or ACH from the Main Operating Account.  The total credit limit for the P-Cards is $500,000 for all participating members, and there is no set limit for the Amex Cards.  The Debtors' treasury department maintains ongoing oversight and administration of the Credit Card Program.  As of the Petition Date, Huntington Bank has issued P-Cards to 12 members of the Debtors' workforce in connection with the Credit Card Program.  Similarly, American Express has issued three Amex Cards to the Debtors' executives.  Expenses incurred on account of the Credit Card Program are billed directly to the Debtors and do not pass through the employees' personal financial accounts.

---

[5]     As of the Petition Date, the Debtors are in the process of closing the two Valley P-Cards.

16. Prior to the Petition Date, the Debtors paid approximately $120,000 in the aggregate per month on account of the Credit Card Program. The Debtors estimate that there is approximately $170,000 outstanding on account of the Credit Card Program as of the Petition Date, approximately all of which will come due prior to entry of the Final Order. The Credit Card Program is an integral part of the Debtors' Cash Management System. Employees' continued use of the Credit Cards for operational and business expenses and the Debtors' ability to pay the balances accrued on the Credit Cards through the Credit Card Program is essential to the continued operation of the Debtors' business. The Debtors request authority, but not direction, to continue the use of the Credit Card Program and to pay prepetition or postpetition amounts, if any, owed with respect thereto, including any administrative fees and charges owed in connection therewith, in each case, in the ordinary course of business.

## V. Intercompany Transactions.

17. In the ordinary course of business, the Debtors engage in intercompany financial transactions with each other and with their non-Debtor affiliates (collectively, the "Intercompany Transactions") resulting in intercompany receivables and payables (the "Intercompany Balances"). The Debtors can ascertain, trace, and account for all Intercompany Transactions through daily activity, payroll and account processing, and quarterly invoice entries, each of which is reflective of actual cash movements, and they will continue to monitor Intercompany Transactions on a postpetition basis in the ordinary course of business. The Intercompany Balances are generally reflected in intercompany invoices and in the Debtors' accounting system. The Debtors do not, however, have any official or documented Intercompany Transactions agreements, and Intercompany Transactions are managed on a largely informal basis.

18. In particular, it is critical that the Debtors maintain the ability to continue making monthly disbursements to non-Debtor GoHealth Slovakia. The GoHealth Slovakia team helps

develop, test, and maintain the Debtors' marketplace technology, which is at the core of the Debtors' business. GoHealth Slovakia records no receipts, so it relies on consistent funding from the Debtors for general and administrative expenses. If the Debtors are unable to make disbursements to GoHealth Slovakia, they will be forced to identify a substitute vendor on an expedited basis. It would likely take such substitute vendor several months to develop the same level of familiarity with the Debtors' business that the GoHealth Slovakia team possesses. Such a delay would disrupt the Debtors' technology initiatives and daily operations, interrupting the Debtors' ability to serve their customers. In addition, finding a substitute technology vendor would likely cause the Debtors to lose the cost savings they capture by utilizing the GoHealth Slovakia team. Accordingly, it is critical the Debtors maintain the ability to make disbursements to GoHealth Slovakia.

19.     In the ordinary course of business, the Debtors transfer approximately $950,000 per month to GoHealth Slovakia. The funds are initially sent from the Main Operating Account to a U.S. dollar account at Tatra Bank (ending 0663) held by GoHealth Slovakia before being swept into a Euro account also at Tatra Bank (ending 2201) for local use. The Debtors track these payments in their general ledgers as Intercompany Transactions. The Debtors do not make loans to non-Debtor entities in the ordinary course of business.

20.     The Intercompany Transactions are an essential component of the Debtors' operations and centralized Cash Management System. Any interruption of the Intercompany Transactions would disrupt the Debtors' operations, harming the Debtors' estates and, by extension, their stakeholders. Accordingly, the Debtors request authority, but not direction, to honor any obligations associated with the Intercompany Transactions and to continue entering into ordinary course Intercompany

Transactions (including with respect to netting or setoffs, if any) consistent with prepetition practice.[6] The Debtors also request that all postpetition payments on account of any postpetition Intercompany Transactions from one Debtor to another Debtor that give rise to an Intercompany Claim (as defined herein) be accorded, in favor of the applicable Debtor payor, administrative expense priority pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code.[7]  This relief will ensure that each entity receiving payments from a Debtor or benefiting from a payment made by a Debtor on behalf of such entity will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.[8]

**VI.     Compliance with the Depository Requirements of the Bankruptcy Code and the U.S. Trustee Guidelines.**

     **A.     Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code.**

21.     Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  In order to comply with section 345 of the Bankruptcy Code, the *Region 3 Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") for

---

[6]  For the avoidance of doubt, the Debtors request authority to set off mutual prepetition obligations and mutual postpetition obligations relating solely to Intercompany Transactions and will not set off any prepetition obligations against any postpetition obligations.

[7]  Notwithstanding anything herein to the contrary, including, but not limited to, the administrative expense status requested for the Intercompany Transactions, all Debtors, for themselves and their parents, subsidiaries, and affiliates, hereby expressly reserve any and all rights, claims, and privileges to dispute any Intercompany Transaction and payment or funds transfer made on account of any Intercompany Transaction.

[8]  This motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described in this motion.  To the extent that there are any outstanding prepetition obligations related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, request authority to honor such obligations.

13

the United States Trustee for the District of Delaware (the "U.S. Trustee") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee (each, an "Authorized Depository"). Section 345(b) of the Bankruptcy Code requires a debtor's bank to post a bond unless a debtor's funds are "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States."  11 U.S.C. § 345(b).

22.     As of the Petition Date, all of the Debtor Bank Accounts are maintained at Authorized Depositories.  Likewise, all of the Debtor Bank Accounts are insured by the Federal Deposit Insurance Corporation (the "FDIC").  Of the 19 Debtor Bank Accounts, only five may hold deposits in excess of the FDIC limits.  Nevertheless, there is no cognizable risk known to the Debtors that suggests that funds in excess of the FDIC insurance limit held in those Debtor Bank Accounts will be in jeopardy during the pendency of these chapter 11 cases.  Huntington Bank, Bank of America, BMO, Valley Bank, and Citibank are all adequately capitalized financial institutions in the global banking system, each with excellent credit ratings.  Requiring the Debtors to post a bond with respect to such excess amounts would impose a substantial expense and administrative burden in the early days of these chapter 11 cases, challenging the Debtors' ability to maintain ongoing stability amid their transition into chapter 11.

23.     When Congress enacted section 345(b) of the Bankruptcy Code, it contemplated a situation in which a debtor in possession would be unable to comply by explicitly enumerating a "for cause" exception.  Ample cause exists here to grant an extension on an interim basis to comply with section 345(b) of the Bankruptcy Code and subsequently grant a waiver thereof, generally allowing the Debtors to continue utilizing the Debtor Bank Accounts and Cash Management System in the ordinary course of business and consistent with past practice.

24.     Because the Debtor Bank Accounts are held at Authorized Depositories, the Debtors believe their accounts comply with section 345(b) of the Bankruptcy Code.  Out of an abundance of caution, however, to the extent the Court does not determine that the requirements of section 345(b) of the Bankruptcy Code are satisfied, the Debtors request a 30-day extension to come into compliance with section 345(b) of the Bankruptcy Code, without prejudice to the Debtors' right to seek an additional extension, to either bring the applicable Debtor Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or seek appropriate relief from the Court.  Granting such relief will allow the Debtors to continue utilizing the existing Bank Accounts and will inure to the benefit of all stakeholders.

> **B.     Compliance with the U.S. Trustee Guidelines as to Business Forms and Books and Records.**

25.     As part of the Cash Management System, the Debtors use a variety of preprinted business forms (including checks, letterhead, correspondence forms, invoices, as well as certain electronically generated business forms) in the ordinary course of business (collectively, and as they may be modified from time to time, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records").  To avoid a material disruption to their business operations and to minimize administrative expense to their estates, the Debtors request authorization, but not direction, to continue using all the Business Forms and Books and Records consistent with prepetition practice, without reference to the Debtors' status as debtors in possession in accordance with Local Rule 2015-1.

**Basis for Relief**

**I.     Maintaining the Cash Management System Is Essential to the Debtors' Ongoing Operations and Restructuring Efforts.**

26.     The Cash Management System constitutes an ordinary course and essential business practice of the Debtors.  The Cash Management System provides material benefits to the Debtors

15

including, among other things, the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information.  Thus, to ensure the stable operation of the Debtors' business and realize the benefits of the Cash Management System, the Debtors should be allowed to continue using the Cash Management System and should not be required to open new bank accounts.

27.     The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor-in-possession accounts; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks.  These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions, payments, and operations, and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

28.     Considering the complexity of the Debtors' business and financial affairs and their need to collect, transfer, and disburse funds throughout the Cash Management System (which ties into the Debtors' existing corporate accounting and cash forecasting reporting), enforcing these provisions of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt the Debtors' business and their ability to efficiently administer these chapter 11 cases.  Accordingly, the Debtors request that the Court allow them to operate each of the Debtor Bank Accounts as they were maintained in the ordinary course of business prior to the Petition Date.

29.    The continuation of the Cash Management System should be permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."    Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter[]." *In re Baldwin United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).  The United States Court of Appeals for the Third Circuit emphasized that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that maintaining an existing cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

30.    Here, requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the ability to, among other things, quickly assess the location and amount of funds, which, in turn, allows management to control such funds, ensure cash availability, and reduce administrative costs through centralized coordination.  In light of the size and complexity of the Debtors' operations, any disruption of the Cash Management System could have a severe adverse effect on the Debtors' restructuring efforts, the cost of which would ultimately be borne by the Debtors' stakeholders.

17

31.    By contrast, maintaining the current Cash Management System will facilitate the Debtors' smooth transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  Maintaining the Cash Management System also will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities as opposed to the non-accretive task of reconstructing the Cash Management System.  Finally, the Debtors can distinguish between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.  With the protective measures put in place by the Debtors and their advisors, the benefits of continuing the Cash Management System decidedly outweigh the costs.

32.    Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Debtor Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' accounting and treasury departments.  In light of such protective measures, maintaining the Cash Management System is in the best interests of their estates and stakeholders.

33.    Accordingly, the Debtors request that the Court authorize, but not direct, the continued use of the existing Cash Management System consistent with prepetition practice to facilitate the Debtors' transition into chapter 11.  Specifically, the Debtors request that the Court authorize the Cash Management Banks to continue to maintain, service, and administer the Debtor Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  In this regard, the Cash Management Banks should be authorized to receive, process, honor,

and pay any and all checks, ACH transfers and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto. Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Cash Management Banks to have drawn, issued, or otherwise presented before the Petition Date may be honored by the Cash Management Banks only to the extent authorized by order of the Court.

34.     The Debtors also seek a waiver of the requirement under the U.S. Trustee Guidelines to establish specific bank accounts for tax payments, including payroll taxes. The Debtors' tax obligations can be paid out of the Debtor Bank Accounts as they are in the ordinary course of business, and the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the accounts, as set forth in the required reporting. Moreover, the creation of a new debtor-in-possession account designated solely for tax obligations would be unnecessary and inefficient.

35.     The Debtors further request that the Court authorize the Cash Management Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or after the Petition Date. The Debtors also request that, to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account either: (a) at the direction of the Debtors; (b) in the good-faith belief that the Court has authorized such prepetition check or item to be honored; or (c) as a result of a mistake made despite implementation of reasonable customary item handling procedures, such bank will not be deemed to be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item honored postpetition. Such relief is reasonable and appropriate because the Cash Management

19

Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

36.     Finally, the Debtors request authority, but not direction, to authorize the Cash Management Banks to: (a) continue to charge the Debtors the Bank Fees, as applicable; and (b) charge-back returned items to the Debtor Bank Accounts, including returned items that result from ACH transactions, wire transfers, or electronic transfers of any kind, regardless of whether such items are dated before, on, or after the Petition Date, in the ordinary course of business and consistent with prepetition practice.

37.     Courts in this district routinely allow debtors in large chapter 11 cases to maintain their existing cash management systems and waive the U.S. Trustee Guidelines on the grounds that they may harm the debtor's postpetition business operations and restructuring efforts to an extent that is out of proportion to the benefit, if any, afforded to the debtor's estate or parties in interest.  Such relief generally is non-controversial.  *See, e.g.*, *In re Claire's Holdings LLC,* No. 25-11454 (BLS) (Bankr. D. Del. Sept. 8, 2025) (authorizing the debtors to continue using their existing prepetition cash management system); *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (same);  *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN, Inc.*,  No. 25-10068  (CTG)  (Bankr.  D.  Del.  Feb.  10,  2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same).[9]

**II.     Authorizing the Debtors to Continue Using Debit, Wire, Credit Card, and ACH Payments Is Warranted.**

38.     The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent such guidelines require that the Debtors make all disbursements by check.  As discussed

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.  Copies of these orders are available upon request to the Debtors' proposed counsel.

above, in the ordinary course of business, the Debtors conduct transactions through wires, ACH transfers, direct deposits, and other similar methods. If the Debtors' ability to conduct transactions by these methods—including their ability to pay associated fees—is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs.

39. In addition, the Debtors request relief to continue operating the Credit Card Program postpetition in the ordinary course of business and consistent with prepetition practice. It is critical to the Debtors' business that employees have the ability to use the Credit Cards for operational and business expenses and that the Debtors have the authority to pay the balances accrued on the Credit Cards. Courts in this district have regularly allowed debtors in large chapter 11 cases to operate credit card programs in the ordinary course of business. *See, e.g.*, *In re Claire's Holdings LLC*, No. 25-11454 (BLS) (Bankr. D. Del. Sept. 8, 2025) (authorizing the debtors to continue operating their credit card program); *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same); *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Sept. 23, 2024) (same).

III.    **The Court Should Authorize Payment of Fees and Prepetition Obligations Related to the Debtor Bank Accounts and Payment Processing.**

40. Finally, the Debtors request authority, but not direction, to continue to pay, honor, or deduct certain Bank Fees from the appropriate accounts postpetition, in the ordinary course of business and consistent with prepetition practice. Payment of the Bank Fees will minimize disruption to the Debtors' operations and is therefore in the best interests of their estates. Absent payment of the Bank Fees, the Cash Management Banks might assert setoff rights against the funds in the Bank Accounts, freeze the Debtor Bank Accounts, and/or refuse to provide banking services to the Debtors.

21

Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authority, in their sole discretion, to pay and/or reimburse the Cash Management Banks in the ordinary course of business for any Bank Fees arising prior to or after the Petition Date consistent with prepetition practice.

41.     The relief requested herein is essential to the Debtors' continuation of ordinary course operations and, as such, is warranted under sections 105(a) and 363 of the Bankruptcy Code on an emergency basis as allowed, to avoid immediate and irreparable harm, by Bankruptcy Rule 6003. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (noting that courts "have approved . . . critical vendor orders that allow payment of essential suppliers' prepetition invoices"); *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *In re James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983). Several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims.

42.     Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

43.     In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825–26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)).

44.     Moreover, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497. Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction

23

of a prepetition claim." *Id.* The court in *CoServ* specifically noted that the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

45.    These standards are satisfied here because the payment of fees, including the Bank Fees and related prepetition obligations, is necessary to maintain the Cash Management System and avoid any disruption to the administration of the Debtor Bank Accounts. The Debtors request authority, but not direction, to continue to pay the Bank Fees, including any prepetition amounts related thereto, in the ordinary course of business and consistent with prepetition practice, in light of the material benefit of maintaining the Cash Management System. The relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003.

## IV.    The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.

46.    To the extent the Debtors have any preprinted checks, and to avoid disruption of the Cash Management System and unnecessary expense, pursuant to Local Rule 2015-1(a), the Debtors request that they be authorized to continue to use such checks and other Business Forms substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession. Parties in interest will not be prejudiced by this relief. Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing preprinted business forms is unnecessary and would be unduly burdensome. Nonetheless, and in accordance with Local Rule 2015-1(a), with respect to any checks that are generated electronically, or following the depletion of the Debtors' preprinted check stock during the pendency of these chapter 11

24

cases, if any, the Debtors shall ensure that such electronic checks and new check stock reflect their status as debtors in possession and the corresponding bankruptcy case number.

47.     Courts in this district have allowed debtors to use their prepetition Business Forms without the "debtor in possession" label.  *See, e.g.*, *In re Claire's Holdings LLC*, No. 25-11454 (BLS) (Bankr. D. Del. Sept. 8, 2025) (authorizing the debtors' continued use of preprinted business forms without a "Debtor in Possession" marking); *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025)  (same);  *In re JOANN,  Inc.*,  No. 25-10068  (CTG)  (Bankr.  D.  Del.  Feb.  10,  2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same).

**V.     The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Expense Priority Status to Postpetition Intercompany Claims Among the Debtors.**

48.     In the ordinary course of business, the Debtors engage in and record Intercompany Transactions with other Debtors and non-Debtor affiliates resulting in Intercompany Balances.[10] Specifically, and as discussed, the Debtors engage in Intercompany Transactions with GoHealth Slovakia, which provides technology services that are integral to the Debtors' ability to serve their customers.  At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor (collectively, the "Intercompany Claims") in connection with the receipt and disbursement of funds.  The Debtors have historically reflected Intercompany Claims as journal entry receivables and payables, as applicable, in the respective Debtor's accounting system. The Debtors closely track all fund transfers in their accounting systems and can ascertain, trace, and

---

[10]     Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Debtors submit that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.  Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors in possession.

25

account for all Intercompany Transactions previously described.  The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.

49.    If the Intercompany Transactions were to be discontinued, the Debtors' ability to access technology services necessary to provide a differentiated service to their clients would be impaired. The Debtors request authority, but not direction, to continue engaging in such transactions postpetition in the ordinary course of business and consistent with prepetition practice without need for further Court order.  To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors further request that pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all postpetition payments on account of postpetition Intercompany Transactions from one Debtor to another Debtor that give rise to an Intercompany Claim be accorded administrative expense status, which would result in an administrative expense claim in favor of the applicable Debtor payor.  For the avoidance of doubt, the relief requested herein with respect to the postpetition Intercompany Transactions and the Intercompany Balances resulting therefrom shall not constitute an admission of the Debtors or any other party as to the validity, priority, or status of any prepetition Intercompany Balance or the Intercompany Transaction(s) from which such Intercompany Balance may have arisen.  Out of an abundance of caution, the Debtors request authority, but not direction, to continue conducting the Intercompany Transactions in the ordinary course of business and consistent with prepetition practice without need for further Court order.

50.    The relief requested herein should be approved as it fairly balances the Debtors' need to facilitate the ordinary course operation of their business, minimize disruption, and preserve value, on the one hand, with maintaining the substantive interests of their stakeholders and the general Bankruptcy Code interest in transparency, on the other hand.

26

51. Similar relief has been granted in comparable chapter 11 cases in this district. *See, e.g.*, *In re Claire's Holdings LLC*, No. 25-11454 (BLS) (Bankr. D. Del. Sept. 8, 2025) (authorizing the continuation of intercompany transactions in the ordinary course of business and according administrative expense status to intercompany claims related thereto); *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 10, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same).

**VI.     Cause Exists for an Interim Extension to Comply with Section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines Regarding Approved Depositories and a Subsequent Waiver Thereof on a Final Basis.**

52. To the extent that the requirements of section 345 of the Bankruptcy Code are inconsistent, or otherwise conflict, with (a) the cash management practices under the Cash Management System or (b) any actions the Debtors take in accordance with an order of this Court, the Debtors seek an extension (and ultimately a waiver) to come into compliance with the requirements of section 345 of the Bankruptcy Code to allow the Debtors to continue their existing cash management practices.

53. Section 345(a) of the Bankruptcy Code authorizes deposit or investment of the money of the estate, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Although section 345(b) of the Bankruptcy Code generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee approved corporate surety, the court is permitted to dispense with this undertaking "for cause." 11 U.S.C. § 345(b).

54.     Courts may extend, modify, or waive compliance with section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines for "cause." In evaluating whether "cause" exists, courts have considered a number of factors, such as:

(a)     the sophistication of the debtor's business;

(b)     the size of the debtor's business operations;

(c)     the amount of the investments involved;

(d)     the bank ratings (*e.g.*, Moody's Investor Service, Inc. and Standard & Poor's Financial Services LLC) of the financial institutions where the debtor-in-possession funds are held;

(e)     the complexity of the case;

(f)     the safeguards in place within the debtor's own business for ensuring the safety of the funds;

(g)     the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(h)     the benefit to the debtor;

(i)     the harm, if any, to the debtor;

(j)     the harm, if any, to the estate; and

(k)     the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*See In re Service Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

55.     Cause exists in these chapter 11 cases to grant the Debtors an extension, and subsequently waive the requirements, of section 345(b) of the Bankruptcy Code.  As more fully described in the First Day Declaration, the Debtors operate a complex insurance-related business, which necessarily requires significant sophistication and effort to operate and manage.  All of the Debtor Bank Accounts are held at Cash Management Banks that are well-capitalized, financially stable, reputable, have excellent credit ratings, and, with only a handful of exceptions, hold cash under

the FDIC limit. The nature of the Debtors' business, the number of Debtor Bank Accounts, and the size of the Debtors' liabilities also introduce substantial complexity in these chapter 11 cases. Currently, the Debtors' Cash Management System and the internal treasury team have active safeguards in place to both protect funds and ensure that distributions are made efficiently and accurately.

56. Maintaining the current Cash Management System involves the least amount of operational disruption in these chapter 11 cases, while conversely, attempting compliance with section 345(b) of the Bankruptcy Code by posting a bond would place an extreme burden on the Debtors at a time when they simply cannot afford it. Additionally, given the prepackaged nature of these chapter 11 cases and the expedited timeline on which they are being administered, it would be impractical to require the Debtors to post a bond and overhaul their Cash Management System for approximately six weeks. For these reasons, cause exists under section 345(b) of the Bankruptcy Code and Local Rule 2015-1(b) to grant an interim extension of the requirements of section 345(b) of the Bankruptcy Code and a subsequent waiver thereof on a final basis.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

57. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**The Requirements of Bankruptcy Rule 6003(a) Are Satisfied**

58.    Bankruptcy Rule 6003(a) empowers a court to grant certain relief within the first 21 days after the petition date only to the extent that relief is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a).  For the reasons set forth above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm.  The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and request that the Court grant the requested relief.

**Reservation of Rights**

59.    Notwithstanding anything to the contrary herein, nothing contained in this motion or any actions taken pursuant to any order granting the relief requested in this motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount, validity, or priority of, or basis for any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, lease, program, or policy pursuant to section 365 of the Bankruptcy Code (or otherwise affecting the Debtors' rights pursuant to section

365 of the Bankruptcy Code); (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

60.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

61.     The Debtors will provide notice of this motion to the following parties or their respective counsel, as applicable: (a) the U.S. Trustee; (b) counsel to the Ad Hoc TL Group; (c) counsel to the Ad Hoc Revolver Group; (d) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (e) the state attorneys general for states in which the Debtors conduct business; (f) the United States Attorney for the District of Delaware, District of Massachusetts, and District of Columbia; (g) the Internal Revenue Service; (h) the Cash Management Banks; and (i) any party that is entitled to notice pursuant to Bankruptcy Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

62.     No prior request for the relief sought in this motion has been made to this or any other court.

31

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  June 7, 2026
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS LLP** |
| Laura Davis Jones (DE Bar No. 2436) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| James E. O'Neill (DE Bar No. 4042) | Anup Sathy, P.C. (*pro hac vice* pending) |
| Edward A. Corma (DE Bar No. 6718) | Alexandra F. Schwarzman, P.C. (*pro hac vice* pending) |
| 919 North Market Street, 17th Floor | David R. Gremling (*pro hac vice* pending) |
| Wilmington, Delaware 19801 | 333 West Wolf Point Plaza |
| Telephone:  (302) 652-4100 | Chicago, Illinois 60654 |
| Facsimile:  (302) 652-4400 | Telephone:  (312) 862-2000 |
| Email:  ljones@pszjlaw.com | Facsimile:  (312) 862-2200 |
|   joneill@pszjlaw.com | Email:  anup.sathy@kirkland.com |
|   ecorma@pszjlaw.com |   alexandra.schwarzman@kirkland.com |
| |   dave.gremling@kirkland.com |

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*