**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOHEALTH, INC., *et al.*,[1] | ) | Case No. 26-10914 [●] |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS**
**FOR ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING PAYMENT OF ALL**
**TRADE CLAIMS IN THE ORDINARY COURSE OF BUSINESS,**
**(II) CONFIRMING THE ADMINISTRATIVE EXPENSE PRIORITY**
**OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

as follows in support of this motion:[2]

**Preliminary Statement**

1.      As described in greater detail in the First Day Declaration, the Debtors commenced

these chapter 11 cases with the overwhelming support of 100% of their prepetition lenders,

approximately 61% of the holders of GoHealth, Inc. Class A Common Stock, and greater than

99%[3] of the holders of GoHealth Holdings, LLC interests to effectuate a change of control

transaction that, among other things, leaves both general unsecured creditors and preferred equity

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:  GoHealth, Inc. (3805); Blizzard Midco, LLC (3732); Connected Benefits, LLC (2162); e-TeleQuote Insurance, Inc. (2336); ETQ Holdings, LLC (8260); GoHealth Holdings, LLC (3653); GoHealth, LLC (5175); and Norvax, LLC (3063).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  222 West Merchandise Mart Plaza, Suite 1750, Chicago, Illinois 60654.

[2]     A detailed description of the Debtors and their business, including the facts and circumstances supporting this motion, is set forth in the *Declaration of Vijay Kotte, Chief Executive Officer of GoHealth, Inc., in Support of Chapter 11 Petitions, First Day Motions, and Access to Cash Collateral* (the "First Day Declaration"). Capitalized terms used but not defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

[3]     This represents only those interests held by third parties and does not include interests held by GoHealth, Inc.

holders unimpaired and provides a $10 million cash recovery to common stockholders.  While the Debtors have proposed a preliminary voting deadline of May 19, 2026 and a secondary voting deadline of July 7, 2026,[4] the Debtors have already received ballots accepting their Plan (as defined herein) from holders of 100% of the outstanding Super-Priority Term Loans and 100% of the outstanding First Lien Term Loans, among other classes.  These chapter 11 cases mark the culmination of several months of extensive and good-faith restructuring discussions with the Debtors' prepetition lenders.  The *Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* (the "Plan") enables a highly consensual transition in ownership that preserves GoHealth's enterprise value, ensures continued operations, protects critical business relationships and partnerships, and positions the Company for long-term success.

2.    In light of the design of the Plan, the goal of these chapter 11 cases, and the importance of uninterrupted business operations, the Debtors now seek to make payments to the vendors and trade creditors (the "Trade Creditors") on account of trade liabilities incurred prepetition (the "Trade Claims"), as and when they come due during the course of these chapter 11 cases.  Trade Creditors provide mission critical business services and the Debtors' key stakeholders recognize that timely payment of all general unsecured claims, including the Trade Claims, is necessary to avoid needless disruption to the Debtors' business and ensure a smooth and timely restructuring process, preserving value for all stakeholders.  Given the fact that the Trade Claims are unimpaired under the Plan, the relief requested herein would merely expedite the

---

[4]    See the *Motion of Debtors for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (V) Granting Related Relief*, filed concurrently herewith.

treatment and distribution to the Trade Creditors that they would otherwise be entitled to receive upon consummation of the Plan.

3. Given the overwhelming support for the Plan expressed by all of the Debtors' prepetition lenders and a majority of their equityholders, the prepackaged nature of these chapter 11 cases, and the unimpaired treatment of general unsecured claims under the Plan, the Debtors believe that the relief requested in this motion is appropriate.

## Relief Requested

4. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and "Final Order," respectively): (a) authorizing the Debtors to pay all Trade Claims in the ordinary course of business; (b) confirming the administrative expense priority of Outstanding Orders (as defined herein) and authorizing, but not directing, the Debtors to satisfy such Outstanding Orders in the ordinary course of business; and (c) granting related relief. In addition, the Debtors request that the Court (as defined herein) schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

## Jurisdiction and Venue

5. The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the

3

Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

**Background**

8. On June 7, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**The Debtors' Business Obligations**

**I.     The Trade Claims.**

9. The Debtors are a leading health insurance marketplace and Medicare-focused digital health company. Given the highly regulated nature of health insurance and the specialized nature of the Debtors' work, particularly in the Medicare Advantage market, the Trade Creditors are a critical component of the Debtors' ability to operate their business and offer high-quality customized support to consumers searching for a health plan that best meets their individual

medical needs. The majority of the Debtors' Trade Creditors provide the Debtors with services in the ordinary course of business, and such creditors include, but are not limited to:

- external agents who supplement the Debtors' internal licensed agent network (the "Downline Partners");[5]

- call center-based lead generation partners that use external marketing agents to drive calls to the Debtors' internal licensed agent network;

- digital, television, and mail-based advertising partners who use various platform-based advertising to drive leads into the Debtors' online platform and their licensed agent network;

- technology service providers supporting the Debtors' information technology infrastructure and data maintenance; and

- internet and telecommunications service providers that provide internet connectivity and telecommunications products and services to the Debtors.

10. While the Debtors have a variety of payment arrangements with the Trade Creditors, a majority of the Trade Creditors provide the Debtors with "net 30" payment terms. The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business.

11. These payment obligations averaged approximately $15 million per month for the six months preceding the Petition Date, and, as of the Petition Date, the Debtors estimate that there are approximately $46 million of accrued and unpaid Trade Claims, all of which are general unsecured claims.[6] None of the accrued and unpaid Trade Claims are owed to Trade Creditors based in foreign jurisdictions or are subject to any lien rights. The Debtors estimate that approximately $13 million of the accrued and unpaid Trade Claims will come due within the first 21 days of these chapter 11 cases.

---

[5] The Downline Partners are further described in the First Day Declaration.

[6] The total amount of accrued and unpaid Trade Claims includes liabilities related to certain trade settlement agreements entered into by the Debtors.

12.     A substantial portion of the Trade Creditors, including but not limited to, certain marketing vendors and technology service providers, may be difficult, if not impossible, for the Debtors to replace without creating a disruption to the Debtors' business.  This is primarily due to the unique nature of the Debtors' business as an insurance broker.  For example, the Debtors utilize only a select number of lead generation partners that service the Debtors with regular information and data regarding potential customers.  Such Trade Creditors are specialized and integrated into the Debtors' core business generation pipeline.  Any attempt to quickly transition service providers may not be possible, and even if it is, it will create significant costs, operational inefficiencies, and diminished consumer confidence, all of which would materially impair the Debtors' ability to write new business.  As such, maintaining relationships with Trade Creditors and having the ability to pay them is vital to the Debtors' reorganization efforts.

13.     The services that give rise to the Trade Claims are necessary to the Debtors' business operations.  As previously highlighted, a significant portion of the Trade Claims are related to services necessary for supporting the Debtors' marketing activities and lead generation, a core part of the Debtors' revenue generation.  In fact, the Debtors' success largely depends on their ability to work with major health insurance providers (the "Carriers") to renew and enroll consumers in the various health plans, which the Trade Creditors are essential to facilitate.  The risks inherent in failing to pay the Trade Claims held by Trade Creditors are considerable as much of the Debtors' business relies on the engagement of, and productive working relationship with, the lead generation partners and marketing vendors.  The failure to pay the Trade Claims in a timely manner could materially disrupt the Debtors' ongoing business operations, in turn having a negative impact on the Debtors' reputation and relationship with the Carriers.  Such irreparable harm to the Debtors' business jeopardizes the restructuring transactions contemplated by the Plan.

14.     As discussed above, the relief requested herein would merely expedite the treatment and distribution to the Trade Creditors that they would otherwise be entitled to receive upon consummation of the Plan, which the Debtors anticipate will occur in less than two months.[7]  No party in interest will be prejudiced by the relief requested herein because the Trade Claims are classified as general unsecured claims, which will "ride through" these chapter 11 cases (*i.e.*, be reinstated or receive payment in full of all prepetition obligations in the ordinary course of business).  Thus, the relief requested herein seeks to alter only the timing, not the amount or priority, of the payment of such claims.  Disruption of such services is entirely unnecessary; there is no benefit in risking critical business relationships and partnerships by delaying payment of the Trade Claims that are already scheduled to be paid.  Accordingly, the Debtors request authority, but not direction, to pay all Trade Claims as they come due in the ordinary course of business, consistent with the Plan's intent and design.

15.     Finally, while the Debtors do not believe there are any lien claims and believe that any claims arising under section 503(b)(9) of the Bankruptcy Code are *de minimis* because the Trade Claims are almost entirely for services, not goods, the Debtors recognize that such claims would be entitled to administrative priority and would be required to be paid in full to confirm a plan of reorganization.  In the event such claims arise, failing to pay such claims in a timely manner could unnecessarily disrupt the Debtors' business operations.  Out of an abundance of caution, the Debtors seek authority, but not direction, to pay such claims if they come due.

---

[7]     *See* Jan. 29, 2025, Hr'g Tr. at 47:8-20, *In re Jervois Texas, LLC*, No. 25-90002 (CML) (Bankr. S.D. Tex. Jan. 28, 2025) (explaining that an "all-trade motion" in "a prepackaged plan that proposes to render the trade unimpaired . . . makes a lot of sense," because "it is just a matter of timing more than anything else").

II.     **Customary Trade Terms.**

16.     Subject to the Court's approval, the Debtors intend to pay the Trade Claims in full to preserve and enhance the value of their estates.  In return for paying the Trade Claims in full in the ordinary course of business, the Debtors propose that they be authorized, in their sole discretion, to require the Trade Creditors to continue to provide favorable trade terms for the postpetition procurement of goods and services.

17.     Specifically, the Debtors also seek authority, but not direction, to condition the payment of any Trade Claim hereunder upon such Trade Creditor's agreement, including by email, to:  (a) continue or resume supplying goods and services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those practices and programs (including pricing, cash discounts, timing of payments, licenses, availability, performance standards, compliance obligations, and other customary trade terms) consistent with the parties' ordinary course practices or as otherwise acceptable to the Debtors in their discretion (the "Customary Trade Terms") and (b) not cancel any contract, agreement, or arrangement pursuant to which the Trade Creditors provide such goods and/or services to the Debtors during the course of these chapter 11 cases.  The Debtors also seek authority to require, at their discretion, that the Customary Trade Terms be commemorated in writing, including by email or through a trade agreement, as a condition to payment.

18.     The Debtors further request that if a Trade Creditor accepts payment premised on compliance with Customary Trade Terms pursuant to the relief requested by this motion and thereafter does not continue to provide goods or services on Customary Trade Terms or as otherwise agreed to by the Trade Creditor and the Debtors, then:  (a) such payment may be deemed to be an avoidable postpetition transfer on account of a prepetition claim and therefore immediately recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the

Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this motion to the outstanding postpetition balance, and such supplier will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise; and (d) the Debtors may pursue any other remedy available to them under the applicable law or any executed writing with such party.  The Debtors also request authority to require additional favorable trade terms with any party as a condition to payment of any prepetition claims.  Such relief is necessary to ensure that the Trade Creditors who receive payment on account of their Trade Claims fulfill their postpetition obligations to the Debtors.

### III.    The Outstanding Orders.

19.    Prior to the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods or services that will not be delivered or provided until after the Petition Date (the "Outstanding Orders").  The Debtors and their advisors believe there are no material Outstanding Orders as of the Petition Date.  However, in the event that such Outstanding Orders do exist, certain Trade Creditors may refuse to provide these respective goods and services in connection with the Outstanding Orders unless the Debtors issue substitute purchase orders or statements of work postpetition—potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time, effort, and resources in issuing such substitute orders.  Because claims on account of any Outstanding Orders would be afforded administrative expense priority under section 503(b) of the Bankruptcy Code, out of an abundance of caution, the Debtors request that the Court confirm the administrative expense priority of any

Outstanding Orders and authorize the Debtors to pay amounts due, if any, on account of Outstanding Orders in the ordinary course of business.

**Basis for Relief**

I.    **Payment of the Trade Claims Is Warranted Under Sections 363(b), 105(a), 1107(a), and 1108 of the Bankruptcy Code.**

20.    Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (noting that courts "have approved . . . 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices"); *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *In re James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983). Several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims.

21.    Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

22.    In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825–26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)).

23. Moreover, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497. Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The court in *CoServ* specifically noted the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

11

24.     In light of the above, the Debtors respectfully submit that the relief requested herein is in the best interests of their estates, the Trade Creditors, and other parties in interest.  A significant portion of the Trade Claims are held by Trade Creditors that provide the Debtors with services critical to run their business.  In instances where a Trade Creditor may itself be facing financial hardship or where a Trade Creditor may be able to transition its business to competitors of the Debtors, the Debtors' failure to timely pay Trade Claims may result in Trade Creditors stopping work for the Debtors, which may severely disrupt the Debtors' business.  Further, a portion of the Trade Creditors provide services to the Debtors that simply cannot be replaced speedily, if at all.  The loss of the services provided by such Trade Creditors could result in the Debtors' inability to serve both existing and prospective customers and Carriers, as well as earn commissions.  This would immediately and irreparably harm the Debtors' business, damage the Debtors' vital relationships with customers and Carriers, and significantly impair the value of their estates.

25.     These disruptions may occur before the Debtors would be able to successfully bring an action to compel performance or otherwise enforce the automatic stay.  Also, the Debtors interact with the Trade Creditors pursuant to a variety of arrangements, including arrangements that may not be executory in nature.  The counterparty of such an arrangement may not agree to continue to do business with the Debtors unless paid on account of prepetition amounts due from the Debtors and would be under no obligation to do so.

26.     Because the Debtors will pay the Trade Claims in full under the Plan, the relief requested in this motion seeks to alter only the timing of payments, not whether such payments will ultimately be made to Trade Creditors.  Moreover, by expediting payment of Trade Claims that otherwise would be paid at a later date, the relief requested herein avoids unnecessary

disruption and harm to the Debtors' business and facilitates a timely restructuring process, a key goal of these prepackaged chapter 11 cases.

27.     Further, payment of certain Trade Claims complies with the statutory requirements of the Bankruptcy Code.  Section 503(b)(9) of the Bankruptcy Code provides that Trade Claims related to goods delivered to the Debtors within the 20 days prior to the Petition Date are administrative expense claims against the applicable Debtor's estate.  In the event that such claims arise, the Debtors are required to pay such Trade Claims in full to confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority).  The Plan provides for payment in full of administrative expense claims in the ordinary course of business, on the effective date of the Plan, or as soon as reasonably practicable thereafter (or, if not then due, then when such administrative expense claim is due or as soon as reasonably practicable thereafter).  Accordingly, payment of the Trade Claims that are entitled to administrative priority will only change the timing of the payment of such Trade Claims, not the amounts, and no party in interest will be materially prejudiced.  *See In re CEI Roofing, Inc.*, 315 B.R. 50, 60 (Bankr. N.D. Tex. 2004) ("[T]he payment of prepetition . . . claims . . . that qualify as priority . . . claims . . . does not trigger the same concerns (i.e., upsetting priorities under the [Bankruptcy] Code and unfair discrimination among general unsecured claims).").

28.     For all these reasons, courts in this jurisdiction routinely authorize payments of the kind contemplated herein in prepackaged bankruptcy cases.  *See, e.g.*, *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 10, 2024) (approving payment of all trade claims in the ordinary course of business postpetition on a final basis); *In re Appgate, Inc.*, No. 24-10956 (CTG) (Bankr. D. Del. May 28, 2024) (same); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 5, 2023) (authorizing payment of all accounts payable claims owed to vendors and trade

counterparties in the ordinary course of business postpetition on a final basis); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sept. 22, 2022) (same); *In re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del. Mar. 26, 2021) (authorizing payment of specified trade claims in the ordinary course of business postpetition on a final basis).[8]

## II.    The Court Should Confirm That Outstanding Orders Are Administrative Expense Priority Claims and That Payment of Such Claims Is Authorized.

29.    Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 810 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority).    Although the Debtors believe there are currently no Outstanding Orders, in the event certain Trade Creditors raise claims in connection with Outstanding Orders, the Court granting the relief sought herein will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.    Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain Trade Creditors with assurance of such administrative priority.    The attendant disruption to the continuous and timely flow of critical goods and services to the Debtors would potentially halt the Debtors' operations and lead to a loss of revenue—all to the detriment of the Debtors and their stakeholders.    Accordingly, out of an abundance of caution, the Court should confirm that claims

---

[8]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

arising from the Outstanding Orders are entitled to administrative expense priority status and should authorize the Debtors to pay such claims, if any, as they come due in the ordinary course of business and consistent with past practice.

30.     Indeed, courts in this district routinely grant the type of relief requested herein. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (confirming administrative expense priority to undisputed obligations on account of outstanding orders); *In re Marelli Auto. Lighting USA LLC*, No. 25-11034 (CTG) (Bankr. D. Del. July 11, 2025) (same); *In re Am. Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 18, 2024) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 13, 2024) (same); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 10, 2024) (same).

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

31.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**The Requirements of Bankruptcy Rule 6003(a) Are Satisfied**

32.     Bankruptcy Rule 6003(a) empowers a court to grant certain relief within the first 21 days after the petition date only to the extent that relief is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a).  For the reasons set forth above, the Debtors believe

an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and request that the Court grant the requested relief.

**Reservation of Rights**

33. Notwithstanding anything to the contrary herein, nothing contained in this motion or any actions taken pursuant to any order granting the relief requested in this motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount, validity, or priority of, or basis for any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, lease, program, or policy pursuant to section 365 of the Bankruptcy Code (or otherwise affecting the Debtors' rights pursuant to section 365 of the Bankruptcy Code); (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity

16

under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

34.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

35.    The Debtors will provide notice of this motion to the following parties or their respective counsel, as applicable: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Ad Hoc TL Group; (c) counsel to the Ad Hoc Revolver Group; (d) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (e) the state attorneys general for states in which the Debtors conduct business; (f) the United States Attorney for the District of Delaware, District of Massachusetts, and District of Columbia; (g) the Internal Revenue Service; and (h) any party that is entitled to notice pursuant to Bankruptcy Rule 2002. As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

36.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

17

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  June 7, 2026
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS LLP** |
| Laura Davis Jones (DE Bar No. 2436) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| James E. O'Neill (DE Bar No. 4042) | Anup Sathy, P.C. (*pro hac vice* pending) |
| Edward A. Corma (DE Bar No. 6718) | Alexandra F. Schwarzman, P.C. (*pro hac vice* pending) |
| 919 North Market Street, 17th Floor | David R. Gremling (*pro hac vice* pending) |
| Wilmington, Delaware 19801 | 333 West Wolf Point Plaza |
| Telephone:     (302) 652-4100 | Chicago, Illinois 60654 |
| Facsimile:     (302) 652-4400 | Telephone:     (312) 862-2000 |
| Email:     ljones@pszjlaw.com | Facsimile:     (312) 862-2200 |
|                joneill@pszjlaw.com | Email:     anup.sathy@kirkland.com |
|                ecorma@pszjlaw.com |                alexandra.schwarzman@kirkland.com |
| |                dave.gremling@kirkland.com |

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*