**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOHEALTH, INC., *et al.*,[1] | ) | Case No. 26-10914 [●] |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY**
**PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND**
**REIMBURSABLE EXPENSES AND (B) CONTINUE COMPENSATION**
**AND BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

as follows in support of this motion:[2]

**Relief Requested**

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order,"

respectively):    (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other

compensation, and reimbursable expenses on account of the Compensation and Benefits Programs

(as defined herein) and (ii) continue to administer the Compensation and Benefits Programs in the

ordinary course consistent with prepetition practices, including payment of prepetition obligations

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:   GoHealth, Inc. (3805); Blizzard Midco, LLC (3732); Connected Benefits, LLC (2162); e-TeleQuote Insurance, Inc. (2336); ETQ Holdings, LLC (8260); GoHealth Holdings, LLC (3653); GoHealth, LLC (5175); and Norvax, LLC (3063).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  222 West Merchandise Mart Plaza, Suite 1750, Chicago, Illinois 60654.

[2]     A detailed description of the Debtors and their business, including the facts and circumstances supporting this motion, is set forth in the *Declaration of Vijay Kotte, Chief Executive Officer of GoHealth, Inc., in Support of the Debtors' Chapter 11 Petitions, First Day Motions, and Access to Cash Collateral* (the "First Day Declaration"). Capitalized terms used but not defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

related thereto; and (b) granting related relief.  In addition, the Debtors request that the Court (as defined herein) schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

### Jurisdiction and Venue

2.      The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

### Background

5.      On June 7, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.   Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### The Debtors' Workforce

6.     As of the Petition Date, the Debtors' workforce is comprised of approximately 239 employees (the "Employees") whose skills and knowledge are essential to the Debtors' ordinary course business operations.   All of the Employees are employed on a full-time basis. Approximately 140 Employees earn a salary, and approximately 99 Employees are paid on an hourly basis.   None of the Employees is represented by a union or covered by a collective bargaining agreement.   The Employees include the Debtors' agents and personnel who are intimately familiar with the Debtors' business, processes, and systems and who cannot easily be replaced.

7.     In addition to the Employees, the Debtors also source critical labor support from various agencies and periodically retain specialized individuals as independent contractors (the "Independent Contractors") to supplement the Debtors' workforce and provide support in functions such as information technology, finance, tax, and accounting.   The Independent Contractors are retained through third-party staffing agencies (the "Staffing Agencies").   The Independent Contractors are an important supplement to the efforts of the Debtors' Employees. As of the Petition Date, the Debtors retain approximately three Independent Contractors across two Staffing Agencies.

8.      The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  These Employees will be materially harmed and exposed to significant financial hardship if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these chapter 11 cases.  The Employees and Independent Contractors are the lifeblood of the Debtors' business. Together, the Employees and the Independent Contractors perform a variety of critical functions including overseeing sales, accounting, administration, distribution, finance, tax, human resources, management, security, information technology, and other tasks that are essential to the Debtors' continued operations and the ultimate preservation of the value of the Debtors' estates.  Without the continued, uninterrupted services of the Employees and the Independent Contractors, the Debtors' business operations would suffer immediate and irreparable harm, and their restructuring efforts would be materially impaired.  Consequently, the relief requested herein is necessary and appropriate.

## Compensation and Benefits Programs

9.      The Debtors seek to minimize the personal hardship that the Employees would suffer and the potential Employee attrition that likely would follow if prepetition compensation and benefits remain unpaid during these chapter 11 cases.  The Debtors seek authority, but not direction, to:   (a) pay and honor certain prepetition claims for Unpaid Wages, Independent Contractor Obligations, Non-Insider Bonus Programs, Non-Employee Director Compensation, Reimbursable Expenses, Withholding Obligations, Health Benefits, COBRA, HSA and FSA, Life and AD&D Insurance and Disability Benefits, Supplemental Insurance Plans, Accrued PTO, Workers' Compensation Program, 401(k) Plan, Additional Benefit Programs, and UKG Fees (each as defined herein and collectively, the "Compensation and Benefits Programs"); and (b) continue

4

to honor obligations relating to the Compensation and Benefits Programs on a postpetition basis, as applicable, in each case, on a case-by-case basis and in the Debtors' discretion, on an interim and a final basis, as detailed herein, and summarized in the chart below. In addition, the Debtors also seek to pay all costs incidental to the Compensation and Benefits Programs. Importantly, the Debtors only seek approval of the postpetition Non-Employee Director Compensation (as defined herein) pursuant to the Final Order.

10.     Subject to the Court's approval, the Debtors intend to continue their prepetition Compensation and Benefits Programs in the ordinary course of business and consistent with prepetition practices on a postpetition basis, including paying any outstanding prepetition amounts related thereto. Recognizing that certain of the Compensation and Benefits Programs are mandated by applicable law, out of an abundance of caution, the Debtors further request confirmation of their authority to modify, change, and/or discontinue any of their Compensation and Benefits Programs and to implement new programs, policies, and benefits in the Debtors' discretion, in the ordinary course and consistent with prepetition practices during these chapter 11 cases, in consultation with the Ad Hoc TL Group and the Ad Hoc Revolver Group, and without the need for further Court approval, subject to applicable law; *provided, however*, that the Debtors will provide notice to the Ad Hoc TL Group and the Ad Hoc Revolver Group at least five business days prior to such modification, change, and/or discontinuation of any of the Compensation and Benefits Programs and/or implementation of any new programs, policies, and benefits.

11.     As set forth below, by this motion, the Debtors seek authority, but not direction, to pay, remit, or reimburse, as applicable, the following aggregate prepetition amounts on account of the Compensation and Benefits Programs:

| Compensation and Benefits Programs | Approximate Accrued and Unpaid Interim Amount | Approximate Accrued and Unpaid Final Amount[3] |
|---|---|---|
| **Compensation** | | |
| Unpaid Wages | $1,000,000 | $1,000,000 |
| Independent Contractor Obligations | $40,000 | $70,000 |
| Non-Insider Bonus Programs | $100,000 | $200,000 |
| Non-Employee Director Compensation (Final Order only) | $0 | $0 |
| Reimbursable Expenses | $20,000 | $20,000 |
| Withholding Obligations | $3,200,000 | $3,200,000 |
| **Employee Benefits Programs[4]** | | |
| Health Benefits | $950,000 | $2,210,000 |
| COBRA | *De minimis* | *De minimis* |
| HSA and FSA | $20,000 | $20,000 |
| Life and AD&D Insurance and Disability Benefits | $40,000 | $40,000 |
| Supplemental Insurance Plans | $0 | $0 |
| Accrued PTO | $10,000 | $140,000 |
| Workers' Compensation Program | $0 | $0 |
| 401(k) Plan | $100,000 | $100,000 |
| Additional Benefit Programs | $20,000 | $20,000 |
| UKG Fees | $0 | $0 |
| **Total** | **$5,500,000** | **$7,020,000** |

12.     As of the Petition Date, the Debtors estimate that approximately $7,020,000 on account of the Compensation and Benefits Programs will be accrued and unpaid, approximately $5,500,000 of which will come due between entry of the Interim Order and the Final Order (the "Interim Period").  The Debtors do not seek to pay any outstanding prepetition amounts on account of the Compensation and Benefits Programs in excess of the priority amount of $17,150 imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Priority Cap") pursuant to the Interim Order.  The Debtors do not believe that they owe any amounts in excess of the

---

[3]    For the avoidance of doubt, the approximate accrued and unpaid final amounts listed herein are inclusive of the corresponding approximate accrued and unpaid interim amounts.

[4]    The amounts identified in this Employee Benefits Programs section include, where applicable, both Employee contributions processed through deductions and remitted to the appropriate third parties as well as the Debtors' contributions.

Priority Cap; however, to the extent they do, they request such relief solely pursuant to the Final Order.

## I. Compensation.

### A. Employee Wages.

13. In the ordinary course of business, the Debtors pay wages, overtime, salaries, and other compensation (collectively, excluding reimbursable expenses and paid leave, the "Wages") to their Employees on a biweekly basis. Because the Employees generally are paid in arrears, certain Employees and former Employees may be owed accrued but unpaid Wages as of the Petition Date. Wages may also be due and owing as of the Petition Date due to, among other things, pay discrepancies that, upon resolution, may reveal that additional amounts are owed to certain Employees and/or former Employees.

14. The Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' bank accounts or other electronic means on a biweekly basis, and Wages accrue on either a salaried or hourly basis. On average, the Debtors paid Employees approximately $2,600,000 per month on account of Wages for the four months immediately preceding the Petition Date. As of the Petition Date, the Debtors estimate that they owe approximately $1,000,000 in accrued and unpaid wages (the "Unpaid Wages"), all of which are currently payable or will become payable during the Interim Period. The Debtors seek authority, but not direction, to pay any Unpaid Wages, including amounts that may have accrued or been incurred prior to the Petition Date, and continue to pay the Wages in the ordinary course and consistent with prepetition practices on a postpetition basis during these chapter 11 cases.

**B.      Independent Contractor Obligations.**

15.      In the ordinary course of business, the Debtors incur payment obligations to the Staffing Agencies for services rendered by the Independent Contractors (the "Independent Contractor Obligations"), all of whom are hired through the Staffing Agencies.  The Debtors typically pay most of the Independent Contractors on an hourly basis at an agreed rate through invoices payable to the Staffing Agencies, depending on the terms of the Debtors' agreement with the contracting Staffing Agency.

16.      On average, the Debtors paid approximately $20,000 per month to the Staffing Agencies on account of the Independent Contractor Obligations for the four months immediately preceding the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $70,000 in accrued and unpaid Independent Contractor Obligations to two Staffing Agencies, of which $40,000 will become payable within the Interim Period.  Accordingly, the Debtors seek authority, but not direction, to pay all outstanding prepetition amounts on account of the Independent Contractor Obligations and to continue to pay the Independent Contractor Obligations in the ordinary course and consistent with prepetition practices on a postpetition basis during these chapter 11 cases.

**C.      Non-Insider Bonus Programs.**

17.      In the ordinary course of business, the Debtors offer their non-Insider Employees[5] certain incentive programs (as further described below) to ensure that their Employees feel valued

---

[5]    "Insiders", as used herein, means the "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) = general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor."  11 U.S.C. § 101(31)(B).  For the avoidance of doubt, the Debtors reserve all rights with respect to the classification of any Employee as an Insider, and no description of any Compensation and Benefits Programs hereunder indicating that such Compensation and Benefits Programs cover or are made available to Insiders or non-Insiders shall be construed as an admission or concession by the Debtors that any Employee of the Debtors is an Insider.

and are performing at their maximum potential. These programs consist of: (a) the Agent Bonus Program and (b) the Equity Incentive Program (each as defined herein, and collectively, the "Non-Insider Bonus Programs"). The Debtors believe the Non-Insider Bonus Programs are necessary to properly motivate the Employees to outperform and drive value for all stakeholders, and that payment of all obligations thereunder is critical not only to maintaining employee morale and loyalty but also to minimizing attrition and operational disruption as the Debtors transition into chapter 11. Accordingly, the Debtors seek authority, but not direction, to pay any prepetition amounts owed on account of the Non-Insider Bonus Programs and to continue operating the Non-Insider Bonus Programs in the ordinary course consistent with prepetition practices on a postpetition basis during these chapter 11 cases.

### 1.      Agent Bonus Program.

18.     The Debtors' frontline sales and customer service agents, which include approximately 100 Employees, are eligible for bonus payments based on the amount of sales volume generated by the applicable Employee to incentivize individual sales and customer service performance metrics (the "Agent Bonus Program"). Bonuses earned prior to May 31, 2026, under the Agent Bonus Program are paid to eligible Employees on a monthly basis for sales made in the prior month as part of their regular compensation. Such bonuses under the Agent Bonus Program are not forfeited if an Employee is terminated by the Debtors for any reason other than cause. However, bonuses under the Agent Bonus Program are forfeited upon an Employee's resignation or termination by the Debtors for cause.

19.     On June 1, 2026, the Debtors implemented several changes to the Agent Bonus Program. As a result of these changes, bonuses earned under the Agent Bonus Program for periods after June 1, 2026, will be paid to eligible Employees on an annual basis and will be determined based on the applicable Employee's job level and performance. Bonuses earned under the Agent

Bonus Program for periods after June 1, 2026, will be forfeited if an Employee resigns or is terminated by the Debtors before the applicable payout date.

20.     The vast majority of the Debtors' Employees who receive bonuses under the Agent Bonus Program are paid hourly wages rather than a salary.  The Debtors do not believe that any Employees are owed prepetition amounts under the Agent Bonus Program that, when taken in the aggregate with other Wages, would exceed the Priority Cap.

21.     The Debtors paid approximately $100,000 per month to approximately 100 Employees on account of the Agent Bonus Program for the four months immediately preceding the Petition Date.  As of the Petition Date, approximately $200,000 is accrued and outstanding on account of the Agent Bonus Program, $100,000 of which will become payable to approximately 100 Employees within the Interim Period.  Accordingly, the Debtors seek authority, but not direction, to pay any accrued but unpaid amounts on account of the Agent Bonus Program, and to continue the Agent Bonus Program in the ordinary course and consistent with prepetition practices on a postpetition basis during these chapter 11 cases.

**2.     Equity Incentive Program.**

22.     Historically, the Debtors provided certain Employees an equity incentive program (the "Equity Incentive Program"), where such Employees received certain stock-based awards and other equity-linked compensation, including restricted stock units (the "RSUs").  The terms of the program outlined that the number of awarded RSUs and the vesting schedule were determined at the Debtors' discretion on a case-by-case basis for each individual eligible Employee according to a preset formula.  The RSUs typically vest within three years.  The Debtors terminated the Equity Incentive Program, and stock-based awards and other equity-linked compensation were not awarded in 2026.  As of the Petition Date, approximately 1,662,428 RSUs and *de minimis* stock

options remain outstanding and are held by approximately 72 Employees.[6]  The vesting of such equity awards involves no cash outlay.

23.     As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Equity Incentive Program.  Nevertheless, out of an abundance of caution, the Debtors seek authority, but not direction, to satisfy any prepetition obligations due and owing to non-Insider Employees (whether incurred prepetition or postpetition) on account of the Equity Incentive Program and to continue meeting their obligations under the Equity Incentive Program in the ordinary course consistent with prepetition practices on a postpetition basis during these chapter 11 cases.

**D.     Non-Employee Director Compensation.**

24.     The Debtors' boards of directors include seven non-Employee Directors, three of whom are independent directors (collectively, the "Non-Employee Directors"). The Non-Employee Directors receive cash compensation for their services.  The independent Non-Employee Directors are paid monthly compensation for their services in the amount of $45,000 per month, payable at the beginning of each month.  Other Non-Employee Directors are paid either monthly compensation in the amount of $25,000 per month payable at the beginning of each month, or quarterly in the amount of $37,500 per quarter, payable at the beginning of each quarter (collectively, the "Non-Employee Director Compensation").

---

[6]     Pursuant to Article IV.P of the *Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and its Debtor Affiliates* (the "Plan"), the Debtors will not assume any (1) equity or equity-based incentive plans, employee stock purchase plans and any other agreements or awards or provisions set forth in any agreements, awards, plans or programs that provide for rights to acquire Interests or New Common Interests (as defined in the Plan) and (2) any agreement, award, program, or plan whose value or performance is related to Interests or New Common Interests (as defined in the Plan) or other ownership interests of any Debtor, in each case, which shall be deemed to be terminated on the Effective Date (as defined in the Plan).

25.    In the six months immediately preceding, the Debtors paid on average approximately $200,000 per month on account of the Non-Employee Director Compensation. The Non-Employee Directors are critical components of the Debtors' governance structure and vital to ensuring that the Debtors continue to adhere to governance best practices. As of the Petition Date, the Debtors do not believe that they owe any amounts that are currently outstanding on account of the Non-Employee Director Compensation. However, out of an abundance of caution, the Debtors seek authority, but not direction, to continue to pay the Non-Employee Director Compensation in the ordinary course of business and consistent with prepetition practices on a postpetition basis during these chapter 11 cases, solely pursuant to the Final Order.

E.    **Reimbursable Expenses.**

26.    The Debtors reimburse approximately 20 Employees for approved expenses incurred on behalf of the Debtors in the ordinary course, and the Debtors expect that the Employees will continue to incur necessary reimbursable expenses (the "Reimbursable Expenses") in connection with the Debtors' operations during these chapter 11 cases. Reimbursable Expenses include out-of-pocket expenses associated with transportation, lodging, and meals incurred in connection with business travel and other work-related expenses including, but not limited to, office supplies, technology expenses, licenses, and permits. Most of the Employees' Reimbursable Expenses are incurred through corporate credit cards, but in some cases Reimbursable Expenses are incurred directly by the Employees with their personal funds.[7] In such cases, the Employees

---

[7]    The Debtors' corporate credit cards and any expenses permitted to be charged thereon are described in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief* (the "Cash Management Motion"), filed contemporaneously herewith. All relief with respect to the use of corporate credit cards is sought in the Cash Management Motion.

submit receipts through Concur Technologies, Inc., the Debtors' expense reimbursement system, to request reimbursement, and, if approved in accordance with internal policies and procedures, are then paid through a regular payroll cycle.  Without reimbursement, the Employees may be held personally liable for any unpaid obligations.  The Debtors' inability to reimburse such expenses would impose significant financial hardship on such individuals where the obligations were incurred for the Debtors' benefit.

27.     The Debtors expect there might be a significant backlog of expenses incurred by the Employees but not yet submitted for reimbursement.  The Debtors estimate that this amount could total up to approximately $20,000 of Reimbursable Expenses incurred by approximately 20 Employees, all of which would become payable to the Employees as the expenses are submitted and processed over the course of these chapter 11 cases, including during the Interim Period as applicable.  Accordingly, the Debtors seek authority, but not direction, to satisfy any accrued but unpaid prepetition Reimbursable Expenses and to continue to pay the Reimbursable Expenses in the ordinary course consistent with prepetition practices on a postpetition basis during these chapter 11 cases.

**F.      Withholding Obligations.**

28.     In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Employer Payroll Taxes (each as defined herein and collectively, the "Withholding Obligations").

29.     The Debtors accumulate a monthly average of approximately $1,700,000 in Withholding Obligations on account of federal, state, and local income taxes, employee benefits elections and garnishments, and employer taxes.  As of the Petition Date, the Debtors believe that there are approximately $3,200,000 in prepetition amounts accrued but not yet remitted on account

of the Withholding Obligations. The Debtors seek authority to pay any prepetition amounts outstanding on account of the Withholding Obligations and to continue meeting their obligations with respect thereto in the ordinary course consistent with prepetition practices on a postpetition basis during these chapter 11 cases.

### 1. Payroll Deductions.

30. During each applicable payroll period, the Debtors internally process payroll, and routinely deduct certain amounts from the Employees' pay, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein (the "Payroll Deductions"). Such deductions include an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and other deductions. In addition, the Debtors make employer contributions to certain employee benefit plans and programs, including healthcare and insurance benefits, and other employer-funded benefits, in the ordinary course of business and consistent with prepetition practices.

31. As of the Petition Date, the Debtors estimate that they owe approximately $800,000 on account of the Payroll Deductions, all of which will become payable within the Interim Period. The Debtors seek authority to pay any prepetition amounts owed on account of the Payroll Deductions and to continue to honor their Payroll Deductions on a postpetition basis in the ordinary course of business and consistent with prepetition practice during these chapter 11 cases.

### 2. Payroll Taxes.

32. In addition to the Payroll Deductions, certain federal and state laws require that the Debtors withhold amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Employee Payroll Taxes"). The Debtors must then

14

pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, and local taxing authorities in accordance with remittance intervals and deadlines established by those taxing authorities.

33.    As of the Petition Date, the Debtors estimate that they owe approximately $2,400,000 on account of the Payroll Taxes, all of which will become payable within the Interim Period.  Accordingly, the Debtors seek authority to remit the Payroll Taxes to the respective taxing authorities and to continue to honor and process the Payroll Taxes on a postpetition basis in the ordinary course and consistent with prepetition practice during these chapter 11 cases.

**II.    Employee Benefits Programs.**

34.    The Debtors offer certain health and welfare benefits programs to eligible Employees and former Employees, including Health Benefits, COBRA, HSA, FSA, Life and AD&D Insurance Programs and Disability Benefits, Supplemental Insurance Plans, Paid Leave and Unpaid Leave, Workers' Compensation Program, 401(k) Plan, and Additional Benefit Programs (each as defined herein, and, collectively, the "Employee Benefits Programs").  Each of the Employee Benefits Programs is described in greater detail below.

**A.    Health Benefits.**

35.    The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, which include Health Insurance Plans, Dental Plans, and Vision Plans (each as defined herein and collectively, the "Health Benefits").  The Health Benefits are

available to eligible Employees regularly working more than 26 hours per week and salaried Employees (collectively, the "Eligible Employees").

36.     The Health Benefits are customary for similarly sized companies, and the Employees and their dependents have come to rely on the Health Benefits.  Without the Health Benefits, the Employees may be forced to either forego health benefit coverage completely or obtain potentially expensive out-of-pocket insurance coverage, which would likely adversely affect Employee morale and make Employee retention difficult.

37.     As of the Petition Date, the Debtors estimate that they owe approximately $2,210,000 in accrued but unpaid obligations on account of the Health Benefits, $950,000 of which the Debtors estimate is currently payable or will become payable during the Interim Period.[8] Accordingly, the Debtors seek authority, but not direction, to pay all outstanding prepetition amounts on account of the Health Benefits and to continue offering the Health Benefits on a postpetition basis in the ordinary course and consistent with prepetition practices.

### 1.     Health Insurance Plans.

38.     The Debtors offer medical and prescription drug coverage to Eligible Employees (the "Health Insurance Plans"), which are administered by Blue Cross Blue Shield of Illinois ("Blue Cross").  The Debtors self-insure the Health Insurance Plans, and also maintain a stop loss policy administered by Blue Cross, whereby the Debtors are protected from the financial risk associated with unexpectedly high or catastrophic medical claims.  The coverage offered by the Health Insurance Plans differs depending on the level of coverage Employees elect to receive. Employees are eligible to select their coverage option, or waive coverage, during the Debtors'

---

[8]     This estimate reflects amounts estimated to be paid out in claims (including incurred but not reported claims) under the Health Insurance Plans, as well as accrued and outstanding amounts owed under the Dental Plans and the Vision Plans.

open enrollment period. Monthly healthcare premiums differ depending on the Health Insurance Plan in which the Employee is enrolled and whether the Employee has dependents covered by the applicable plan. The Debtors self-fund the Health Insurance Plans.

39.     In the four months immediately preceding the Petition Date, the Debtors paid Blue Cross an average of approximately $800,000 per month on account of the Health Insurance Plans. As of the Petition Date, the Debtors estimate that they owe approximately $2,100,000 to Blue Cross on account of the Health Insurance Plans, of which $900,000 will come due in the Interim Period.

### 2.     Dental and Vision Plans.

40.     The Debtors offer Eligible Employees dental insurance through Blue Cross. Eligible Employees can choose between a higher premium preferred provider organization plan, which has a higher plan year benefit maximum, and a lower premium preferred provider organization plan (collectively, the "Dental Plans"), which costs Employees less but has a lower plan year benefit maximum. In addition, the Debtors offer all Eligible Employees the option to enroll in vision insurance through VSP Vision (the "Vision Plan").

41.     In the four months immediately preceding the Petition Date, the Debtors paid on average approximately $50,000 per month on account of the Dental Plans and Vision Plans. As of the Petition Date, the Debtors estimate that they owe no amounts on account of the Vision Plans and $110,000 on account of the Dental Plans, of which $50,000 will come due and owing during the Interim Period.

### B.     COBRA.

42.     Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former Employees of the Debtors (the "COBRA Participants") may continue

17

insurance coverage under the Health Insurance Plans, Dental Plans, and the Vision Plans (the "COBRA Benefits").  COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to 18 months, and in some instances up to 36 months, following termination of employment.  The COBRA Benefits are administered through WEX Health Inc. ("WEX").

43.    Typically, COBRA Participants are responsible for paying all costs associated with the COBRA Benefits, except with respect to those COBRA Participants who are eligible for a certain amount of Company-paid COBRA health benefits as previously negotiated in certain Employees' employment and/or separation agreements.  In the four months preceding the Petition Date, the Debtors paid on average less than $1,000 per month on account of COBRA Benefits.  As of the Petition Date, the Debtors estimate that the amount owed for COBRA Benefits is *de minimis*. However, out of an abundance of caution, the Debtors seek authority, but not direction, to continue providing the COBRA Benefits, including any prepetition amounts that may ultimately be owed on account of the COBRA Benefits, and honor all obligations related thereto in the ordinary course and consistent with prepetition practices on a postpetition basis during these chapter 11 cases.

C.    **Health Savings Accounts and Flexible Spending Accounts.**

44.    The Debtors offer Employees enrolled in certain Health Insurance Plans the opportunity to contribute to a health care flexible spending account ("FSA") or a health savings account ("HSA"), which can be used to cover, among other things, medical, dental and vision deductibles, copays, coinsurance, prescription drugs, vision care, physical therapy, and counseling. Employee FSA and HSA are administered by WEX.  For an Employee enrolled in an HSA, the applicable Debtor provides an annual HSA contribution of up to $1,000 for employee-only coverage and up to $2,000 for employee and dependents coverage (the "Debtor HSA Contributions").

18

45.     The Debtors remit Employee HSA and FSA contributions to UKG, Inc. ("UKG"), which then funds WEX directly.  The Debtors withhold approximately $30,000 per month and remit such amounts to the respective accounts upon an Employee's request, in accordance with the Debtors' policy.  As of the Petition Date, the Debtors estimate that approximately $10,000 of FSA and HSA contributions have been deducted but not yet remitted to the appropriate third-party payee, and the Debtors must remit such amount within the Interim Period.  Accordingly, the Debtors seek the authority, but not direction, to remit all outstanding prepetition FSA and HSA deductions and to continue doing so on a postpetition basis in the ordinary course and consistent with prepetition practice.

46.     In addition to amounts withheld, the Debtors contribute approximately $10,000 monthly on account of the Debtor HSA Contributions.  The Debtors make the Debtor HSA Contributions to UKG, which then funds WEX directly.  As of the Petition Date, the Debtors estimate that approximately $10,000 in the Debtor HSA Contributions are accrued and unpaid, all of which will come due during the Interim Period.  The Debtors seek authority, but not direction, to pay any outstanding prepetition amounts on account of the Debtor HSA Contributions and to continue honoring their obligations under the HSA on a postpetition basis in the ordinary course of business consistent with prepetition practice.

**D.      Life and AD&D Insurance Programs and Disability Benefits.**

47.     The Debtors provide life insurance and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance") to Eligible Employees through Guardian Life Insurance Company ("Guardian").  In the event of an Employee's death or serious injury, the Basic Life and AD&D Insurance provides for a one-time payment equal to the Employee's salary up to $500,000.

48.　In addition, Eligible Employees can purchase additional life and accidental death and dismemberment insurance ("Supplemental Life and AD&D Insurance") covering themselves and their spouses and children at discounted group rates. Supplemental Life and AD&D Insurance is an optional benefit for Eligible Employees who wish to supplement the Basic Life and AD&D Insurance. Supplemental Life and AD&D Insurance is funded by participating Employees through after-tax Payroll Deductions but administered by the Debtors.

49.　The Debtors provide Eligible Employees with short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term Disability Benefits" and together with the Short-Term Disability Benefits, the "Disability Benefits"). Disability Benefits are administered through Guardian.

50.　The Short-Term Disability Benefits replace up to 60 percent of such Employee's pre-disability monthly income with a maximum benefit of $2,000 per week for Eligible Employees for up to 26 weeks. The Short-Term Disability Benefits begin on the eighth day after an Employee is absent from work following a covered accident or illness.

51.　Following the period of the Short-Term Disability Benefits, Employees are eligible to receive Long-Term Disability Benefits. The Long-Term Disability Benefits replace up to 60 percent of an Employee's pre-disability monthly income, up to a maximum of $15,000 per month, if such Employee is disabled and unable to work for more than 26 weeks.

52.　The monthly cost to the Debtors for the Basic Life and AD&D Insurance, Supplemental Life and AD&D Insurance, and Disability Benefits (collectively, "Life and AD&D Insurance and Disability Benefits") is approximately $30,000 in the aggregate. As of the Petition Date, the Debtors estimate that they owe approximately $40,000 on account of the Life and AD&D Insurance and Disability Benefits, all of which must be remitted during the Interim Period. The

20

Debtors seek authority, but not direction, to pay prepetition amounts owed on account of the Basic Life and AD&D Insurance, Supplemental Life and AD&D Insurance, and Disability Benefits and to continue the Basic Life and AD&D Insurance, Supplemental Life and AD&D Insurance, and Disability Benefits on a postpetition basis in the ordinary course and consistent with prepetition practice.

### E.    Supplemental Insurance Plans.

53.    The Debtors offer Eligible Employees several Supplemental Insurance Plans (as defined herein), including accident insurance (the "Accident Insurance Plans"), critical illness insurance (the "Critical Illness Insurance Plans"), hospital indemnity insurance (the "Hospital Indemnity Insurance Plan," and collectively with the Accident Insurance Plans and the Critical Illness Insurance Plans, the "Supplemental Insurance Plans"). The Supplemental Insurance Plans are administered through Voya Financial, Inc. ("Voya"). Each Supplemental Insurance Plan pays participating Employees a fixed, one-time benefit amount to offset expenses related to such accident, critical illness, or hospital stay not covered by an Employee's health care plan. The Supplemental Insurance Plans are paid for entirely by the participating Employees through Payroll Deductions, which the Debtors remit to Voya on the participating Employees' behalf.

54.    The Debtors remit approximately $10,000 per month on account of the Supplemental Insurance Plans. As of the Petition Date, the Debtors do not believe that any amount is owed on account of the Supplemental Insurance Plans. However, out of an abundance of caution, the Debtors seek authority, but not direction, to remit any outstanding prepetition amounts incurred on account of the Supplemental Insurance Plans and to continue the Supplemental Insurance Plans on a postpetition basis in the ordinary course and consistent with prepetition practice.

21

**F.        Paid and Unpaid Leave.**

55.        The Debtors provide paid time off ("PTO") and certain other statutory paid leave (together, "Paid Leave") to eligible Employees in the ordinary course of business.  The Debtors also provide Unpaid Leave (as defined herein) in certain situations.

56.        In the ordinary course of business, the Debtors provide PTO to certain eligible Employees as a Paid Leave benefit, which may be used for any reason.  Certain Employees employed by Debtor Norvax, LLC (collectively, the "Norvax Employees") follow a flexible time-off ("FTO") model.  Because time off does not accrue when Employees work on an FTO model, the Debtors do not have any obligations to Norvax Employees on account of Paid Leave or related obligations.  The Employees who are employed by Debtor GoHealth, Inc. (collectively, the "GoHealth Employees") accrue PTO.  GoHealth Employees can carry forward a maximum of 40 hours of accrued but unused PTO (the "Accrued PTO") from one calendar year to the next.  Accrued PTO in excess of those amounts at the end of a calendar year is forfeited and not paid.  The Debtors estimate that, as of the Petition Date, the aggregate amount of Accrued PTO is approximately $140,000.  This amount is not a current cash payment obligation; however, the Debtors "cash out" any Accrued PTO to an Employee upon the termination of such Employee's employment.  Of the aggregate amount of Accrued PTO as of the Petition Date, approximately $140,000 is for Employees residing in states that require Accrued PTO to be paid out upon termination or resignation.  The Debtors estimate that, as of the Petition Date, the aggregate amount of Accrued PTO due and owing to former Employees is approximately $10,000, all of which will become due and payable during the Interim Period.

57.        In addition to PTO and FTO, the Debtors provide certain other forms of Paid Leave to certain Employees, including:

22

- Leave for bereavement to GoHealth Employees for up to five days and to Norvax Employees for up to three days;

- Paid holidays throughout the year, during which eligible Employees are not required to work and are paid their base rate of pay;

- Paid Leave under the Family and Medical Leave Act; and

- Other Paid Leave for personal reasons, many of which are required by law, including statutory sick leave, workers' compensation leave, jury or court attendance, and time spent voting.

58.     Additionally, the Debtors provide unpaid leaves of absence for additional sick leave, military leave, leave under the Family and Medical Leave Act, and other similar purposes (collectively, the "Unpaid Leave"). As indicated, the Unpaid Leave is not a paid benefit; rather, it allows eligible Employees to maintain their employment with the Debtors while addressing any longer-term personal issues that may arise. The Debtors expect that certain eligible Employees may need to take Unpaid Leave during the pendency of these chapter 11 cases.

59.     The Debtors believe that the continuation of the Paid Leave and the Unpaid Leave policies, in accordance with their prepetition practices, is essential to maintaining Employee morale, and thus facilitating the Debtors' ordinary course operations throughout these chapter 11 cases. These policies are broad-based programs upon which all Employees have come to depend. Other than with respect to Accrued PTO that is required to be paid out in certain circumstances as discussed previously, the Paid Leave and Unpaid Leave typically do not involve incremental cash outlays beyond standard payroll obligations. Accordingly, out of an abundance of caution, the Debtors seek authority to continue the Paid Leave and Unpaid Leave policies in the ordinary course of business on a postpetition basis and pay prepetition claims, if any, with respect thereto, including making any "cash out" payments of Accrued PTO to certain Employees who are terminated or resign after the Petition Date as may be required by state law.

**G.      Workers' Compensation Program.**

60.      In the ordinary course of business, the Debtors maintain workers' compensation insurance at the level required by statute for each state in which the Debtors conduct business (the "Workers' Compensation Program") to satisfy any claims made by Employees for workers' compensation (each, a "Workers' Compensation Claim").

61.      All Employees participate in the Debtors' Workers' Compensation Program, which is fully insured.  The Debtors maintain coverage for the Workers' Compensation Program through Hub International as the broker and Travelers Insurance Company as the carrier (collectively, the "Workers' Compensation Vendors").  The Debtors pay an annual premium of approximately $20,000 to the Workers' Compensation Vendors to maintain the Workers' Compensation Program.

62.      Under their coverage, the Debtors do not pay any amounts associated with each compensable claim; instead, the applicable insurance providers pay any claim amounts directly. As of the Petition Date, the Debtors do not believe that any amount is owed under the Workers' Compensation Program.  However, out of an abundance of caution, the Debtors seek authority, but not direction, to continue providing the workers' compensation insurance, including any prepetition amounts that may ultimately be owed on account of the Workers' Compensation Program.

63.      For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual and legal obligations, the Debtors must continue to assess, determine, and adjudicate claims brought under the Workers' Compensation Program during these chapter 11 cases.  In addition, to the extent any Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with

24

their claims under the Workers' Compensation Program.  This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

64.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that would disrupt the chapter 11 process.  Accordingly, the Debtors seek authority to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, including by modifying the automatic stay solely to allow affected Employees to assert claims under the Workers' Compensation Program.

**H.     401(k) Plan**

65.     The Debtors maintain a retirement savings plan for the benefit of their eligible Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  The 401(k) Plan is administered by Bank of America Merrill Lynch ("Merrill Lynch"), in which there are approximately 213 active participants.  The 401(k) Plan allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  Each pay period, the Debtors deduct their Employees' 401(k) Plan contributions from the applicable Employees' paychecks (the "401(k) Deductions") and immediately forward such 401(k) Deductions to Merrill Lynch.  As of the Petition Date, the Debtors estimate that they have deducted, but not yet remitted, $70,000 in 401(k) Deductions, which must be remitted within the Interim Period.  The Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.  Nevertheless, out of an abundance of caution, the Debtors seek authority, but not direction, to remit all outstanding prepetition amounts incurred on account of the 401(k) Deductions and to continue doing so on a postpetition basis in the ordinary course and consistent with prepetition practice.

25

66.     Under the 401(k) Plan, the Debtors provide matching contributions to eligible Employees (the "Matching Contributions") at a rate of 100 percent for the first three percent of an Employee's compensation contributed and 50 percent for the next two percent of an Employee's compensation contributed.   On average, the Debtors pay approximately $90,000 in Matching Contributions per month.   The Matching Contributions are funded each payroll cycle and are immediately vested.   As of the Petition Date, the Debtors believe that they owe approximately $30,000 on account of Matching Contributions, all of which is currently payable or will become payable during the Interim Period.

67.     Many Employees' retirement savings consist primarily of the 401(k) Plan, and continuing the 401(k) Plan is essential to maintaining Employee morale and protecting their future well-being.   Accordingly, the Debtors seek authority, but not direction, to pay unpaid prepetition amounts owed on account of the 401(k) Plan, including the Matching Contributions, to remit any unpaid prepetition 401(k) Deductions, and to continue paying amounts that come due on a postpetition basis in the ordinary course and consistent with prepetition practice during these chapter 11 cases.

**I.      Additional Benefit Programs.**

68.     In addition to the above-mentioned benefits programs, the Debtors maintain an employee assistance program, commuter benefits, early wage access, subsidized gym membership, pet insurance, employee referral bonuses, identity theft assistance, and legal insurance (collectively, the "Additional Benefit Programs").   The Additional Benefit Programs are an important part of the total benefits package offered by the Debtors to their Employees.

69.     On average, the Debtors paid approximately $40,000 per month on account of the Additional Benefit Programs for the four months immediately preceding the Petition Date.

Additionally, the Debtors estimate that as of the Petition Date, they owe approximately $20,000 on account of the Additional Benefit Programs, all of which is currently payable or will become payable during the Interim Period. The Debtors seek authority, but not direction, to pay unpaid prepetition amounts owed on account of the Additional Benefit Programs and to continue paying amounts that come due on a postpetition basis in the ordinary course and consistent with prepetition practice.

**J.      UKG Fees.**

70.      In the ordinary course, the Debtors utilize payroll software provided by UKG, which supports payroll processing, payroll tax calculations and filings, human resources information system (HRIS) functions, workforce management, timekeeping, scheduling, and other payroll- and HR-related services. The Debtors pay UKG certain software, payroll- and HR-related fees (the "UKG Fees") on a quarterly basis. Failure to satisfy the UKG Fees could lead to a delay in payroll processing and disbursement of payroll taxes to the appropriate third parties to the detriment of the Employees and the Debtors' operations. Continuing to pay the UKG Fees, and thus preserving the Debtors' use of the payroll software and their ability to continue administering payroll, is critical to the Debtors' continued operations while in chapter 11.

71.      On average, the Debtors paid approximately $350,000 per quarter on account of the UKG Fees for the six months immediately preceding the Petition Date. As of the Petition Date, the Debtors estimate that they do not owe an amount for accrued but unpaid UKG Fees, but out of an abundance of caution the Debtors seek authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the UKG Fees and to continue paying the UKG Fees on a postpetition basis in the ordinary course and consistent with prepetition practice.

**Basis for Relief**

I.    **Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Programs.**

   A.    **Certain Compensation and Benefits Programs Are Entitled to Priority Treatment.**

72.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits Programs to priority treatment, to the extent such payments do not exceed $17,150 for each individual as provided for under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code for (a) wages, salaries, or commissions, including vacation and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than $17,150 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. The Debtors do not believe that they owe any amounts in excess of the Priority Cap. However, to the extent they do, they request such relief solely pursuant to the Final Order. Given the importance of these Employees to the Debtors' operations, however, any such payment would be warranted under section 363(b)(1) of the Bankruptcy Code and the doctrine of necessity, as explained further below.

73.    The Debtors' Employees and Independent Contractors are essential to the success of these chapter 11 cases and the Debtors' business. As such, payment of obligations on account of the Compensation and Benefits Programs at this time is necessary to avoid potential material disruption to the Debtors' ordinary-course operations. Finding, attracting, and training new

28

qualified talent would be extremely difficult in light of the circumstances. Even if ultimately successful, such recruitment efforts would most likely leave the Debtors with personnel vacancies at a critical business juncture and, once replacement personnel were hired, leave the Debtors to invest additional resources in training new staff members. The additional uncertainty created by needing to expend time, manpower, and money recruiting and training new personnel at a critical time would be non-accretive. In light of the Debtors' ongoing restructuring efforts, losing the Debtors' significant talent base would create additional challenges to maximizing value in these chapter 11 cases. Furthermore, to avoid potentially costly disputes that could reduce the value of the Debtors' estates, as well as ease potential concerns from Employees regarding ongoing compensation, it is prudent for the Debtors to be authorized, but not directed, to pay any accrued but unpaid amounts, as may be required by law, on account of the Compensation and Benefits Programs owed to recently terminated Employees.

> **B.**     **Payment of Certain Compensation and Benefits Programs Is Required by Law.**

74.     As discussed above, the Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. *See* 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its Employees' wages created a trust

relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because certain of the Withholding Obligations may not be property of the Debtors' estates, the Debtors should be authorized to transmit such Withholding Obligations on account of the Employees to the proper parties in the ordinary course, and consistent with prepetition practice. *See Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 721 (4th Cir. 1998).

75.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the success of these chapter 11 cases.

76.     The Debtors therefore request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business and consistent with prepetition practices.

**II.     Payment of the Compensation and Benefits Programs Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.**

77.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (noting that courts "have approved . . . critical vendor orders that allow payment of essential suppliers' prepetition invoices"); *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *In re James A. Phillips, Inc.*, 29 B.R. 391, 398

(S.D.N.Y. 1983).  Several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims.

78.     Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so.  *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

79.     In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business.  *See Just for Feet*, 242 B.R. at 825–26.  Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business).  A bankruptcy court's use of its

equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)).

80.     Moreover, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497. Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The court in *CoServ* specifically noted that the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . " *Id*.

81.     These standards are satisfied here. Payment of the Compensation and Benefits Programs in the ordinary course represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code. Paying the Compensation and Benefits Programs in the ordinary course will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. The Employees and Independent Contractors are essential to the success of these chapter 11 cases. Absent timely payment of amounts owed pursuant to the Compensation and Benefits Programs, the Employees and Independent Contractors may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business to the detriment of all parties.

32

82.     The loss of valuable Employees and Independent Contractors and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on swiftly prosecuting these chapter 11 cases to emerge ahead of the 2026 AEP.  Accordingly, the Debtors must do their utmost to retain their workforce by, among other things, paying Compensation and Benefits Programs in the ordinary course.

83.     In addition, many Employees and Independent Contractors rely exclusively on the Compensation and Benefits Programs to satisfy their daily living expenses and consequently will be exposed to significant financial difficulties if the Debtors are not permitted to honor unpaid obligations on account of the Compensation and Benefits Programs in the ordinary course. Moreover, failure to timely satisfy such obligations will jeopardize workforce morale and loyalty at this critical time, when needed most.  Furthermore, if the Court declines to grant the relief requested herein, Employees will not receive continued health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied.  The loss of healthcare coverage will likely result in considerable anxiety for the Employees (and likely attrition) at a time when the Debtors need all Employees to perform at their best.  Accordingly, the relief requested herein is a necessary and critical element of the Debtors' efforts to maximize estate value and will give the Debtors the greatest likelihood of retention of their Employees and Independent Contractors as the Debtors seek to operate their business in these chapter 11 cases.

84.     The importance of a debtor's workforce to its operations has been repeatedly recognized by courts in this district, and such courts have granted similar relief to that requested herein.  *See, e.g.*, *In re Claire's Holdings LLC*, No. 25-11454 (BLS) (Bankr. D. Del. Sept. 9, 2025) (authorizing the debtors to pay prepetition wages, salaries, other compensation, and reimbursable expenses, and continue employee benefits programs); *In re Marelli Auto. Lighting USA*,

No. 25-11034 (CTG) (Bankr. D. Del. July 23, 2025) (same); *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Mar. 19, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 10, 2025) (same).[9]

### III.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

85.    Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

86.    Section 362 of the Bankruptcy Code, however, permits a debtor or another party in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with Workers' Compensation Claims in the appropriate judicial or administrative forum. Staying the Workers' Compensation Claims would have a detrimental effect on the financial wellbeing and morale of certain Employees and lead to the departure of Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business, which would be to the detriment of all parties in interest. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay

---

9    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

34

for purposes of allowing the Workers' Compensation Program and workers' compensation claims to proceed.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

87.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**The Requirements of Bankruptcy Rule 6003(a) Are Satisfied**

88.     Bankruptcy Rule 6003(a) empowers a court to grant certain relief within the first 21 days after the petition date only to the extent that relief is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a).  For the reasons set forth above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm.  The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief

35

is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and request that the Court grant the requested relief.

**Reservation of Rights**

89.     Notwithstanding anything to the contrary herein, nothing contained in this motion or any actions taken pursuant to any order granting the relief requested in this motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount, validity, or priority of, or basis for any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, lease, program, or policy pursuant to section 365 of the Bankruptcy Code (or otherwise affecting the Debtors' rights pursuant to section 365 of the Bankruptcy Code); (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

90.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

91.     The Debtors will provide notice of this motion to the following parties or their respective counsel, as applicable:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Ad Hoc TL Group; (c) counsel to the Ad Hoc Revolver Group; (d) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (e) the state attorneys general for states in which the Debtors conduct business; (f) the United States Attorney for the District of Delaware, District of Massachusetts, and District of Columbia; (g) the Internal Revenue Service; and (h) any party that is entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

92.     No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

37

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: June 7, 2026
Wilmington, Delaware

*/s/  Laura Davis Jones*

| | |
|---|---|
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS LLP** |
| Laura Davis Jones (DE Bar No. 2436) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| James E. O'Neill (DE Bar No. 4042) | Anup Sathy, P.C. (*pro hac vice* pending) |
| Edward A. Corma (DE Bar No. 6718) | Alexandra F. Schwarzman, P.C. (*pro hac vice* pending) |
| | David R. Gremling (*pro hac vice* pending) |
| 919 North Market Street, 17th Floor | 333 West Wolf Point Plaza |
| Wilmington, Delaware 19801 | Chicago, Illinois 60654 |
| Telephone:    (302) 652-4100 | Telephone:    (312) 862-2000 |
| Facsimile:    (302) 652-4400 | Facsimile:    (312) 862-2200 |
| Email:    ljones@pszjlaw.com | Email:    anup.sathy@kirkland.com |
|         joneill@pszjlaw.com |         alexandra.schwarzman@kirkland.com |
|         ecorma@pszjlaw.com |         dave.gremling@kirkland.com |

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*