**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GOHEALTH, INC., *et al.*,[1] | ) | Case No. 26-10914 (TMH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' MEMORANDUM OF LAW
IN SUPPORT OF AN ORDER (I) APPROVING
THE DEBTORS' DISCLOSURE STATEMENT AND
(II) CONFIRMING THE JOINT PREPACKAGED CHAPTER 11
PLAN OF GOHEALTH, INC. AND ITS DEBTOR AFFILIATES**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
    joneill@pszjlaw.com
    ecorma@pszjlaw.com

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**

Anup Sathy, P.C.
Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*)
David R. Gremling (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    anup.sathy@kirkland.com
    alexandra.schwarzman@kirkland.com
    dave.gremling@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:  GoHealth, Inc. (3805); Blizzard Midco, LLC (3732); Connected Benefits, LLC (2162); e-TeleQuote Insurance, Inc. (2336); ETQ Holdings, LLC (8260); GoHealth Holdings, LLC (3653); GoHealth, LLC (5175); and Norvax, LLC (3063).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  222 West Merchandise Mart Plaza, Suite 1750, Chicago, Illinois 60654.

i

## TABLE OF CONTENTS

**Page(s)**

**RELIEF REQUESTED** .......................................................................................................1

**Preliminary Statement**....................................................................................................2

**Background** .......................................................................................................................3

**I.** **General Background and Events Leading to the Chapter 11 Filing**............................3

**II.** **The Investigation.**.......................................................................................................5

**III.** **The Noticing Process, Solicitation Process, and Voting Results.**...................................6

**IV.** **Confirmation Objections.**...........................................................................................11

**Argument** ........................................................................................................................11

**I.** **Approval of the Disclosure Statement Is Warranted.** ........................................................12

    **A.** **The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and the Bankruptcy Rules.** ..........................................12

        **1.** **The Debtors' Prepetition Solicitation Was Exempt from Registration and Disclosure Requirements Otherwise Applicable Under Nonbankruptcy Law.** ................................................13

        **2.** **The Disclosure Statement Contains Adequate Information.** ...............15

    **B.** **The Debtors Complied with Applicable Notice Requirements.**........................18

        **1.** **The Debtors Complied with the Notice Requirements Set Forth in the Scheduling Order and the Bankruptcy Rules.**............................18

        **2.** **The Ballots Used to Solicit Holders of Claims and Interests Entitled to Vote on the Plan Complied with the Scheduling Order.**...............................................................................................19

        **3.** **The Voting Record Date Complied with Bankruptcy Rule 3018(b) and the Scheduling Order.** ...........................................20

        **4.** **The Debtors' Solicitation Period Complied with Bankruptcy Rules 3017(a) and 3018(b) and the Scheduling Order.**..........................20

        **5.** **The Debtors' Tabulation Procedures Complied with the Scheduling Order.**...............................................................................21

6.       **Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**................................................................**21**

II.      **The Plan Satisfies Each Requirement for Confirmation**...............................................**22**

    A.     **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).** ................................................**22**

         1.     **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.** ......................................**23**

         2.     **The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.** .................................**26**

             a.     Designation of Classes of Claims and Equity Interests, Specification of Unimpaired Classes, and Treatment of Impaired Classes (Section 1123(a)(1)–(3)).................................**26**

             b.     Equal Treatment within Classes (Section 1123(a)(4))...................**26**

             c.     Means for Implementation (Section 1123(a)(5)). .........................**27**

             d.     Issuance of Non-Voting Securities (Section 1123(a)(6))...............**28**

             e.     Directors and Officers (Section 1123(a)(7)). ...............................**28**

         3.     **The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.** ...............................**29**

         4.     **The Plan Complies with Section 1123(d) of the Bankruptcy Code.**................................................................................**30**

    B.     **The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**................................................**31**

         1.     **The Debtors Complied with Section 1125 of the Bankruptcy Code.**................................................................................**31**

         2.     **The Debtors Complied with Section 1126 of the Bankruptcy Code.**................................................................................**32**

    C.     **The Plan Was Proposed in Good Faith (Section 1129(a)(3)).** ...........................**34**

    D.     **The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).** .......................**35**

    E.     **The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (Section 1129(a)(5)).** ...................................**36**

F. The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)). ...........................................................................37

G. The Plan Is in the Best Interests of All the Debtors' Stakeholders (Section 1129(a)(7)). .......................................................................37

H. The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ...........................................39

I. The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)). .......................................................................40

J. At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (Section 1129(a)(10)). ...............................................................41

K. The Plan Is Feasible (Section 1129(a)(11)). .........................................41

L. All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)). ...............44

M. The Debtors Have No Remaining Retiree Benefits Obligations (Section 1129(a)(13)). .....................................................................44

N. Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ......................................................................45

O. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ..................................................................45

   1. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (Section 1129(b)(1)). ..................................................................46

   2. The Plan Is Fair and Equitable (Section 1129(b)(2)). ....................47

P. The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)). ........................................48

III. The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code. .................................................48

A. The Debtor Release in the Plan Is Appropriate. .......................................49

B. The Consensual Third-Party Release Is Appropriate. ................................54

C. The Exculpation Provision Is Appropriate. ............................................58

D. The Injunction Provision Is Appropriate. ..............................................61

IV. The Debtors Should Be Authorized to Enter into the TRA Amendment. ..................61

iv

**V.      Modifications to the Plan.** ..............................................................................................**64**

**VI.    The Voora Objection Should Be Overruled.** ..................................................................**65**

**Conclusion** .............................................................................................................................**66**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143, 150 n.5 (3d Cir. 1986)......................................................................34

*In re Accuride Corp.*,
    No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) ...........................................56, 59

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)....................................................................38

*In re AeroCision Parent, LLC*,
    No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) .............................................56

*In re Aleris Int'l, Inc.*,
    No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)..................31, 43, 47

*In re Am. Solar King*,
    90 B.R. 808 (Bankr. W.D. Tex 1988)......................................................................65

*In re Ambanc La Mesa L.P.*,
    115 F.3d 650 (9th Cir. 1997) ............................................................................46, 47

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006)..........................................................................23, 47, 48

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................46

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)..............................................................................................38

*In re Boy Scouts of Am. & Del. BSA, LLC*,
    650 B.R. 87 (D. Del. 2023).....................................................................................65

*In re Boy Scouts of Am.*,
    137 F.4th 126 (3d Cir. 2025) ................................................................................23

*In re Burns & Roe Enters., Inc.*,
    No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009) ..........................................65

*In re Capmark Fin. Grp. Inc.*,
    No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Aug. 24, 2011) ..............42

*In re Century Glove, Inc.*,
   1993 WL 239489 (D. Del. Feb. 10, 1993) ................................................................34

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
   860 F.2d 94 (3d Cir. 1988) ......................................................................................16

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986) ......................................................................35

*In re Chateaugay Corp.*,
   10 F.3d 944 (2d Cir. 1993) ......................................................................................24

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ..........................................................24, 47, 50, 56

*In re Emerge Energy Servs. LP*,
   No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) .............56

*In re Enron Corp.*,
   326 B.R. 497 (S.D.N.Y. 2005) ................................................................................61

*In re Exaeris, Inc.*,
   380 B.R. 741 (Bankr. D. Del. 2008) ........................................................................50

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ..........................................................................51

*In re EXP OldCo Winddown, Inc.*,
   No. 24-10831 (KBO) (Bankr. D. Del. Dec. 17, 2024)............................50, 56, 59

*In re FAH Liquidating Corp.*,
   No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) ................................................59

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
   81 B.R. 274 (D. Del. 1988) ......................................................................................13

*In re Firstbase.io, Inc.*,
   2025 WL 3072479 (Bankr. S.D.N.Y. Nov. 3, 2025) ..............................................38

*In re Flintkote Co.*,
   486 B.R. 99 (Bankr. D. Del. 2012) ..........................................................................42

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................46

*In re Future Energy Corp.*,
   83 B.R. 470 (Bankr. S.D. Ohio 1988) ......................................................................35

*In re Glob. Safety Textiles Holdings LLC*,
No. 09-12234, 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ........................................65

*Harrington v. Purdue Pharma L. P.*,
603 U.S. 204 (2024)...................................................................................................................57

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ..............................................................................52, 55, 61

*In re ION Media Networks, Inc.*,
419 B.R. 585 (Bankr. S.D.N.Y. 2009)......................................................................................48

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987).....................................................................................................24

*In re JOANN Inc.*,
No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025)..........................................................56, 59

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993)..................................................................................................24, 46

*Kane v. Johns-Manville Corp.*,
843 F.2d 636, 649 (2d Cir. 1988)...............................................................................................42

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003).......................................................................................................15

*In re Lab'y Partners, Inc.*,
No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) ...............................................................59

*In re Landing Assocs.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993).....................................................................................36

*In re Lapworth*,
1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998).....................................................................31

*In re Lernout & Hauspie Speech Prods., N.V.*,
301 B.R. 651 (Bankr. D. Del. 2003) ..........................................................................................47

*In re Lisanti Foods, Inc.*,
329 B.R. 491 (D.N.J. 2005) ..................................................................................................16, 35

*In re Lucky Bucks*,
No. 23-10758 (KBO) (Bankr. D. Del. July 28, 2023) ...............................................................56

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)................................................................................51, 54

viii

*In re Mercy Hosp.*,
No. 23-00623, 2024 WL 2890139 (Bankr. N.D. Iowa June 7, 2024)....................................54

*In re Metrocraft Pub. Servs., Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) .................................................................................17

*In re Monnier Bros.*,
755 F.2d 1336 (8th Cir. 1985) ...........................................................................................15

*In re NII Holdings, Inc.*,
288 B.R. 356, 362 (Bankr. D. Del. 2002) ..........................................................................34

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ..................................................................................23

*In re Nuverra Env't Sols., Inc.*,
590 B.R. 75 (D. Del. 2018)...........................................................................................24, 46

*In re Oldco Tire Distribs., Inc.*,
No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025)...............................................50, 56, 59

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988)...............................................................................................16

*In re PC Liquidation Corp.*,
383 B.R. 856 (E.D.N.Y. 2008) ...........................................................................................16

*In re Phx. Petrol., Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ....................................................................15, 16, 17

*In re Pizza of Haw., Inc.*,
761 F.2d 1374, 1382 (9th Cir. 1985) ..................................................................................42

*In re Premier Int'l Holdings, Inc.*,
No. 09-12019, 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010)......................................59

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) .................................................................................42

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)..................................................................................34, 59, 61

*In re River Village Assoc.*,
181 B.R. 795 (E.D. Pa. 1995) ............................................................................................16

*In re S B Bldg. Assocs. Ltd. P'ship*,
621 B.R. 330 (Bankr. D.N.J. 2020) ...................................................................................36

*In re S&W Enter.*,
  37 B.R. 153 (Bankr. N.D. Ill. 1984) ........................................................................23

*In re Scioto Valley Mortg. Co.*,
  88 B.R. 168 (Bankr. S.D. Ohio 1988)........................................................................17

*In re Sea Garden Motel & Apartments*,
  195 B.R. 294, 305 (D.N.J. 1996) ..............................................................................42

*In re Seasons Partners, LLC*,
  439 B.R. 505 (Bankr. D. Ariz. 2010) ........................................................................36

*In re Smallhold, Inc.*,
  665 B.R. 704 (Bankr. D. Del. 2024) ....................................................................55, 56

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) ....................................................................51, 55

*In re Spansion, Inc.*,
  No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) ...............59

*In re Specialty Equip. Cos., Inc.*,
  3 F.3d 1043, 1047 (7th Cir. 1993) .............................................................................55

*In re Stone & Webster, Inc.*,
  286 B.R. 532 (Bankr. D. Del. 2002) ..........................................................................38

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) .....................................................................................34

*In re SunPower Corp.*,
  No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024)................................................50

*In re T-H New Orleans Ltd. P'ship*,
  116 F.3d 790 (5th Cir. 1997) .....................................................................................34

*In re Tonopah Solar Energy, LLC*,
  657 B.R. 393 (D. Del. 2022) ......................................................................................55

*In re Trib. Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ....................................................................42, 54

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438, 449 (1976)...........................................................................................15

*In re Tupperware Brands Corp.*,
  No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025)............................................56, 59

x

*In re U.S. Brass Corp.*,
  194 B.R. 420 (Bankr. E.D. Tex. 1996) ...............................................................17

*In re U.S. Truck Co.*,
  47 B.R. 932 (E.D. Mich. 1985).........................................................................42

*In re Unichem Corp.*,
  72 B.R. 95 (Bankr. N.D. Ill. 1987) ...................................................................15

*In re Virgin Orbit*,
  No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) ........................................56

*In re Vyaire Med., Inc.*,
  No. 24-11217 (BLS) (Bankr. D. Del. Nov. 14, 2024) .........................................50

*In re W. Coast Video Enters., Inc.*,
  174 B.R. 906 (Bankr. E.D. Pa. 1994) ...............................................................56

*In re W.R. Grace & Co.*,
  475 B.R. 34, 87 (D. Del. 2012).....................................................................34, 42

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ......................................................51, 52, 55

*In re WCI Cable, Inc.*,
  282 B.R. 457 (Bankr. D. Or. 2002)...................................................................51

*In re Wheel Pros, LLC*,
  No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024)..........................................50

*In re World Health Alts., Inc.*,
  344 B.R. 291 (Bankr. D. Del. 2006) .................................................................50

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ..............................................................51, 52

**Statutes**

11 U.S.C. Ch. 7 ..................................................................................13, 33, 34

11 U.S.C. Ch. 11 ........................................................................................ *passim*

11 U.S.C. § 101(51D)(B)..................................................................................48

11 U.S.C. § 101–1532........................................................................................1

11 U.S.C. § 365(b)(1) ......................................................................................30

11 U.S.C. § 502................................................................................................32

11 U.S.C. § 503(b) ................................................................................................................. 40

11 U.S.C. § 507(a)(1) ............................................................................................................. 40

11 U.S.C. § 507(a)(2) ........................................................................................................ 40, 44

11 U.S.C. § 507(a)(4) ............................................................................................................. 40

11 U.S.C. § 507(a)(5) ............................................................................................................. 40

11 U.S.C. § 507(a)(6) ............................................................................................................. 40

11 U.S.C. § 507(a)(7) ............................................................................................................. 40

11 U.S.C. § 507(a)(8) ............................................................................................................. 40

11 U.S.C. § 1114 .................................................................................................................... 44

11 U.S.C. § 1122 .............................................................................................................. *passim*

11 U.S.C. § 1122(a) ............................................................................................................... 23

11 U.S.C. § 1123 .............................................................................................................. *passim*

11 U.S.C. § 1123(a) ............................................................................................................... 26

11 U.S.C. § 1123(a)(1) ........................................................................................................... 26

11 U.S.C. § 1123(a)(2) ........................................................................................................... 26

11 U.S.C. § 1123(a)(3) ........................................................................................................... 26

11 U.S.C. § 1123(a)(4) ........................................................................................................... 26

11 U.S.C. § 1123(a)(5) ....................................................................................................... 27, 28

11 U.S.C. § 1123(a)(6) ........................................................................................................... 28

11 U.S.C. § 1123(a)(7) ....................................................................................................... 28, 29

11 U.S.C. § 1123(b) ............................................................................................. 45, 46, 47, 60

11 U.S.C. § 1123(b)(1) ..................................................................................................... *passim*

11 U.S.C. § 1123(b)(2) ....................................................................................................... 29, 30

11 U.S.C. § 1123(b)(3) ....................................................................................................... 29, 50

11 U.S.C. § 1123(b)(3)(A) .................................................................................................. 29, 50

11 U.S.C. § 1123(b)(4) ...................................................................................................29

11 U.S.C. § 1123(b)(5) ...................................................................................................29

11 U.S.C. § 1123(b)(6) ...................................................................................................29

11 U.S.C. § 1123(d) ...................................................................................................30, 31

11 U.S.C. § 1125 ..................................................................................................... *passim*

11 U.S.C. § 1125(a) ................................................................................................. *passim*

11 U.S.C. § 1125(a)(1) ...............................................................................................13, 15

11 U.S.C. § 1125(b) .........................................................................................................12

11 U.S.C. § 1125(e) ...................................................................................................21, 22

11 U.S.C. § 1125(g) ...................................................................................................12, 13

11 U.S.C. § 1126 ..................................................................................................... *passim*

11 U.S.C. § 1126(a) .........................................................................................................32

11 U.S.C. § 1126(b)(2) ...............................................................................................14, 18

11 U.S.C. § 1126(c) ...................................................................................................21, 33

11 U.S.C. § 1126(f) ..............................................................................................8, 32, 33

11 U.S.C. § 1126(g) .............................................................................................8, 32, 33

11 U.S.C. § 1127 .........................................................................................................63, 64

11 U.S.C. § 1127(a) .........................................................................................................63

11 U.S.C. § 1129 ..................................................................................................... *passim*

11 U.S.C. § 1129(a) ................................................................................................. *passim*

11 U.S.C. § 1129(a)(1) .....................................................................................................22

11 U.S.C. § 1129(a)(2) .........................................................................................31, 33, 59

11 U.S.C. § 1129(a)(3) .................................................................................................34, 59

11 U.S.C. § 1129(a)(4) .....................................................................................................35

11 U.S.C. § 1129(a)(5) .................................................................................................36, 37

11 U.S.C. § 1129(a)(5)(A)(ii) ..................................................................................................36

11 U.S.C. § 1129(a)(6) ...........................................................................................................37

11 U.S.C. § 1129(a)(7) .........................................................................................37, 38, 39, 65

11 U.S.C. § 1129(a)(8) ......................................................................................................39, 45

11 U.S.C. § 1129(a)(9) ................................................................................................... *passim*

11 U.S.C. § 1129(a)(9)(A) .................................................................................................40, 41

11 U.S.C. § 1129(a)(9)(B) .................................................................................................40, 41

11 U.S.C. § 1129(a)(9)(C) .................................................................................................40, 41

11 U.S.C. § 1129(a)(10) .....................................................................................................39, 41

11 U.S.C. § 1129(a)(11) .................................................................................................41, 42, 43

11 U.S.C. § 1129(a)(12) ...........................................................................................................44

11 U.S.C. § 1129(a)(13) ...........................................................................................................44

11 U.S.C. § 1129(a)(14) ...........................................................................................................45

11 U.S.C. § 1129(a)(15) ...........................................................................................................45

11 U.S.C. § 1129(a)(16) ...........................................................................................................45

11 U.S.C. § 1129(b) ....................................................................................................... *passim*

11 U.S.C. § 1129(b)(1) ......................................................................................................45, 46

11 U.S.C. § 1129(b)(2) ...........................................................................................................47

11 U.S.C. § 1129(c) .................................................................................................................48

11 U.S.C. § 1129(d) .................................................................................................................48

11 U.S.C. § 1129(e) .................................................................................................................48

28 U.S.C. § 1930......................................................................................................................44

Securities Act of 1933, Section 5 (15 U.S.C. § 77) ........................................................6, 13, 14, 48

**Rules**

Fed. R. Bankr. P. 1015(b) ..........................................................................................................5

Fed. R. Bankr. P. 2002 ................................................................................12, 20, 21

Fed. R. Bankr. P. 3017 ...........................................................................12, 18, 20, 31

Fed. R. Bankr. P. 3018 ...................................................................................... *passim*

Fed. R. Bankr. P. 3018(c) ....................................................................................12, 20

Fed. R. Bankr. P. 3019 ................................................................................21, 63, 64

Fed. R. Bankr. P. 9019 ...........................................................................................50

Local Rule 1015-1 ...................................................................................................5

Local Rule 3017-1 .................................................................................................18

## Other Authorities

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ..................................23, 31

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978)........................................23, 31

**RELIEF REQUESTED**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law in support of (a) approval of the *Disclosure Statement Relating to the Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* [Docket No. 6] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and (b) confirmation of the *Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* [Docket No. 5] (as may be further amended, modified, or supplemented from time to time, the "Plan"),[2] pursuant to sections 1125, 1126, and 1129, respectively, of the Bankruptcy Code.

In support of confirmation of the Plan, the Debtors also anticipate filing the following:  (a) the *Declaration of Alan J. Carr in Support of Confirmation of the Amended Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* (the "Carr Declaration"); (b) the *Declaration of Matthew Frank, Managing Director of Alvarez & Marsal North America, LLC, in Support of Confirmation of the Amended Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* (the "Frank Declaration"); (c) the Declaration of *Vijay Kotte, Chief Executive Officer of GoHealth, Inc., in Support of Confirmation of the Amended Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* (the "Kotte Declaration"); and (d) the *Declaration of John Burlacu Regarding the Solicitation and Tabulation*

---

[2]    A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Vijay Kotte, Chief Executive Officer of GoHealth, Inc., in Support of the Debtors' Chapter 11 Petitions, First Day Motions, and Access to Cash Collateral* [Docket No. 4] (the "First Day Declaration") and the Disclosure Statement.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them later in this memorandum or in the Plan or the Disclosure Statement, as applicable.

1

*of Votes on, and Elections to Opt In to the Third-Party Release of, the Amended Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* (the "<u>Final Voting Report</u>," and together with the Carr Declaration, the Frank Declaration, and the Kotte Declaration, the "<u>Declarations</u>").  In further support of confirmation of the Plan and approval of the Disclosure Statement, and in response to the objection thereto, the Debtors respectfully state as follows:

### Preliminary Statement

1.      The Debtors commenced these cases to effectuate a change of control transaction that leaves general unsecured creditors and preferred equity holders unimpaired and provides an approximately $10 million cash recovery to the Company's common equity holders.  These cases mark the culmination of extensive and good-faith negotiations with the Company's Key Stakeholders and enable a highly consensual transition in ownership that will preserve GoHealth's enterprise value.  The Debtors now seek to bring this chapter 11 process to a conclusion with approval of the Disclosure Statement and confirmation of the Plan.

2.      The Plan implements the change of control through several transactions, including, but not limited to:  entry into a $20 million first lien exit facility that will fund, among other things, the Equity Recovery Pool; conversion of approximately $174 million of loans under the Super-Priority Credit Agreement into second-out term loans and conversion of approximately $588 million of loans under the First Lien Credit Agreement into third-out term loans; reinstatement of general unsecured claims and preferred equity interests; and customary Debtor and third-party releases.

3.      The Debtors entered chapter 11 with overwhelming support for the Plan already in-hand.  Specifically, as of the Petition Date, the Debtors had already received ballots accepting the Plan from 100% of their prepetition lenders, holders of greater than 99% of GoHealth Holdings

Interests,[3] and holders of approximately 61% of the outstanding GoHealth, Inc. Class A Common Stock.[4]

4.      Support for the Plan among the Debtors' stakeholders increased following the Petition Date, with holders of 64.55% of the outstanding GoHealth, Inc. Class A Common Stock voting in favor of the Plan.  Additionally, the Debtors resolved all issues raised by the U.S. Trustee and received only one objection, which should be overruled for the reasons set forth herein.

5.      The Plan is a significant achievement for GoHealth and the result of months of collaboration among the Debtors and the Key Stakeholders.  The Plan and the Disclosure Statement satisfy all applicable provisions of the Bankruptcy Code for the reasons stated herein and in light of the evidentiary support to be offered at the hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing").  Therefore, the Disclosure Statement should be approved and the Plan should be confirmed.

## Background

### I.      General Background and Events Leading to the Chapter 11 Filing

6.      GoHealth is a leading health insurance marketplace and Medicare-focused digital health company.  By combining cutting-edge technology, deep industry expertise, and a customer-centric approach, GoHealth is a critical resource for millions of seniors navigating the complexities of Medicare Advantage enrollment and a leading e-broker for Medicare Advantage plan submissions and renewals in the United States.

---

[3]    Excludes such interests held by GoHealth, Inc.

[4]    A detailed description of these preliminary voting results is set forth in the *Preliminary Declaration of John Burlacu Regarding the Solicitation and Tabulation of Votes On, and Elections to Opt In to the Third-Party Release Of, the Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and its Debtor Affiliates* [Docket No. 9].

7.      In the 18 months leading up to the Petition Date, GoHealth faced headwinds due to, among other things, increased competition and sudden and significant negative shifts in the healthcare environment.  The Company attempted to address these headwinds throughout 2025 by, among other things, securing additional capital, increasing flexibility under its existing credit documents, and reducing operational costs.  Meanwhile, the Debtors and the Key Stakeholders maintained regular dialogue regarding strategic alternatives for GoHealth to address the Company's existing capital structure, including potential M&A opportunities.  As it became clear that a third-party transaction was unlikely to come to fruition in the short-term, the Company pivoted conversations to a potential change of control transaction that would transition ownership to the secured lenders while providing meaningful recoveries to junior stakeholders or leaving them unimpaired.

8.      The Company and the Key Stakeholders considered multiple means of effectuating such a transaction and ultimately agreed that the best alternative was to implement the transaction through these chapter 11 cases.  As more fully described below and in the Scheduling Motion,[5] the Debtors commenced solicitation of the Plan with the Key Stakeholders on May 15, 2026, prior to formally launching solicitation on the Petition Date.  On June 7, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Also on the Petition Date, the Debtors filed the Plan, the Disclosure Statement, and the Scheduling Motion, pursuant to which the Debtors sought to schedule a joint hearing on confirmation of the Plan and

---

[5]    The "Scheduling Motion" means the *Motion of Debtors for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (V) Granting Related Relief* [Docket No. 7].

approval of the Disclosure Statement.    On June 10, 2026, the Court entered an order [Docket No. 56] authorizing the procedural consolidation and the joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

**II.    The Investigation.**

9.    In August 2025, Debtor GoHealth, Inc. appointed three new independent directors, Alan Carr, Timothy Pohl, and William Transier (the "Independent Directors"), and created a new four-member committee (the "Transformation Committee") responsible for overseeing the evaluation of strategic alternatives, including a potential merger or sale transaction.    The Transformation Committee was endowed with exclusive power and authority to review, formulate, negotiate, and recommend to the GoHealth, Inc. Board for approval various strategic alternatives such as potential refinancings, securitizations, mergers, acquisitions, and restructurings.

10.    As will be set forth in the Carr Declaration, on May 14, 2026, the Independent Directors, with the assistance of independent counsel Pachulski Stang Ziehl & Jones LLP ("PSZJ"), commenced an investigation (the "Investigation") to determine whether the Debtors held claims or causes of action worth pursuing against the holders of a majority of the Company's outstanding equity interests (the "Significant Shareholders") or their respective Board designees.

11.    At the Independent Directors' direction, PSZJ reviewed voluminous documents in connection with the Investigation, provided by the Company and accessible through public sources.  Also at the Independent Directors' direction, PSZJ interviewed three individuals:  Vijay Kotte, the Company's Chief Executive Officer and a director since June 2022; Clinton Jones, one of the Company's founders, Chief Executive Officer of the Company from 2001 to 2022, and a director throughout the period covered by the Investigation; and a member of a significant equity holder's investment team.  No limits were placed on the scope of PSZJ's inquiries.

5

12.    The Investigation was extensive, and PSZJ concluded that the Debtors do not hold any claims or causes of action worth pursuing against the Significant Shareholders or their respective Board designees.

**III.    The Noticing Process, Solicitation Process, and Voting Results.**

13.    On May 15, 2026, prior to commencing these chapter 11 cases and as more fully described in the Scheduling Motion, the Debtors began distributing preliminary Solicitation Packages and Ballots[6] to certain key stakeholders ("Key Stakeholders")[7] in advance of launching formal solicitation.  Such Key Stakeholders include the Holders of Super-Priority Loan Claims (Class 3) and First Lien Claims (Class 4) and certain Holders of GoHealth Holdings Interests (Class 6) and GoHealth, Inc. Class A Common Stock (Class 8).  Holders of Claims in Class 3 and Class 4 were required to deliver executed and completed ballots to the Claims and Noticing Agent by May 19, 2026, at 5:00 p.m. (prevailing Eastern Time) (the "Lender Voting Deadline"), to be held in escrow pending release by June 7, 2026, at 12:00 p.m. (prevailing Eastern Time).

14.    On or before June 7, 2026 (the "Solicitation Commencement Deadline"), the Debtors caused their noticing, claims, and solicitation agent, Donlin, Recano & Company, LLC (the "Claims and Noticing Agent") to distribute via email and/or first-class mail (including a postage-prepaid return envelope) Solicitation Packages containing (a) the Solicitation Cover Letter, including instructions to obtain access, free of charge, to the Plan and the Disclosure

---

6    The approved form of Ballots used in solicitation are attached as Exhibit 3A, Exhibit 3B, Exhibit 3C, Exhibit 3D, Exhibit 3E, and Exhibit 3F to the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Conditionally Waiving the Requirement that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (V) Granting Related Relief* [Docket No. 57] (the "Scheduling Order").

7    All Key Stakeholders are qualified institutional buyers under the Securities Act of 1933 (as amended, the "Securities Act"), accredited investors (as defined under the Securities Act), or non-U.S. persons.

Statement, and (b) the applicable Ballot(s) to the rest of the Holders of Interests in the Voting Classes, in accordance with sections 1125 and 1126 of the Bankruptcy Code.  The Debtors set May 12, 2026 as the voting record date (the "Voting Record Date").

15.    Each Holder of a Claim or Interest to whom a Solicitation Package was transmitted was directed in the Disclosure Statement and applicable Ballot to follow the instructions contained therein to complete and submit its respective Ballot to cast a vote to accept or reject the Plan.  Each Interest Holder who was not a Key Stakeholder was informed in the Disclosure Statement and its applicable Ballot that such Holder needed to submit its Ballot such that it was actually received by the Claims and Noticing Agent on or before July 8, 2026, at 4:00 p.m. (prevailing Eastern Time) (the "Interests Voting Deadline" and together with the Lender Voting Deadline, the "Voting Deadlines").

16.    On June 10, 2026, the Bankruptcy Court entered the Scheduling Order, which (a) established July 8, 2026, at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to the adequacy of the Disclosure Statement and confirmation of the Plan (the "Objection Deadline") and (b) approved the form and manner of the Confirmation Hearing Notice and the Publication Notice (each as defined below).

17.    Starting on June 10, 2026, the Debtors caused the *Notice of (I) Commencement of Prepackaged Chapter 11 Bankruptcy Cases, (II) Confirmation Hearing on the Disclosure Statement, Confirmation of the Joint Prepackaged Chapter 11 Plan, and Related Matters, and (III) Related Objection and Briefing Deadlines*, substantially in the form attached as Exhibit 1 to the Scheduling Order (the "Confirmation Hearing Notice") to be served via U.S. first class mail upon all parties in interest.  The Confirmation Hearing Notice informed recipients of:  (a) the commencement of these chapter 11 cases on June 7, 2026; (b) the scheduling of the Confirmation

Hearing to consider approval of the Disclosure Statement and Confirmation of the Plan on July 16, 2026, at 1:00 p.m. (prevailing Eastern Time) (rescheduled to July 20, 2026 at 12:00 p.m. (prevailing Eastern Time) due to Court availability); (c) the key terms of the Plan, including classification and treatment of Claims and Interests; (d) key dates and information regarding approval of the Disclosure Statement, Confirmation of the Plan, and the Objection Deadline; (e) the methods by which parties may request copies of the Plan and the Disclosure Statement; and (f) the full text of the release, exculpation, and injunction provisions set forth in the Plan.[8] In addition, the Debtors caused notice regarding the commencement of the chapter 11 cases and the Confirmation Hearing (the "Publication Notice") to be published in the *New York Times* (national edition) on June 13, 2026.[9]  The Confirmation Hearing Notice was also made available at no charge on the public website maintained by the Claims and Noticing Agent at: https://www.bankruptcy.angeiongroup.com/Clients/ghi/Index.

18.    Holders of Claims or Interests in Classes 1, 2, 5, 7, 9, 10, and 11 (collectively, the "Non-Voting Classes" and such Holders, the "Non-Voting Parties") were not provided with Solicitation Packages because their respective Claims or Interests are either (a) unimpaired, and conclusively presumed to accept, the Plan under section 1126(f) of the Bankruptcy Code or (b) impaired, and conclusively deemed to reject, the Plan under section 1126(g) of the Bankruptcy Code.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

---

[8]    *See Certificate of Service*, Exhibit F [Docket No. 87] (the "Confirmation Hearing and Notices of Non-Voting Status and Opt-In Affidavit").

[9]    *See Proof of Publication* [Docket No. 90] (the "Publication Affidavit").

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | GoHealth, Inc. Preferred Stock | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 9 | GoHealth, Inc. Class B Common Stock | Impaired and Receiving No Distribution | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Intercompany Claims | Unimpaired / Impaired and Receiving No Distribution | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired / Impaired and Receiving No Distribution | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

19.     Shortly after the Petition Date, the Debtors mailed, or caused to be delivered, the Notice of Non-Voting Status to all Holders or potential Holders of Claims and Interests in the Non-Voting Classes.  The Notice of Non-Voting Status informed recipients of their status as ineligible to vote and gave them the opportunity to opt in to the Third-Party Release (as defined below) in the Plan.[10]  All notices prominently noted the various methods by which the Non-Voting Parties could obtain, at no cost, copies of the Plan and Disclosure Statement in paper or electronic form, at their election.

20.     The Voting Classes overwhelmingly voted in favor of accepting the Plan.  As set forth below and as will be reflected in the Final Voting Report, Holders of Super-Priority Loan Claims in Class 3 and First Lien Claims in Class 4 representing 100% in both number and amount voted to accept the Plan, with no Holders in those Classes abstaining from voting.  With respect to Holders of GoHealth Holdings Interests, 100% in number and amount voted to accept the Plan (reflecting greater than 99% of total GoHealth Holdings Interests, excluding Interests held by GoHealth, Inc.).  Finally, 97.83% of Holders of GoHealth, Inc. Class A Common Stock in Class 8

---

[10]     The Debtors were not required to mail Notices of Non-Voting Status to Classes 10 and 11.

who voted, representing 99.62% in amount of total Interests of Class 8 Holders who voted, voted to accept the Plan.

| VOTING CLASS | ACCEPT | | REJECT | |
|---|---|---|---|---|
| | NUMBER (% of Number Voting) | AMOUNT (% of Amount Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount Voting) |
| Class 3 – Super-Priority Loan Claims | 33 100% | $173,952,831.80 100% | 0 0% | $0 0% |
| Class 4 – First Lien Claims | 36 100% | $592,573,890.20 100% | 0 0% | $0 0% |
| Class 6 – GoHealth Holdings Interests | 5 100% | $12,588,769.00 100% | 0 0% | $0 0% |
| Class 8 – GoHealth, Inc. Class A Common Stock | 2,799 (97.83)% | $10,771,555.89 99.62% | 62 2.17% | $40,656.32 0.38% |

21.    Accordingly, each of Class 3, 4, 6, and 8 voted to accept the Plan under section 1126 of the Bankruptcy Code.

22.    With the exception of Holders of Claims and Interests in Classes 10 or 11, all Holders had the opportunity to "opt in" to the Third-Party Release, regardless of whether they were entitled to vote on the Plan.  As of the Interests Voting Deadline, 275 parties opted in to the Third-Party Release.  Holders of Claims in Classes 3 and 4 either checked the box to opt in to the Third-Party Release or were deemed to opt in by voting to accept the Plan.[11]  Holders of Interests in Classes 6 and 8 could opt in by affirmatively checking the box on their Ballot and returning the Ballot.  Finally, Non-Voting Parties, with the exception of Holders of Claims and Interests in Classes 10 or 11, could opt in by completing and returning the applicable Opt-In Form.  Both the

---

[11]    These Holders—the Secured Lenders—not only approved the Plan and the forms of Ballots containing these provisions, but all of them also voted to accept the Plan with full awareness that doing so required opting into the Third-Party Release.

Ballots and the Opt-In Form provided each Holder of a Claim or Interest with ample notice and instructions regarding how to opt in to the Third-Party Release.

23.     The Plan represents a significant achievement for the Debtors and is the direct result of extensive, good-faith negotiations with the Debtors' key stakeholders.  The Plan will preserve the value of the Estates and maximize recoveries to Holders of Claims and Interests.  Because the Plan meets the requirements of section 1129(b) as described below, the Court should confirm the Plan with respect to the Classes that were deemed to reject the Plan.

## IV.     Confirmation Objections.

24.     The Debtors received one formal objection to confirmation from Ms. Gayatri N. Voora, a former employee and current shareholder [Docket No. 93] (the "Voora Objection").  For the reasons set forth herein, the Debtors believe that the Court should confirm the Plan over the Voora Objection.  The Debtors also received several informal comments from the U.S. Trustee, the Department of Justice, and one of the Debtor's contract counterparties, all of which have been, or the Debtors expect will be as of the Confirmation Hearing, resolved.  The Debtors reserve their rights to address all objections, if any, at the Confirmation Hearing.

## Argument

25.     This memorandum is organized as follows:  *First*, the Debtors present their case for approval of the Disclosure Statement and a finding that the Debtors complied with the Scheduling Order.  *Second*, the Debtors present their case-in-chief that the Plan satisfies the applicable requirements of section 1129 of the Bankruptcy Code by a preponderance of the evidence and should therefore be confirmed.  *Finally*, the Debtors request that the Bankruptcy Court overrule the Voora Objection.

26.     For the reasons stated herein, and in light of the evidentiary support to be offered at the Confirmation Hearing and in the Declarations, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement and confirm the Plan.

## I.    Approval of the Disclosure Statement Is Warranted.

### A.    The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and the Bankruptcy Rules.

27.     To determine whether prepetition solicitation of votes to accept or reject a plan should be approved, the Bankruptcy Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 2002, 3017(d), 3018(b), and 3018(c).

28.     Section 1125(g) of the Bankruptcy Code provides that:

> Notwithstanding subsection (b), an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.[12]

29.     Section 1126(b) of the Bankruptcy Code provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if— (1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.[13]

---

[12]    11 U.S.C. § 1125(g).  Section 1125(b) of the Bankruptcy Code prohibits solicitation of a plan unless and until a disclosure statement is approved.  *See* 11 U.S.C. § 1125(b).  As further explained herein, section 1125(b) does not apply to the Debtors' prepetition solicitation.

[13]    11 U.S.C. § 1126(b).

30.     Prepetition solicitations must therefore either comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, the solicited holders must receive "adequate information," as such term is defined in section 1125(a)(1) of the Bankruptcy Code.  As discussed below, the Debtors satisfied sections 1125(g) and 1126(b) of the Bankruptcy Code.

### 1.     The Debtors' Prepetition Solicitation Was Exempt from Registration and Disclosure Requirements Otherwise Applicable Under Nonbankruptcy Law.

31.     As discussed in more detail in the Scheduling Motion, the Debtors' prepetition solicitation of votes on the Plan from Eligible Holders (as defined below) was exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") under one or more of the exceptions from registration provided thereunder, including section 4(a)(2) thereof, state "Blue Sky" laws, or any similar rules, regulations, or statutes.  To comply with the Securities Act, the Debtors conducted prepetition solicitation of votes on the Plan only from Eligible Holders.  "Eligible Holders" means holders who are either:  (a) (i) an "accredited investor" (within the meaning of Rule 501(a) of Regulation D under the Securities Act) or (ii) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act); or (b) not a "U.S. person" (as defined in Regulation S under the Securities Act).  Specifically, section 4(a)(2) of the Securities Act creates an exemption from the registration requirements of the Securities Act for transactions not involving a "public offering."[14]  With respect to Eligible Holders of Claims in Class 6 (GoHealth Holdings Interests) and Class 8 (GoHealth, Inc. Class A Common Stock), they were not offered and will not receive securities pursuant to a "public offering."  The Debtors believe that all parties solicited prepetition were Eligible Holders, and that there was no general solicitation

---

[14]     15 U.S.C. § 77d(a)(2).

13

or general advertising or directed selling efforts in connection with the sale of securities under the Plan.  Moreover, the Debtors believe that all Holders of Claims in Class 3 (Super-Priority Loan Claims)—which will receive Senior Takeback Debt—and all Holders of Claims in Class 4 (First Lien Claims)—which will receive a combination of Junior Takeback Debt and New Common Interests—are qualified institutional buyers and/or accredited investors under the Securities Act. Accordingly, the Debtors were not required to file a registration statement regarding the offer of the New Common Interests, and the requirements of section 1126(b)(1) of the Bankruptcy Code are satisfied by the Debtors' prepetition solicitation process.

32. Additionally, whether or not a registration statement is required, the Securities Act and regulations promulgated thereunder contain additional disclosure requirements that apply.[15] Under those generally applicable requirements, a party offering or selling securities may not make "any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."[16]  "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[17]  No stakeholder has objected alleging the Debtors made any untrue statement of, or omitted, a material fact.

33. Accordingly, the Debtors respectfully submit that the Disclosure Statement satisfies the disclosure requirements of section 1126(b)(2) of the Bankruptcy Code by providing adequate information, as defined in section 1125(a) of the Bankruptcy Code and as further discussed below.

---

[15] *See, e.g.*, 15 U.S.C. § 77q(a)(2); 17 C.F.R. § 240.10b-5(b); *see also* 7 *Collier on Bankruptcy* ¶ 1126.03[d] (16th ed.) (recognizing that the securities laws contain provisions regarding the accuracy of disclosure).

[16] 15 U.S.C. § 77q(a)(2); *see also* 17 C.F.R. § 240.10b-5(b) (same).

[17] *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (internal quotations omitted).

**2.      The Disclosure Statement Contains Adequate Information.**

34.      The primary purpose of a disclosure statement is to provide all material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[18] Congress intended that such informed judgments would be needed to both negotiate the terms of, and vote on, a chapter 11 plan.[19]

35.      "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[20] Courts within the Third Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy

---

[18] *See, e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotations omitted); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Phx. Petrol., Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan.").

[19] *See Century Glove, Inc.*, 860 F.2d at 100 ("The necessity of 'adequate information' was intended to help creditors in their negotiations.").

[20] *See* 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of [section] 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources); S. Rep. No. 95-989, at 121 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5907 (stating that "the information required will necessarily be governed by the circumstances of the case").

Code resides within the broad discretion of the court.[21]  Accordingly, the determination of whether a disclosure statement contains adequate information must be made on a case-by-case basis, focusing on the unique facts and circumstances of each case.[22]

36.     In determining whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts typically look for disclosures related to topics such as:

a.      the events that led to the filing of a bankruptcy petition;

b.      the relationship of the debtor with its affiliates;

c.      a description of the available assets and their value;

d.      the debtor's anticipated future performance;

e.      the source of information stated in the disclosure statement;

f.      the debtor's condition while in chapter 11;

g.      claims asserted against the debtor;

h.      the estimated return to creditors under a chapter 7 liquidation of the debtor;

i.      the future management of the debtor;

j.      the chapter 11 plan or a summary thereof;

k.      financial information, valuations, and projections relevant to a creditor's decision to accept or reject the chapter 11 plan;

---

[21]  *See, e.g.*, *In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *In re Phx. Petrol.*, 278 B.R. at 393 (noting the Bankruptcy Court's discretion in determining adequacy of disclosure statements).

[22]  *See In re Phx. Petrol.*, 278 B.R. at 393 (stating that an adequacy determination depends on various case-dependent factors); *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes 'adequate information' in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court." (citation omitted)); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) (stating that "[t]he information required will necessarily be governed by the circumstances of the case").

l.      information relevant to the risks posed to creditors under the plan;

m.      the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

n.      litigation likely to arise in a non-bankruptcy context; and

o.      tax attributes of the debtor.[23]

37.    The Disclosure Statement contains a number of categories of information that courts consider "adequate information," including, without limitation:

- **_Corporate History and Business Operations_**.  An overview of the Debtors' corporate history, business operations, organizational structure, and capital structure is described in Article IV of the Disclosure Statement;

- **_Events Leading to Filing of These Chapter 11 Cases_**.  An overview of the Debtors' out-of-court restructuring efforts in response to liquidity constraints and the events leading to such liquidity constraints are described in Article V of the Disclosure Statement;

- **_The Prepackaged Plan and These Chapter 11 Cases_**.  A summary of the course of events in the chapter 11 cases, including the Restructuring Transactions, is described in Article VI of the Disclosure Statement;

- **_Risk Factors_**.  Certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement, are described in Article VIII of the Disclosure Statement;

- **_Solicitation and Voting Procedures_**.  A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan is provided in Article IX of the Disclosure Statement;

- **_Confirmation of the Plan_**.   Confirmation procedures and statutory requirements for confirmation and consummation of the Plan are described in Article X of the Disclosure Statement;

---

[23]    _See In re U.S. Brass Corp._, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); _see also In re Scioto Valley Mortg. Co._, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); _In re Metrocraft Pub. Servs., Inc._, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).  Disclosure regarding all topics is not necessary in every case.  _In re U.S. Brass Corp._, 194 B.R. at 425 ("Disclosure of all factors is not necessary in every case."); _see also In re Phx. Petrol._, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

17

- ***Certain Securities Law Matters***.   A description of certain U.S. federal income tax law consequences of the Plan is provided in Article XI of the Disclosure Statement;

- ***Certain United States Federal Income Tax Consequences***.   A description of certain important disclosures regarding securities laws is provided in Article XII of the Disclosure Statement;

- ***Releases and Retained Causes of Action.***   A description of the Plan's release provisions is contained in Article III.V of the Disclosure Statement, and a description of the Plan's details regarding the Reorganized Debtors' rights to commence, prosecute, or settle the Retained Causes of Action, is provided in Article III.U of the Disclosure Statement; and

- ***Recommendation***.   A recommendation by the Debtors that Holders of Claims in the Voting Classes should vote to accept the Plan is included in Article XIII of the Disclosure Statement.

38.    In addition, prior to solicitation, the Disclosure Statement and the Plan were subject to review and comment by the Key Stakeholders.  No stakeholder disputed that the Disclosure Statement contained information sufficient for Impaired Holders of Claims and Interests in the Voting Classes to be able to cast an informed vote on the Plan.  For the reasons set forth above, the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code in satisfaction of section 1126(b)(2) and should be approved.

**B.        The Debtors Complied with Applicable Notice Requirements.**

39.    The Debtors complied with the solicitation and Confirmation-related procedures and timeline approved by the Scheduling Order, including all applicable notice requirements.

**1.        The Debtors Complied with the Notice Requirements Set Forth in the Scheduling Order and the Bankruptcy Rules.**

40.    The Debtors satisfied the notice requirements set forth in the Scheduling Order, Bankruptcy Rule 3017, and Local Rule 3017-1.  ***First***, the Debtors began transmitting the Solicitation Packages to the Key Stakeholders on May 15, 2026 for administrative convenience and in advance of formal solicitation.  Subsequently, the Debtors commenced formal solicitation on June 7, 2026, transmitting the Solicitation Packages to Holders of Claims and Interests in the

Voting Classes.  Specifically, the Solicitation Package contained:  (a) the Solicitation Cover Letter, including instructions to obtain access, free of charge, to the Plan and the Disclosure Statement; and (b) the Ballots. [24]  ***Second***, on June 10, 2026, in accordance with the Scheduling Order, the Debtors caused the Claims and Noticing Agent to mail the Confirmation Hearing Notice to all parties-in-interest listed on the Debtors' creditor matrix, informing the recipients of, among other things:  (a) the date of commencement of these chapter 11 cases; (b) the date for the hearing to consider approval of the Disclosure Statement and Confirmation of the Plan; and (c) the deadline for filing objections to the Plan and the Disclosure Statement.[25]  The Confirmation Hearing Notice also included instructions on how to obtain the Plan and the Disclosure Statement free of charge through the Debtors' restructuring website or for a fee on the Bankruptcy Court's PACER website.[26]  ***Third***, on June 10, 2026, in accordance with the Scheduling Order, the Debtors caused the Claims and Noticing Agent to mail the Notices of Non-Voting Status and Opt-In Forms to all members of the Non-Voting Classes (with the exception of Classes 10 and 11).  ***Fourth***, the Debtors caused the Publication Notice to be published in *The New York Times* on June 13, 2026.[27]

> ### 2.    The Ballots Used to Solicit Holders of Claims and Interests Entitled to Vote on the Plan Complied with the Scheduling Order.

41.    The forms of Ballots used comply with the Bankruptcy Rules and were approved by the Bankruptcy Court pursuant to the Scheduling Order.[28]  They were transmitted in accordance

---

[24]    *See Certificate of Service*, [Docket No. 72] (the "Solicitation Affidavit").

[25]    *See* Confirmation Hearing and Notices of Non-Voting Status and Opt-In Affidavit.

[26]    *See* Confirmation Hearing Notice.

[27]    *See* Publication Affidavit.

[28]    *See* Scheduling Order, ¶ 10.

with the Scheduling Order. No party has objected to the sufficiency of the Ballots or to the Debtors' distribution thereof. Accordingly, the Debtors submit that they complied with the Scheduling Order and satisfied the requirements of Bankruptcy Rule 3017(d) and 3018(c).

### 3. The Voting Record Date Complied with Bankruptcy Rule 3018(b) and the Scheduling Order.

42. In a prepetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date specified in the solicitation."[29] The Disclosure Statement and the Ballots clearly identified the Voting Record Date, May 12, 2026, as the date for determining which Holders were entitled to vote to accept or reject the Plan.[30] Further, the Court approved the Voting Record Date in the Scheduling Order.[31] Accordingly, the Debtors have complied with the Scheduling Order and satisfied the applicable requirements of the Bankruptcy Code.

### 4. The Debtors' Solicitation Period Complied with Bankruptcy Rules 3017(a) and 3018(b) and the Scheduling Order.

43. Under Bankruptcy Rule 3017(a), a hearing on the adequacy of the disclosure statement generally requires 28 days' notice.[32] Similarly, Bankruptcy Rule 2002(b) provides that parties in interest should receive 28 days' notice of the objection deadline and the hearing to

---

[29]  Fed. R. Bankr. P. 3018(b).

[30]  *See* Disclosure Statement VI.B (listing proposed confirmation schedule).

[31]  *See* Scheduling Order, ¶ 1 (approving Voting Record Date).

[32]  *See* Fed. R. Bankr. P. 3017(a) ("[T]he court must hold a hearing on a disclosure statement filed under Rule 3016(b) and any objection or modification to it. The hearing must be held on at least 28 days' notice under Rule 2002(b) to: the debtor; creditors; equity security holders; and other parties in interest.").

consider approval of the disclosure statement.[33]  As set forth above and in the Scheduling Motion, the Debtors began transmitting the Solicitation Packages, which included instructions for accessing electronic or hard-copy versions of the Plan and Disclosure Statement, to all Holders of Claims and Interests entitled to vote on the Plan on or before June 7, 2026, which is 43 days prior to the Confirmation Hearing and 31 days prior to the Objection Deadline.[34]  The Debtors' solicitation period complied with the Scheduling Order and statutory notice periods and thus was not "unreasonably short" as described in Bankruptcy Rule 3018(b)(2)(B).[35]

### 5. The Debtors' Tabulation Procedures Complied with the Scheduling Order.

44.  The Debtors request that the Bankruptcy Court find that the Debtors' tabulation of votes complied with the Scheduling Order.  As will be set forth in the Final Voting Report, the Claims and Noticing Agent reviewed all Ballots received in accordance with the Solicitation and Voting Procedures approved pursuant to the Scheduling Order, and submitted the Solicitation Affidavit regarding the solicitation and tabulation of votes.  Accordingly, the Debtors respectfully submit that the Bankruptcy Court should approve the Debtors' tabulation of votes, confirming that the requisite Claims voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

### 6. Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.

45.  Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions

---

[33]  *See* Fed. R. Bankr. P. 2002(b) (all creditors shall receive 28 days of notice to the objection deadline for the approval of a disclosure statement).

[34]  Scheduling Motion, ¶ 45.

[35]  *See* Scheduling Order, ¶ 8; Solicitation Affidavit; Fed. R. Bankr. P. 3019(b)(2)(B).

of [title 11] . . . is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[36] As set forth in the Final Voting Report, the First Day Declaration, Disclosure Statement, and the Kotte Declaration, and as demonstrated by the Debtors' compliance with the Scheduling Order, the Debtors at all times engaged in arm's-length, good-faith negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code. Therefore, the Debtors respectfully request that the Bankruptcy Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.    The Plan Satisfies Each Requirement for Confirmation.

46.    To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[37] As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code— including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

47.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code. The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122

---

[36]    11 U.S.C. § 1125(e).

[37]    *See In re Boy Scouts of Am.*, 137 F.4th 126, 158 n.18 (3d Cir. 2025) ("To confirm a consensual reorganization plan, on the other hand, the debtor must carry its burden of satisfying § 1129(a)'s sixteen statutory requirements by a preponderance of evidence. And those requirements increase when a debtor seeks to "cram down" a plan over the objection of a nonconsenting impaired class." (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006))); *In re Armstrong*, 348 B.R. at 120, n.15 (applying the preponderance of the evidence standard).

and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a chapter 11 plan, respectively.[38] As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

48. The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[39] For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[40] Instead, claims or interests designated to a particular class must be substantially similar to each other.[41] Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[42]

---

[38] S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368; *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[39] 11 U.S.C. § 1122(a).

[40] *See Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra Env't Sols., Inc.)*, 590 B.R. 75, 96 (D. Del. 2018), *aff'd on equitable mootness grounds*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("Section 1122 of the [Bankruptcy] Code provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes." (quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004))).

[41] *Id.*

[42] *Id.* Courts have identified grounds justifying separate classification, including (a) where members of a class possess different legal rights and (b) where there are good business reasons for separate classification. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as

23

49.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into 11 separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class based on legal or factual criteria or other relevant criteria.[43]   Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

    a.    <u>Class 1</u>:  Other Secured Claims;

    b.    <u>Class 2</u>:  Other Priority Claims;

    c.    <u>Class 3</u>:  Super-Priority Loan Claims;

    d.    <u>Class 4</u>:  First Lien Claims;

    e.    <u>Class 5</u>:  General Unsecured Claims;

    f.    <u>Class 6</u>:  GoHealth Holdings Interests;

    g.    <u>Class 7</u>:  GoHealth, Inc. Preferred Stock;

    h.    <u>Class 8</u>:  GoHealth, Inc. Class A Common Stock;

    i.    <u>Class 9</u>:  GoHealth, Inc. Class B Common Stock;

    j.    <u>Class 10</u>:  Intercompany Claims;

    k.    <u>Class 11</u>:  Intercompany Interests.

50.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in each such Class.  The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into

---

long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *accord In re Chateaugay Corp.*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement).

[43]     *See* Plan, Art. III.

account the relative priority among Claims and Interests. In addition, valid legal and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests. Namely, the Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' estates legally dissimilar to the Claims or Interests in other Classes.

51. For example, the classification scheme distinguishes Holders of Super-Priority Loan Claims (Class 3) from First Lien Claims (Class 4) because of the different priorities underlying the Claims in each Class. General Unsecured Claims (Class 5) are separately classified because they have differing legal rights from the Debtors' secured funded debt creditors.[44] Similarly, GoHealth Holdings Interests (Class 6), GoHealth, Inc. Preferred Stock (Class 7), GoHealth, Inc. Class A Common Stock (Class 8), and GoHealth, Inc. Class B Common Stock (Class 9) are separately classified because the legal rights of each of the Interests differ. Other Secured Claims (Class 1) and Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.[45]

52. Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class, and the separation of Classes is based on valid factual and legal distinctions. The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code. No party has asserted otherwise.

---

[44] *See* Plan, Art. III.

[45] *See id*.

**2. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

53. Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy. The Plan satisfies each of these requirements.

*a. Designation of Classes of Claims and Equity Interests, Specification of Unimpaired Classes, and Treatment of Impaired Classes (Section 1123(a)(1)–(3)).*

54. The first three requirements of section 1123(a) of the Bankruptcy Code are that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the treatment of any impaired class under the plan.[46] Article III of the Plan sets forth these specifications in detail, in satisfaction of these three requirements.[47] No party has asserted otherwise.

*b. Equal Treatment within Classes (Section 1123(a)(4))*

55. Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[48] The Plan satisfies this requirement because Holders of Allowed Claims or Interests will receive the same

---

[46] 11 U.S.C. § 1123(a)(1)–(3).

[47] Plan, Art. III.A–B.

[48] 11 U.S.C. § 1123(a)(4).

26

treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class, unless such Holder has agreed to less favorable treatment.  No party has asserted otherwise.

   c.      *Means for Implementation (Section 1123(a)(5)).*

56.      Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[49]  The Plan, together with the documents and forms of agreement included in the *Plan Supplement for the Debtors' Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* [Docket No. 116] (the "Plan Supplement") and the *First Amended Plan Supplement for the Debtors' Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* [Docket No. 126] (the "First Amended Plan Supplement"), provides the means by which the Plan will be implemented.  Among other things, Article IV of the Plan describes the means for the cancellation of documents evidencing existing Claims and Interests and implementation of the transactions provided for in the Plan, including, among other things: (a) the Restructuring Transactions; (b) the consummation of the Exit Facilities, including the execution, delivery, and filing of all Exit Facility Documents; (c) the issuance and distribution of the New Common Interests; (d) the execution of the TRA Amendment (as defined below); (e) the adoption of the New Organizational Documents; (f) the consummation of various corporate transaction steps necessary to implement the new corporate structure upon emergence; and (g) the preservation of Claims and Causes of Action not released pursuant to the Plan.[50]

57.      In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtors' emergence, such as the vesting of Estate assets in the Reorganized Debtors, the

---

[49]   11 U.S.C. § 1123(a)(5).

[50]   *See* Plan, Art. IV.

assumption of Executory Contracts and Unexpired Leases, and the settlement of Claims and Interests.[51]

58.     The precise terms governing the execution of certain of these transactions are set forth in the applicable Definitive Documents or forms of agreements included in the Plan Supplement.  Accordingly, the Plan sets forth adequate means for its implementation and satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.  No party has asserted otherwise.

> d.     *Issuance of Non-Voting Securities (Section 1123(a)(6)).*

59.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate documents prohibit the issuance of nonvoting equity securities.   The New Organizational Documents and Article IV.H of the Plan prohibit the issuance of non-voting equity Securities to the extent required to comply with section 1123(a)(6) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.  No party has asserted otherwise.

> e.     *Directors and Officers (Section 1123(a)(7)).*

60.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[52] The Plan satisfies this requirement by providing for the deemed resignation of the Debtors' directors and managers from their duties following the Effective Date, except to the extent that a current director or manager is designated to serve as a director, manager, or sole manager of a

---

[51]   *See id.*

[52]   11 U.S.C. § 1123(a)(7).

Reorganized Debtor.[53]  The initial members of the New Board of the Reorganized Debtors will be identified in an amended Plan Supplement.  Each of the directors, managers, sole managers, and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced, or removed in accordance with such New Organizational Documents.[54]  Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.  No party has asserted otherwise.

**3.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

61.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of the debtor's estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) include any other appropriate provision not inconsistent with the Bankruptcy Code.[55]

62.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, 5, and 7 are Unimpaired because the Plan leaves

---

[53]    *See* Plan, Art. IV.I.

[54]    *See* Plan, Art. IV.I.

[55]    *See* 11 U.S.C. § 1123(b)(1)–(6).

unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes. On the other hand, Classes 3, 4, 6, 8, and 9 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code. Classes 10 and 11 are either Unimpaired or Impaired, depending on their treatment under the Plan.

63.    In addition, pursuant to section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the assumption or assumption and assignment of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code, except to the extent set forth in the Plan.[56] The Plan also contains release, exculpation, and injunction provisions and provides for the TRA Amendment, each of which, for the reasons set forth below, is consistent with section 1123(b) of the Bankruptcy Code.

### 4.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.

64.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[57]

65.    The Plan complies with section 1123(d) of the Bankruptcy Code. Article V.C of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code by payment of Cures, if any, on or prior to the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated

---

[56]    *See* Plan, Art. V.A.

[57]    11 U.S.C. § 1123(d).

by the underlying agreements and/or the ordinary course of business among the parties thereto.[58]

Accordingly, the Debtors submit that the Plan fully complies with section 1123(d) of the Bankruptcy Code.  No party has asserted otherwise.

**B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

66.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[59] The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[60]  As set forth herein, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by soliciting votes on the Plan in accordance with the Scheduling Order.

**1.      The Debtors Complied with Section 1125 of the Bankruptcy Code.**

67.      As discussed in Part I.A of this Memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.

---

[58]    Plan, Art. V.C.

[59]    *See* 11 U.S.C. § 1129(a)(2).

[60]    *In re Lapworth*, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("The legislative history of section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368.

**2.    The Debtors Complied with Section 1126 of the Bankruptcy Code.**

68.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a chapter 11 plan.   Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.   Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan . . . .

(f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.[61]

69.    As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Claims in Class 3 (Super-Priority Loan Claims) and Class 4 (First Lien Claims) and Holders of Interests in Class 6 (GoHealth Holdings Interests) and Class 8 (GoHealth, Inc. Class A Common Stock).[62]   The Debtors did not solicit votes from Holders of Claims and Interest in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 5 (General Unsecured Claims) and Holders of

---

[61]    11 U.S.C. § 1126(a), (f), (g).

[62]    *See* Solicitation Affidavit.

Interests in Class 7 (GoHealth, Inc. Preferred Stock) because Holders of Claims and Interests in these Classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.[63]   Depending on their ultimate treatment, Holders of Claims and Interests in Class 10 (Intercompany Claims) and Class 11 (Intercompany Interests) will be either conclusively presumed to accept or deemed to reject the Plan, and in either scenario are not entitled to vote on the Plan.[64] Holders of Interests in Class 9 (GoHealth, Inc. Class B Common Stock) will receive no distribution on account of their Interests and, pursuant to section 1126(g) of the Bankruptcy Code, are deemed to reject the Plan.[65]

70.    With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that a class of claims accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims voting in such class vote to accept such plan.  Section 1126(d) of the Bankruptcy Code provides that a class of interests accepts a plan where holders of interests holding at least two-thirds in amount of allowed interests voting in such class vote to accept such plan.

71.    The Final Voting Report will reflect the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  Based upon the foregoing, the Debtors submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

---

[63]    *See* Plan, Art. III.A–B.

[64]    *See* Plan, Art. III.A–B.

[65]    *Id*.

C.       **The Plan Was Proposed in Good Faith (Section 1129(a)(3)).**

72.      Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[66]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[67]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[68]

73.      The Debtors negotiated, developed, and proposed the Plan in good faith, and the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  The Plan was negotiated with the Key Stakeholders over a period of several months, with the purpose of effectuating a consensual change of control while providing meaningful, if not full, recoveries to junior stakeholders.  The Plan achieves these goals by leaving unimpaired Holders of General Unsecured Claims and Preferred Interests and providing the Equity Recovery Pool for Holders of Class A Common Stock and

---

[66]    11 U.S.C. § 1129(a)(3).

[67]    *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986))); *see also In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002) ("[T]he Plan has been proposed with the legitimate purpose of reorganizing the business affairs of each of the Debtors and maximizing the returns available to creditors of the Debtors.  Accordingly, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code."); *accord In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985))).

[68]    *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) ("[A] determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal." (citing *In re Sun Country Dev., Inc.*, 764 F.2d at 408)); *In re Century Glove, Inc.*, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ("The requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start." (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408)); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 802 (same).

34

GoHealth LLC Interests.  All Voting Classes overwhelmingly voted to accept, evidencing the Plan's high likelihood of success.

**D.      The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).**

74.      Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness.[69]

75.      The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these chapter 11 cases from the Petition Date through Confirmation, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.[70]  Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 45 days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Court.[71]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.  No party has asserted otherwise.

---

[69]     *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd sub nom. In re Lisanti Foods Inc.*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) (holding that fees and expenses related to the plan are subject to the approval by the bankruptcy court); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[70]     *See* Plan, Art. II.

[71]     Plan, Art. II.B.

**E.      The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (Section 1129(a)(5)).**

76.      Section 1129(a)(5) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  In addition, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[72]  The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[73]   Courts have held that these provisions ensure that the post-confirmation governance of a reorganized debtor is in good hands.[74]

77.      With respect to directors, the Plan satisfies section 1129(a)(5)(A) of the Bankruptcy Code, because the known members of the New Board as of the Effective Date will be disclosed in an amended Plan Supplement.  Control of the Reorganized Debtors by the proposed individuals or individuals to be appointed in accordance with the Plan and pursuant to the New Organizational Documents will be consistent with public policy.  Therefore, the requirements under section 1129(a)(5)(A) are satisfied.

78.      The Debtors satisfy section 1129(a)(5)(B) with respect to their officers because, as set forth in the First Amended Plan Supplement, the Debtors identify certain of their existing

---

[72]   11 U.S.C. § 1129(a)(5)(A)(ii).

[73]   7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2021).

[74]   *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330 (Bankr. D.N.J. 2020) ("Continued service by prior management may be inconsistent with the interest of creditors and public policy 'if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor.'" (quoting *In re Seasons Partners, LLC*, 439 B.R. 505, 513 (Bankr. D. Ariz. 2010))); *see also In re Landing Assocs.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors.").

officers who will remain in their current capacities as officers of the Reorganized Debtors.[75]  The

Debtors' existing officers have at all times proceeded in good faith and with diligence and care in

connection with these chapter 11 cases.  Furthermore, the Reorganized Debtors' proposed officers

have significant knowledge and solid business and industry experience, are competent, and will

provide the Reorganized Debtors with continuity in running the business.  Accordingly, it is

reasonable to continue such officers' employment post-emergence.  Thus, the Plan complies with

section 1129(a)(5).  No party has asserted otherwise.

      **F.**      **The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).**

79.      Section 1129(a)(6) of the Bankruptcy Code requires that any rate change provided

for in a plan be approved by or subject to the approval of all governmental regulatory commissions

with jurisdiction, if any.  The Plan does not provide for any rate changes, and the Debtors are not

subject to any such regulation.  Thus, section 1129(a)(6) of the Bankruptcy Code does not apply

to the Plan.

      **G.**      **The Plan Is in the Best Interests of All the Debtors' Stakeholders (Section 1129(a)(7)).**

80.      Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests

test," requires that, with respect to each impaired class of claims or interests, each individual holder

of a claim or interest has either accepted the plan or will receive or retain property having a present

value of not less than that which such holder would receive if the debtor were liquidated under

chapter 7 of the Bankruptcy Code.[76]  The best interests test "applies to individual dissenting holders

of impaired claims and interests rather than entire classes, and is generally satisfied through a

---

[75]   *See* First Amended Plan Supplement, <u>Exhibit C</u>.

[76]   *See* 11 U.S.C. § 1129(a)(7)(A)(ii).

comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7

liquidation of that debtor's estate against the estimated recoveries under the proposed plan of

reorganization."[77]

81.    The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests

test.  As set forth in the Disclosure Statement, the Debtors, with the assistance of their financial

advisors, prepared a liquidation analysis (the "Liquidation Analysis") that estimates recoveries for

members of each Class under the Plan, demonstrating that projected recoveries for each Class

under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7

liquidation.[78]

82.    Significantly, in a hypothetical chapter 7 liquidation, Holders of General Unsecured

Claims, Other Secured Claims, and Other Priority Claims—which are Unimpaired in these

chapter 11 cases and are paid in full under the Plan—would receive no recovery.[79]  Additionally,

Holders of Super-Priority Loan Claims are paid in full under the Plan but would only receive 55%

recovery in a hypothetical chapter 7 liquidation, Holders of First Lien Claims will receive up to a

19% recovery under the Plan, compared to a guaranteed 0.00% recovery in a hypothetical chapter

7 liquidation, and Holders of GoHealth, Inc. Class A Common Stock and GoHealth Holdings

---

[77]    *In re Firstbase.io, Inc.*, 2025 WL 3072479, at *6 (Bankr. S.D.N.Y. Nov. 3, 2025).  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation"); *see also In re Stone & Webster, Inc.*, 286 B.R. 532, 544–45 (Bankr. D. Del. 2002) ("The application of the best interest test involves a hypothetical application of chapter 7 to a chapter 11 plan.  A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a 'hypothetical Chapter 7 distribution' to those classes." (citation omitted)).

[78]    *See* Disclosure Statement, Exhibit C.

[79]    *Id.*

Interests will receive their pro rata distribution of the Equity Recovery Pool, compared to no recovery in a hypothetical chapter 7 liquidation.[80]   Finally, although Holders of GoHealth, Inc. Class B Common Stock are not recovering under the Plan, they would not recovery in a hypothetical chapter 7 liquidation either.[81]

83.     All Holders of Claims or Interests entitled to vote on the Plan received the Liquidation Analysis (which was attached to the Disclosure Statement) and have been provided ample time to consider the contents thereof.    Accordingly, the Plan complies with section 1129(a)(7), and no party has asserted otherwise.

**H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

84.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[82]   Holders of Interests in Class 9 are deemed to have rejected the Plan and thus were not able to vote, and Holders of Claims and Interests in Classes 10 and 11 are either deemed to have rejected the Plan, and thus were not entitled to vote, or a presumed to have accepted the Plan.  While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed to reject the Plan, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

---

[80]    *Id*.

[81]    *Id.*

[82]    11 U.S.C. § 1129(b).

**I.**    **The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)).**

85.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan or receive certain other specified treatment as agreed by the claim holder in satisfaction of the claim, and that the holders of certain other priority claims receive deferred cash payments.[83]   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[84]   Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan) or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[85]   Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the Petition Date, the present value of which equals the allowed amount of the claim.[86]

---

[83]    *See* 11 U.S.C. § 1129(a)(9).

[84]    11 U.S.C. § 1129(a)(9)(A).

[85]    11 U.S.C. § 1129(a)(9)(B).

[86]    11 U.S.C. § 1129(a)(9)(C).

86.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Claim.  *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan. *Third*, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code.  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.  No party has asserted otherwise.

**J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (Section 1129(a)(10)).**

87.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider."[87]  Here, Classes 3 and 4, each of which is Impaired, voted to accept the Plan independent of any insiders' votes.  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.     The Plan Is Feasible (Section 1129(a)(11)).**

88.     Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the

---

[87]   11 U.S.C. § 1129(a)(10).

debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[88]  To

demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[89]  Rather,

a debtor must provide only a reasonable assurance of success.[90]  There is a relatively low threshold

of proof necessary to satisfy the feasibility requirement.[91]  As demonstrated below, the Plan is

feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

89.    In determining standards of feasibility, courts have identified the following

probative factors:

    a.    the adequacy of the capital structure;

    b.    the earning power of the business;

    c.    the economic conditions;

    d.    the ability of management;

    e.    the probability of the continuation of the same management; and

---

[88]    11 U.S.C. § 1129(a)(11).

[89]    *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (stating that the bankruptcy court "need not require a guarantee of success") (internal citations and quotation marks omitted); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd,* 800 F.2d 581 (6th Cir. 1986).

[90]    *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. at 139; *In re W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) ( "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] (15th ed. 1984))); *In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Aug. 24, 2011) (same).

[91]    *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation marks and citations omitted); *Berkeley Fed. Bank & Tr. v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Trib. Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).

42

f.    any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[92]

90.    The Plan is feasible. As described in the Disclosure Statement, the Debtors prepared projections (the "Financial Projections") of the Debtors' financial performance for the remainder of the fiscal year ended December 31, 2026, and for fiscal years 2027 through 2029 (the "Projection Period").[93] These Financial Projections reflect a series of realistic assumptions regarding the Debtors and their industry and demonstrate the Debtors' liquidity and ability to meet their obligations in the ordinary course.[94] The detailed projections demonstrate the Reorganized Debtors' ability to generate sufficient cash to meet the ongoing financial obligations of the business and otherwise meet their obligations under the Plan.[95]

91.    In addition, upon the Effective Date, the Debtors expect to have sufficient funds to make all payments contemplated by the Plan as a result of the enhanced liquidity provided by the New Money Exit Facility. The Debtors, along with their professionals, have closely evaluated their Cash situation to ensure that they will be able to make all Plan payments required on the Effective Date as well as throughout the Projection Period.[96]

92.    The Debtors therefore submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code. No party has asserted otherwise.

---

[92]    *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

[93]    *See* Disclosure Statement, Exhibit B.

[94]    *Id*.

[95]    *See id*.

[96]    *See id*.

**L.      All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)).**

93.      Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[97]   Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under section 1930 of chapter 123 of title 28" are afforded priority as administrative expenses.[98]

94.      The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII.C of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter (including any fraction thereof) until these chapter 11 cases are converted, dismissed, or closed, whichever occurs first.[99]

95.      Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

**M.      The Debtors Have No Remaining Retiree Benefits Obligations (Section 1129(a)(13)).**

96.      Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).   Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these chapter 11 cases or the Plan.

---

[97]   11 U.S.C. § 1129(a)(12).

[98]   11 U.S.C. § 507(a)(2).

[99]   Plan, Art. XII.C.

**N.      Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

97.      Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.   Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the Debtors are a moneyed, business, or commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of non-bankruptcy law, is not applicable to these chapter 11 cases.

**O.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

98.      Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[100]

---

[100]   *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he Plan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the Plan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the Plan.").

1. **The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (Section 1129(b)(1)).**

99. The Plan does not unfairly discriminate with respect to Classes 9, 10, and 11. Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[101] In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[102] A threshold inquiry to assessing whether a proposed chapter 11 plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[103]

---

[101] *Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra Env't Sols., Inc.)*, 590 B.R. 75, 93 (D. Del. 2018), *aff'd on equitable mootness grounds*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[102] *See In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims "is acceptable if the separate classification is justified because they are essential to a reorganized debtor's ongoing business"); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *accord In re Ambanc La Mesa*, 115 F.3d at 656–57 (same).

[103] *See In re Aleris Int'l*, No. 09-10478 (BLS), 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) ("The unfair discrimination standard of section 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes." (citation omitted)); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006) ("A finding that all classes of the same priority will receive the identical amount under the proposed Plan is not necessary to find that the Plan does not discriminate. . . . [T]he presumption of unfair discrimination only arises if the dissenting class would receive a 'materially lower' percentage recovery or will have a 'materially greater risk' in connection with the distribution." (citation omitted)).

46

100.    Here, the Plan's treatment of the non-accepting Impaired Classes is proper because all similarly situated Holders of Claims and Interests at each applicable Debtor will receive substantially similar treatment, and the Plan's classification scheme is consistent with the absolute priority rule. Holders of Claims and Interests in each of the non-accepting Impaired Classes are not similarly situated to those of any other Classes, given the distinctly different legal character of such Claims and Interests from all other Claims and Interests. Accordingly, the Plan does not discriminate unfairly with respect to Classes 9, 10, or 11, who are deemed or are potentially deemed to reject the Plan, or for whom the Debtors waived their rights to solicit votes on the Plan, and, therefore, satisfies the requirements of section 1129(b).

## 2.    The Plan Is Fair and Equitable (Section 1129(b)(2)).

101.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule. This requires either that an impaired rejecting class of claims or interests be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[104] Under the Plan, no Holder of a Claim or Interest junior to an Impaired rejecting Class of Claims or Interests will receive any recovery under the Plan on account of such Claim or Interest.[105]

---

[104]   *See* 11 U.S.C. § 1129(b)(2); *see also In re Armstrong World Indus.*, 348 B.R. at 114 (stating that the absolute priority rule is embodied in section 1129(b) of the Bankruptcy Code).

[105]   *See Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re ION Media Networks, Inc.)*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

102.    Accordingly, the Plan satisfies the absolute priority rule, does not unfairly discriminate, and is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

**P.    The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).**

103.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. *First*, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan. *Second*, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[106] Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds. As discussed herein and as will be set forth in the Kotte Declaration, the Plan was proposed in good faith and not by any means forbidden by law. *Lastly*, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[107] Accordingly, the Plan satisfies the requirements of section 1129(c), (d), and (e) of the Bankruptcy Code. No party has asserted otherwise.

**III.    The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

104.    The Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision. These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations among the Debtors and the Key Stakeholders and were critical to obtaining support for the Plan. Further, these

---

[106]    *See* 15 U.S.C. § 77e.

[107]    *See* 11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $3,424,000 (excluding debt owed to 1 or more affiliates or insiders)." 11 U.S.C. § 101(51D)(B).

provisions were fully and conspicuously disclosed to all parties in interest through the Confirmation Hearing Notice, the Ballots, and the applicable Notices of Non-Voting Status and Opt-In Forms, which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.  Such provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).

### A.   The Debtor Release in the Plan Is Appropriate.

105.   Article VIII.C of the Plan provides for releases by the Debtors and their Estates of various Claims and Causes of Action, including any derivative claims, that the Debtors or their Estates or affiliates could assert against each of the Released Parties (the "Debtor Release").[108]  The scope of the Debtor Release is tailored to exclude any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.[109]  The Debtor Release meets the applicable business judgment standard (discussed below) because, as will be set forth in the Carr Declaration and the Kotte Declaration, it is fair, reasonable, and in the best interests of the Debtors' Estates, the product of extensive arm's-length negotiations, and was critical to obtaining support for the Plan.  Indeed, the Debtor Release was negotiated as part of the Plan and is an indispensable component to achieve final resolution of potential disputes that would otherwise negatively affect the Debtors' Estates and the recoveries

---

[108]   Article I.A.111 of the Plan defines "Released Parties" as, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Agents; (d) the Releasing Parties; (e) each current and former Affiliate of each Entity in clause (a) through clause (f); and (f) each Related Party of each Entity in clause (a) through clause (e).

[109]   *See* Plan, Art. VIII.C.

available to creditors under the Plan. Further, the scope of the Debtor Release is consistent with those regularly approved in this district.[110]

106. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[111] Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[112] In determining whether a debtor release is proper, courts in this jurisdiction and elsewhere generally may consider the following five factors:

    a. whether the non-debtor has made a substantial contribution to the debtor's reorganization;

    b. whether the release is essential to the debtor's reorganization;

    c. whether there is an agreement by a substantial majority of creditors to support the release;

    d. whether there is an identity of interest between the debtor and the third party; and

---

[110] *See In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (confirming a chapter 11 plan including a similar scope of debtor releases); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. Nov. 14, 2024) (same); *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024) (same); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (same).

[111] *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) ("The standards for approval of a settlement under section 1123 [of the Bankruptcy Code] are generally the same as those under [Bankruptcy] Rule 9019."). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement exceeds "the lowest point in the range of reasonableness." *Id.* at 330 (internal citations omitted); *e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746 (Bankr. D. Del. 2008); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be "within the reasonable range of litigation possibilities" (internal quotation marks omitted)).

[112] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"); *accord In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Or. 2002) ("A debtor-in-possession has the burden of proof by a preponderance of the evidence to establish that a proposed settlement is reasonable, adequate, fair and equitable.").

e.   whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[113]

Not all of the above factors need to be satisfied for a court to approve a debtor release.[114]

107.   As will be described in the Carr Declaration, the Company's Independent Directors, with the assistance of PSZJ as independent legal counsel, conducted the Investigation to determine whether the Debtors or their estates hold any potentially viable claims or causes of action that are worthy of pursuit or maintenance in the context of the chapter 11 cases against the Significant Shareholders or their respective Board designees.   After investigation, analysis, and due deliberation, the Company's Independent Directors concluded that the Debtors' estates do not have any viable Claims against such parties.

108.   Additionally, as will be described in the Kotte Declaration, the Debtor Release satisfies the *Zenith* factors.   **First**, each Released Party has made a substantial contribution to the Debtors' Estates.   Delaware bankruptcy courts have recognized that a wide variety of acts may illustrate a substantial contribution to a debtor's estate.[115]   The Released Parties made significant concessions and contributions to these chapter 11 cases, including, as applicable, negotiating and actively supporting the Plan and the chapter 11 cases, providing the Debtors with access to Cash Collateral, settling and compromising substantial rights and Claims against the Debtors, and

---

[113]   *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)); *In re Spansion*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[114]   *See, e.g.*, *In re Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness.") (internal citation omitted); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

[115]   *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.*, 442 B.R. at 348 (denying releases to the creditors committee after finding that they did not contribute "cash or anything else of a tangible value to the [chapter 11 plan] or to creditors"); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding that directors' and officers' prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

proposing, negotiating in good faith, and ultimately consummating the value-maximizing Restructuring Transactions contemplated by the Plan for the benefit of the Debtors', their Estates, and all parties in interest.

109.    In particular, Released Parties in Class 3 (Super-Priority Loan Claims) and Class 4 (First Lien Claims) contributed direct value by committing new capital to fund the Equity Recovery Pool, consenting to the Debtors' use of Cash Collateral, and agreeing to be Impaired while preserving full recoveries for Holders of Class 5 (General Unsecured Claims). Certain Released Parties in Class 6 (GoHealth Holdings Interests) and Class 8 (GoHealth, Inc. Class A Common Stock) contributed significant value by agreeing to the TRA Amendment without which, as discussed below, the Restructuring Transactions could not have occurred. Each of these contributions was integral to the Debtors' ability to effectuate the Restructuring Transactions, and without the Debtor Release, the Released Parties may not have been willing to provide such support. The Debtor Release, therefore, is key to the successful implementation of the Plan for the benefit of all stakeholders.

110.    *Second*, the Debtor Release is essential to the success of the Debtors' Plan because it constitutes an integral term of the Plan and underpins the various compromises of issues achieved by the Plan. Indeed, absent the Debtor Release, the Debtors may not have been able to build the level of consensus with respect to the Plan and the transactions contemplated thereby. Importantly, the Debtor Release is the product of arm's-length and good-faith negotiations between the Debtors and the Key Stakeholders and is limited in scope. The Debtor Release does not release any entity other than the Released Parties and does not release the Claims and Causes of Action expressly set

forth and preserved by the Plan.[116] In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties. The Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. Therefore, the inclusion of the Debtor Release is integral to the Plan's success, is worthwhile, and inures to the benefit of the Debtors' stakeholders.

111.    ***Third***, as noted herein and as will be further evidenced in the Voting Report, the Debtors' stakeholders overwhelmingly support the Plan, including the Debtor Release, and no stakeholder has objected to the Debtor Release contained in the Plan. This degree of consensus evidences the Debtors' stakeholders' support for the Debtor Release and Plan.

112.    ***Fourth***, an identity of interest exists between the Debtors and the Released Parties. Whether there is an identity of interest depends on whether the debtor and non-debtor are sufficiently interlinked such that a lawsuit against the non-debtor would effectively be a lawsuit against the debtor or would deplete the assets of the debtor's estate.[117] Lawsuits against the Released Parties may implicate the Debtors, and each Released Party shares a common goal with the Debtors in seeing the Plan succeed and implementing the transactions contemplated thereunder.[118] Moreover, with respect to certain of the releases—*e.g.*, those relating to the Debtors'

---

[116]    *See* Plan, Art. IV.L; Plan, Art. VIII.C.

[117]    *In re Master Mortg. Inv. Fund*, 168 B.R. at 935.

[118]    *See In re Mercy Hosp.*, No. 23-00623, 2024 WL 2890139, at *4 (Bankr. N.D. Iowa June 7, 2024) ("Particularly persuasive [to finding that there exists an identity of interest] is the fact that these releases were integral to the consensual nature of the Plan and necessary to avoid the prospect of immense and complex litigation absent the releases."); *see also In re Trib. Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding that the debtors and released

current and former directors—there is a clear identity of interest supporting the Debtor Release because the Debtors will assume certain indemnification obligations under the Plan.  Thus, a lawsuit commenced by the Debtor (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Debtors' own interest.

113.    *Fifth*, the Plan maximizes the value of the Debtors' assets and the distribution of available proceeds to creditors.  The Plan provides for meaningful recoveries for creditors in exchange for, among other things, the Debtors' Release of potential claims, and the Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances.

114.    For the reasons set forth above, the *Zenith* factors support approval of the Debtor Release, and the Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  Thus, the Bankruptcy Court should approve the Debtor Release in the Plan.

### B.    The Consensual Third-Party Release Is Appropriate.

115.    The Plan also provides for mutual releases by certain Holders of Claims and Interests.  Specifically, Article VIII.D of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such parties could assert against the Released Parties (the "Third-Party Release"), with certain limited exceptions.  The Releasing Parties include, collectively, and in each case in their capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Agents; (d) all Holders of Claims in Class 3 or Class 4 who vote to accept the Plan; (e) all Holders of Interests in Class 6 and Class 8 who affirmatively opt in to the releases set

---

parties "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest").

forth in the Plan; (f) all Holders of Claims or Interests who are presumed to accept the Plan and affirmatively opt in to the releases set forth in the Plan; (g) all Holders of Claims or Interests who are deemed to reject this Plan and affirmatively opt in to the releases set forth in the Plan; (h) each current and former Affiliate of each Entity in clause (a) through clause (i); and (i) each Related Party of each Entity in clause (a) through clause (h) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan.   The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan.   The Third-Party Release should therefore be approved.

116.    Courts in this jurisdiction routinely approve such release provisions if, as here, they are consensual and appropriately tailored.[119]  Consensual releases are permissible on the basis of general principles of contract law.[120]  Courts have also held that an affirmative agreement from an affected creditor will render a release consensual.[121]  The law is clear that a release is consensual where parties have received sufficient notice and have had an opportunity to object to and/or opt in to the releases.  In *Emerge*, this Court recognized that a release by a non-debtor third party is

---

[119]  *See, e.g.*, *In re Smallhold, Inc.*, 665 B.R. 704, 708 (Bankr. D. Del. 2024) (post-Purdue observing that "*[c]onsensual* releases, on the other hand, are commonplace") (emphasis in original); *In re Indianapolis Downs*, 486 B.R. at 304–06 (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *In re Spansion*, 426 B.R. at 144 ("Courts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan.") (citing *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993)); *In re Wash. Mut., Inc.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *cf. In re Tonopah Solar Energy, LLC*, 657 B.R. 393, 407 (D. Del. 2022) (holding that creditors were not impaired by plan's consensual third-party release that they did not opt in to).

[120]  *See In re Smallhold*, 665 B.R. at 722–23 (following the "contract model" of evaluating third-party releases); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("[A] [p]lan is a contract that may bind those who vote in favor of it.").

[121]  *See id.* ("[T]o the extent creditors or shareholders voted in favor of [a plan providing for the release of their claims] they are bound by that [plan]."); *In re W. Coast Video Enters., Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the [non-debtor] release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise.").

consensual where the releasing party indicates its consent by an affirmative act, as distinguished from mere silence or inaction.[122]   Since *Emerge*, this Court has approved numerous third-party releases as consensual where the releasing third parties were required to indicate their consent by returning a form indicating the party's desire to participate in the third-party release[123] or by returning a ballot voting to accept the plan.

117.   Furthermore, the Supreme Court's decision in *Purdue* is not at odds with the release provisions commonly approved by this Court, and its holding is generally inapplicable to the consensual release provisions in the Plan.  In *Purdue*, the Supreme Court made clear the narrow scope of the decision by pointing out that "nothing in [this opinion] should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan."[124]   Therefore, *Purdue*'s applicability is limited to cases where a debtor or debtors seek non-consensual third-party releases.

118.   Approval of the Third-Party Release under the circumstances of these chapter 11 cases is appropriate because it is not binding on any non-consenting parties.  Here, all parties in interest were provided extensive notice of these chapter 11 cases, the Plan, and the

---

[122]   *Compare In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (declining to approve third-party release where holders of claims and interests were presumed to consent to participation in the third-party release if they did not return an opt-out form, regardless of whether such holder returned a ballot); *with*, *e.g.*, *In re AeroCision Parent, LLC*, No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) (approving a consensual third-party release that included, among others, all holders of claims who return a ballot voting to accept the plan, with no option to opt out); *In re Virgin Orbit*, No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) (same); *In re Lucky Bucks,* No. 23-10758 (KBO) (Bankr. D. Del. July 28, 2023) (same, also including all holders of claims who return a ballot voting to reject plan who do not opt out).

[123]   *See In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including opt-in third-party releases); *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) (same); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

[124]   *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 226 (2024) (emphasis added).

deadline to object to confirmation of the Plan. Moreover, the Disclosure Statement, the Confirmation Hearing Notice, the Ballots, the Notices of Non-Voting Status, and the Opt-In Forms provided recipients with timely, sufficient, appropriate, and adequate notice of the Third-Party Release. Holders were informed that (a) Holders of Claims in Class 3 and Class 4 who checked the "Opt In" box on their Ballots or who voted to accept the Plan, (b) Holders of Interests in Class 6 and Class 8 who checked the "Opt In" box on their Ballot, regardless of whether such Holders voted to accept or reject the Plan, and (c) Holders of Claims or Interests in each applicable Non-Voting Class who checked the "Opt In" box on their Opt-In Form, would be deemed to have consented to the Third-Party Release to the extent set forth in the Plan. As of the Interests Voting Deadline, 275 parties have affirmatively opted in to the Third-Party Release by, as applicable, voting to accept the Plan, completing and returning a Ballot with the applicable box checked, or completing and returning the applicable Opt-In Form.

119. Moreover, the Confirmation Hearing Notice, the Opt-In Forms, and the Ballots, as applicable, quoted the entirety of the Third-Party Release in bold, conspicuous font, and clearly provided such Holders with detailed instructions regarding the consequences of voting to accept the Plan or, as applicable, how to opt in to the Third-Party Release. With respect to the Holders in Classes 3 and 4, such Key Stakeholders reviewed, and approved of, the form of Ballots explaining that they would be deemed to opt in to the Third-Party Release by voting to accept the Plan. Thus, affected parties were on notice of the Third-Party Release, including the option to opt in to the Third-Party Release. All Holders of Claims and Interests also had the opportunity to object to the Third-Party Release by timely filing an objection to the Plan. The Third-Party Release is therefore consensual as to all creditors and interest holders who affirmatively consented to the Third-Party Release.

57

120.     The Third-Party Release brought key stakeholders to the table for negotiations and facilitated participation in the prepetition negotiation of the Plan, which contributed to the Debtors' success in these chapter 11 cases.  As will be described further in the Kotte Declaration, the Third-Party Release was instrumental in securing support for the Plan and was a negotiated deal term to which all Class 3 and Class 4 Holders and certain large Holders of Interests in Classes 6 and 8 agreed prepetition.  And importantly, the Third-Party Release only applies to parties who have (a) actively participated in the chapter 11 or Plan process, including in the formulation and negotiation of the Third-Party Release or (b) manifested their affirmative consent to the Third-Party Release by voting to accept the Plan knowing that they would be deemed to opt in to the Third-Party release (and approving of such opt in mechanism), voting to accept the Plan and checking the "opt in" box on the Ballot, or returning the "Opt-In" Form.

121.     For the foregoing reasons, the Third-Party Release is consensual, permissible, and an integral and necessary part of the Plan.  Accordingly, the Third-Party Release should be approved.  No party has asserted otherwise.

## C.     The Exculpation Provision Is Appropriate.

122.     Exculpation provisions that apply only to estate fiduciaries and are limited to claims not involving actual fraud, willful misconduct, or gross negligence are customary and generally approved in this district under appropriate circumstances.[125]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties per se, but rather set a standard of

---

[125]   *See In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including an exculpation provision); *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) (same); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

58

care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for claims arising over the course of the chapter 11 cases.[126]

123.    Article VIII.E of the Plan provides for the exculpation of the Exculpated Parties.[127] The exculpation is fair and appropriate under both applicable law and the facts and circumstances of these chapter 11 cases.[128]   The Plan's exculpation provision is the product of good-faith, arm's-length negotiations, is critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' major stakeholders. The exculpation provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these chapter 11 cases in reliance upon the protections afforded to those constituents by the exculpation.

124.    Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2) of the Bankruptcy Code, that the Debtors have complied with the applicable

---

[126]  *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019, 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690, 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

[127]  Article I.A.53 of the Plan defines "Exculpated Parties" as, collectively, and in each case solely in its capacity as such (and to the extent permitted by Law):  (a) each of the Debtors and (b) each of the Debtors' current and former (i) directors, limited liability company managers, officers, and (ii) attorneys, financial advisors, or other professionals or advisors that were retained with Bankruptcy Court approval during any portion of the chapter 11 cases.

[128]  *See In re Lab'y Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor purchaser was appropriate under section 1123(b)).

provisions of the Bankruptcy Code. This Court must also find, under section 1129(a)(3) of the Bankruptcy Code, that the Plan has been proposed in good faith and not by any means forbidden by law. These findings apply to the Debtors and, by extension, to certain of the Debtors' officers, directors, employees, and professionals. Furthermore, these findings imply that the Plan was negotiated at arm's-length and in good faith. Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.

125. Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these chapter 11 cases. As will be set forth in the Kotte Declaration, such negotiations were extensive, and the resulting agreements and compromises were implemented in good faith with a high degree of transparency. As a result, the Plan is supported by all Voting Classes, including the Debtors' key stakeholders. Accordingly, the Court's findings of good faith vis-à-vis the chapter 11 cases should also extend to the Exculpated Parties.

126. In addition, the promise of exculpation played a significant role in facilitating prepetition Plan negotiations. All of the Exculpated Parties played a key role in negotiating, formulating, and implementing the Restructuring Transactions, the Disclosure Statement, the Plan, and related documents in furtherance thereof. The Exculpated Parties may not have been inclined to participate in the plan process without the promise of exculpation. Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[129] Accordingly, under the circumstances, it is appropriate for the

---

[129] *See In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (noting that excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

Court to approve the exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[130]

### D.    The Injunction Provision Is Appropriate.

127.    The injunction provision set forth in Article VIII.F of the Plan (the "Plan Injunction") merely implements the Plan's release and exculpation provisions by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action that are released, discharged, settled, or subject to the exculpation pursuant to the Plan.  Thus, the Plan Injunction is a key provision because it enforces the release and exculpation provisions that are centrally important to the Plan.  Moreover, the Plan Injunction is narrowly tailored to achieve its purpose and consensual as to any party that did not specifically object to it.  As such, to the extent the Bankruptcy Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the Plan Injunction must also be appropriate.

## IV.    The Debtors Should Be Authorized to Enter into the TRA Amendment.

128.    In connection with GoHealth's July 2020 IPO and the related Up-C structure put into place, Debtors GoHealth, Inc. and GoHealth Holdings, LLC entered into that certain Tax Receivable Agreement with the TRA Holders (as defined therein), dated as of July 15, 2020 (the "TRA").  As part of the Debtors' negotiations with the Secured Lenders regarding implementation of the Restructuring Transactions, the Secured Lenders required an amendment to the TRA that provides the change of control effectuated by the Plan would not trigger the Early

---

[130]    *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (same).

Termination Payment (as defined in the TRA). Absent such change, payments triggered by a change of control under the TRA would likely result in several hundred million dollars of general unsecured claims. Accordingly, without the TRA Amendment, the Secured Lenders would have been unwilling to implement the Restructuring Transactions on the terms set forth in the Plan. Additionally, the Secured Lenders required the amendment to stipulate that GoHealth would not make payments on account of the TRA until the Company's senior secured debt is paid in full. The Debtors received sufficient consent from the TRA Holders to effectuate such amendment (the "TRA Amendment"), and the Debtors request that the Court authorize entry into the TRA Amendment in conjunction with confirmation of the Plan.

129. Under the TRA, an amendment to the TRA must be approved in writing by the Corporation with TRA Holder Approval (as defined below), and any amendment that materially, adversely, and disproportionately affects a TRA Holder with respect to any rights under the TRA requires the written approval of such affected TRA Holder. TRA § 7.5(b). Further, to amend the definition of change of control, the written approval of a majority of the Independent Directors is required. *Id.* The TRA Amendment satisfies each of these requirements.

130. TRA Holder Approval means "written approval by TRA Holders whose rights under this Agreement are attributable to at least 50% of the Units outstanding (excluding any Units held by the Corporation) immediately after the Unit Purchase." TRA § 1.1. In other words, amending the TRA requires the affirmative written consent of parties that held greater than 50% of GoHealth Holdings, LLC interests at the time of the IPO in July 2020. As of the date hereof, over 95% of the requisite TRA Holders consented to the TRA Amendment. Therefore, the Company has considerably exceeded the TRA Holder Approval consent threshold necessary to effectuate the TRA Amendment.

131.     With respect to the change to the definition of change of control, under the TRA, "Independent Directors" are defined as "the members of the Board who are 'independent' under the standards of the principal U.S. securities exchange on which the Class A Common Stock is traded or quoted." TRA § 1.1.  The TRA Amendment was approved unanimously by the full nine-member Board of Directors of GoHealth, Inc., which includes all six Directors who satisfy the NASDAQ's independence standard.[131]

132.     Further, the Company ensured that all TRA Holders were notified and given an opportunity to object.  Specifically, (a) the Debtors included a Form of TRA Amendment Notice in the Solicitation Package[132] distributed to all Voting Classes in advance of the Petition Date, (b) on June 23, 2026, Kirkland, on behalf of the Debtors, sent an e-mail to every TRA Holder, which included a copy of the TRA Amendment, explaining why the Company was proposing it and asking for voluntary signatures thereto, (c) the Debtors included a copy of the proposed TRA Amendment in the Plan Supplement,[133] and (d) the Debtors filed, and served on all TRA Holders, a TRA Amendment Notice which included the proposed TRA Amendment.[134]  The Debtors received no objections, either formal or informal, to the TRA Amendment.  To the contrary, several TRA Holders above the required threshold consented to and affirmatively signed the TRA Amendment.  Thus, the Debtors have complied with all procedures required by applicable

---

[131]     *See* Omnibus Unanimous Written Consent in Lieu of a Special Meeting of the Governing Bodies, dated as of June 5, 2026 (the "Filing Resolution").

[132]     *See* Solicitation Package, Exhibit 6.

[133]     *See* Plan Supplement, Exhibit G.

[134]     *See Notice of Filing of Amendment to the Tax Receivable Agreement* [Docket No. 118].

bankruptcy law, and the TRA Amendment has the requisite approval to be authorized without issue.

**V.      Modifications to the Plan.**

133.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[135]  As courts have recognized, "a plan modification is immaterial unless it will 'so affect a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.'"[136]

134.    The Debtors expect to file a modified version of the Plan prior to the Confirmation Hearing, which will make technical clarifications and resolve certain informal comments by the U.S. Trustee.  The anticipated modifications, including, among other things, increasing the Equity

---

[135]    *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234, 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191, 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[136]    *In re Boy Scouts of Am. & Del. BSA, LLC*, 650 B.R. 87, 168 (D. Del 2023) (quoting *In re Am. Solar King*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988)).

Recovery Pool to account for certain postpetition trades of GoHealth, Inc. Class A Common Stock, are immaterial or do not adversely affect the way creditors and stakeholders who have previously accepted the Plan are treated and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Because none of the expected modifications to the Plan are material or adversely affect Holder of Claims, the Debtors submit that no additional solicitation or disclosure will be required and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## VI.     The Voora Objection Should Be Overruled.

135.    The Voora Objection does not present a basis to deny confirmation of the Plan. Ms. Voora, who holds GoHealth, Inc. Class A Common stock, is a Holder of a Class 8 Interest. Class 8 overwhelmingly voted to accept the Plan, with 97.83% in number and 99.62% in amount of Class 8 Holders who voted, voting in favor.

136.    As described previously, Class 8, and Ms. Voora individually, will recover more under the Plan than in a hypothetical chapter 7 liquidation, satisfying the best interests test. As a Holder of Class 8 Interests, Ms. Voora will receive her pro rata share of the Equity Recovery Pool—a cash pool of greater than $10 million to be distributed to Holders of Class A Common Stock—consistent with Class 8 treatment under the Plan. The Plan contemplates the best available recovery to all equity holders. Indeed, the Liquidation Analysis indicates that in a chapter 7 liquidation scenario, Ms. Voora and all other Class 8 Holders would receive $0.00. Because the Plan provides Ms. Voora with a greater recovery than she would receive in a chapter 7 liquidation, the recovery Ms. Voora will receive on account of her Class 8 Interest is in her best interest.

65

137. Further, the Plan complies with the Bankruptcy Code and all applicable statutory requirements, as described herein, and Ms. Voora is set to receive treatment pursuant to such Plan. Therefore, the Court should overrule the Voora Objection.

## Conclusion

138. For all of the reasons set forth herein and in the Declarations, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling the outstanding Objection, and granting such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

66

Dated:  July 13, 2026
Wilmington, Delaware

*/s/ Laura Davis Jones*

| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS LLP** |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| James E. O'Neill (DE Bar No. 4042) | Anup Sathy, P.C. |
| Edward A. Corma (DE Bar No. 6718) | Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*) |
| 919 North Market Street, 17th Floor | David R. Gremling (admitted *pro hac vice*) |
| Wilmington, Delaware 19801 | 333 West Wolf Point Plaza |

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              joneill@pszjlaw.com
              ecorma@pszjlaw.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Anup Sathy, P.C.
Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*)
David R. Gremling (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        anup.sathy@kirkland.com
              alexandra.schwarzman@kirkland.com
              dave.gremling@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*