**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOHEALTH, INC., *et al.*,[1] | ) | Case No. 26-10914 (TMH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF VIJAY KOTTE,
CHIEF EXECUTIVE OFFICER OF GOHEALTH, INC., IN SUPPORT
OF CONFIRMATION OF THE AMENDED JOINT PREPACKAGED
CHAPTER 11 PLAN OF GOHEALTH, INC. AND ITS DEBTOR AFFILIATES**

I, Vijay Kotte, hereby declare under penalty of perjury as follows:

**Background and Qualifications**

1. I am the Chief Executive Officer of GoHealth, Inc. (together with its affiliated debtors and debtors in possession, the "Debtors," and together with its non-Debtor subsidiaries and affiliates, "GoHealth" or the "Company").

2. I joined GoHealth in June 2022 as Chief Executive Officer ("CEO") and serve on GoHealth, Inc.'s board of directors. I have over 20 years of experience developing and transforming innovative healthcare models and Medicare-focused platforms and public and private ventures. Prior to joining GoHealth, from 2019 to 2022, I was the Chief Solutions Officer and Executive Vice President, Strategy and Corporate Development of R1 RCM Inc., a leading technology provider of revenue-cycle management for healthcare providers. Prior to joining R1 RCM, I worked for DaVita Medical Group as the Chief Financial Officer from December 2015 to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are: GoHealth, Inc. (3805); Blizzard Midco, LLC (3732); Connected Benefits, LLC (2162); e-TeleQuote Insurance, Inc. (2336); ETQ Holdings, LLC (8260); GoHealth Holdings, LLC (3653); GoHealth, LLC (5175); and Norvax, LLC (3063). The location of the Debtors' service address for purposes of these chapter 11 cases is: 222 West Merchandise Mart Plaza, Suite 1750, Chicago, Illinois 60654.

December 2017 and as Chief Value Officer from March 2017 to October 2019. Prior to joining DaVita Medical Group, I was the President and Chief Operating Officer of Medicare Operations for Meridian Health Plan. I received a Bachelor of Business Administration with a focus on Finance and Organizational Management from Emory University, Goizueta School of Business, and a Masters of Business Administration from the Kellogg School of Management at Northwestern University.

3.    I submit this declaration (this "Declaration") in support of confirmation of the *Amended Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* [Docket No. 141] (as may be modified, amended, or supplemented from time to time, the "Plan").[2] In my capacity as GoHealth's CEO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except where specifically noted, the statements in this Declaration are based upon my personal knowledge and experience, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team or the Debtors' advisors.

4.    I am over the age of 18, and I am authorized to submit this Declaration on behalf of the Debtors. If called to testify, I would testify to the facts set forth herein.

## The Proposed Restructuring Transactions

5.    GoHealth is a leading health insurance marketplace and Medicare-focused digital health company. By combining cutting-edge technology, deep industry expertise, and a customer-

---

2    Capitalized terms used but not defined herein have the meanings ascribed to them in the *Debtors' Memorandum of Law in Support of an Order (I) Approving the Debtors' Disclosure Statement and (II) Confirming the Amended Joint Prepackaged Chapter 11 Plan of GoHealth, Inc., and Its Debtor Affiliates* [Docket No. 140], the Plan, or the *Disclosure Statement Relating to the Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* [Docket No. 6] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), as applicable.

centric approach, GoHealth is a critical resource for millions of seniors navigating the complexities of Medicare Advantage enrollment and a leading e-broker for Medicare Advantage plan submissions and renewals in the United States.

6.      As described in the *Declaration of Vijay Kotte, Chief Executive Officer of GoHealth, Inc., in Support of Chapter 11 Petitions, First Day Motions, and Access to Cash Collateral* [Docket No. 4] (the "First Day Declaration"), the Debtors commenced these chapter 11 cases approximately five weeks ago with the overwhelming support of their prepetition lenders and equity holders to effectuate a change of control transaction.  The contemplated transaction leaves general unsecured creditors and preferred equity holders unimpaired and provides an approximately $10 million cash recovery to the Company's common equity holders.

7.      Prior to the Petition Date, including in the preceding 18 months, the Company faced several significant challenges—including, but not limited to, increasing competitive pressure, rising healthcare costs, and insurance carrier partners scaling back their business—that left the Company unable to generate the cash necessary to service its debt obligations.  The Company engaged advisors in May 2025 to assist with the upcoming maturity of the Company's revolving credit facility and a constrained liquidity position, each of which contributed to a going-concern qualification in its quarterly Form 10-Q.  Following resolution of these issues, the Company, along with its advisors, immediately began evaluating longer-term solutions.  In August 2025, the Company, with the assistance of its advisors, entered into the Super-Priority Credit Agreement and the 14th Amendment, which provided the Company with liquidity necessary to operate its business through the date hereof.  In September 2025, the Company, together with its advisors, began evaluating a broader set of strategic alternatives, including potential M&A opportunities, and began taking further steps to reduce operational costs.  As it became clear that a third-party

transaction was unlikely to come to fruition in the short-term, by late February 2026, the Company shifted its focus to negotiating a potential change of control transaction with its secured lenders and certain other key stakeholders while providing meaningful recoveries to junior stakeholders or leaving them unimpaired.  These negotiations culminated in the Plan and the Restructuring Transactions set forth therein.

8.        The Debtors solicited votes from their Key Stakeholders in the weeks prior to the Petition Date, following months of extensive and good-faith negotiations, and entered chapter 11 with overwhelming support, which continued to build following commencement of these chapter 11 cases.

9.        The key terms of the Plan are as follows: [3]

- issuance of a $20 million first out exit facility that will, among other things, fund the Equity Recovery Pool;

- conversion of approximately $174 million of loans under the Super-Priority Credit Agreement into second-out term loans and conversion of approximately $588 million of loans under the First Lien Credit Agreement into third-out term loans;[4]

- reinstatement of all General Unsecured Claims;

- reinstatement of Preferred Equity Interests;

- cash recovery to Common Stockholders of approximately $10 million;

- execution of the TRA Amendment; and

- Debtor and Third-Party releases.

10.        I believe that the Plan represents the value-maximizing path forward for the

---

[3]    This summary of key terms of the Plan is qualified in its entirety by reference to the Plan, the exhibits thereto, and other materials referenced therein.  Among these, the Plan is the only operative document and controls in the event of any inconsistencies between the Plan and this summary.

[4]    Prior to the Petition Date, the prepetition lenders executed a commitment letter regarding the provision of the new money exit facility.

Debtors.   This belief is predicated on a number of factors, including, but not limited to, the following.  *First*, the Plan provides meaningful recoveries to a broad set of stakeholders, including the Company's equity holders.  Specifically, the Plan provides that each Holder of Super-Priority Loan Claims (Class 3) will receive its pro rata share of the Senior Takeback Debt and each Holder of First Lien Claims (Class 4) will receive its pro rata share of the Junior Takeback Debt and the New Common Interests, subject to dilution, if any, on account of the Management Incentive Plan. The Plan also provides a cash recovery to GoHealth Holdings Interests (Class 6) and GoHealth, Inc. Class A Common Stock (Class 8) of approximately $10 million in the aggregate. Additionally, General Unsecured Claims (Class 5) will be either paid in full in Cash or Reinstated, and GoHealth, Inc. Preferred Stock (Class 7) will be Reinstated.

11.     *Second*, as further described in the Burlacu Declaration, the Plan enjoys an extremely high level of support—Holders of 100% of the outstanding amount of Super-Priority Loan Claims (Class 3), Holders of 100% of the outstanding amount of First Lien Claims (Class 4), and 100% of voting Holders of GoHealth Holdings Interests (Class 6) (representing greater than 99% of the outstanding amount of GoHealth Holdings Interests, excluding such Interests held by GoHealth, Inc.) voted to accept the Plan.  In addition, 97.83% of voting Holders of GoHealth, Inc. Class A Common Stock (Class 8) voted to accept the Plan, representing 99.62% in amount of the total Interests of Class 8 Holders who voted and 64.55% of the outstanding amount of GoHealth, Inc. Class A Common Stock.

12.     *Third*, I am not aware of any actionable proposal that represents an alternative to the Plan, let alone one that would provide recovery to junior stakeholders and preserve the Debtors' ability to successfully emerge from chapter 11.

13.     *Fourth,* the Plan provides for the execution of the TRA Amendment.  Debtors

5

GoHealth, Inc. and GoHealth Holdings, LLC initially executed the TRA in July 2020 in connection with the Company's IPO and related Up-C structure.  I understand that the TRA Amendment will modify the TRA to, among other things, (a) avoid triggering an Early Termination Payment (as defined in the TRA), which could result in a several hundred million dollar general unsecured liability, and (b) provide that no payments shall be made to TRA Holders until such time as the Reorganized Debtors' secured obligations have been repaid in full.  I am aware that amending the TRA as proposed requires the approval of a majority of the GoHealth, Inc. directors who satisfy NASDAQ's independence standard and a majority of the TRA Holders.  I understand that the full Board of Directors of GoHealth, Inc., which includes six directors who satisfy such criteria, unanimously approved the TRA Amendment, and that over 95% of the TRA Holders (excluding GoHealth, Inc.) have signed the proposed TRA Amendment.[5]  I further understand that no party raised any formal or informal objections with respect to the TRA Amendment.

14.     I believe the Restructuring Transactions contemplated by the Plan are fair and equitable, maximize value for all stakeholders, represent the best path forward for a successful emergence from chapter 11, and are in the best interests of the Debtors, their Estates, and all parties in interest.

---

[5]     *See* Filing Resolution dated as of June 5, 2026, attached to the voluntary petitions in these chapter 11 cases (available on the case website at https://www.bankruptcy.angeiongroup.com/gohealth).

**The Plan and the Confirmation Requirements[6]**

I. **THE PLAN'S COMPLIANCE WITH APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE — SECTION 1129(A)(1).**

   A. **Proper Classification of Claims and Interests — Section 1122.**

15.    I understand that the Plan places Claims and Interests into eleven separate Classes[7] based on legal or factual distinctions or otherwise based on other relevant criteria.  I believe that the differences in classification foster the Debtors' reorganization efforts and do not needlessly increase the number of Classes.

16.    I also understand that the Plan's classification generally corresponds to the Debtors' corporate and capital structure and thus considers the relative priority among Claims and Interests for purposes of determining the Classes.  Generally, the Plan classifies Claims (rights to payment) separately from Interests (representing ownership in the businesses).  I believe valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the eleven Classes created under the Plan, and no improper purpose for doing so or unfair discrimination exists between or among Holders of Claims and Interests.  Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

---

[6]    Evidence concerning certain other factors of the Bankruptcy Code necessary for confirmation of the Plan is contained in the *Declaration of Matthew Frank, Managing Director of Alvarez & Marsal North America, LLC, in Support of Confirmation of the Amended Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* (the "Frank Declaration") and the *Declaration of John Burlacu Regarding the Solicitation and Tabulation of Votes On, and Elections to Opt In To the Third-Party Release of, the Amended Joint Prepackaged Chapter 11 Plan of GoHealth, Inc. and Its Debtor Affiliates* (the "Burlacu Declaration"), each of which was filed contemporaneously herewith.

[7]    Article III.A of the Plan provides for the following Classes:  Class 1 (Other Secured Claims); Class 2 (Other Priority Claims); Class 3 (Super-Priority Loan Claims); Class 4 (First Lien Claims); Class 5 (General Unsecured Claims); Class 6 (GoHealth Holdings Interests); Class 7 (GoHealth, Inc. Preferred Stock); Class 8 (GoHealth, Inc. Class A Common Stock); Class 9 (GoHealth, Inc. Class B Common Stock); Class 10 (Intercompany Claims); and Class 11 (Intercompany Interests).

17.     For example, the classification scheme distinguishes Holders of Super-Priority Loan Claims (Class 3) from First Lien Claims (Class 4) because of the different priorities underlying the Claims in each Class.  I understand that the Plan classifies Other Secured Claims (Class 1) and Other Priority Claims (Class 2) separately due to their treatment under the Bankruptcy Code.  I also understand that the Plan separately classifies General Unsecured Claims (Class 5) because they have differing legal rights than the Debtors' secured funded debt creditors.  Further, many of the Holders of Class 5 Claims are vendors and trade creditors that provide mission critical business services, and the Key Stakeholders recognize that timely payment in full of all general unsecured claims, including the Trade Claims, is necessary to avoid needless disruption to the Debtors' business and ensure the economic viability of the Reorganized Debtors. Similarly, I understand that the Plan separately classifies GoHealth Holdings Interests (Class 6), GoHealth, Inc. Preferred Stock (Class 7), GoHealth, Inc. Class A Common Stock (Class 8), and GoHealth, Inc. Class B Common Stock (Class 9), because they each have rights against different entities and/or different entitlements to distributions.  For example, the Holders of GoHealth Holdings Interests in Class 6 have rights against GoHealth Holdings, LLC, which issued the GoHealth Holdings Interests, and the Holders of GoHealth, Inc. Preferred Stock in Class 7 have rights against GoHealth, Inc.  In addition, GoHealth, Inc. Class A Common Stock (Class 8) has both voting and economic rights, and GoHealth, Inc. Class B Common Stock (Class 9) has voting rights but not economic rights.

**B.     Specification of Classes, Impairment, and Treatment — Section 1123(a)(1)–(3).**

18.     I understand that Article III of the Plan specifies in detail the classification of Claims and Interests, whether such Claims and Interests are Impaired, and the treatment that each Class of Claims and Interests will receive under the Plan.

**C.     Equal Treatment of Similarly Situated Claims and Interests — Section 1123(a)(4).**

19.     I understand that Holders of Allowed Claims or Interests under the Debtors' Plan will receive the same treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class, unless such Holder has agreed to less favorable treatment.

**D.     Means for Implementation — Section 1123(a)(5).**

20.     I understand that Article IV and various other provisions of the Plan describe the means for cancellation of documents evidencing existing Claims and Interests and implementation of the transactions provided for in the Plan, including, among other things:  (a) the Restructuring Transactions; (b) the consummation of the Exit Facilities, including the execution, delivery, and filing of all Exit Facility Documents; (c) the issuance and distribution of the New Common Interests; (d) the execution of the TRA Amendment; (e) the adoption of the New Organizational Documents; (f) the consummation of various corporate transaction steps necessary to implement the new corporate structure upon emergence; and (g) the preservation of Claims and Causes of Action not released pursuant to the Plan.  The Plan also sets forth the other critical mechanics of the Debtors' emergence, including, but not limited to, the vesting of Estate assets in the Reorganized Debtors and the assumption or assumption and assignment of Executory Contracts and Unexpired Leases.  I understand that the precise terms governing the execution of certain of these transactions are set forth in the applicable Definitive Documents or forms of agreements included in the Plan Supplement.

**E.     Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6).**

21.     I understand that Article IV.H of the Plan provides that the Reorganized Debtors' New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  Further, the relevant New

9

Organizational Documents for the Reorganized Debtors do in fact reflect such prohibition.

**F.        Selection of Officers and Directors — Section 1123(a)(7).**

22.       I understand that Article IV.I of the Plan sets forth the Directors and Officers of the Reorganized Debtors.  I understand that, as of the Effective Date, the terms of the current members of the board of directors of GoHealth, Inc. shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the New Organizational Documents.

23.       The Debtors will disclose known initial members of the New Board in an amended Plan Supplement.  I understand that from and after the Effective Date, the New Board shall serve pursuant to the terms of the applicable New Organizational Documents and may be designated, replaced, or removed in accordance therewith.  I believe the manner of selection of the members of the New Board is consistent with the interests of the Debtors' stakeholders.

**G.        Satisfaction of Monetary Defaults — § 1123(d).**

24.       I understand that Article V.C of the Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan, by payment of the default amount *i.e.,* Cures, if any, on or prior to the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreements and/or the ordinary course of business among the parties thereto.

**H.        The Debtors' Solicitation of the Plan — Section 1129(a)(2).**

25.       I understand that section 1129(a)(2) of the Bankruptcy Code encompasses the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.  I understand that the Debtors, through their Claims and Noticing Agent, solicited and tabulated votes on the Plan in accordance with the Court ordered solicitation procedures, the Bankruptcy Code, and applicable non-bankruptcy law.

26.     With respect to modifications to the Plan, it is my understanding that such changes, including increasing the Equity Recovery Pool to account for certain postpetition trades of GoHealth, Inc. Class A Common Stock, are permissible modifications to the Plan that do not adversely affect or reflect material differences to recoveries of each affected Class—*i.e.*, in my opinion, no Holder is likely to reconsider its acceptance.

27.     I also understand that the Burlacu Declaration reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.

**I.       The Debtors' Proposal of the Plan in Good Faith — Section 1129(a)(3).**

28.     Based on my knowledge and understanding of, as well as participation in, the extensive negotiations with the various constituencies regarding prepetition preparations and the Plan, I believe that the Plan was negotiated, developed, and proposed in good faith and with the legitimate honest purposes of enabling the Debtors to reorganize and maintain their value as a going concern.  As discussed in greater detail in the First Day Declaration, the Plan is the product of months of extensive arm's-length negotiations among the Debtors, the Key Stakeholders, and other constituents, with the purpose of effectuating a consensual change of control while providing meaningful, if not full, recoveries to junior stakeholders.  The Plan leaves unimpaired Holders of General Unsecured Claims and Preferred Interests and provides the Equity Recovery Pool for Holders of Class A Common Stock and GoHealth LLC Interests.  I believe that the Plan maximizes the value of the Debtors' estates for all stakeholders in light of the totality of the facts and circumstances of these chapter 11 cases.  Upon emergence, the Reorganized Debtors will have a New Money Exit Facility in the amount of $20 million, the proceeds of which will be used to, among other things, fund distributions under the Plan, including the Equity Recovery Pool, and provide additional liquidity for the go-forward business.  I further believe that the near-unanimous support from all Voting Classes corroborates my belief that the Plan maximizes value for all

11

stakeholders. I also believe that the Debtors have upheld their fiduciary duties to their stakeholders, have acted in good faith, and have appropriately protected the interests of all constituents.

**J.    Payment of Professional Fees and Expenses — Section 1129(a)(4).**

29.    I understand that the Plan provides that Professional Fee Claims and corresponding payments of professional fees paid out of estate assets are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code. I also understand that Article II.B.1 of the Plan requires Professionals to file all final requests for payment of Professional Fee Claims no later than 45 days after the Effective Date, and the Court shall determine the allowed amounts of such Professional Fee Claims after proper notice and a hearing, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.

**K.    Compliance with Governance Disclosure Requirements — Section 1129(a)(5).**

30.    I understand that, as of the Effective Date, the terms of the current members of the board of directors of GoHealth, Inc. shall expire, and except to the extent that a current director on the board of directors or applicable Governing Body of the Debtors is designated to serve as a director, manager, or sole manager of a Reorganized Debtor, the current directors or managers on the board of directors or other Governing Body, or any sole manager, of the Debtors prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Debtors on or after the Effective Date and shall be deemed to have resigned or shall otherwise cease to be a director of the Debtors on the Effective Date. I understand that in accordance with Article IV.I of the Plan, each of the directors, managers, sole managers, and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and, for subsequent terms, may be designated, replaced, or removed in

12

accordance with such New Organizational Documents.

31.     The Debtors propose that their existing Chief Executive Officer, Chief Financial Officer, and Secretary remain in their current capacities as officers of the Reorganized Debtors. I believe that the Debtors' other existing officers and I have at all times proceeded in good faith and with diligence and care in connection with these chapter 11 cases.  These officers and I have significant knowledge and business and industry experience, are competent, and will provide the Reorganized Debtors with continuity in running the business.

**L.      Governmental Regulatory Approval of Rate Change — Section 1129(a)(6).**

32.     I understand that the Plan does not provide for any rate changes, nor am I aware of the Debtors being subject to any such regulation.

**M.      Classes Unimpaired Under or Accepting the Plan — Section 1129(a)(8).**

33.     I understand that there were four Voting Classes, and all or nearly all Holders of the Claims or Interests in Classes 3, 4, 6, and 8 voted to accept the Plan.  Holders of Claims and Interests in Class 9 are deemed to have rejected the Plan and thus were not entitled to vote.  I understand that Holders of Claims in Classes 1, 2, 5, and 7 are Unimpaired and conclusively presumed to accept the Plan and thus were not entitled to vote.  I understand that Holders of Claims and Interests in Classes 10 and 11 are either Unimpaired or Impaired and will be either conclusively deemed to accept or conclusively deemed to reject the Plan, and in either scenario were not entitled to vote.

**N.      Priority Cash Payments — Section 1129(a)(9).**

34.     I understand that Article II.A of the Plan provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date if such Administrative Claim is Allowed on or prior to the Effective Date or at such other times set forth in Article II.A of the Plan.  In addition, I understand that the

Plan does not reduce, change, or otherwise impair the rights of Holders of the types of Claims described in section 1129(a)(9)(B) of the Bankruptcy Code—e.g., wage, employee benefit, and deposit claims entitled to priority.

35.     Additionally, I understand that Article II.C of the Plan provides that, except to the extent that a Holder of an Allowed Priority Tax Claims agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, on the Effective Date, or when otherwise due and owing, each Holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(C) of the Bankruptcy Code on account of such claim.

**O.     Impaired, Non-Insider Accepting Class of Claims — Section 1129(a)(10).**

36.     I understand that all or nearly all Holders of Claims or Interests in the Voting Classes (Class 3, Class 4, Class 6, and Class 8) who voted, voted to accept the Plan.  Based on my review of the Burlacu Declaration, including the exhibits attached thereto, I also understand that Classes 3 and 4 voted to accept the Plan independently from the votes of any insiders, *e.g.*, directors or officers of the Debtors, person in control, and relatives of the foregoing.

**P.     The Plan's Provision for Payment of All Statutory Fees — Section 1129(a)(12).**

37.     I understand that Article XII.C of the Plan provides that all fees payable under section 1930 of title 28 of the United States Code shall be paid for each quarter until the applicable chapter 11 cases of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

**Q.     Retiree Benefits — Section 1129(a)(13).**

38.     I understand that the Debtors do not have any remaining obligations to pay retiree benefits.  Nonetheless, I understand that Article IV.P of the Plan provides that, as of the Effective Date, all retiree benefits as defined in section 1114 of the Bankruptcy Code, if any, shall continue

14

to be paid in the ordinary course in accordance with applicable law.

       **R.**      **Domestic Support Obligations and Other Provisions — Section 1129(a)(14)– (16).**

39.     I understand that the Debtors are not subject to any domestic support obligations, nor is any Debtor an "individual" as defined in the Bankruptcy Code. Likewise, I understand that each of the Debtors is a moneyed, business, or commercial corporation.

## II.   THE PLAN'S COMPLIANCE WITH THE "CRAM DOWN" REQUIREMENTS — SECTION 1129(B).

40.     I understand that the Plan's treatment of the non-accepting Impaired Classes deemed to reject the Plan—Class 9 and possibly Class 10 and Class 11 (collectively, the "Deemed Rejecting Classes")—is proper because the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the Deemed Rejecting Classes.

41.     I understand that the Plan does not discriminate unfairly because all similarly situated Claims and Interests will receive substantially similar treatment and as described above, there is a reasonable basis for the Plan to classify those Claims and Interests of the Deemed Rejecting Classes separately from other Claims and Interests that remain Unimpaired. I understand that no Holder of a Claim or Interest junior to Holders in the Deemed Rejecting Classes will receive recovery.

## III.   ONLY ONE PLAN IS ELIGIBLE TO BE CONFIRMED SECTION — 1129(C).

42.     I understand that the Bankruptcy Code prohibits the confirmation of multiple plans. There is only one proposed chapter 11 plan in these chapter 11 cases.

## IV.   THE PLAN'S PRINCIPAL PURPOSE — SECTION 1129(D).

43.     The Debtors filed the Plan to accomplish their objective of transitioning ownership of the Company to its secured lenders and maximizing value for all its constituents, including junior stakeholders. Accordingly, the Debtors did not file the Plan for the principal purpose of

avoiding taxes or the application of section 5 of the Securities Act of 1933, as amended. Moreover, no party that is a governmental unit, or any other entity, has requested that the Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is avoiding taxes or the application of section 5 of the Securities Act of 1933.

## V.       NO SMALL BUSINESS CASE — SECTION 1129(E).

44.     I understand that none of the Debtors' chapter 11 cases is a "small business case" as that term is used in the Bankruptcy Code.

## VI.      THE PLAN'S COMPLIANCE WITH DISCRETIONARY PROVISIONS — SECTION 1123(B).

45.     The Plan (a) classifies certain Classes of Claims and Interests as Impaired and leaves others Unimpaired, (b) provides for the assumption of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code (except to the extent set forth in the Plan), and (c) provides for a general settlement of all Claims and Interests pursuant to section 1123 of the Bankruptcy Code. With respect to (a), Classes 1, 2, 5, 7, and possibly Classes 10 and 11 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims and Interests within such Classes. In contrast, Classes 3, 4, 6, 8, 9, and possibly Classes 10 and 11 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such Classes.

46.     In addition, I understand that the Plan, which was heavily negotiated and agreed upon by various key stakeholders, includes a Debtor Release, a Third-Party Release, an exculpation provision, and an injunction provision. I believe these provisions each represent a valid exercise of the Debtors' business judgement, are fair, reasonable, and in the best interests of the Debtors' Estates and all stakeholders, are the product of extensive arm's-length negotiations, and were critical to obtaining support for the Plan.

16

A.      **The Debtor Release Is Appropriate.**

47.      Article VIII.C of the Plan provides for releases by the debtors (the "Debtor Release") against the Released Parties.[8]  The Debtor Release was negotiated in connection with the comprehensive settlement to be implemented through the Plan and is an indispensable component to achieve full and final resolution of potential disputes that would otherwise negatively affect these chapter 11 cases and the available recoveries under the Plan.

48.      ***First***, the Released Parties have made substantial contributions to the Debtors' Estates.  The Released Parties played an integral role in facilitating the Restructuring Transactions and contributed to the implementation of the Plan not only by expending significant time and resources analyzing and negotiating the terms thereof, but also by giving up material economic interests to ensure the success of the Debtors' chapter 11 cases.

49.      In particular, in exchange for the Debtor Release, Released Parties in Classes 3 (Super-Priority Loan Claims) and 4 (First Lien Claims), contributed direct value by committing new capital to fund the Equity Recovery Pool, consenting to the Debtors' use of Cash Collateral to fund the chapter 11 cases, and agreeing to be Impaired while preserving full recoveries for Holders of Class 5 (General Unsecured Claims) and Reinstatement of GoHealth Preferred Stock (Class 7).  Additionally, certain Released Parties in Class 6 (GoHealth Holdings Interests) and Class 8 (GoHealth, Inc. Class A Common Stock) contributed significant value by agreeing to the TRA Amendment.  I believe that without the TRA Amendment, the Secured Lenders would have been unwilling to implement the Restructuring Transactions on the terms set forth in the Plan.

---

[8]      "Released Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors, (b) the Reorganized Debtors, (c) the Agents, (d) the Releasing Parties, (e) each current and former Affiliate of each Entity in clause (a) through clause (f); and (f) each Related Party of each Entity in clause (a) through clause (e).

50.     Finally, the Debtors' directors, officers, professionals, and other agents have been instrumental in negotiating, formulating, and implementing the Restructuring Transactions contemplated by the Plan.  Among other things, as the Restructuring Transactions were being negotiated, the Transformation Committee convened a meeting approximately once a week for several months in advance of the Petition Date, and the full board met regularly, on an approximately biweekly basis, in the months prior to filing.  Additionally, the Debtors' management team has worked closely with the Debtors' advisors to develop the Restructuring Transactions while ensuring uninterrupted operations during these chapter 11 cases.

51.     ***Second***, the Debtor Release is essential to the Debtors' reorganization because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, I do not believe the Debtors would have been able to build the extraordinary level of consensus with respect to the Plan and the transactions contemplated thereby, because, from my observations during negotiations, the Debtor Release was a critical term to the Company's stakeholders in connection with negotiating the Plan.  Further, the Debtor Release facilitated the implementation of these chapter 11 cases as expedited, prepackaged cases, and contributed to the secured lenders' willingness to fund new money to support the Equity Recovery Pool and the Company's go-forward operations.  Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and the Key Stakeholders, is limited in scope, is an express condition of the change of control transaction memorialized by the Plan, which remains the only option at this time to preserve the Debtors' business as a going concern, provides finality, and avoids significant and unnecessary delay in consummating the Plan.  Therefore, I believe that inclusion of the Debtor Release is appropriate and inures to the benefit of all the Debtors' stakeholders.

52.     ***Third***, I understand that no stakeholders have objected to the Debtor Release contained in the Plan.  Indeed, all of the creditors and almost all of the Interest Holders in the Voting Classes that have cast a Ballot voted to accept the Plan, after receiving full notice that the Plan includes the Debtor Release.  Further, sophisticated entities represented by experienced counsel and financial advisors heavily negotiated the Plan, including the Debtor Release.  I believe that the result is a compromise that reflects the give-and-take of a true good faith, arm's-length negotiation process.

53.     ***Fourth***, the Plan provides for meaningful recoveries for creditors in exchange for, among other things, the Debtors' Release of potential claims, and the Plan has been carefully crafted to maximize value and provide meaningful recoveries for all stakeholders under the circumstances.

54.     ***Finally***, I understand that in conjunction with these chapter 11 cases, the Independent Directors who sit on the Transformation Committee conducted a claims investigation, with the help of independent counsel, and evaluated the Debtor Release.  I understand that after extensive work, the Independent Directors found the Plan's inclusion of the Debtor Release is in the best interests of the Debtors and their estates and represents an appropriate exercise of the Debtors' business judgment.

55.     For these reasons, I believe that the Debtor Release is justified, is a sound exercise of the Debtors' business judgment, is in the best interests of creditors and all stakeholders, is an integral part of the Plan, and provides a necessary measure of finality.

**B.      The Consensual Third-Party Release.**

56.     Article VIII.D of the Plan contains the releases by the Releasing Parties (the "Third-Party Release").  I understand that  Holders of Claims in Class 3 (Super-Priority Loan Claims) and Class 4 (First Lien Claims) who voted in favor of the Plan were informed that they

19

would be deemed to opt in to the Plan and to have conclusively, absolutely, unconditionally, irrevocably, and forever consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties to the extent set forth in and consistent with the terms of the Plan, and such Holders approved the form of the Ballots that explained such treatment. I also understand that (a) Holders of Interests in Class 6 (GoHealth Holdings Interests) and Class 8 (GoHealth, Inc. Class A Common Stock) who checked the "Opt In" box on their Ballot, regardless of whether such Holders voted to accept or reject the Plan, and (b) Holders of Claims and Interests in each applicable Non-Voting Class that did not vote on the Plan but checked the "Opt In" box on their opt-in form, were also informed that they would be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties to the extent set forth in and consistent with the terms of the Plan.

57.     I believe that the Third-Party Release is an integral and essential provision of the Plan and provides finality for the Released Parties regarding the Party's respective obligations under the Plan, is in exchange for good and valuable consideration provided by the Released Parties, is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and is fair, equitable, and reasonable.

58.     Prior to the commencement of these chapter 11 cases, certain Released Parties worked constructively with the Debtors to negotiate and implement a value-maximizing reorganization embodied in the Plan. Such parties have provided material concessions, benefits, and commitments to the Debtors through the Plan and during the pendency of the cases. In particular, as described above, certain of the Released Parties consented to the Debtors' use of Cash Collateral and committed to providing the New Money Exit Facility. Based on my role in

the negotiations, without the Third-Party Release, I do not believe such Released Parties would have been willing to fund and otherwise support the Restructuring Transactions contemplated by the Plan, which will enable the Debtors to swiftly emerge from bankruptcy. As such, the Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process. The Third-Party Release has the consent of the Debtors and the Releasing Parties, and the scope of the Third-Party Release is also appropriately tailored to the facts and circumstances of these chapter 11 cases.

59. In addition, I believe that the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders. The Debtors' directors and management have provided their extensive industry knowledge to the Debtors during the Plan negotiations, which required collaborating constructively with their stakeholders. I believe that the Debtor's directors and management will continue to facilitate the restructuring process during and after these chapter 11 cases and, as such, have made, and will continue to make, indispensable contributions to the successful reorganization of the Debtors.

**C.       The Exculpation Provision Is Appropriate.**

60. The exculpation provision described in <u>Article VIII.E</u> of the Plan (the "<u>Exculpation</u>") was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, including the U.S. Trustee, and is appropriately limited in scope. I understand that the Exculpation functions to prevent collateral attacks against Estate fiduciaries or parties that have acted in good faith to help facilitate the Debtors' reorganization.

61. Here, the Debtors and their officers, directors, and Professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and the Restructuring Transactions contemplated in these chapter 11 cases. Such negotiations

21

were extensive and the resulting agreements were implemented in good faith with a high degree of transparency and consensus. Indeed, the Plan enjoys extensive support from all Voting Classes. In addition, from discussions with the Debtors' advisors, I understand that the promise of exculpation played a significant role in facilitating Plan negotiations. The exculpated parties played a key role in negotiating, formulating, and implementing the Restructuring Transactions, the Disclosure Statement, the Plan, and related documents in furtherance thereof. In short, I believe that the Exculpation represents an integral piece of the overall settlement embodied in the Plan and is the product of good-faith, arm's-length negotiations, and significant sacrifice by the Exculpated Parties, which means, collectively, and in each case solely in its capacity as such (a) each of the Debtors, (b) each of the Debtors' current and former (i) directors, limited liability company managers, officers, and (ii) attorneys, financial advisors, or other professionals or advisors that were retained with Court approval during any portion of these chapter 11 cases. Finally, as set forth in the Plan, the Exculpation relates to acts or omissions taking place between the Petition Date and Effective Date and contains a carve-out for actual fraud, willful misconduct, or gross negligence.

## D.    The Injunction Provision Is Appropriate.

62.    The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties on account of, or in connection with, or with respect to, any such Claims, Interests, liabilities, or Causes of Action discharged, released, exculpated, or settled under the Plan.

63.    I believe that the Injunction Provision is a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan,

22

and the injunction provided for in the Plan is narrowly tailored to achieve its purpose. Further, the Debtors revised the Injunction Provision in response to comments from the U.S. Trustee and otherwise received no objections related thereto. As noted above, I believe these provisions are each foundational to the success and finality of the Plan and these chapter 11 cases.[9]

## VII.    LIMITED MODIFICATIONS TO THE PLAN.

64.    The Debtors made certain modifications to the Plan after the end of the period for solicitation of the Plan and since its initial filing on the Petition Date. I believe that such modifications are (a) immaterial or technical clarifications and/or (b) modifications that resolve an informal objection to the Plan. In particular, I understand that (i) the Debtors resolved all issues and informal comments raised by the U.S. Trustee, generally related to, among other things, the scope of the discharge, settlement, and release, injunction, and exculpation provisions, as well as those raised by other stakeholders such as the Department of Justice and one of the Debtor's contract counterparties, and (ii) the Plan increases the Equity Recovery Pool to account for certain postpetition trades of GoHealth, Inc. Class A Common Stock. The amended Plan reflects such modifications. Importantly, I also understand that all Holders of Claims in Voting Classes are receiving the same recovery as contemplated under the original Plan.

---

[9]    The foregoing description is a summary of the operative plan provisions only. To the extent there is any conflict between the foregoing summary and the Plan, the Plan shall control.

23

**Conclusion**

65.     In conclusion, it is my opinion as the Chief Executive Officer of the Debtors, and having been involved in virtually every aspect of these chapter 11 cases and the negotiation of the Plan, that confirmation of the Plan is appropriate, is in the best interests of all parties-in-interest, and should be approved.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  July 16, 2026                          */s/ Vijay Kotte*
                                                     Name:  Vijay Kotte
                                                     Title:   Chief Executive Officer